**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| Taher Achagzai ) | |
| c/o 1666 Connecticut Ave. NW ) | |
| Suite 222 ) | |
| Washington DC 20009 ) | |
| ) | |
| and ) | |
| ) | |
| Syed B. Shah ) | |
| c/o 1666 Connecticut Ave. NW ) | |
| Suite 222 ) | |
| Washington DC 20009 ) | Case No. |
| ) | |
| and ) | Judge_____ |
| ) | |
| Mohammed Zamen Mohmand ) | JURY TRIAL REQUESTED |
| c/o 1666 Connecticut Ave. NW ) | |
| Suite 222 ) | |
| Washington DC 20009 ) | |
| ) | |
| and ) | |
| ) | |
| Zeba Khadem ) | |
| c/o 1666 Connecticut Ave. NW ) | |
| Suite 222 ) | |
| Washington DC 20009 ) | |
| ) | |
| and ) | |
| ) | |
| Naseem S. Stanazai ) | |
| c/o 1666 Connecticut Ave. NW ) | |
| Suite 222 ) | |
| Washington DC 20009 ) | |
| ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | |
| ) | |
| ) | |
| BROADCASTING BOARD ) | |
| OF GOVERNORS ) | |

JEFFREY SHELL                )
In his official capacity as Chairman    )
c/o Paul Kollmer-Dorsey, General Counsel  )
330 Independence Ave. SW         )
Washington DC 20237             )
                                  )
            Defendant      )
_____)

## COMPLAINT

For their Complaint against the Board of Broadcast Governors, Plaintiffs, Taher

Achagzai, Syed B. Shah, Mohammed Zamen Mohmand, Zeba Khadem and Naseem S. Stanazai,

all of whom are International Broadcasters at the Pashto Language Service, Voice of America,

by and through their undersigned attorney, based on information and belief and/or the Plaintiffs'

knowledge and state the following:

## JURISDICTION

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C.§§451 (judiciary), 28

U.S.C.§1331 (federal question), 28 U.S.C. §1337 (commerce), 28 U.S.C. §1343 (civil rights), 29

U.S.C.§626(b) (ADEA Enforcement, Age Discrimination in Employment Act, 29 U.S.C. §633a)

and 42 U.S.C. §2000e-5(f)(1)(unlawful employment practices) and (Title VII Enforcement) and

42 U.S.C. §1981a(equal rights).

## VENUE

2.      The employment practices of Defendant alleged to be unlawful were committed

within the jurisdiction of the District of Columbia.  In addition, Defendant maintains its primary

business location within the jurisdiction of the District of Columbia.  Accordingly, venue is

proper pursuant to 28 U.S.C. §1391(b)(1)&(2).

**PENDANT CLAIMS**

3.      Plaintiffs invokes this Court's jurisdiction pursuant to Rule 18(a) of the Federal Rules of Civil Procedure and 28 U.S.C. §1367 to hear and adjudicate claims arising out of the transactions set forth herein that violate rights and duties established by the laws of the District of Columbia.

4.      Defendant has committed various torts including but not limited to negligence and conspiracy against Plaintiffs as well as breach of contract under District of Columbia Law of which jurisdiction to adjudicate those torts and breach of contract rest with this courts.

**EXHAUSTION OF ADMINISTRATION REMEDIES**

5.      Prior to filing this action, Plaintiffs timely filed with Office of Civil Rights within the forty five (45) days, their written charge asserting Defendant's discrimination based on age and national origin, as well as hostile work environment and harassment, including continued retaliation revealed, and all additional claims.  In  conformance with the law, Plaintiffs have exhausted administrative remedies, therefore all conditions precedent to the Plaintiffs maintaining this civil action have occurred or been waived.

**PROTECTED CLASS MEMBERSHIP**

6.       This lawsuit is brought under 42 U.S.C. §2000 et. Seq. (Title VII) and its counterpart 42 U.S.C. §1981 and 29 U.S.C. §626(b).  Title VII and §1981 prohibit employers form discriminating "against any individual with respect to their compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin.  See: 42 U.S.C. §2000e-2(a).

7.      This lawsuit is brought under 42 U.S.C. §2000 et seq. (Title VII) and its

counterpart 42 U.S.C. §1981 and 29 U.S.C. §626.  Title VII and §1981 prohibit employers from

discriminating against any individual with respect to their compensation, terms, conditions, or

privileges of employment because of such individual's race, color, religion, sex or national

origin. 42 U.S.C. §2000e-2(a).  Additionally this lawsuit is brought pursuant to the Age

Discrimination Act 29 U.S.C. §636. Plaintiffs identify that they are members of the following

protected classes

> a) Age – over forty (40) years old; and
> b) National origin; and
> c) Hostile work environment; and
> d) Filed complaint with Office of Civil Rights concerning unlawful
>    employment conditions; and
> e) Retaliation; and
> f) Pattern and/or practice of discrimination; and
> g) Disparate treatment.

Plaintiffs identify that they are members of a protected class as identified in paragraph 662.

## PARTIES

8.       Plaintiff, Mr. Mohammed Zamen Mohmand is a naturalized citizen of the United

States who is of Afghan national origin and who is over the age of 40. Mr. Mohmand is an

International Broadcaster (GS-12) at Voice of America (VOA).  Mr. Mohmand has been an

International Broadcaster at VOA for the last *29 years*.  Mr. Mohmand started his VOA career on

September 21, 1985.  He is assigned to South Asia Division, Afghan Service (Pashto Language),

located at 330 Independence Ave. Washington DC.

9.      Plaintiff, Mr. Syed B. Shah is a naturalized citizen of the United States who is of

Afghan national origin and who is over the age of 40.  Mr. Shah is an International Broadcaster

(GS-12) at Voice of America (VOA). Mr. Shah has been an International Broadcaster at VOA for the *last 32 years*.  Mr. Shah started his VOA career in 1982.  He is assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.  He was hired as a Purchase Order Vendor (contractor) in 1982 and was promoted to full staff in June 1989.

10.     Plaintiff, Mr. Naseem S. Stanazai is a naturalized citizen of the United States who is of Afghan national origin and who is over the age of 40.  Mr. Naseem Stanazai is an International Broadcaster (GS-12) at Voice of America (VOA).  Mr. Naseem Stanazai started at VOA in 2001.  Mr. Stanazai has been with VOA for the last *13 years*.  He is assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.

11.     Plaintiff, Mr. Taher Achagzai is a naturalized citizen of the United States who is of Afghan national origin and who is over the age of 40.  Mr. Achagzai is an International Broadcaster (GS-12) at Voice of America (VOA). Mr. Achagzai started his VOA career in 1988. Mr. Achagzai has been an International Broadcaster at VOA for the last *26 years*.  He was hired as a contractor or Purchase Order Vendor in November 1988 and was promoted to full staff in November 2001. He is assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.  He was promoted to GS-12 in 2013 after he filed a complaint with Office of Civil Rights and Office of Human Resources at VOA.

12.     Plaintiff, Ms. Zeba Khadem is a naturalized citizen of the United States who is of Afghan national origin and who is over the age of 40. Ms. Zeba Khadem is an International Broadcaster (GS-12) at Voice of America (VOA). Ms. Khadem has been an International Broadcaster at VOA for the last *30 years*.  She started her VOA career in October of 1984. She is

assigned to the South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.

13.     Defendant, Broadcasting Board of Governors (hereinafter BBG) is an independent federal agency responsible for all U.S. government and government sponsored non-military, international broadcasting.  The Voice of America (hereinafter VOA) is Plaintiffs' current employer and one of Defendant's Broadcasters.

## BACKGROUND FACTS COMMON TO ALL PLAINTIFFS[1]

14.     Plaintiffs' immediate and second level supervisors, managers or persons responsible for work assignments, as well as management during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.     Mr. Mohammad Ibrahim Nasar (Nasir or Nasar) current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.     Mr. Ghilzai Amanullah, former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

c.     Ms. Beth Mendelson, former Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from August 2006 to upon information and belief, sometime early in 2012;

d.     Mr. Masood Farivar, current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

e.     Ms. Spozhmai Maiwandi, GS-15, former Director, South Asia Division, who held this position from 2007 to, on or about, April 2013;

f.     Mr. Ismail Dahiyat, the current Director, South & Central Asia Division;

g.     Ms. Rebecca McMenamin, Acting Associate Director for Language Programming;

H.     Barbara Brady was named VOA, Chief of Staff in January 2010;

I.     David Ensor was sworn in as the 28th Director of the Voice of America on June 16, 2011.

---

[1] Facts are based on and continued from Office of Civil Rights Report of Investigation and Exhibits for all five of the named complainants.

15.     Beginning in some instances since 2006, but mostly since 2010, management has continuously discriminated against the senior staff at VOA and in particular against the five senior Plaintiffs.  The discrimination became more overt when Mr. Ibrahim became the Managing Editor on or about April 2010 and upon information and belief when Ms. Barbara Brady was named VOA's Chief of Staff on or about January 2010.

16.     Upon information and belief Management has been aware since 2006, and/or at the latest since 2010, of senior complaints regarding, hostile work environment, harassment, discrimination based on age and national origin, as well as a disparate treatment by management between the five senior staff, (who were forced to complain) and the junior staff as well as those members of the staff who support management in their efforts to force the five senior complainants into retirement by whatever means necessary.

17.     Few of the seniors (not party to this matter) succumbed to the pressure to retire and did in fact retire.  While the remaining five complainants, hung on, and worked hard and maintained hope that such circumstances will change, but it never did and the harm escalated until they were forced to file formal complaints as a result of having suffered great damage.

18.     Management ignored the senior staff complaints in an effort to force them into retirement.  VOA management relied on and practices such as the New Format to harass and force the seniors into retirement.  As a direct result of the New Format, there was a disparate impact on the Senior staff of the language services.  The had a particularly adverse impact on senior Afghan employees.  Management's implementation of the New Format to discriminate and harass the seniors that cannot be justified by any necessity and for which alternative policies

and practices with less discriminatory impact could be utilized that equally service any asserted justification.

19.     Management failed to follow-up on the discriminatory policy, harassment, reprisal and hostile work environment, despite the senior complaints to different members of management, which includes filing complaints with the Office of Human Resources and later Office of Civil Rights. Management responded with claims of implementation of the New Format.  However the New Format as it was implemented was highly discriminatory against the senior staff.

20.     On different occasions, the five senior complainants, complained to upper management including, Ms. Maiwandi (the Director of South Asia Division at the time, who was removed on or about April 2013), and Ms. Mendelson (Chief of Afghanistan Service, who was removed from this position on or about 2012) and Mr. Ismail Dahiyat, the current Director, South & Central Asia Division as well as Ms. Rebecca McMenamin, Acting Associate Director for Language Programming; Barbara Brady, VOA Chief of Staff; even to Human Resources, the reaction was that this situation will get better, this will change.

21.     When the senior staff complained to the members of Management individually, not any of these members of management denied that the seniors were being discriminated against.  Most of them failed to help and others such as Mr. Ibrahim and Ms. Maiwandi, retaliated creating an even more hostile work environment.  In fact on August 13, 2012 Ms. Maiwandi put a gag on seniors' work related e-mails.  On August 17, 2012, Ms. McMenamin called the seniors in an emergency meeting to tell them that they should continue to work hard and she as Ms. Maiwandi's superior wanted to let the four complainants know that Ms.

Maiwandi was not following VOA policy when on August 13, 2012 she put a gag on senior e-mails.

22.     Both Ms. Maiwandi and Mr. Ibrahim retaliated against the senior complainants after they engaged in protected activity of complaining about discrimination to HR and even higher management.  Mr. Ibrahim, the Managing Editor and upper-management are now more emboldened in their acts against the five senior complainants, believing the seniors will retire for fear of management's continued retaliation.  Management has and will continuously take advantage of the seniors' vulnerability, based on their age.

23.     Management has acted willfully and with intent to discriminate against the senior staff.  Mr. Ibrahim, the Managing Editor, uses his position of power to harm the senior staffer in the service.  His direct and reckless discrimination against the five senior complainants is specifically designed to force the five complainants to resign, retire, or be removed by some other means.  Mr. Ibrahim's predecessor, Mr. Amanullah Ghilzai who was the Managing Editor for several years up until 2010, states the following:  "I confirm that the Service Chief of the Afghanistan Service, Miss. Beth Mendelson would push me on a regular basis to get rid of the senior and older staff members and replace them by much younger people."

24.     From on or about April 2010, when Mr. Ibrahim became the Managing Editor of the Pashto Service, he has been adverse towards the five seniors.  First he changed the schedules to discriminate against the seniors in the service.

25.     There is a pattern and practice by which management runs the Pashto Service and other VOA language services in a discriminatory manner.  During one of the first staff meeting,

in response to a senior staff's question regarding the new schedule, in which Mr. Ibrahim had

marginalized the seniors, he stated that "I am the law."  Because he claimed to be the law, thus

he is capable and permitted to do whatever it is he wants with the schedules even if the intent and

result is to harm, harass, discriminate, create a hostile work environment and force the seniors to

either be forced to retire, leave their jobs, or be fired.  Mr. Ibrahim made his discriminatory

intentions clear from the start and from that day he has conducted all of the Pashto Service

affairs under the principle that he is the "law."

26.     This pattern and practice of discrimination by VOA management has caused great

damage to the complainants' physical and mental well-being, to their reputations, and their

ability to continue their job under such deliberately discriminatory and malicious circumstances.

When Plaintiffs complained, the management failed to remedy this situation which has

perpetuated a pattern of the discriminatory practices as described in the facts of this complaint

and beyond.

27.     The pattern and practice of harassment established by Mr. Ibrahim, and

management, includes abruptly switching the assignment of senior staff without providing

adequate time to complete the assignment.  Typically Mr. Ibrahim uses this tactic as a form of

retaliation against the seniors for complaining against him.  Upper-Management masks this

harassment as part of the New Format.

28.     The schedules created by Mr. Ibrahim since 2010, have consistently marginalized

the seniors and replaced them with less experienced, less trained, even contractor junior staff.

Further the schedules have created chaotic and divisive environment, where the seniors are

treated as though they are not part of the service or simply on call or substitute employees and

the substance of the shows and assignments go to the junior staff.   This new format has had a disparate impact on the seniors of the language services.

29.     Mr. Ibrahim ignores the needs of the service, the substance and quality of the programming, and only manipulates the schedule to serve his discriminatory goals of harassing and retaliating against the seniors to force them to leave their jobs.   This is reflected in the constant deterioration of the Pashto Service programing, including repeated and egregious linguistic mistakes on the air.

30.     The junior staff are often favored and the seniors have been marginalized, pushed out of their shows and demoted because of their age and national origin. The five senior complainant's assignments reflect a hostile work environment stemming from a lack of fairness and disparate treatment based on age and in retaliation for engaging in protected activity.

31.     The management has taken every opportunity to force a hostile work environment on the seniors, which included tampering with their schedules in a specific way so as to harass each of them individually, demote them individually, assign them to tasks in which they have not trained and/or tasks that are not part of their job, such as production, all in an effort to create a hostile work environment and eventually force the seniors into retirement.

32.     Mr. Ibrahim has reduced Ms. Khadem's 15 shows per week to only one program per week.

33.     Mr. Ibrahim has demoted seniors from their position of editor and assigned them to production, or he has set them aside as mere translators.   But most importantly, he has taken

their voices off the air, to the best of his ability.  Since Mr. Ibrahim has been the Managing

Editor, seniors' voices mostly go on the air mostly as substitute for other staff.

34.      The additional schedules created by Mr. Ibrahim, through the last schedule of

January/February 2014, have mismatched staff qualifications with assignments.  He has

discriminated against the senior staff.  He has assigned the junior staff tasks and shows and

programing for which they lack the necessary experience.   Below are just a few examples of

management's decisions pertaining to senior participation and scheduling.

A.  For example, during the most recent elections in Afghanistan (April 2014) Mr. Ibrahim

assigned a junior staff to do the coverage for *four hours*, while senior and experienced

experts were present and available to help with the programing, but deliberately and

intentionally ignored by Mr. Ibrahim.  In fact when the junior staff, Nazrana Ghaffar

returned to the office after the four hour marathon coverage she was complaining that it

was too much for her.  But, Mr. Ibrahim made this decision to ensure that one of the most

important events in Afghanistan was not covered by any of the seniors.  While in

comparison the Dari service rotating the announcers and those covering the elections on

the air.

B.  Ms. Khadem is a broadcaster with thirty (30) years of experience.  It is a known fact that

Ms. Khadem is well-respected for her interviews, talk shows, poetry shows, news casting,

MC, and gathering fresh new ideas for programming, which is why she has always been

considered an "on air talent."  Her audiences know her for her voice and qualities of

being an excellent journalist.  But Mr. Ibrahim intentionally took her voice was taken off

the air, except for when she substitutes for someone else.

C. Mr. Shah is a talented editor, with decades of experience at the VOA. But he was partially removed by Mr. Ibrahim from that position.

D. Mr. Mohmand is a talented editor, with decades of experience at the VOA. But he was partially removed by Mr. Ibrahim from that position.

E. Mr. Stanazai is a Pashto language expert, who has been marginalized and pigeonholed into a translator, while he should be given the same opportunities as everyone else. Also, his talent in the Pashto language is marginalized and he is not permitted to edit the news. Mr. Ibrahim knows that Mr. Stanazai is one of the best editors of the Pashto language, in the service, while the news contains many linguistic mistakes, but he will not allow Mr. Stanazai to edit the news, for example news that gets put on the Pashto language web-page of VOA. Mr. Ibrahim gave news that was translated by Mr. Stanazai to Mr. Khalil (a junior staff from Pakistan) to read on the air, while typically Mr. Stanazai should have been reading the news that he himself translated. But Mr. Ibrahim took it from Mr. Stanazai and gave it to Mr. Khalil to prevent Mr. Stanazai air-time and also to pigeonhole him into translation. Unfortunately, Mr. Ibrahim's judgment was flawed and Mr. Khalil was not able to read the news, he made copious mistakes on the air.

F. Mr. Achagzai's poetry show was taken from him. The poetry show by Mr. Achagzai, and a co-anchor, had great following and many listeners. Mr. Ibrahim created a false pretense to snatch the show from Mr. Achagzai. He and management created new shows and gave them to the junior staff who are not qualified for the position. As a result of their incompetence they have ruined the reputation of the service with their obvious and elementary language mistakes.

G. The new hired staff have been heard and observed speaking negatively about the five senior staff members, they told witness during an after party of international journalists conference here in Washington DC, that "we have to get rid of them"… they laughed and said they are slow, and also make jesters of the senior's mannerisms as to mock them and ridicule them in the midst of their professional colleagues.

35.     Mr. Ibrahim has removed the seniors even though they have experience, are qualified, available and able to continue to improve the service.  Two of the junior staff, Mr. Khan and Ms. Ghaffar, have not even taken the language test, are prearranged to get opportunities and privileges.  Management made allowances for them and hired them at GS-12, as a means for those two individuals to avoid taking the language test.  However, based on their work product it is clear they lack language skills.  Both these individuals, Mr. Khalil Khan and Ms. Nazrana Ghaffar are from Pakistan, as is Mr. Ibrahim (the Managing Editor) who supports them.  Mr. Ibrahim takes opportunities from senior staff and gives them to Mr. Khan and Ghaffar.

36.     The April 2012 schedule is neither fair to Ms. Khadem or to the quality of programming.  The scheduled is created with an agenda to push out the seniors and there is a complete lack of equal opportunity between on the one hand the five senior staffer and on the other hand the non-senior staff or those who support Mr. Ibrahim in his harassment of the five complainants.

37.     The seniors are asked by their junior colleagues when they will retire.

38.     There are insinuations from management that seniors should retire or will be fired.

39.     Ms. Khadem complained to management about her schedule, she was told that the reductions in the schedule tasks were temporary.  Thereafter, Mr. Ibrahim reduced her air time again, and in the subsequent schedules her assignments have been either reduced or she has been assigned unfairly.

40.     Mr. Ibrahim concealed information about the new shows from the five seniors. The seniors were excluded. The five seniors were excluded as though they were not even part of the Pashto service.

41.     The best assignments, the plum assignments, such talk shows, music shows, youth shows, as well as travel to New York or Tokyo for example are distributed to the junior staff and mostly kept concealed form the seniors.

42.     Regular, weekly or daily shows were created for the junior staff, while the seniors were forced off the air.  Management on occasion gave hope to the seniors that there situation might change, there might be other opportunities for the seniors, but those opportunity never came, because it was not true, management never intended on including the seniors.

43.     The senior were not only removed from regular shows but also from shift editor positions in retaliation for their complaints about harassment and hostile work environment. Management at VOA has claimed that these violations of United States Civil Rights Statutes are justified based on VOA's New Format policy.  As a result of the new format seniors in all the

language services have been impacted.   Many of these seniors from the Afghanistan service

retired.

44.     Mr. Ibrahim changes schedules and assignments most of the time without telling

the seniors.  Mr. Ibrahim changed Mr. Stanazai's duties, Ms. Khadem's duties, Mr. Shah's

duties, Mr. Mohmand's duties as well as Mr. Achagzai's duties and removed them from

assignments without notice.  It was standard practice in Afghanistan Service Pashto Radio, since

1982 that any schedule changes and assignments would be discussed in staff meetings.  If the

Managing Editor wanted to introduce new programs, the requirements would be explained and

conveyed to the staff, and staff suggestions would be seriously considered.  Many times some

employees would volunteer to do the new assignments.  If no one volunteered, it would be

assigned based on the background in the subject, training and experience of individual members

of staff.  However, when Mr. Ibrahim changed the seniors schedules they were not included as

part of this discussion.

45.     Mr. Ibrahim continues to consult only the junior staff while deliberately excluding

the five seniors from assignment related discussions and new programming meetings, as a result

of the new format.

46.     Mr. Ibrahim did not follow protocol established by many decades at this service

of giving notice before making changes to the schedule.  He deliberately flouts scheduling

methods, which were fair, only to create an environment that is hostile towards the senior staff.

When anyone of the seniors mention the past standard practices, such as notice, discussion, and

informed group decisions about programming, Mr. Ibrahim's simple answer is either "I am the

law here now" or "forget about the past we do things differently now" other times, he and his right hand man Mr. Noor would say this is how the "higher-ups" want things to be.

47.     Mr. Abid Noor, a close and trusted friend of Mr. Ibrahim, specifically told Ms. Khadem, that the "higher-ups" want the seniors to be reduced from the service and that is why Mr. Ibrahim is creating the schedules and giving assignments in a biased manner.

48.     The predecessor to the current Managing Editor was Mr. Aminullah Ghalzai, who quit his post partly based on managements' conflict with him over his refusal at times to agree or "go along with" the discriminatory practices against the senior staff at the expense of producing good programing.   For example, Ms. Mendelson refused to send Mr. Stanazai to cover President Obama's visit to Egypt, because she wanted a junior staff to go to Egypt for the coverage.   When asked by the Managing Editor, at the time, why not send Mr. Stanazai who is more qualified and should being doing this type of coverage, and simultaneous translations, she responded with "over my dead body."

49.     Mr. Ibrahim replaced Mr. Amanullah Ghilzai as the Managing Editor.   Mr. Ghilzai disagreed several times over matters regarding the senior employees with management. It is possible that the New Format was implemented at that time, during Mr. Ghilzai's time as the Managing Editor of the Pashto Service.

50.     Mr. Ghilzai, by his own account realized that he could not convince management not to target the seniors, and seriously started looking for a different job and soon thereafter he left the position of Managing Editor of the Pashto language service.   After Mr. Ghilzai left the position the current Managing Editor, Mr. Ibrahim was hired, and he was on board with the

harassment of senior staff.  In one of the first meetings in which Mr. Ibrahim was transitioning

into his new post, he stated that he was the law, he said "I am the law" in response to one of the

senior staff members question about the changes in the schedule.

51.    Mr. Ibrahim was aware of management's goal to get rid of the seniors by

harassing them and pushing them out of their jobs, reducing their shows, changing their

schedules, humiliating them, harassing them and blocking their complaints and worse of all

constantly retaliating against them.  In step with management's mandates Mr. Ibrahim took the

lead against the seniors but mostly the five complainants of the Pashto Service.

52.    Plaintiffs' Managing Editor created inaccurate and accusatory emails regarding

Plaintiffs' performance.  Mr. Ibrahim, takes facts out of context to use against the seniors and

writes up e-mails of violation when there was either no violation or a misunderstanding created

and perpetuated by Mr. Ibrahim himself, with the intent to later harass the seniors with his e-

mails.   Mr. Ibrahim did not believe he would be caught by the seniors, in what he was doing, not

just with one or two seniors but at least with the five Plaintiffs.

53.    Mr. Ibrahim made unreasonable demands, such as the use of a male voice when a

male voice was not available and he either knew or should have known this fact. These

prejudicial and unfair critics were designed to point out flaws and incompetence of seniors.

54.    When Mr. Shah and other seniors complained to upper-management they were

told by Director of South Asia Division, Ms. Maiwandi, to "retire now" or even further she told

Mr. Shah, that the Pashto language service was " being closed down anyway" and there would

not be any point in continuing at this job, knowing full well that the Pashto language service

would not be "closed down" when American interest in Afghanistan has increased and that the

Pashto language programing was of great importance to building democracy in Afghanistan and region as United States had committed to doing.

55.     Plaintiffs' Managing Editor refused to interact with the seniors, rather than engaging seniors to go over assignments or possible changes in assignments he would send junior colleagues who lacked the authority to make such changes, to inform senior employees, of assignment changes.  For example, a junior employee would the senior employee that he/she will be working as a producer that day.

56.     Starting on or about December 2010, Mr. Shah and other seniors were directly asked by co-workers when he (they) was going to retire.

57.     Management insinuated to some of the seniors that it is time to retire.  For example, Mr. Ibrahim told Mr. Mohmand in response to Mr. Mohmand's inquiry for demoting him form shift editor that Mr. Mohmand should "go and relax."

58.     Mr. Ibrahim, the Managing Editor, instructed junior staff members not to help the seniors.  Mr. Mohammad Ibrahim, the Managing Editor told several of the junior employees to not help the senior staff.  He said this to Ashiqullah Rahimzoy who later told Mr. Shah.

59.     Upon information and belief, Mr. Ashiqullah Rahimzoy, who became a witness to the harassment and discrimination and who admitted to Mr. Shah that he had been told by Mohammad Ibrahim not to help the seniors was later influenced by management with bribes, as to stop him from stating what Mr. Ibrahim had told him.

60.     Because Mr. Rahimzoy was a witness, management tried to influence him. Sometime in January or February 2014, Mr. Ibrahim, permitted Mr. Rahimzoy to work double

shifts because Mr. Rahimzoy was planning on traveling overseas and these additional shifts would help him save money to take with him on his trip. Mr. Ibrahim gave him less work in the new schedule, and favored him in assignments, to prevent him from being a witness.

61.     Both Mr. Ibrahim and Ms. Maiwandi arranged to give more opportunity to Mr. Rahimzoy for making additional income, which is very important to Mr. Rahimzoy as he supports his family. After the senior's complaint to Human Resources on or about May 2012, both Mr. Ibrahim, the Managing Editor and Ms. Spozhmai Maiwandi (former Director of South Asia Department) deliberately and actively tried to influence Mr. Rahimzoy by giving him greater opportunities and greater leverage in the schedule, by giving him more hours to make more money because Mr. Rahimzoy is a contractor.

62.     Ms. Maiwandi promised to use her contacts to gain assignments at the State Department, for Mr. Rahimzoy, these assignments are well paid and very competitive. Mr. Rahimzoy eventually was hired for these assignments at the State Department. Whether Ms. Maiwandi's contacts influenced the decision to give these short term assignments to Mr. Rahimzoy or whether it was Mr. Rahimzoy's own expertise is unclear, but Mr. Maiwandi made sure that Mr. Rahimzoy was under the impression that she was the one behind him receiving this opportunity.

63.     Plaintiff's Managing Editor failed to send him to computer training in a timely fashion and at times only sent the junior staff to learn Dalet Plus. Mr. Ibrahim told the seniors that he was sending junior staff to learn Dalet Plus and later teach it to the seniors. However, when the junior staff came to train the seniors, they knew even less compared to what the seniors

already knew.  But this opportunity for formal training in Dalet Plus was not provided to the senior staff.

64.    Plaintiffs' Managing Editor, Mohamad Ibrahim bombarded them with assignments, making it impossible at times for them to complete them all in the time given.  Mr. Ibrahim ignored the fact that other non-senior staff members were available to do the assignments.  He deliberately allowed them to sit around chatting while the seniors were struggling to complete multiple assignments.

65.    Plaintiffs' Managing Editor changed their performance standards and annual evaluations in secret without informing any of the five senior staff Plaintiffs.   Plaintiffs' performance evaluations were changed on or about 2011.  The changes were designed so as to target seniors by creating vague areas of evaluation that would be used against the seniors as a basis or cause to terminate their position.

66.    Plaintiffs' schedules were changed multiple times.  Plaintiffs were not informed of the changes as a form of harassment.  Typically, schedules would only change based on needs of the service.  However, under Mr. Mohammad Ibrahim's discriminatory agenda against the seniors, he would make significant changes to the schedule without informing the senior staff.  The last schedule change of January 2014, was again without notice, and discriminatory.

67.    Plaintiffs' Managing Editor, not only tried to prevent the seniors from receiving computer training, but also when possible interfered with their attempts to receive computer training, by failing to include them on the list of names schedule for training.

68.    Upon information and belief, Mr. Mohamad Ibrahim has directed, instructed and commanded, other employees on different occasions not to help the seniors.

69.     Upon information and belief Mr. Mohamad Ibrahim directed, instructed and commanded other employees to "write a report on any senior you help and give me the report." He was collecting data about the seniors to later use it against them as evidence of their incompetence.  However at the same time he was creating situations in which seniors would need to ask for help such needing the Dalet Plus password.  Mr. Ibrahim only sent a few of the junior staff to get training and gave them his own password.  The seniors were left without the use of Dalet Plus.

70.     As with other projects, Mr. Ibrahim excluded seniors when creating or working on creating the Google Hangouts.  The seniors were not only excluded but the information was kept secret form them.  While Google Hangouts is not the core means of relaying the news, it still shows Mr. Ibrahim's attitude and reaction to hiding materials and innovation from the seniors.

71.     Mr. Ibrahim sent junior staff on travel assignments, for example to New York or Tokyo, etc. and actively kept it a secret from the senior staff.  Typically such official trips are not kept a secret, or kept hidden, they are part of the reporting network, about which the home base reporters including seniors should be made aware.

72.     Management and Mr. Ibrahim created new programing for the junior staff, and took the seniors off the air and also without any notice, discussion or input from the senior staff. Such programing and changes were also made secretly by upper management.

73.     Mr. Ibrahim manipulated the schedule unnecessarily to assign seniors to production, for which some of the seniors were not trained, and more, which was not part of their job.  After harassing them and calling some of them failures, the senior staff formally complained to HR in May 2012. Mr. Ibrahim wrote on July 17, 2012, that production was not part of seniors' job description.  Mr. Ibrahim knew or should have known that production is not

part of the senior staff's job before attacking the seniors and causing them great distress, pain and emotional trauma, which he followed up with e-mails in which he called one of the seniors a failure.[2]

74.     Mr. Ibrahim also said Mr. Achagzai is a man from the 70s and 80s, insinuating that this must make him an incompetent Pashto Language International Broadcaster.

75.     Mr. Ibrahim targets the seniors by pointing out that they need to check their e-mail, insinuating that e-mail is technology that the seniors are not abele to use.  Mr. Ibrahim knows or should know that seniors are able to and do check their e-mails.  For example, Mr. Ibrahim told Mr. Shah that he missed an assignment and needs to check his e-mails, when in reality it was during the time Mr. Shah was out of the office.   He has also targeted Ms. Khadem and the other seniors and accused them of not checking her e-mails.

76.     Mr. Ibrahim misinformed to upper management and complained that the senior staff were not productive, were lazy and unable to learn new technology, ignoring the fact that the seniors had worked at this service for decades and were and are the most active members, all evidenced in the logs.  Mr. Ibrahim either failed to check the logs or intentionally lied about the seniors and their output and work product.  Further, when technology was taught to the senior staff they learned and use that technology.

77.     Upper management deceived and mislead senior staff by telling them that the Pashto service was closing down and that they should retire.

78.     Staff at the Pashto service wanted to know when the 5 senior complainants were planning to retire.

---

[2] Removing Ms. Khadem, and other seniors from behind the microphone and forcing them to do production is same as removing Dian Rehm (NPR) from behind the microphone and forcing her to to do the production instead and replacing her with an intern who is still learning the English language; or forcing Barbara Walters to produce the show and not do the interviews.

79.     Upper management mislead the five  seniors by telling them to wait and their schedules at the the office would improve while at the same time harassing them to force them into retirement.  Several of the senior staff at the Afghanistan service succumbed to the harassment and actually retired.

80.     On August 13, 2012 Ms. Maiwandi (the Director of South Asia Division, no longer at that position) convened a meeting in which she scolded those who were complaining, i.e. the seniors and put a gag on their e-mails.

81.     On August 17, 2012, the Director of Language Programing, Rebecca McMenamin, met with four of the senior complainants and their attorney to explain that it was not VOA's policy to stop work related e-mails and that Ms. Maiwandi was not following agency policy in putting a gag on work related e-mails.

82.     Plaintiffs' Managing Editor, Mr. Ibrahim deliberately and intentionally interfered with senior staff members ability to successfully prepare and deliver the news, by giving them assignments for which he knew the seniors had not been trained.  For example, giving Mr. Shah a same day assignment to handle the phones for a live show, without any training and without any notice or discussion of this assignment.  Mr. Shah had not been properly and fully trained to handle the phones during a live show.  Mr. Noorzai volunteered to either go in his stead or to train Mr. Shah, something to which the manager agreed when Mr. Shah was not there.  However later that day when the opportunity arose, and Mr. Ibrahim found himself in a group which included Mr. Shah and his colleagues, he humiliated Mr. Shah. Mr. Ibrahim pointed at him in the presence of his colleagues and said to him, that he must "go" be on the phones, regardless of his lack of training.  The manager did this in public and with malice to humiliate Mr. Shah, knowing Mr. Shah is a mild mannered and considerate person who would not want to get into a verbal

altercation by reminding the manager that he just agreed to allow Mr. Shah to complete another assignments and allow Mr. Noorzai be on the phones.  Mr. Noorzai had verified that he was not busy at that time, had completed all his tasks and was idle at the time when he would be able to help out on the phones, and also help train Mr. Shah.  But Mr. Ibrahim did not allow Mr. Noorzai to help in this manner.

83.     Mr. Ibrahim scheduled Ms. Khadem, Mr. Achagzai and Mr. Mohmand for production without giving them adequate training or help.  Mr. Ibrahim's actions here are consistent with his direction to the junior staff to "don't help the senior staff" or to "report them" to him, if anyone does help the five senior complainants.  This egregious behavior by Mr. Ibrahim had never before been the policy of VOA or Pashto Service (or for that matter a policy of  United States non-military, Government Agency, such as BBG).

84.     Plaintiffs' Managing Editor, Mr. Ibrahim bombarded five senior complainants with assignments, making it impossible for them to complete the assignments.  Mr. Ibrahim ignored the fact that other non-senior staff members were available to do the assignments but he rather targeted the seniors.

85.     Plaintiffs' Managing Editor after making unreasonable demands wrote e-mails manipulating the facts of the situation to place the blame on the senior staff.

86.     Plaintiffs' Managing Editor changed the seniors' performance standards and annual evaluations without informing them, or giving them notice of the changes.

87.     Plaintiffs' performance evaluations were changed on or about 2011 so as to target Plaintiffs and designed to harass the seniors and force them to retire from their jobs.

88.     Plaintiffs' performance evaluations were changed on or about 2011 to target seniors in retaliation for having complained about harassing behavior by management.

89.     Plaintiffs' managers failed to provide the five senior complainants a completed copy of their  previous annual evaluations.

90.     Plaintiffs' Managing Editor, Mr. Mohamad Ibrahim sent Plaintiffs to office of human resources.  In late 2013, when Plaintiffs went to human resources, Ms. Yoko Hoffman told them that the copies of evaluations that had been submitted by Mr. Mohamad Ibrahim were incomplete.

91.     On or about May 2012, Plaintiffs requested the office of Human Resources to investigate the purpose of such discriminatory acts against themselves and other seniors (aged) similarly situated and put a stop to the harassment and discrimination and disparate treatment and hostile work environment.  However this resulted in further harassment, retaliation, discrimination and disparate treatment that continued to cause the seniors great deal of harm and suffering.

92.  On or about July 2012, Ms. Ain Munn of HR, without responding to the HR complaints filed by the seniors, scheduled individual interviews for all the seniors, except Mr. Stanazai who had not yet joined the complaint.  Ms. Munn interviewed each senior for hours at a time.  Rather than trying to gather facts to inquire about possible discriminatory policy, or individual acts of discrimination, harassment, hostile work environment or retaliation, Ms. Ain Munn and Sheryl Williams Jones (acting director of HR) crated a combative and defensive interview, more geared towards litigation and deflecting responsibility and covering up issues and actions and decisions made by first and second tier management, than trying to resolve a very serious policy and management violation, even when the senior complainants told her that all they really wanted at the time, was for the harassment to stop.  The harassment did not stop

and the schedule did not improve.  But the hostile work environment became worse prompting the fifth senior, Mr. Stanazai to join the complaint.

93.     After the seniors, had already given notice to their managers since 2006 and 2010, and to HR on or about May 2012, regarding management's discriminatory actions and hostile work environment and harassment, to try to resolve the issues, the managers retaliated more aggressively.

94.     This time, Ms. Maiwandi, (Director of South Asia Department) on August 13, 2012 placed a gag on senior work related defensive e-mails.  Thus, the department of Human Resources failed to remedy the situation and made the situation far worse, causing greater damage to the senior complainants.  On August 13, 2012, only a few weeks, after the seniors filed their complaints with HR, the Managing Editor continued to harass the seniors, the environment continued to be hostile, and discriminatory behavior continued as before, and finally it culminated with second tier manager, Ms. Maiwandi (Director, South Asia Division) calling an urgent meeting, with everyone everyone on shift that day, to her office and reproaching the seniors for defending themselves against being management's constant target based on their age and national origin.  Ms. Spozhmai Maiwandi retaliated against the Plaintiffs by exposing them during that staff meeting. Mr. Maiwandi retaliated against the seniors for complaining of unfair treatment by placing a gag on their work related defensive e-mails.

95.     Mr. Ibrahim, the Managing Editor, did not provide password for Dalet Plus to the seniors, he gave his own password to the junior staff.  While the junior staff had the password and were able to work together with each-other when one of them needed the password, the seniors were left out.  The senior staff would have to ask help from one of the junior employees, knowing the Mr. Ibrahim had told the junior staff not to help the senior staff.  Mr. Ibrahim was

forcing the senior staff into a compromising situation, because he had also told the junior staff not to help the seniors.

96.    Mr. Ibrahim, made unreasonable changes in the schedule to accommodate the junior staff and those with whom he shared an animosity towards the seniors, with whom he acted as a team and those who were simply his allies against the senior staff.

97.    Plaintiffs' Managing Editor allows the junior staff to manage their own schedules and assignments compared to the senior staff.

98.    Plaintiffs' Managing Editor, deliberately, intentionally and maliciously retaliates against Plaintiffs by interfering with their job, their assignments, their schedules etc. Plaintiffs' manager maliciously, intentionally and deliberately bombards Plaintiffs with assignments making it impossible to successfully complete them all in the time provided.

99.    The work logs will show that the seniors are required to work more compared to the other junior employees on shift.  For example on October 25th, 2012, Mr. Shah completed 4 assignments while Shafia Sardar (who is a senior but also in favor of senior discrimination) did not translate or produce and Ashiquillah Rahimzoy translated one piece on Pakistan and women. Still Mr. Ibrahim complains that the seniors are not doing as much work as the junior staff, which is unsubstantiated and in fact false on most accounts.

100.    Upon information and belief on or about November 24th, 25th or 26th, 2012, Mr. Ibrahim had a Thanksgiving party at his house, to which he had invited everyone from the Pashto service except the five seniors, who had complained. During this party Mr. Ibrahim asked the junior staff from the Pashto Service, to show him a way to help keep the juniors at the Pashto service and how to force the seniors out, to retire, leave their job.  Mr. Ibrahim was asking them for help to harass the seniors into forced retirement.

101.    Mr. Ibrahim will go so far as waste precious time (in the news business where being timely is of great importance) only to make sure that a senior (aged) employee is undermined, and his work and schedule are interrupted, he or she is harassed, upset, and made to feel useless to the service and forced into retirement.  On of March 15, 2012, one person could have produced the show without incident and without a second person present, or it could have been used as a training session, because Mr. Shah is one of the seniors being directly targeted to this day, he sent Mr. Shah to production, knowing Mr. Shah is not trained on the phones and he has trouble with the phones.  Mr. Ibrahim pointed his finger at Mr. Shah and said, "you – I want you to go" in front of his colleagues after Mr. Ibrahim had agreed for Mr. Noorzai to do production on that day.  This was just a way for Mr. Ibrahim to feel powerful and show everyone that he is "the law" something he stated in one of the first meetings he had with the team, in 2010 when he started at the Managing Editor.

102.    Plaintiffs have been told by management either directly or indirectly that he or she should retire.  Since 2006 and ongoing, it has been the intent of VOA management, to somehow through an assortment of harassment and hostile acts to pressure the seniors to have no other choice but to retire or resign, as was the case with several of their colleagues such as Abdul Bari Jahani, and Dr. Amin Walkman as well as other seniors in the Afghanistan Service both Farsi and Dari, who were forced into retirement, harassed, subjected to a hostile work environment and discriminated against.

103.    In March of 2012, Mr. Ibrahim said that he was following recommendation of the "higher ups" to get rid of the seniors in the Pashto Service.  By their own admission, upper management was following the New Format.

104.    Mr. Ibrahim has orchestrated a string of inaccurate accusations by e-mail, and making false statements from scheming scheduling through making changes in the performance report without giving notice to the seniors.

105.    Mr. Ibrahim wanted to create, in his own terms "a report on the seniors" giving him a false basis, excuse or reason to give the seniors a poor performance reports.  On or about November 2012 and through today, it has became clear that both Beth Mendelson and Spozhmai Maiwandi ignored all of seniors' e-mails and in person complaints with the malicious intent to force the seniors to leave the service and retire.

106.    Management also targeted the seniors, by giving them overwhelming assignments when there were other junior staff available and capable of doing that assignment.

107.    Management excluded seniors when the assignments were important or historical in Afghan politics.  In the recent elections of April 2014, a historic moment in Afghanistan's history, the seniors were not assigned on air shows, while one of the junior staff covered the program for four hours and later complained that it was too much work for her and that it was Mr. Ibrahim and upper-management's decision to put her on that assignment.

108.    VOA management went about deliberately harassing the seniors by isolating them, even by telling the junior staff not help the seniors in work related tasks, while knowing that radio is a group effort.  Mr. Ibrahim was constantly dividing the service between the junior and the senior staff which in turn was harming the shows and ultimately VOA, as well as damaging the health and well being of the complainants.   All notices to management regarding this damaging and dangerous situation was ignored and sneered at by management.  As a result the senior staff has been damaged and the Pashto language programing has been damaged.

109.     The schedule that was supposed to have been implemented on February 25, 2013, was again packed with discriminatory scheduling in which the seniors were not treated fairly.  In a staff meeting the seniors explained certain mistakes, and both sides (senior and junior) agreed that the schedule should be revised by staff members and never again created by Mr. Ibrahim or management.  But, Mr. Ibrahim after seeing the staff created schedule again made discriminatory changes.  If anyone complained he simply stated that he is the law or that this is what "higher-ups" want, i.e. to discriminate against the seniors in the schedule.

110.     On January 2014, Mr. Ibrahim changed the schedule again, this time, failing to follow the protocol he had agreed to allow staff to help in preparing a balanced and fair schedule.  Again this new schedule is biased against the five seniors, and unfair and imbalanced.

111.     Defendant's discriminatory acts are based on reprisal for Plaintiffs' reporting of discrimination and harassment behavior.  Plaintiffs reported the nature of the harassment by their to several members of upper management, the Ombudsman, Human Resources and finally to the Office of Civil Rights. After the reports to management the harassment and retaliation continued. Management continues to systematically create a hostile work environment, retaliate whenever necessary, and carry out a clear plan to force the senior staff and in particular these five seniors, out of the service.  In that effort management has also created a divisive environment which creates a hostile work environment with aggression, malice and animus towards the five senior complainants.  This hostility makes the seniors' day to day job circumstances difficult causing damage to the victims health and welfare.

112.     On or about February 2014, Mr. David Ensor visited the language services, and to the Pashto and Dari language services he said that there will be cuts in each service. Immediately after this meeting, within days, the junior staff were attacking the senior staff, and

the seniors have nowhere to complain or ask for help, because they have complained to most members of management.  However, it seems that management is also forcing the seniors to leave their positions.

113.    The annual evaluations were changed without notice to the seniors.  The changes made in the evaluations are biased against the seniors.  The changes in the annual evaluations coincides with the New Format.

114.    Ms. Yoko Hoffman of human resources is not able to provide the seniors with a completed set of evaluations for the last two years.  However, now that the five complainants request copies of their previous two year evaluations, completed by Mr. Ibrahim, since the changes were made, management including HR refuse to provide them to the seniors.

115.    The senior staffs' ability to successfully perform their duties were negatively impacted by having their performance standards changed.  When the seniors looked through the changed evaluations carefully they realized that many of the criteria had been changed to include vague and biased items that Mr. Ibrahim could easily manipulate to target the seniors.  For example where Mr. Ibrahim did not allow the seniors proper training, he was now going to evaluate them in that category, such as production.  Further production is an item in the annual evaluation when it is not part of the seniors' job description.  The new language leaves much to Mr. Ibrahim's discretion, a discriminatory manager who believes he is the law.  Plaintiffs' evaluations were changed without their knowledge, when it clearly states on the evaluations that notice must be provided when such changes are made. Plaintiffs did not have any notice of material changes to their job.

116.    Before Ms. Maiwandi (Director of South Asia Division) was removed from position of managing the service, sometime in early part of 2013, Mr. Mohmand visited her in

her office to complain on behalf himself and the other seniors about discrimination in the Pashto service.  Ms. Maiwandi responded with mentioning the names of the seniors and saying they will be let go, for this reason she encouraged him to retire.  She said "you (Mohmand) and Mr. Achagzai and Mr. B. Shah and Ms. Khadem will be let go."

117.    In a division wide meeting with the Pashto and Dari Service, Mr. Ahmadi of the Dari service stated that the seniors cannot work because they are "like old cars and their parts don't work," Ms. Mendelson acknowledged this statement and conceded with a smile.  The seniors who were attending, Mr. B. Shah, Mr. Stanazai and Mr. Mohmand expected Ms. Mendelson to object to this service wide biased against the seniors.  But, Ms. Mendelson's reaction to this discriminatory statement was to approvingly smile and tacitly agree and encourage the behavior.

118.    Ms. Mendelson failed to acknowledge senior greetings to her in the hall or anywhere they would see her. For example, she made eye contact with Mr. Mohmand, refused to respond to his greeting. Very often, she would pretend she is in a hurry often she would rush by the seniors and warmly greet junior  staff.  She was highly prejudicial against the seniors.  She even asked one of the junior staff, if he would marry her.  Ms. Mendelson is no longer the Chief of the Afghan Service.

119.    Some of the junior staff members at the Pashto service who management treats differently and who receive preferential treatment include Khalil Khan, Nazrana Ghafar, and Abid Noor.

120.    Khalil Khan and Nazrana Ghaffar have been hired at GS-12 as international broadcasters at the Pashto Service. However contrary to the requirements of GS-12, they do not have enough broadcasting experience or the necessary language skills. Their language tests were

waived by Ms. Maiwandi and with the support of Mr. Ibrahim.  They have been exempt from

doing the news, the most important and most difficult job in broadcast radio.  While, Mr. Ibrahim

has assigned at least one of the seniors, Mr. Stanazai to do the news, five days a week and five

different broadcasting shifts.

121.    Mr. Khalil Khan, a junior employee of the Pashto service, who does not have the

necessary training or language skills to do the news, had been assigned as a shift editor.  Abid

Noor who also does not have any translating and editing skills and is unable to copy-edit was

promoted by Ms. Maiwandi to GS-12 and he is now some type of advisor to Mr. Ibrahim and at

times is/was the shift editor five days a week (while Mr. Achagzai's promotion to GS-12 was

rejected by Maiwandi and delayed for years).

122.    The seniors complained to Ms. Mendelson, Ms. Maiwandi and also Mr. Ibrahim

as well as Human Resources and later to Office of Civil Rights (investigation report included

herein).  They also contacted and met with the Office of the Ombudsman in hopes that they

could help.  These harms could have been alleviated and the problem could have easily been

resolved, but for VOA management's direct intent to harm the seniors.  Some of the seniors also

complained to Ms. Barbara Brady, VOA, Chief of Staff, as well as Ms. Rebecca McMenamin,

Acting Associate Director for Language Programming; and David Ensor was sworn in as the

28th Director of the Voice of America on June 16, 2011.  They forwarded the e-mails and sought

out help, but because they are seniors, they were marginalized and their request for help was

ignored.  VOA management owed a duty to the senior staff if not only to stop the harm but to try

to investigate and help repair the harm that was becoming more and more confrontational and

more damaging and more difficult to tolerate for the seniors.  In fact, it put the seniors in the

hospital at different times, all due to the stress of having been targeted by their immediate managers and ignored by all the others.

123.    Mr. Ibrahim and management were "going after" the seniors.  Everyone could see that only the senior staff was being ridiculed and harassed in public and treated like "second class citizens." They were taken off the shows, off the air, Mr. Achagzai was taken off the poetry show, schedules were being changed and manipulated to target the seniors.  The seniors were not receiving training, or necessary equipment.  Seniors were and still are excluded from meetings and meaningful discussions for radio programming.

124.    When the accusations by Mr. Ibrahim became more outrageous and more untrue with each sent e-mail, Mr. Achagzai states "I saw that it was really going after me and I heard my colleagues (seniors) also very distraught."  Mr. Ibrahim and his supporters were basically forcing out the five senior complainants.  Mr. Ibrahim even told junior  employees to not help the seniors or even to report them if they make a mistake or if they ask for help.

125.    Mr. Ibrahim's intent to harm the senior staff is evident in an e-mail he wrote to Mr. Achagzai on August 12, 2012 where he wrote: "I am sorry to say, you are stuck in the 70s and early 80s and still think that the time has not moved a day forward."  He told Mr. Mohmand, that it is time for Mr. Mohmand to "go and relax" i.e. retire. He complained that Mr. Shah and Ms. Khadem are not checking their e-mails.

126.    Mr. Ibrahim told the staff "I am the law" during one of the first meetings he had with the staff when he first started this post of Managing Editor.  There was a discussion between Khan Alamy the shift editor (Mr. Alamy, also a senior staff member, who is no longer with VOA), Ms. Zeba Khadem and at that time Mr. Ibrahim said "I am the law" or "I am the law here." Mr. Ibrahim said this to frighten the senior staff.

127.     VOA management knew of Mr. Ibrahim's opinion that he believes he is the law

and the abuse of power and harassment that came with it, but still they endorsed him as he

targeted the seniors and showed them that he really is the law at the expense of their health and

well being and even after they complained to Ms. Maiwandi (Director) and Ms. Mendelson

(Chief) nothing was done to help alleviate the harm.  Finally, after the seniors went to HR with

their complaints, Ms. Maiwandi retaliated by telling the seniors to stop writing e-mails and stop

defending themselves because Mr. Ibrahim is right in whatever he does, including discriminating

against the seniors.  Further, this was not the only occasion that he said he was the law.

128.     On August 13, 2012 Ms. Maiwandi, Director of South Asia Division, realized that

the senior staff had taken their complaint to Human Resources and were replying to Mr.

Ibrahim's harassing e-mails.  In response to their complaint she publically put a gag on work

related e-mails written by the seniors.

129.     On February 27, 2013 in an e-mail Mr. Ibrahim designated "staff responsibilities"

without holding any meetings and without asking the opinion or input of the staff, as far as the

senior staff members are aware.  In that new schedule Mr. Ibrahim assigned Khalil Khan (whom

he hired at GS-12 and who was advocating Mr. Ibrahim's gold medal and who Mr. Ibrahim

admitted is unable to do the news) became the shift editor on Saturday.  Mr. Ibrahim also gave

Khalil Khan position of copy editor on Saturday which means he has to do copy editing of the

news, intros and reports.  Khalil Khan, who is not able to even read the news was now

responsible for copy editing.   This was a decision Mr. Ibrahim made knowing that Mr. Khan is

under great deal of criticism for his lack of skills and most importantly, lack of Pashto language

skills.  He lacks the basics of the language, and if he writes an item or translates the news or CRs

etc.  it is often difficult to understand what he is writing.  It is frequently non-sense.  Because of

Mr. Ibrahim's insistence on keeping the senior staff in marginal roles, the stuff that Mr. Khan writes ends up on the radio, which in fact has ruined the reputation of the Pashto Service amongst the Afghan Pashtun listeners in Afghanistan and around the world.

130.    In the schedule of February 27, 2013 Mr. Ibrahim assigned Mr. Achagzai the 2:30 pm air show without discussing it with him to find out whether it is even feasible, thus putting Mr. Achagzai under unnecessary duress.

131.    Plaintiffs' supervisors and management have treated Plaintiffs with condescension and disdain, ignoring their pleas for help, ignoring their expertise and experience, down playing their radio and journalistic experience and taking away their long held shows only to give them to less qualified junior employees.

132.    In an effort to force the seniors into retirement, upper management were telling the seniors that the Pashto language service would close down anyway, the seniors might as well retire now.  Ms. Maiwandi, who was the Division Director at the time, told them that the division was going to close anyway.  She said this to Mr. Syed B. Shah.  On a different occasion, Ms. Maiwandi, in response to a complaint by Mr. Mohmand, in respond to his concerns about discrimination told him  that the following people will be fired she listed the names of four of the seniors in the division.

133.    Management exposed the complainants during a staff meeting as the trouble makers, complaining of unfair treatment.  On August 13, 2012, Division Director Ms. Spozhmai Maiwandi wrote an e-mail addressed to everyone on shift and at the office to urgently attend a meeting at her office.  It was 2:00 in the afternoon when everyone met at her office.  Those who were attending included Managing Editor Ibrahim, as well as Khalil Khan, Abid Noor, Nazrana

Ghaffar, Roshan Noorzai, Noshaba, Hasib Alikozay (all witnesses to the complaint) and three seniors, Mr. Shah and Mr. Mohmand and Ms. Khadem.

134.    In the meeting of August 13, 2012, Mr. Maiwandi attacked the senior complainants and tried to shame them for complaining.  This meeting was an attack by Mr. Maiwandi on the seniors who had complained about discrimination.  She had an e-mail with her on the desk, she was very angry, and she was very serious about putting a stop to defensive e-mails to Mr. Ibrahim's false accusations.  She put a gag on senior employee e-mails and told them "your e-mails are unacceptable from here on."  She said "I have seen Shah's and Mohmand's e-mails" as she pointed at them.  She said some of the e-mails mention "my name" (this was done by the other senior complainant Mr. Achagzai).  When she asked "what is your problem" to everyone, no one had a problem, except the seniors.  Mr. Shah said that he was not able to speak to this in a public meeting such as this one, because he had signed "downstairs" (meaning he had signed confidentiality with HR when he filed his complaint).  Ms. Maiwandi came to Mr. Mohmand next and he too a senior with a complaint said I agree with Mr. Shah and when she asked Ms. Khadem she said "same as Shah and Mohmand."  Everyone else did not have a problem except for the seniors.  The seniors to whom Ms. Maiwandi very explicitly was telling to stop writing work related e-mails in their own defense.

135.    During the meeting of August 13, 2012, Ms. Maiwandi exposed the seniors to the same Managing Editor, Mohamad Ibrahim, against whom they had complained, as well as possibly destroying additional witness' credibility (because some of the members of the meeting were witnesses), not to mention dividing the service against the seniors by putting a great deal of emphasis that Mr. Ibrahim was right in what he was doing and giving her show of support on his behalf and against the seniors.

136.    After the meeting with Ms. Maiwandi, on August 13, 2012, Mr. Khalil Khan asked Ms. Khadem (on that Wednesday, August 15, 2012) to sign a petition and vote for Mr. Ibrahim.  Ms. Khadem told him to ask others to sign.  This was Mr. Khan's way of showing his support for Mr. Ibrahim.

137.    On August 17, 2012, Ms. Rebecca McMenamin who is above Mr. Maiwandi, asked to meet with the four seniors, whose e-mails were stopped by Ms. Maiwandi.  During the meeting she said it is not VOA's policy to suppress or put a gag on employee work related e-mails.  Regardless the damage by Ms. Maiwandi's intentional act of August 13, 2012 and her public shaming of the seniors could not be reversed, and cannot be reversed to this day.  Ms. Maiwandi is no longer in the position of Director of South Asia Division.

138.    The Plaintiffs have extensive experience, with Pashto language.  However, Plaintiffs, especially Mr. Stanazai was removed from the schedule and replaced with junior staff, less experienced staff, who made such terrible mistakes on the air that it has permanently damaged the reputation of the Pashto Service.

139.    Mr. Ibrahim, without any explanation, reason or logic, placed junior staff to be shift editors, cover press conferences; and edit the news; as well as having their own shows and assignments to travel abroad for coverage of events, while at the same time, trying to reduce the involvement of the senior staff by delegating them to mere translators and production.

140.    Mr. Ibrahim's made himself inaccessible to the senior staff.  He uses his position as a means of animosity towards the seniors.  He only communicates with the junior staff or those staff members who support him against the five complainants.

141.    Many times Mr. Ibrahim scheduled the senior staff of the Pashto Service for jobs or tasks for which they were not trained: for example, production.  While production is a skill

that most of the seniors are familiar with and have done in the past, it is not a skill that was part of their job requirements.  It was unfair and retaliatory action by management to force the Plaintiffs to a marginal role in the service and usher them out the door, to retire and leave their position.

142.    Mr. Ibrahim applies a double standard when it comes to the senior staff at the Pashto service.  He will not require the junior staff, especially those who are hired based on their national origin, (Pakistan) to perform the critical skills required and expected of a GS-12 employee.

143.    Since April, 2010, when Mr. Ibrahim started the position of Managing Editor, he has never assigned or required a few of his favorite and junior employees to do those jobs that VOA considers critical performance skills in the annual evaluation, such as news judgment, review translation for accuracy, translate from English into Pashto in conformity with standards of Pashto, usage, accurate vocabulary, grammar, and radio style.

144.    The seniors were being targeted, forced to retire, their voiced removes from the air, by management, while the junior employees were given easy assignments such as air shows: "voice of friends," music shows, women's shows, youth programing, and trips abroad, talk shows and poetry shows. They were simply excused from any other critical tasks necessary for their position, such is news casting, features, editorials and other complex issues such as translating and adapting complex English texts into idiomatic Pashto appropriate for International radio broadcasting for which they were not qualified, and while these are the major duties of a GS-12 broadcaster.  But to cover-up these enormous short-comings, Mr. Ibrahim targeted the seniors instead to place the blame on the senior staff for his and his friends inability to perform as required and to run an efficient service.

145.     Two of the junior staff Khalil Khan and Nazrana Ghaffar clearly lack the qualification and functional knowledge of Pashto language. Based on their current level of recitation and writing it is evident that they do not have the necessary basic knowledge of Pashto and they are not trained.  It seems they don't have any formal education in Pashto language either.  It is however, VOA management's decision to waive the necessary Pashto Language test for these two individuals who are not from Afghanistan and who admittedly do not speak the additional necessary Dari language.

146.     Upon information and belief, Mr. Mohamad Ibrahim, the Managing Editor is not from Afghanistan, does not speak or write idiomatic Afghan Pashto language, and does not speak Dari.

147.     Upon information and belief one of the junior staff, failed the standard Pashto language test at another international broadcasting services in Europe, as well as Mashal radio in Prague, before being hired at VOA as a GS-12.

148.     Mr. Ibrahim assigned Mr. Khalil Khan and Abid Noor as a shift editor which is ironic because the duty of a shift editor is to copy edit and review translated and adapted features, news stories by other employees which requires at least some college level education in Pashto language and a few years of experience as a writer in a news room or electronic media environment.  These individuals do not have these qualifications Mr. Khan also do not have basic knowledge of Pashto.  Yet Mr. Ibrahim had appointed Mr. Khan as a shift editor and only after numerous complaints by other employees that Khalil Khan and Abid Noor are not capable of editing and reviewing for accuracy and standard usage of Pashto vocabulary and after the issue was brought to the attention of news service chief in a staff meeting, Mr. Ibrahim changed the name of the position from shift editor to shift coordinator.

149.     Rather than making positive changes to the schedule after many complaints, about the lack of shift editors, Mr. Ibrahim simply changed the name of the position, leaving the junior staff in the same semi-managerial, privileged position, in which they simply tell others what to do.  While the senior staff, are bombarded with work, ridiculed and accused of ignorance and stupidity.  Mr. Ibrahim and his supporters simply ridicule the senior staff, to cover-up their own lack of proficiency in their job and also the Pashto language.

150.     The Plaintiffs have done this job for decades and are active passionate and expert journalists, who are also experts in the Pashto language, who are well known and mentors to many of the new up-and-coming journalists in Afghanistan and among the Afghans around the world who listen to VOA Pashto programming. They are an asset to the Pashto service. However, management discriminates against them and has collectively decided to get rid of them, based on-no fault of their own.  Management has given Mr. Ibrahim indiscriminate power to harass the five seniors from Afghanistan until they leave.

151.     Even when the position of coordinator was created no one was assigned to do the editing in the service, when one of the best editors in the Pashto language works at the Pashto Service, VOA.  Mr. Stanazai is a gifted editor who is willing to edit. Mr. Ibrahim would not assign a senior, such as Mr. Stanazai to do the editing position. When Mr. Stanazai is requested to copy-edit, he is told not to use "tracking" on word documents, but make corrections directly on the document, so as to not show how many corrections were made by Mr. Stanazai and have the corrected saved on his hard drive or e-mailed.

152.     At the same time, the seniors are harassed and ridiculed into doing the hardest jobs, and the jobs in which they are experts are snatched from them and given to the junior staff. They are treated as though they have already retired.  If they complain about the inequality or

unfairness, they are retaliated against even further, with more harassing e-mails from the manager and more interference with their ability to complete their jobs, with greater stress, and more damage to their health and well being.

153.    Management's goal, as part of its New Format is to force senior staff to retire, they even tell the junior staff not to help the seniors, causing seniors hardship, frustration, and making their jobs very difficult if not impossible at times.  Several senior staff could not handle the level of harassment and decided to retire.

154.    Management has claimed that seniors are either not interested in learning technology or cannot learn it, so they should be replaced by junior and technology savvy employees.  Regardless of how rapidly technology evolves, in broadcasting one still needs a fine journalist and writer to write a comprehensive, objective news story with clear language of the target country, in this case Afghanistan and in Pashto Language. The message should be clear and comprehensible, regardless of technology. This can be achieved by seniors. The technology Mr. Ibrahim is talking about is production of the radio show, and some internet such as google hangout, or twitter, or even face-book, anyone with proper training can learn these "advancements" in technology.  There is no need for management to hide behind the cover of technology and harass the seniors when in reality the real problem is the junior employees who do not have the "critical skills" for news judgment, news and feature translation of idiomatic Pashto and correct recitation and who have now been put into place, to force the senior staff out of the service.

155.    The Pashto service also treats senior and junior employees differently. The junior staff members are given plum assignments, travel, leeway with their schedules, and put into managerial positions while the seniors are marginalized or reduced to a simple translator or

producer.  The other obvious difference in treatment of seniors and juniors is that very often all the seniors were required by the new Managing Editor and the service chief to perform jobs related to technical skills such as production and Pashto web, or translation of audio files from Pashto into English which is not part of their job, but the young employees are not required to acquire news casting skills or translation skills or other complex texts such as background reports and editorials.

156.    By looking at the last three to four schedules it is obvious the junior employees are given supervisory positions such as shift editorship, and shows, without the required qualifications, while the seniors who are fully qualified are not given such positions in the service and are demoted to production or reduced to a simple translator which is the case with Mr. Stanazai and the other four senior complainants.

157.    This discriminatory practice has greatly damaged VOA Ashna Radio quality and the effectiveness of the message or communication that VOA is trying to send to the Afghan audiences.  In fact there are several examples of when the message is distorted or rendered vague and unintelligible, due to lack of editing and correct pronunciation on the air by junior employees.  VOA is United States means of fostering relations with such conflicted parts of the world as Afghanistan.  VOA is important means of fostering democracy and helping Afghans understand the privileges of a free democratic society.  But, here because Mr. Ibrahim is from Pakistan and has this agenda against the senior Afghans, an agenda approved by VOA's upper management, all these opportunities to the US are lost at the expense of VOA funding.

158.    On May 7th, 2013, Mr. Stanazai's and Mr. Achagzai's requested and met with Mr. Farivar, current Chief of the Afghan Service.  They met at 3:00 pm, regarding web improvement.  Mr. Taher Achagzai requested the Service Chief to listen to at least one of the

evening shows where Khalil Khan is an MC, to see for himself how the quality is butchered by

him, the same goes to Nazrana Ghaffar's quality of reading.  His mumbling and numerous

mistakes and miss-pronunciations show not only, he did not have any prior experience in radio

journalism, but his language skills are below standard.   However, the seniors who are experts in

Pashto language, have been recognized around the world, and who have built this service with

their reputations, and who are available to do the shows, are excluded and in certain instances,

permanently reduced to doing production (a simple skill that can be learned with a few weeks

training and practice).

159.    Mr. Ibrahim gets in the way of seniors performing their jobs. In the schedule

issued on February 25, 2013 and again on April 10th, 2013 it became evident to every single

member of Pashto Service team that schedule was not fair and balanced, but it is a tool used by

Mr. Ibrahim to discriminate against the seniors while he promoted those junior staff he was

supporting or those who support him in harassing these five Plaintiffs.

160.    He uses the schedule to retaliate against others especially seniors by increasing

their work load.  On April 21, 2013 Mr. Stanazai was bombarded with copy editing, press review

and two productions while some junior staff, such as Mr. Noor, were not doing any assignments.

But because of Mr. Noor's relationship with Mr. Ibrahim, Mr. Stanazai was marginalized and

also afraid to mention this unfairness to Mr. Ibrahim or to other management.  It seemed no

matter how much the seniors complained, management either at best ignored them or retaliated

against them.

161.    On or about August 2012, in an effort to harass Mr. Mohmand, Mr. Ibrahim

assigned Mr. Mohmand translation of a piece from Pashto into English.  This assignment of

translation from Pashto into English was created and designed by Mr. Ibrahim to harass Mr.

Mohmand. It is a Pashto service and the broadcasting is from English into Pashto not vice a versa, thus the senior journalists do not have as much experience translating from Pashto into English.  Mr. Ibrahim clearly discriminates against the Afghan, Pashtun seniors, whose Pashto language skills are superior to his own.  There is no reason to assign any of the seniors or Mr. Mohmand or Mr. Achagzai to translate into English.  But since the junior staff cannot translate into Pashto, Mr. Ibrahim was forcing the seniors to translate into English, while the target language is Pashto. Mr. Ibrahim knows this and he intentionally harasses the seniors and tries to force them into retirement.

162.     On or about August 2012, Mr. Mohmand had misplaced the translation and asked Mr. Stanazai to help locate it.  Mr. Ibrahim saw Mr. Stanazai while he was at Mr. Mohmand's desk helping him look for the piece. Later Mr. Ibrahim cornered Mr. Stanazai (who at that time was not one of the complainants) and told him that they, seniors, "should do their own stuff." He said "how long you or others (meaning junior  staff) will assist them?"  Mr. Stanazai told him "If I am asked for assistance I cannot refuse because we work here as a team." Instead of fostering a spirit of team work Mr. Ibrahim was discouraging a normal act of courtesy. Mr. Stanazai believes in promoting a spirit of teamwork that will help VOA's mission in terms of quality programing.

163.     On or about middle of March, 2012, the service was short staffed and required some changes in the assignments.  For one day, Mr. Stanazai changed Ms. Zeba from a producer to MC, and Mr. S. Shah to producer.  But Mr. Ibrahim changed it back while the team was on their way to the studio.  Mr. Ibrahim wanted to force Ms. Khadem into production.  He considered Mr. Stanazai's decision to change assignments as a way of helping Ms. Khadem, but missing the real point, which was to have a smoothly run show.  The change was necessary

because the schedule Mr. Ibrahim had made was not working. It was irrational and specifically designed to harass the seniors and to ruin the show and as a result their reputations.

164.   Mr. Ibrahim uses a new category of "translation from Pashto into English" against Mr. Stanazai and other seniors.   On February 5, 2013, Mr. Stanazai was told to translate 3 minutes audio from Pashto into English in 20-30 minutes.  Mr. Stanazai simply told him "I need more time for this assignment" because he had three more assignment on that day, a U. S press review on Afghanistan and two production and two logs to be completed. Mr. Stanazai had simply asked for more time. Mr. Ibrahim deliberately and intentionally misinterpreted this to Pashto Service Chief as denial of assignment and wrote an email about it. It is a common practice to negotiate time for an assignment, especially if an extra unplanned assignment is added to the rest of the work load. Mr. Stanazai has always done extra assignments for VOA, namely simultaneous translations for Ashna TV, (Pashto and Dari) for the Past 7 years along with his daily tasks, thus it was not a problem.  Mr. Ibrahim knew this, that Mr. Stanazai did not have any problems with doing the assignment.  However, Mr. Ibrahim made sure that he could get as much negative press as possible against Mr. Stanazai, by informing the chief of the service and pointing fingers at Mr. Stanazai. This was Mr. Ibrahim's plan.  His goal was to harass and harm Mr. Stanazai.

165.   Mr. Khalil and Ms. Nazrana Ghaffar, both are from Pakistan.  Mr. Ibrahim is also from Pakistan.

166.   Because Mr. Khan and Ms. Ghaffar are both form Pakistan, and they have poor language skills, Mr. Ibrahim has assigned Mr. Khalil as a shift editor and Ms. Ghaffar to shows, and gives them many more privileges.  He assigns them shows, sends Mr. Khalil on trips and additional privileges on a daily basis, such as overlooking deadlines and translation mistakes as

well lack of language skills.  Further, because they are from Pakistan, both these individuals were not required to take the Pashto language test. These tests were waived.  In return for Mr. Ibrahim's favors, he expects Mr. Khan and Ms. Ghaffar to support him in his discrimination of the Afghan seniors in the Pashto service.

167.     In August 2012, Mr. Ibrahim was nominated for the yearly gold medal award. The year before, 2011 Mr. Ibrahim's wife was the winner of this award.  Mr. Khan campaigned for him during official time to get others to vote for Mr. Ibrahim, for him to be awarded the gold medal.  Mr. Khan spent several hours campaigning hard.  Mr. Stanazai  saw him, as he spoke with Mr. Khawreen, Mr. Mohammdi, Mr. Roshan and a few others including Mr. Stanazai. Later in October 2012, Mr. Ibrahim was in fact awarded the gold medal, when four senior employees had a standing complaint of age discrimination, retaliation, harassment, hostile work environment, and more against him.

168.     In return for Mr. Khan's great support, and his everlasting dedication to Mr. Ibrahim's ongoing attack on the seniors, Mr. Ibrahim assigned Mr. Khan a trip to New York.  On or about the week of Sept. 22-23, 2012 he was secretly sent to New York, to cover UN meetings, possibly during the weekend.  Again a staff did not know that he sent Mr. Khan for coverage, a reporter who fails his assignment on a daily bases in terms of quality and accuracy of writing and pronunciation.

169.     Media environment is booming in Afghanistan. There is an abundance of media talent available to work at VOA, Pashto Service.  But management chooses to hire those from Pakistan, while disregarding the qualification of American citizens with Afghan origins.

170.     As part of the New Format, least five or six new shows were created, however, the seniors were given any of these show and not included in creating the shows.

**BACKGROUND FACTS**
**Mr.  Naseem S. Stanazai**
(Attached Exhibit: Broadcasting Board of Governors Report of Investigation
& Exhibits Case Number:  OCR: 13-10)

171.    Plaintiff repeats and reavers each of the foregoing paragraphs as if they were

specifically restated herein.

172.    Mr. Naseem Stanazai is an International Broadcaster (GS-12) at Voice of America

(VOA).  He is assigned to South Asia Division, Afghan Service (Pashto Language), located at

330 Independence Ave. Washington DC.  Mr. Naseem Stanazai started at VOA in 2001.

173.    Mr. Stanazai has a degree in Mass Communications from University of South

Carolina, along with 15 years experiences as an editor of bilingual newspapers and newsletters

and over 12 years experiences in radio broadcasting.  He is an expert in the Pashto language.  He

holds a Bachelor of Arts from University of Kabul; he has trained in Kabul Radio for 18 weeks

in poetry declamation and news reading and accurate pronunciation. Mr. Stanazai is a career

journalist and broadcaster in the Pashto language.  As a Pashto language expert, Mr. Stanazai has

had great success in simultaneous translation from English to Pashto, during live broadcasts. Mr.

Stanazai has also been requested on several occasions by management for simultaneous

translations for Ashna TV.

174.    Mr. Stanazai is 60 years of age, (DOB: 12-20-1953).  He is a naturalized United

States citizen who is originally from Afghanistan and is a native Pashto and Dari speaker, two of

the main languages spoken in Afghanistan.

175.    The requirement for an International Broadcaster (GS-12) at the Pashto Service is

fluency in both Farsi and Pashto languages that are spoken in Afghanistan.  Plaintiff's duties

include; Editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CR(s), Backgrounders, Editorials, Press Reviews and Feature Programs.

176.    Mr. Stanazai has never before brought a claim against VOA or any other employer.

177.    Plaintiffs immediate and second level supervisors, managers or persons responsible for his work assignments, as well as management during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.    Mr. Mohammad Ibrahim (Nasir or Ibrahim Ibrahim Nasar) is the current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.    Mr. Ghilzai Amanullah, was former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

c.    Ms. Beth Mendelson, was the former chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from  August 2006 to May 2013;

d.    Mr. Masood Farivar, is the current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

e.    Ms. Spozhmai Maiwandi, GS-15, was the former, Director, South Asia Division, who held this position from 2007 to April 24, 2013;

f.    Mr. Ismail Dahiyat, is the current Director, South & Central Asia Division.

178.    Plaintiff, has been deliberately and intentionally targeted by management to force him to retire and leave his job.

179.    When Plaintiff refused to surrender to the hostilities and discriminatory acts based on his age and national origin, he has been and continues to be discriminated against and subjected to a hostile work environment, and reprisal for reporting harassing behavior.

180.    Mr. Stanazai has been and is continuously discriminated against and subjected to a hostile work environment, based on his age (12-20-1953) and in reprisal for reporting harassing

behavior starting 2006 and more recently 2010 and ongoing.   His supervisors began subjecting

him to acts that made productivity nearly impossibly and which prevented him from being able

to successfully perform his duties, including:  taking away assignments; switching up his

assignments; removing him from his position as shift editor; assigning him tasks that are beyond

his job, such as production; assigning him jobs for which he has not been trained; failing to

provide him with adequate training; excluding him from training until after he filed a complaint;

humiliating him by making false accusations against him (such as accusing him of not accepting

an assignment); treating younger staff more favorably by offering them computer training, a

variety of assignment privileges, covering up their mistakes and promoting them regardless of

their lack of language skills and constant mistakes while reducing Mr. Stanazai to a translator;

failing to provide him password for Dalet Plus; affirmatively, maliciously, and intentionally

instructing younger staffers not to help him or the senior (aged) workers; and changing his

performance standards to justify a lower rate of performance; surreptitiously changing his annual

evaluations in reprisal for his complaints about discrimination; ignoring his request for help;

ignoring his notices of discrimination, reprisal, harassment and hostile work environment; falsely

giving him information about the closing the Pashto Service; putting a gag on his work related e-

mails; excluding him from meetings; not including his input with scheduling; not acknowledging

him in public.

181.    Mr. Stanazai's annual evaluations have been stellar. He is a journalist known for

his integrity, expertise in the Pashto language, and most notably for his even temperament,

patience, attention to detail, and professionalism, patience and commitment to the team of

professionals and journalists with whom he has worked for over a decade. His most notable

contribution to the Pashto service is his expertise in the Pashto language, his simultaneous

interpretations and his ability to copy-edit extensive, complex and technical Pashto language news translations.

182.    The main requirement for an International Broadcaster (GS-12) at the Pashto Service is fluency in both Farsi and Pashto languages that are spoken in Afghanistan.

183.    Plaintiff's duties include; editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CR(s), backgrounders, editorials, press reviews and feature programs, news-casting/ reporting/ producing/ feature writing/editing/simultaneous translation, shift editor and news editor.

184.    Mr. Ibrahim targeted Mr. Stanazai with making unnecessary changes in his schedule that were particularly unfair. Mr. Ibrahim removed Mr. Stanazai from the following positions, without notice or discussion as to why these specific positions were being changed:

    a.      News editing;
    b.      Covering events in Washington DC
    c.      Conducting talk shows
    d.      Conducting interviews

185.    Mr. Ibrahim changed the schedule and replaced Mr. Stanazai with younger and less experienced individuals who were and still are unable to complete the tasks at the same level of expertise and professionalism required at VOA, while relegating Mr. Stanazai to translator.

186.    Mr. Ibrahim interfered with Mr. Stanazai's daily work assignments in an assortment of ways to force him to miss deadlines. For example he called Mr. Stanazai on the phone when he knew, Mr. Stanazai was about to leave for a show.  Mr. Ibrahim continued talking and criticizing him about non-urgent, unrelated matters, forcing him to miss airing his news story, even after Mr. Stanazai told Mr. Ibrahim that he was about to head to the studio.

Still Mr. Ibrahim showed complete lack of respect for the schedule, the show, and for the job and responsibilities of he senior staff.

187.    Although it is obvious that Mr. Stanazai is one of the expert copy editors, he is often excluded from this post and reduced to a mere translator (or producer).  Instead of Mr. Stanazai, Mr. Ibrahim assigned Mr. Khalil Khan and Abid Noor as a shift editor which is ironic because the duty of a shift editor is to copy edit and review translated and adapted features, news stories by other staff which requires at least a college level education in Pashto literature and a few years of experience as a writer in a news room or electronic media environment. Mr. Ibrahim assigned Mr. Abid Noor as shift editor, five days a week from June of 2010 until February of 2013.  Neither Ms. Noor not Mr. Khan, have the level of expertise in the Pashto language to become copy editors.

188.    Mr. Khan not only doesn't have language qualifications he also doesn't have basic knowledge of the Pashto language.  He has never taken the VOA Pashto Language test. The Pashto language test was waived for him, when he was hired at GS-12.

189.    After numerous complaints by the staff that Khalil Khan and Abid Noor are not capable of editing and reviewing for accuracy and standard usage of Pashto vocabulary and after the issue was brought to the attention of news service chief in a staff meeting, only then Mr. Ibrahim changed the name of the position from *shift editor* to *shift coordinator*.  He changed the name of the position but kept the same two people in the same position. Rather than making positive changes to the schedule Mr. Ibrahim changed the name of the position, leaving the junior staff in the same managerial position, except as shift coordinator they would only tell others what to do and not have any editing responsibilities.  Mr. Noor's title from shift editor to

shift coordinator was changed on April 10, 2013.  This gave him more authority but less responsibility.

190.     After the coordinator position was created, Mr. Ibrahim did not assign anyone for copy editing. Mr. Ibrahim would not assign Mr. Stanazai, the obvious choice, to do any editing unless absolutely necessary.  He did not want Mr. Stanazai, a senior to have any type of authority. Mr. Ibrahim simply reduced Mr. Stanazai to a position of translator.  Even now when in a desperate situation, Mr. Stanazai is requested to edit translations, he is told not to use "tracking" on word documents, but make corrections directly on the document, as to not show how many corrections were made by Mr. Stanazai.

191.     Mr. Stanazai, who is an experienced copy-editor is constantly overlooked for the task, based on management's plan to force him into retirement.  This plan includes, harassing Mr. Stanazai, forcing him into a limited position of translator, taking his voice off the air and marginalizing him as a member of the staff, simply having him as a "stand by" or secondary role or an understudy to the junior staff.

192.     Before Mr. Ibrahim became the managing editor, Mr. Stanazai was the shift editor, from 2006-2008. At the same time he was the copy editor for all the Pashto Radio Ashna and Ashna TV.  The items he edited were used on the Pashto web page. Mr. Stanazai was the News Editor from August, 2008- June of 2010.  He continued copy-editing for the web until 2009.  In addition he was providing press conference coverage of Washington D.C., U.S. press reviews and interviewing with American Scholars about Afghanistan.

193.     Mr. Ibrahim changed Mr. Stanazai's job tasks to mere translation and production which was a drastic change from what he used to do for the service.  Reducing him to "standby" or "secondary" or "substitute" employee, waiting to cover for those who did not come to work. It

was the shift editor's job to assign Mr. Stanazai any job he deemed necessary.  Basically he was not sure on a daily basis what he would be doing that day. Normally he would be filling in for those employees who called sick or were on leave. He was doing mainly translation or production for some time. Mr. Ibrahim knows or should know that Mr. Stanazai is a talented journalist and an expert in Pashto language with a proven track record of success.

194.   Mr. Ibrahim has marginalized Mr. Stanazai because Mr. Stanazai is a senior, is from Afghanistan and did not support him in his discrimination against the other senior Afghans.

195.   Mr. Stanazai is a graduate of College of Literature in Humanities from Kabul University, that makes him highly qualified for the poetry and other cultural shows, but management denied him that and gave it to an individual who has very weak ability in this area, as is evident in the work product.

196.   Since Mr. Ibrahim became the managing editor in April 2010, Mr. Stanazai has not been assigned any shows. There are approximately 14 shows in one week. Mr. Stanazai has frequently requested to be assigned to one show, but Mr. Ibrahim has refused or told him to wait.

197.   In the schedule of February 25, 2013, Mr. Stanazai requested again to have a call-in show and recommended that those who are not assigned to news-casting and translation should be assigned at least for a single shift to create a balanced schedule, but Mr. Ibrahim has not responded to this request of a balanced schedule for the senior staff.  Instead Mr. Stanazai is secondary or on call host for the talk show. In spite of Mr. Stanazai long history of expertise and stellar work, he has not been assigned a lead on the talk show, or given his own show, but treated as a substitute, because he is a senior and targeted by management for forced retirement.

198.   Mr. Stanazai's shift editor position was reduced and later eliminated as retaliation and harassment by his editing manager, Mr. Ibrahim Nasar.  Mr. Stanazai was assigned only two

days as shift editor and that was by default, since Mr. Noor was off on Friday and Saturday. In the schedule of 02/25/2013 this was reduced to only one day and in the schedule of 04/10/2013 it is completely eliminated, while Mr. Noor was still the shift editor for five days, without being able to edit.  Both Mr. Ibrahim and Mr. Noor do not have the ability to copy-edit Pashto language translations. This constant reduction of Mr. Stanazai's schedule as a full member of the staff is Mr. Ibrahim's ruses for harassment, discrimination and retaliation against Mr. Stanazai. Every-time Mr. Stanazai complained, to management and finally to Office of Civil Rights, his role in the service was made more marginalized by the managing editor.

199.    Early on, in 2010, after Mr. Ibrahim targeted the seniors and removed them from shows and other essential functions such as copy editing, management received many complaints through e-mails and Pashto Service website and on air shows.  At the time Mr. Stanazai was assigned only one day as a news caster.  There were also complaints about the web-content due to lack of copy editing which were ignored by Mr. Ibrahim, because he did not want to assign copy editing to a senior member of the staff.  Many of those complaints were from language schools that were using Pashto web contents as a text and voice as supplementary materials for their students.

200.    According to Mr. Salem Mandokhil, who was hired to run the Pashto Service website, Mr. Ibrahim told the service chief that he himself and Mr. Noor were editing every piece and that the complaints are just nitpicking and has no validity. While, this was a misleading statement because Mr. Ibrahim and Mr. Noor were not capable or have any qualifications of copy editing and have not copy edited to this day. This is common knowledge in the Pashto Service, that neither individual is capable of copy-editing.  Mr. Ibrahim and upper management

still failed to give this opportunity to Mr. Stanazai, an expert.  They chose to harass him,

marginalize him and force him to retire, because he is a senior in the service.

201.    Copy editing is one of the major job assignments of Managing Editor GS-13. By

the same token any employee who has been promoted to GS-12 is required to have copy editing

skills.  Mr. Ibrahim has been preventing seniors and any other employee to hold this position

during the morning shift.  It became evident in Mr. Stanazai's recent meetings with Mr. Farivar

(Service Chief since 2013), that Mr. Ibrahim and Mr. Noor cannot be assigned copy editing, and

that someone else should be assigned as a shift editor or news editor. But management refuses to

place Mr. Stanazai as a shift editor because he is a senior and their goal is to marginalize the

seniors and force them out the service.

202.    Junior staff who lacks the necessary skills for the position they have been hired

for, gets promoted at the expense of the senior staff. While the senior staff, are ridiculed and

constantly accused of ignorance and stupidity. This is extremely unfair and discriminatory

towards Plaintiffs and their senior colleagues.

203.    Mr. Stanazai has been the victim of retaliation and discriminatory practice

because he is a senior and a good example of the way senior discrimination occurs at Pashto

Service.  After his schedule was changed and manipulated whereby he ended up doing just

translation, younger employees were given awards, and recognized by management through

office e-mails from Mr. Ibrahim and Ms. Maiwandi.  At the same time Mr. Stanazai was

excluded and marginalized because he is a senior and from Afghanistan.  For example, Mr.

Stanazai was providing copy editing for Pashto Ashna Radio and Pashto Ashna TV's pieces to

be used on Pashto website but he was not acknowledged for his extra work, but a junior and new

employee was recognized and congratulated for this work.  There is a double standard in the way the junior and senior staff are treated by management.

204.     Mr. Stanazai was confined to only translation and was not allowed to cover events for Radio and TV inside the U.S. or outside the U.S. Frequently younger and less experienced employees were chosen for such "plum" assignments.  For Example, there was need for coverage of President Obama's trip to Cairo in June of 2009. The Managing Editor at the time was Mr. Ghilzai who told Mr. Stanazai that he wanted this to be covered by a senior, experienced and skilled journalist and said "I have nominated you and there may be need for simultaneous translation as well."  Though the managing editor had selected Mr. Stanazai, the Service Chief, Beth Mendelson and other upper-management on the contrary selected a younger staff member. The same employee was unable to do the assignment because he was not a U.S. citizen and had problems traveling outside of the United States. Ms. Mendelson said Mr. Stanazai will not be sent; she further stated "over my dead body."  As a result the Pashto Service lost the opportunity of covering President Obama's Cairo speech.  However, they did not allow a senior to cover the report because of the policy against senior employees being given opportunities that would show-case their level of expertise and skill.  Rather senior employees are put on tasks for which they are not trained, as a way for management to find ways to unfairly critic them and harass them into leaving their positions at the Pashto Service. If the senior staff tries to defend themselves, management has and continues to retaliate.  On August 13, 2012, Ms. Maiwandi the Director of the South Asia Service at the time placed a gag on senior e-mails that were written to defend themselves form harassment or complain against harassment policies.

205.     Junior employees were receiving training in computer programs such as Dalet Plus, while the senior employees were not. When Mr. Stanazai asked "why am I not selected for

training in Dalet Plus?" to which Mr. Ibrahim responded: "it was only for two individuals and they will teach you guys."

206.    Plaintiff was not given a chance for training and the two individuals who were sent to the training were junior staff who later turned out to knew less compared to the senior staff who had not even been to the training. But it was managements' decision to refuse training to seniors.

207.    At the same time as sending the junior staff for training, which the seniors did not get, the junior employees were told by Mr. Ibrahim to not help the seniors.  The junior employees who had passwords to Dalet Plus were also told not to help the seniors, who were not permitted to receive training in the program, thus excluding the seniors from Dalet Plus.

208.    The senior employees are forced to do the hardest and most challenging part of the job, while junior employees are assigned talk shows and other "plum" assignments.   For example in the schedule effective February 25, 2013, Mr. Khalil Khan and Ms. Nazrana Ghaffar are assigned either MC, which is just voicing, or production.  Mr. Khalil and Ms. Nazrana are not assigned for a single day of news casting and news translation.  Mr. Abid Noor is not assigned a single day either as a newscaster/translator and by the same token he was not assigned as a newscaster or news translator in the past as well.  Yet he was assigned five days a week as a shift editor "a shift editor" who cannot edit, is itself a contradiction.

209.    The junior staff is assigned supervisory positions without required qualification or training but the five seniors (five complainants), including Mr. Stanazai, who are fully qualified are not assigned such responsibilities in the service.

210.    If and when Mr. Stanazai is assigned as a copy editor, he is also loaded with more work, such as two production and translation, while the younger employees have not been and are not assigned a heavy work load even when only voicing the news.

211.    The junior staff have not been required to correctly recite the news and other materials leading to vague and unclear news pieces.  But no questions are asked and more importantly corrections are not made.  However, if anyone senior makes the slightest mistake he is watched and is publically ridiculed and argued with and pointed out and simply harassed and targeted, far beyond what is necessary to address any alleged mistake.

212.    Pashto language mistakes by the junior staff, which interfere with the accuracy and credibility of the news, generally go unnoticed.

213.    Mr. Ibrahim creates imbalanced schedules in which he targets the seniors.  In the last schedule of 2/25/2013, everyone complained.  Mr. Ibrahim asked the staff to create their own version of the schedule which they did, and the new schedule looks different from what he had created.  When the schedule went to him for final approval, he brought changes to it again.  Mr. Stanazai was assigned as a copy editor to edit every written piece because in addition to being aired correctly it will be in the web as well. But he changed Mr. Stanazai's schedule again and along with copy editing he assigned him production as well. While some young employees who cannot do translation and editing are given plum shows, assigned to travel, and managerial tasks.

214.    In 7 days of broadcasting Pashto Service has 14 talk shows. Mr. Stanazai has not been assigned even one, while he requested to be assigned but was denied by Mr. Ibrahim. The five senior members of Pashto service were not even included in meetings during which these shows were awarded to junior staff members and those who support Mr. Ibrahim's harassment of the five seniors.

215.    Mr. Stanazai is a graduate of college of Literature and Humanities, and was trained in Kabul Radio for 18 weeks in poetry declamation and news reading and accurate pronunciation.  Mr. Ibrahim took the poetry show from Mr. Achagzai sometime in May 2012 (another senior complainant) with the pretext that he cannot do that show. The show should have been given to someone more qualified.  However, Mr. Ibrahim assigned it to non-staff member, less qualified and less trained, but not Mr. Stanazai.

216.    Mr. Stanazai showed an e-mail of one of Radio Ashna audience members to Mr. Ibrahim, complaining about the poetry show, after Mr. Achagzai was removed.  In retaliation, for his complaining to OCR and also pointing out this flaw to him,  in the current schedule, Mr. Stanazai is forced to do doing production for the same poetry show and he is a captive audience to listen to 40 minutes of obvious mistakes.

217.    By looking at the  schedules it is obvious the junior employees are favored by Mr. Ibrahim.  They are given supervisory positions such as shift editorship, and shows, without the required qualifications, while the seniors who are fully qualified are not given such opportunities in the service and are demoted to production or reduced to a simple translator which is the case with Mr. Stanazai.

218.    Because Mr. Ibrahim is from Pakistan there seems to be great deal of Deewa duplication (Deewa is the Pakistani VOA station) in the Pashto Service.  Due to the staff's lack of knowledge they are mostly assigned to interview Pakistan based scholars or politicians. This practice has two problems: 1) Pashto service is duplicating Deewa Radio; 2) In a two minutes interview there are over 30 English words and some Urdu words.  Mr. Stanazai brought up this issue in a staff meeting in 2013.  The issue was "why is the Pashto service duplicating Deewa radio?"  Mr. Ibrahim Nasar frowned and did not answer, but continues to allow this to go on. It is

a known fact that over 80% of the Afghans live in rural areas and over 90% of them are illiterate as well as living in villages.  How can one expect that an illiterate villager or even an 8th or 12th grade educated Afghan will understand a piece that has over 30 English language words in two minutes interview?  Yet Mr. Ibrahim Nasar allows such an incomprehensible message to be aired to the Pashtun audiences in Afghanistan.

219.    Mr. Ibrahim Nasar gets in the way of seniors performing their jobs. Mr. Stanazai was working as a shift editor, news editor and copy editor for Pashto Ashna Radio web as well. He was covering press conferences in Washington D.C. area related to Afghanistan. Mr. Ibrahim Nasar removed "news editor" from the schedule; which is ironic a news organization without a news editor.  When Mr. Stanazai asked Mr. Ibrahim Nasar about the reason for eliminating the news editor title from the schedule, Mr. Ibrahim replied, "it is a luxury that we cannot afford" as he concealed his discrimination against the seniors.  However a poorly managed, discriminatory, and hostile news service is an impediment not only to Mr. Stanazai's ability to successfully perform his duties but everyone in the service who is being harmed.  It has yet to be assessed how much the quality of VOA news has been damaged as well as VOA's reputation and credibility with the Afghan people due to use of Pakistani announcers and a Pakistani Managing Editor, who is systematically taking beloved Poshtun news-casters such as the five complainants, off the air.

220.    Mr. Ibrahim changed Mr. Stanazai's schedule many times, but for almost four years he had only made small changes if any to Mr. Noor's schedule or assignments.  While Mr. Ibrahim was told by the staff in a staff meeting that the headlines made by Mr. Noor have mistakes and are not clearly conveying the meaning intended in English language news, still Mr. Ibrahim continues to place Mr. Noor in positions that are managerial.

221.    Mr. Ibrahim changed Mr. Stanazai's duties and removed him from assignments without notice.  It was normal practice in Afghanistan Service Pashto Radio, since 1982 that any schedule changes and assignments would be discussed in staff meetings. Mr. Stanazai was never part of this discussion when his duties were re-assigned.

223.    Mr. Ibrahim did not give Mr. Stanazai equal opportunity for trainings.  Typically training  would be discussed and the needs of the service for such training would be assessed. First, the opportunity would be provided to the volunteers and then the rest of the employees would be asked to take the training courses. But after, Mr. Ibrahim became the Managing Editor, most of the time the seniors wouldn't know who was sent to the training.

224.    Mr. Ibrahim concealed information about the new shows form the five seniors. Mr. Stanazai as well as the other seniors did not know when the shows were introduced and who was assigned, until after the fact. The five seniors were excluded as though they were not even part of the Pashto service.

225.    Only the junior staff received the plum assignments. These shows were created for the junior staff and designed to force the seniors off the air and permanently replace them.

226.    When Mr. Stanazai mentioned the past standard practices, such as being informed or receiving notice about changes in the service, or required discussions about schedule changes, and informed group decisions about programming, Mr. Ibrahim's simple answer was "I am the law here now." Mr. Noor specifically told the seniors that the "higher-ups" wanted the seniors to be reduced to translators and producers while the junior staff were promoted.

227.    Mr. Ibrahim unreasonably blamed Mr. Stanazai for mistake that others or he himself were making.  For example, he blamed Mr. Stanazai and two others for his own lack of preparedness for an event that was scheduled well in advance.  The current President of

Afghanistan, Mr. Hamid Karzai was visiting President Obama in Washington from January 7th, 2013 to January 11th, 2013.  Normally there are at least three different staff meetings ahead of time to schedule the whole event and assign tasks to each of the staff, well in advance. When the plan is finalized the Managing Editor provides not only electronic copies but hard copies to every employee in that staff meeting. This is (or at least, was in the past) the standard procedure for such coverage. Mr. Ibrahim Nasar did not hold a meeting for this event which started on Monday January 7th, 2013 and went on through Friday, January 11th, 2013, being the most important day of the trip.

228.    On Friday January 11th Mr. Ibrahim used Mr. Stanazai as the escape goat and told Mr. Stanazai around eleven in the morning that the management is not happy with the way they were covering President Karzai's trip and he said that he was going to have to write a report on him.  He said "I have asked every employee to send me their daily task report regarding president Karzai' trip." Mr. Stanazai sent him a report of his own assignments based his daily duties and judgment, since there was no clear instructions from Mr. Ibrahim. The same day Friday January 11th, 2013, President Karzai had a joint press conference with President Obama, and a speech at George Washington University. But Mr. Ibrahim left during his normal time (while other managing editors would very likely have stayed for this event). Before leaving in the afternoon Mr. Ibrahim told Mr. Stanazai that Mr. Hasib will bring a report covering the event at George Washington University and instructed Mr. Stanazai and Mr. Rahimzoy to cover the joint press conference and wait for house pieces regarding the joint press conference. Again he did not hold a meeting to assign these tasks or to assign extra employees to cover three important events that were taking place within a 3-4 hour time span. Mr. Stanazai told Mr. Ibrahim that

since the house pieces will be late he will need to stay longer, even thought he was scheduled for the morning shift and should have left at 3:45 pm.

229.    Mr. Stanazai and Mr. Rahimzoy covered the joint press conference of President Obama and President Karzai. Mr. Stanazai had prepared two pieces with 7 acts and an interview with Dr. Vanda Filbab. He had prepared three pieces totaling 12 minutes air time, about President Karzai's trip to Washington DC. Mr. Rahimzoy translated joint statement of the joint conference the moment it became available. Mr. Hasib came back to the office around 8 pm but he did not manage to bring a sound-bit from President Karzai's speech. Mr. Hasib did not come the next day but he called or emailed Mr. Ibrahim.

230.  Mr. Ibrahim blames any senior involved in a project, for example here Mr. Stanazai was the senior in the group who was targeted and forced to miss his show. The next day, January 12th 2013, Mr. Ibrahim called Mr. Stanazai at 12:40 PM while Mr. Stanazai was leaving to the studio to air a live piece.  Mr. Stanazai told him that he was about to leave for the studio.  He asked Mr. Stanazai why Hasib did not come and why he had not managed to put some sound-bits of President Karzai's speech. Mr. Stanazai said "Mr. Hasib is not here and he did not call me so I do not know and please let me go to studio when I come back we can discuss what happened last night."  He did not let Mr. Stanazai go and angrily argued with him, trying to put the blame on him.  Mr. Ibrahim took this opportunity to harass Mr. Stanazai, because this issue could have been discussed in a staff meeting and he could have made it a learning experience about such events. But instead of waiting for a staff meeting on Saturday, January 12th 2013, Mr. Ibrahim, from his home wrote to Mr. Stanazai and two other employees telling them he was disappointed in them, when in reality he himself had not done his job.  This is a typical example of blaming others and especially the seniors for his own lack of planning and for his own mistakes.

231. On February 2nd, 2013 Mr. Stanazai responded, to clarify what had happened, and that it was not his fault. Since Mr. Ibrahim had again failed to convene a staff meeting to find out more about this event.

232. Mr. Ibrahim retaliated against Mr. Stanazai within days, over the incident above (January 12, 2013) and subsequent email of February 2, 2013. He started with accusing Mr. Stanazai of not accepting an assignment. This accusation was serious and could have cost Mr. Stanazai his job. Mr. Ibrahim wrote an email on February 5, 2013 in this regard to the service chief. But he could not prove it that Mr. Stanazai had done anything wrong. He had asked Mr. Stanazai to translate a 3 minute audio from Pashto into English in 30 minutes. Mr. Stanazai asked for more time. Mr. Ibrahim intentionally interpreted that as refusing an assignment. It was obvious he was looking for a fight. Luckily the conversation took place when Dr. Mohmand and Mr. Tahir Achagzai were there and heard the whole exchange.

233. Mr. Stanazai gave notice of Mr. Ibrahim's retaliation to Mr. Masood Farivar, the new Service Chief, who called a meeting with Mr. Stanazai and Mr. Ibrahim on or about February 6th, 2013. Mr. Farivar did not find any credibility in Mr. Ibrahim accusations of Mr. Stanazai refusing an extra assignment. Mr. Stanazai told Mr. Masood Farivar about Mr. Ibrahim's motive in writing the email of January 12 and requested Mr. Farivar read the insulting email and decide whether it had any credibility. It is Mr. Ibrahim pattern with seniors, to write accusatory emails, as evidence to use against them. If the seniors respond, Mr. Ibrahim follows-up with more retaliation and accusations. When Mr. Ibrahim gets caught in his pretext of harmful acts discriminating and retaliating against the seniors, he responds with recoiling only to strike more severely later. In this instance he denied the e-mail and when it was no longer possible to continue falsifying information, as the e-mail evidence was available, he said, much to

everyone's surprise, that he did not intend to send that email of January 12, 2013.  Mr. Stanazai

said that "I simply want him [Mr. Ibrahim] to treat me with fairness, according to rights granted

by the laws of the United States and VOA rules."

234.     In the schedule issued on February 25, 2013 and again on April 10th, 2013 it

became evident to every single member of Pashto Service team that schedule was not fair or

balanced, but a tool used by Mr. Ibrahim to make sure he promoted those junior staff who were

supporting him in his discrimination against the seniors and harass the seniors.  He uses the

schedule to retaliate against others especially seniors by increasing their work load.

235.     On April, 21, 2013 Mr. Noor was assigning Mr. Stanazai copy editing, press

review and two productions while he was idle for parts of the day.  But because of Mr. Noor's

close relationship with Mr. Ibrahim, Mr. Stanazai was afraid to mention this unfairness to Mr.

Ibrahim or to other management, since by now it was clear no matter how much the seniors

complained, management either at best ignored them or more likely retaliated against them.

236.     On April 24th, 2013 Ibrahim wrote to say that Noshaba Ashna will not be at work

from April 26 through 28, 2013. Mr. Ibrahim as usual had failed to make plans for April 27,

2013 and assign someone to fill in on April 27th, 2013 call in show, which is Noshaba Ashna's

show. He waited until the very last moment, left it blank and dumped it on two seniors: Zeba

Khadem and Naseem Stanazai.  Mr. Stanazai had three news shifts on that day.

237.     Mr. Ibrahim should have assigned this show to Mr. Stanazai and Ms. Khadem

(two seniors) well in advance.  The purpose of assigning this early would have been to allow

enough time to book guests for such an important historical day, April 27 in Afghanistan's

history.  It was on this day in 1978 when two communist Parties, Khalq and Parcham launched a

coup d'état in Afghanistan.  This date is known as the "Sawr Revolution" which resulted in a vast

uprising and almost 14 years of struggle by Afghan resistance parties, backed by U.S, Britain, France and Saudi Arabia. This day is remembered every year and a call-in show is specified and scheduled along with interviews with substantive commentary on the outcome of that revolution and its impact on Afghanistan to this day. The discussions usually include analysis of economics, international politics, domestic issues and a variety of reflections on the domino effect of the Sawr Revolution in 1987.  It is a very important and meaningful day for Afghan listeners both in Afghanistan and throughout the world.  If Mr. Ibrahim were form Afghanistan and appreciated the importance and significance of this day, he would not have ignored preparing for it, and potentially not even doing a show on this event.

238.    On April 27, 2013, it was Mr. Ibrahim's duty to assign someone to do the "call in show of April 27, (7th of SAWR).  However, he had not held a staff meeting and left the schedule blank. In other normal and routine days it would not be a big problem but on such a historic day leaving the call in show without at least a week of preparation was highly unprofessional and reckless.  Besides it is unfair to the employee who has to compete with those who have had many months or weeks preparing for such a historical day.

239.    On April 27, 2013, Mr. Stanazai was assigned three shift news translation and news casting, but Mr. Stanazai was left with no choice not to do the talk show. Mr. Ibrahim could have arranged this prior to this date, but he did not with the hope that the show will be imposed on seniors, Naseem Stanazai or Zeba Khadem without prior notice.  Mr. Ibrahim did this with the intention to place these two seniors in a compromising situation.  With the shortage of time Mr. Ibrahim was setting an almost impossible situation for them to make a mistake for him to write long elaborate e-mails about how the seniors are incompetent, as he previously has done.

240.     While other media outlets had prepared for this historic day at least a week in advance, Mr. Stanazai had to prepare on the same day. Mr. Stanazai called ten or more qualified individuals on that day with no luck. Ms. Zeba Khadem and Mr. Ashuqullah Rahimzoy are eyewitnesses of this incident.  Zeba Khadem also tried to call a few qualified individuals with no luck. The reason was that almost everyone, worth interviewing had been booked in advance by other broadcasting entities. Normally on such days to book qualified people the program is outlined, and the host and guests are assigned at least a week or ten days in advance.  But whenever there is an opportunity to harass a senior in this particular, harmful and intentional way, Mr. Ibrahim does it.  Here he knew Mr. Stanazai or Ms. Zeba Khadem would end up doing this show and, thus he set it up so that both would fail for sure.

241.     On April 30, 2013 the coordinator Mr. Noor told Mr. Stanazai that the assigned host of the show has called in sick and Mr. Stanazai would have to do the show. Mr. Stanazai did the show at the request of the coordinator on President Karza's trip to Finland, Belgium and Estonia and its political and economic benefits to Afghanistan. Mr. Stanazai's guests for the show were Dr. Saidi from London and Dr. Kochai from Californai, and a historian from Europe.

242.     Soon thereafter, Mr. Ibrahim called a meeting to discuss this show.  Those present in the meeting were Dr. Roshan, Mr. Abid Noor, Ms. Zeba Khadem, Mr. Tahir Achagzai, Mr. B. Shah, Ms. Shafia Sardar and Dr. Mohmand.  They couldn't meet at the conference room, and came back to the office. Mr. Ibrahim discussed the "call in show" of April 30, 2013, which Mr. Stanazai prepared (on the same day without prior notice).  Mr. Ibrahim, unfairly criticized the show that Mr. Stanazai was not in command of the topic, did not do his homework and the guests were not controlled and the issue went to different topics such good governance, security, agriculture and water distribution and Helmand project once built by Americans worth $17

million Dollar.  The issues Mr. Ibrahim was bringing up were only discussed comparatively, by guests while answering questions. The three guests, the host and the callers were fully engaged in the show.  In-fact, by all accounts, it was the most balanced show in terms of presenting different point of views.  During this discussion Mr. Stanazai could tell form Mr. Ibrahim's comments that he had not listened to the show.  When Mr. Stanazai asked him, if he even listened to the show, Mr. Ibrahim confessed that he did not listen to large part of the show but he just listened to five minutes of it.  It was clear that his intention was not discussing the quality of the show, but to harass Mr. Stanazai; to make Mr. Stanazai look incompetent so as to not get ideas of asking for his own show, considering it was clear that he does a better job compared to the current junior host, who is also good friends and cohorts of Mr. Ibrahim.  Mr. Ibrahim also wanted to criticize Mr. Stanazai because he himself even if he had listened to the show he would not be able to follow the sequence of concepts the guests were discussing, because he does not have the background knowledge of the facts or the Pashto language.  The guests on that day were Dr. Kochay a retired Afghan diplomat, and the other was Dr. Saiedi, from London and the other one was a historian.

243.    Recently Ibrahim, on January 29, 2014 wrote a one paragraph Pashto e-mail to Afghan stringers, about how to write intros. It has several mistakes such as adjective, noun agreement in terms of gender (masculine/feminine). The paragraph also had punctuation mistakes.  Mr. Ibrahim, a manager who is hired as part of his job to edit the work of others, is not expected to write like a 6th grader.  Further, in a related matter, Dari and Pashto languages each have at least 40% borrowed words from Arabic and Mr. Ibrahim who is not able to understand this part of the language, for a lack of schooling in the languages, is at a loss and often bullies, harasses and discriminates against the seniors whose language skills are far superior to his own.

244.    Even after admitting that he had not listened to the show of April 30, 2013, Mr.
Ibrahim was still not giving up on his critic of Mr. Stanazai. Mr. Ibrahim said Mr. Stanazai was
misreading the number, such as "2-0-2- 6-1-9-3-1-3-6, i.e. stating each number separately.  He
suggested Mr. Stanazai should have read it in as 202- 619 and 31 and 36. Dr. Roshan Noorzai
said, he believed it was right the way Mr. Stanazai had read the numbers, "we should continue
reading the number separately as it was read." Mr. Tahir Achagzai a senior who was once the
head of Radio Kabul, and with half century of experience, also said Mr. Stanazai has read the
numbers in a correct and preferable manner. (One reason is that the telephone numbers are read
in the same manner in all call-in shows and the other reason is that in Pashto when you pair the
numbers it creates confusion if 36 for example is read as a pair; which is confusing).

245.    Even though Mr. Ibrahim was wrong, he was making it seem as though Mr.
Stanazai had done an unsatisfactory job, when it was clear that Mr. Ibrahim was targeting Mr.
Stanazai.  Mr. Stanazai had not made the mistakes Mr. Ibrahim would have wanted everyone to
believe. Mr. Ibrahim left the meeting without saying a word and was clearly very angry. While
the staff suggested to listen to the show together. All the staff members were stunned by his exit,
leaving without continuing the conversation or concluding the meeting.  His coordinator, Mr.
Noor, seeing his sudden reaction, shook his head and all participants were surprised at this abrupt
reaction to a logical and reasonable solution to a chaotic problem.  Even though the staff
suggested they listen to the show in staff meetings, but this happened, because Mr. Ibrahim
knowing he would be further embarrassed due to lack of his understanding of Pashto language,
did not say make this available, as he should have done.

246.    Mr. Stanazai also suggested that doing a call-in show once in a while puts him in
a disadvantage compared to those who regularly host shows.  They have at least one week to

prepare, book the guests and build repertoire with his/her guest, which is very important to the

flow of the show.  Unlike the junior staff, Mr. Stanazai does not forget names of the guests, or

fail to know the names of the guest and/or cannot recite it correctly.  All these mistakes have

happened in Pashto service call-in shows especially by the junior staff that Mr. Ibrahim insists on

keeping on the radio as the host of all the shows and removing the seniors from having their own

programs.

247.    Mr. Ibrahim's goal is to humiliate the seniors who are forced to step in at that last

moment of chaos created by Mr. Ibrahim to handle what otherwise would be impossible, if not

for their years of experience and expertise.  At the end, although they have done a wonderful job,

even award winning shows, the five complainants are refused their own shows and programing

and their voices are taken off the air.  Although it was common in the past that the shows will be

rotated among the staff and one staff was required to let the other know ahead of time if he/she

was not going to be at work to do the show. Although this has been suggested to Mr. Ibrahim and

also done before, he refuses to allow this type of teamwork between the senior and junior staff.

As a result Mr. Stanazai does not have a call-in show but he is not allowed to rotate on a show

either.  He is only permitted to be a substitute a secondary staff member, because he is a senior

and because he is Afghan.

248.    Mr. Ibrahim, refuses to take any advice or suggestions, he became angry and said

to Mr. Stanazai: "If you have any complaint you need to write and email it to me."  Mr. Stanazai

was forced to back down, for fear of further harm, and said "it is a suggestion for improvement

of the show and to make it easy to perform a quality job, and no one including me should be put

in a surprising and challenging situation without prior notice" and more importantly, the

preparation is simple to do only if one wants to create a balanced and cohesive work

environment.  However, it is not Mr. Ibrahim's intention to have a stable and cohesive work environment, because in such an environment, he would not be able to harass the seniors and force their retirement.

249.    Mr. Stanazai has several times asked in staff meetings why he was removed from being a news editor and why he has not been assigned any call in show.  Mr. Stanazai has suggested to Mr. Ibrahim that instead of putting Mr. Stanazai as a secondary host he can rotate the show every week, for him to stay current.  Mr. Ibrahim did not do that and said it is the decision of the service, decision of "higher-ups" because Mr. Stanazai is a senior employee of the Pashto Service.

250.    Mr. Stanazai brought the issue to the attention of Afghanistan Service Chief Ms. Beth Mendelson, in May of 2010, a few times about his work environment. Mr. Stanazai told her that he had been removed from news editing and shift editor and replaced with Mr. Noor a junior employee with no prior experiences in shift editing and or copy editing. Ms. Beth Mendelson was not responsive. At one point she said that Mr. Ibrahim told her everything is going well with Pashto Service.  She also said be patient things will change, meaning that Mr. Stanazai might have an opportunity at the service if he waits.  But things did not change for the better, it got worse over time.

251.    In 2012 before Ms. Beth Mendelson, Afghanistan Service Chief, left the service, she asked Mr. Stanazai at least twice whether Mr. Ibrahim was copy editing. Each time Mr. Stanazai responded that the question she should really be asking is "whether Mr. Ibrahim is capable of copy editing Pashto translation and adaptation?"  It is an undeniable fact that Mr. Ibrahim and the two others he supports (Ms. Nazrana Ghafar, and Mr. Khalil Khan) have no formal education in Pashto Language.

252.     Starting on or about October, 2010 members of the audience complained that the Pashto language website was/is sub-standard.  Beth Mendelson, Afghanistan Service Chief at the time, was concerned that the mistakes were as a result of not having any one copyedit the news items that were going on the webpage.  However, Mr. Ibrahim did not want to correct this matter on the web since the senior staff are the only ones with the language skills who would be able to do the type of editing required. Thus every time this subject was brought up by listener complaints, Mr. Ibrahim would become very upset and visibly angry.  When this subject was broached during different meetings with Ms. Mendelson, Mr. Ibrahim attacked anyone who stated that copy editing pieces for the web was/is important.  This happened during a meeting where Mr. Ibrahim attached Mr. Stanazai and on a different occasion, Dr. Roshan, who was also asked in several meetings by Beth Mendelson about the editing issue.  Mr. Ibrahim started fighting Dr. Roshan and negating him right there in that meeting. Recently in one of Pashto Service staff meetings sometime in January, 2013 while the new Service Chief, Masood Farivar was evaluating a show and asked who was  copy-editing the news and features, Mr. Ibrahim, much to everyone's surprise said that he is editing but soon it was obvious that he has not done any copy editing for the past 4 years and neither has the junior shift editor, Abid Noor, who has replaced the seniors. It was Mr. Ibrahim's attempt to mislead Mr. Farivar, about his editing skills, as he did Ms. Beth Mendelson, but Mr. Farivar knowing the language, seemed not to believe him.

253.     Mr. Stanazai complained to Ms. Maiwandi on several occasions.  One of the times he complained was soon after November 8, 2012, because Mr. Ibrahim had designated him to be a mere translator and had assigned Mr. Khalil Khan to voice the news Mr. Stanazai had translated.  Mr. Ibrahim had deliberately and intentionally reduced Mr. Stanazai to a simple

language translator and removed Mr. Stanazai's voice from the air.  But Mr. Khalil failed to recite the news properly.  Mr. Stanazai told Ms. Maiwandi that according to VOA tradition and policy anyone who writes or translates a feature or news story, will voice them as well. Mr. Stanazai said Mr. Ibrahim is not supposed to let Mr. Khalil practice in a live show. He should have tested him in a studio. In addition he cannot use him only as a translator, while he could voice his own news stories.

254.     Ms. Maiwandi failed to take action to resolve the discriminatory actions against the seniors. She also failed to take measures to stop Mr. Ibrahim from irresponsible changes in the shows without safeguarding the quality of the shows. Instead she begin to support Mr. Ibrahim and Khalil Khan's resumes, by allowing Mr. Ibrahim to receive the gold medal and calling  Mr. Khan's report " fantastic."

255.     Ms. Maiwandi supported Mr. Ibrahim's discriminatory actions by failing to stop such actions against the senior staff and Mr. Stanazai after he and others reported it to her.

256.     Ms. Ghafar still butchers the pronunciation of certain Pashto and Arabic borrowed words and can draw laughs from those who listen to her. Mr. Farivar, the current Chief of the Afghanistan Service has turned a blind eye to this. When it was brought to his attention by Mr. Stanazai and Mr. Achagzai, he did not remedy the situation or set up any type of filter to stop this from happening.  Mr. Farivar once said it is his job to protect Mr. Ibrahim as well, it is also his duty to protect VOA quality.

257.     Mr. Stanazai was marginalized as a mere translator while, Abid Noor become an editor and Khalil Khan was on the radio reading news he had not even translated (even that was not something he could do successfully).

258.    On a different occasion, Mr. Stanazai complained to Ms. Maiwandi again about a staff meeting where senior employees were compared to old cars and the new employees were called new model cars in terms of the qualifications for their jobs, meeting deadlines and learning new technology. In the same meeting the junior staffs were commenting to each other about how the seniors are slow. This has become the culture of the service where it is accepted by staff and encouraged by the management, to laugh and joke and make fun of the seniors. When a person in a managerial position has any opportunity to harass the seniors, they will, by taking away their shows and reducing them to a single task and harassing them into forced retirement. This type of behavior against the seniors was and still is accepted and perpetuated by management.

259.    Mr. Stanazai also complained to Mr. Maiwandi about misleading statements in staff meetings.  It came to a point when unreasonable claims were being made by the junior staff just to make the senior staff look bad.  For example claiming an unreasonable time to recount how long translations take.  Mr. Stanazai complained about the staff meeting where Ms. Beth Mendelson was present, and where managers tried to discredit the senior employees by claiming that only 30 minutes is enough time to translate ten minute news to be aired. This is untrue and mathematically impossible.  But this false statement was accepted by Ms. Mendelson during a staff meeting.

260.    After Ms. Mendelson, blindly accepted the outrageous claim that junior staff can translate 10 minutes worth of news in 30 minutes, Mr. Stanazai explained to her (Mendelson) that this was untrue and her and managements accepting of this falsehood was creating a split between senior and junior employees and has created a hostile work environment.

261.    Mr. Stanazai explained the whole episode to Ms. Maiwandi as well.  Her answer was "well they are young and energetic and they might be able to do it." While it is obvious that no one can translate 10 minute air time in 30 minutes. The process requires: A. news judgment and selection of the news in terms of a balancing it internationally and regionally, this whole process requires reading of news. B. Translation and summarization in a standard, idiomatic Pashto.  C. Reviewing for clarity and getting ready for broadcasting, preparing headlines and discussion with shift editor for stringer reports and actualities to be used in the ten minutes process. Anyone who is in the business of news casting especially language services who normally translate the news from English into their own language would be laughing at this claim. Mr. Stanazai has explained that it is a simple mathematics "an average newscaster will read between 165- 175 words per minute. Thus a newscaster should be preparing at least a translated and reviewed document of (1,750) words are more.   The news cannot be prepared in 30 minutes as it was claimed by two managers and the service chief Ms. Beth Mendelson.

262.    Mr. Stanazai also complained to Ms. Rebecca McMenamin.  Mr. Stanazai requested a meeting with her on August 7, 2012 and met with her a few days later. Mr. Stanazai complained about VOA hiring practices and that VOA is not considering education and experiences for hiring purposes at the Afghanistan Service, as a result the seniors with education, training, and experience are sidelined, marginalized and harassed in an assortment of ways.  She told Mr. Stanazai "these are strong words that you say that there is discrimination, favoritism and double standard practiced in Afghanistan service."  She said "we cannot undo the past but we will not allow these practices if exist in the future." She promised she would discuss this with VOA Chief Mr. David Ansor. Mr. Stanazai never heard back from her regarding this complaint.

263. Mr. Stanazai requested to meet VOA chief David Ansor, but Mr. Ensor's office said since you have spoken to Ms. Rebecca McMenamin, she will let Mr. Ensor know about the issue. However, Mr. Ansor knew of the circumstances at the Pashto Service, because Mr. Achagzai (another Plaintiff here) had forwarded his e-mail in response to Mr. Ibrahim's false attacks, to Mr. Ensor, to keep him abreast of what was going on at the Pashto Service.

264. David Ensor or his office failed to act further in trying to prevent further harm. Neither Mr. Stanazai nor Mr. Achagzai heard from David Ensor's office. The egregious matter was simply and completely ignored.

265. Mr. Stanazai met with Ms. Barbra Brady, VOA Chief of Staff, on or about October 25th, 2012. Mr. Stanazai complained that the Pashto Service is completely ignoring the hiring procedures in hiring new employees and discriminating against the seniors. Mr. Stanazai discussed the Pashto Service as well as the double standard by Mr. Ibrahim, Editing Manager. She promised Mr. Stanazai to discuss this with the new Service Chief Mr. Masood Farivar. However Mr. Ibrahim's harassing emails targeting Mr. Stanazai and retaliatory practices continued.

266. When Mr. Farivar started as the new Service Chief, he acknowledged that there is a problem in the Pashto service, but failed to resolve the issues.

267. On or about August 2012, Mr. Ibrahim Nasar assigned Dr. Mohmand translation from Pashto into English. Mr. Mohmand had misplaced the translation and asked Mr. Stanazai to help locate it. Mr. Ibrahim saw Mr. Stanazai while he was at Mr. Mohmand's desk helping him look for the piece. Later Mr. Ibrahim cornered Mr. Stanazai and told him that they, seniors, should do their own "stuff." He said "how long you or others (meaning younger staff) will assist them?" Mr. Stanazai told him "If I am asked for assistance I cannot refuse because we

work here as a team." Instead of fostering a spirit of team work he was discouraging a normal act of courtesy amongst colleagues. Mr. Stanazai believes in promoting a spirit of teamwork that will help VOA's mission in better quality programing. It is a manager's duty to ensure a friendly environment but he creates rifts and hostility based on age, country of origin, assignments, and scheduling, on purpose.

268.    The reason Mr. Ibrahim did not want to see Mr. Stanazai help Mr. Mohmand was because that assignment he had given to Mr. Mohmand, asking him to translate from Pashto into English was created and designed by Mr. Ibrahim to harass Mr. Mohmand. Mr. Mohmand is an employee of the Pashto service and every broadcast is from English into Pashto not "vice a versa." Mr. Ibrahim clearly discriminates against the Afghan, Pashtun seniors, whose Pashto language skills are trained and well founded because they are native speakers, from Afghanistan whose language skills are unmatched. There is no reason to assign any of the seniors or Mr. Mohmand or Mr. Achagzai to translate into English. But since the junior staff cannot translate into Pashto, Mr. Ibrahim was forcing the seniors to translate into English, while the target language is Pashto. Ibrahim knows this and he intentionally harasses the seniors and tries to force them into retirement. This is his goal. One can never find assignments such as news translation for Abid Noor, Nazrana Ghafar, Noshaba Ashna and Khalil Khan, and Shafia Sardar, on the schedule. While all these individuals are GS-12 and news, feature translation is one of the main duties of this grade. Since VOA Afghanistan Service is in the business of broadcasting, obviously "news casting" is one of the main tasks, but these individuals are not assigned a main task Mr. Ibrahim.

269.    On or about middle of March, 2012, the service was short staffed and required some changes in the assignments. For one day, Mr. Stanazai changed Ms. Zeba Khadem from a

producer to MC and Mr. S. Shah to producer.  But Mr. Ibrahim Nasar changed it back while the team was on their way to the studio.  Mr. Ibrahim wanted to force Ms. Khadem into production. He considered Mr. Stanazai's decision to change assignments as a way of helping Ms. Khadem, but missing the real point, and not understanding that the only concern the team had on that day, was to have a smoothly run show.  The change was necessary because the schedule was not working it was irrational and specifically designed to harass the seniors and to ruin the VOA shows.

270.    Mr. Ibrahim has never cared for the quality of the show, so long as reaches his goal to marginalize the seniors and force them into retirement. There was a time that Ms. Maiwandi justified, Noshaba Ashna's hiring part time based on a need for a female voice. She hired Ms. Ashna without any exam or voice testing.  But in our current schedule, Mr. Ibrahim has four females (Ms. Noshaba Ashna, Ms. Nazrana Ghafar and Ms. Shafia and Ms. Zeba) on Friday, Saturday and Sunday during the day shift.  Mr. Ibrahim could have rotated some of these female voices for the evening programing but he does not care. As a result evening shows are aired with all male voices.  But no matter what kind of in competencies Mr. Ibrahim demonstrates, in destroying VOA quality, there is no one to care.  Mr. Farivar is well aware of this schedule.

271.    Mr. Ibrahim reduced assignments and made changes in the schedule as a form of retaliation against the seniors without considering the needs of VOA programing.  For example it does not make sense to schedule the seniors for production. Based on their qualifications, and VOA needs they should be scheduled as shift editors and desk editors.  But he assigned seniors to production, because he was taking the seniors' voices off the air and marginalizing them in the service as a form of harassment to force them into retirement.

272.     Management changed Mr. Stanazai and other seniors' annual evaluations.  The language in the evaluation is vague and would allow the managing editor to give better evaluations to those younger staff that he favors and give poor evaluations to the senior employees.

273.     The changes in the evaluations were done in secret the seniors were not told that the changes had been made. Trainings was not offered based on the changes that were made, but the seniors were expected to meet the requirement, nonetheless.

274.     Mr. Stanazai asked about getting training, Mr. Ibrahim said "slots are limited a young employee who got training will train you."  The changes made in the evaluations were designed to show seniors' weaknesses, resulting in poor evaluations.  These changes were brought about after the senior staff started complaining about harassment and discrimination.

275.     Further the evaluation also includes a category requiring translation from English to Pashto and also from Pashto to English.  This is a category that is unusual because they rarely have these types of assignments, unless this area is added to simply harass some of the senior employees that Mr. Ibrahim wants to target.  The new evaluation would harm all the seniors' scores.  It was specifically designed to harass seniors. Again, some juniors who still cannot perform the main tasks of the grade (GS12) they hold were not required to do translation and adaptations from English into Pashto. This is example of the double standard and discrimination against the seniors.

276.     Mr. Ibrahim used this new category 'translation from Pashto into English' against Mr. Stanazai and other seniors.   On February 5, 2013, Mr. Stanazai was told to translate 3 minutes audio from Pashto into English in 20-30 minutes. Mr. Stanazai simply told him "I need more time for this assignment" because he had three more assignment on this day, a U.S. press

review on Afghanistan and two production and two logs to be completed. Mr. Stanazai had

simply asked for more time. Mr. Ibrahim deliberately and intentionally misinterpreted this to the

new Pashto Service Chief as denial of assignment and wrote an email about it.  It is a common

practice to negotiate time of the assignment, especially if it is an extra unplanned assignment

added to the rest of the work load. Mr. Stanazai has always done extra assignments for VOA,

namely simultaneous translations for Ashna TV, (Pashto and Dari) for the Past 7 years along

with his daily job, and there is no question of whether he was capable of doing the assignment.

When he tried to negotiate some additional time for an assignment designed to harass him, Mr.

Ibrahim made sure that he could get as much negative press as possible against Mr. Stanazai, by

informing the chief of the service and pointing fingers at Mr. Stanazai.  This was Mr. Ibrahim's

plan.  His goal was to harass and harm Mr. Stanazai over this task.

   277. Mr. Ibrahim discriminated against Mr. Stanazai and the other Plaintiffs, based on

their nationality.

   278. Thos junior employees who are from Pakistan as is Mr. Ibrahim are given more

opportunities.  Management mostly ignores the shortcomings of Mr. Khalil and Ms. Nazrana

Ghaffar, both from Pakistan.  Mr. Ibrahim has assigned Mr. Khalil as a shift editor.  Mr. Ibrahim

gives them both privileges, such as giving them shows, sending Mr. Khalil Khan on trips and

additional privileges on a daily basis.  When it comes to the Pakistani staff of the Pashto servive

Mr. Ibrahim overlook deadlines and translation mistakes as well lack of language skills.  Both

these individuals were not required to take the Pashto language test. These tests were waived

because they were hired at GS 12.  In return for Mr. Ibrahim's favors, he expects Mr. Khan and

Ms. Ghaffar to support him in his discrimination of the Afghan seniors in the Pashto service.

While at the same time, the senior Afghans are marginalized and pushed out of the service,

harassed, blamed and used as scape goats for the mistakes of others, all while their schedules are changed and manipulated in an effort to set them up to fail.

279.    Both Nazrana Ghaffar and Khalil Khan were introduced by Beth Mendelson to the service as professional journalists with a strong radio background, who would be an asset to the service and bring much needed new help to the high volume of work.

280.    However, since Ms. Ghaffar did not have the language skills necessary for this job, Mr. Ibrahim who had helped hire her, assigned her to a music show in which she selected a few young Pakistani singers and played the songs.  For sometime there was no Afghan music in her programs. Ms. Ghaffar was favored because of  her national origin although her language skills in the Pashto spoken in Afghanistan was and still is not at the level which can go on the air from the Voice of America.  The listeners who had been brought up listening to Ms. Khadem, Mr. Stanazai, Mr. Achagzai, Mr. Shah, and Mr. Mohmand expect more from this service -- a broadcast of the United States, particularly during this pivotal time of US, Afghan relations.

281.    Hiring these two individuals is intentional otherwise based on Washington Post and Guardian's reports there are thousands Afghans, young and qualified in the US who in recent years, served the US military as linguists.  Ashiqulla Rahimzoy and Hasib Alikozai are the best examples. And dozens of them are still looking for such linguistic and journalistic jobs that Mr. Khan and Ms. Ghafar are still not able to do professionally.

282.    In August, 2012, Mr. Ibrahim nominated himself for the yearly gold medal award. Mr. Khan campaigned for him during official time to get others to vote for Mr. Ibrahim, for him to be awarded the gold medal.  Mr. Khan spent almost 4 hours campaigning hard.  Mr. Stanazai saw him, as he spoke with Mr. Khawreen, Mr. Mohammdi, Mr. Roshan and a few others including Mr. Stanazai.  Later in October 2012, Mr. Ibrahim was in fact awarded the gold medal,

approved by Maiwandi , when four senior employees had a standing complaint of age discrimination, retaliation, harassment, hostile work environment, and more against him.

283.     As a manager Mr. Ibrahim, used four hours of Federal government time permitting Mr. Khan's campaigning for his personal use. Stealing federal government time for personal benefit is a offense that one can be fired upon committing.

284.     In return for Mr. Khan's great support, and his everlasting dedication to Mr. Ibrahim's ongoing attack on the seniors, he was awarded.  On or about the week of Sept. 22-23, 2012, Mr. Ibrahim sent Mr. Khan to New York, to cover UN meetings. Again a staff meeting was not held, it was never mentioned in a staff meeting, and no one was aware of this trip by Khalil Khan.  Mr. Khan was sent for coverage, while by most accounts he is a reporter who fails his assignment on a daily bases in terms of quality and accuracy of writing and pronunciation.

285.     Mr. Ibrahim Nasar misled the higher management when he gave a recommendation to hire Mr. Khan and Ms. Ghaffar at the Pashto Service at GS-12.  Mr. Ibrahim falsely recommended them on federal form forms that Mr. Khan and Ms. Ghaffar were experienced journalist, while he knew that this was not true.  There  is no other justification except they are   hired mostly because they are from Pakistan and they are young, while many other Afghans and Afghan Americans had applied for these positions, but were denied.

286.      Upon information and belief, one of the junior staff failed the required Pashto language test, when she tested for Mashal radio in Prague, before being hired at VOA as a GS-12.

287.     On Tuesday, November 8th, 2011 Mr. Ibrahim told Mr. Stanazai that when he finished the news translation, he should gave it to Mr. Khan for news casting.  It is unusual, because everyone who is a news caster will translate the news, but he/she will be assisted by the

editor for copy editing.  Mr. Ibrahim wanted to use Mr. Stanazai as a translator and allow Mr.

Khan to broadcast the news, get all the credit. When they went to the studio Mr. Stanazai was

excited to hear what, according to Mr. Ibrahim "a strong journalist" such as Mr. Khan, will do? It

was a complete disaster.  He made almost 7 to 10 mistakes in the first moment and 15 seconds.

288.    Mr. Ibrahim blamed Mr. Stanazai for the mistakes by Mr. Khan, by saying that

Mr. Stanazai gave Mr. Khan a long news piece to read.  He turned toward Mr. Stanazai and

asked "who has given him such a long news piece?" Mr. Ibrahim once again wanted to put the

blame for Mr. Khalil's incompetency in reading news on a long news piece or perhaps personally

blame Mr. Stanazai. "Sir, the news should be ten minutes long" Mr. Stanazai said: "let us see

what he will do in the rest of nine minutes."  It was a disaster resulting from Mr. Ibrahim

intentional discrimination against Mr. Stanazai to keep him from going on the air to read the

news.

289.    When everyone returned to the office, after the 12:30 PM show, Mr. Ibrahim

called  Mr. Noor, and Dr. Roshan, to tell them "Do not assign Khalil to read live news, he wants

to focus on other assignments."  The two shift editors did not know the story behind this

decision.  Mr. Ibrahim made it seem as thought Mr. Khan, wants to focus on other more urgent,

important or pressing assignments, which was not true, the real reason was that he could not read

the news. Mr. Ibrahim put a positive spin on his own failure and Mr. Khan's failure.  Mr.

Ibrahim was glossing over the mistakes and instead of  putting him on coaching to work on his

reading and translation skill, he put a positive spin on it and allowed him to focus on other plum

assignments, such as coverage and interviews with  English speaking scholars, thus excluding

Afghan scholars and Poshtun scholars.

290.     Since this distortion of facts was highly manipulative and unfair to the senior staff, who were being targeted, Mr. Stanazai was upset and the next day went to Ms. Maiwandi's office early in the morning.  Mr. Stanazai explained to her what happened in the studio. Mr. Stanazai told her Mr. Ibrahim will not put Mr. Khan in coaching to work on his news-casting skill, instead assigned him other tasks. "Is that so" she expressed with a surprise. She said "well what can I do, it is his job, I do not know what she is doing" referring to Ms. Mendelson, as if she hired him.   Mr. Stanazai was surprised by her remarks, because Ms. Mendelson was the only one who could potentially be misled because she did not know the language and according to Ms. Ghaffar she was interviewed by Ms. Maiwandi in Pashto.  Ms. Maiwandi was putting blame on Mr. Mendelson, who had relied on Ms. Maiwandi and Mr. Ibrahim, both of whom had likely mislead her and were now blaming her.

291. Ms. Maiwandi failed to investigate and stop claims of discrimination.  She failed to stop Mr. Ibrahim and Mr. Khan from damaging VOA further. If she wanted to know she could have easily found out that VOA news casting was downgraded. She could have taken proper measures to save further damage. In recent review of Afghan service, it is rated below Kabul radio. While once it was second only to BBC. She absolutely did nothing to stop further damages inflicted by Mr. Ibrahim.

292.     Mr. Ibrahim Nasar continues to favor Mr. Khan and Ms. Ghaffar and help advance their careers. He assigned Mr. Khan to shift editor on the schedule of 02/25/2013, while he removed Mr. Stanazai completely from the schedule as a shift editor.  Mr. Ibrahim continues to mislead upper management by providing them false impression that Mr. Khan can do his job better than any other employees especially seniors.

293.     On July17, 2012 Mr. Ibrahim sent Khalil Khan to cover "Afghanistan the first country mapped using broad scale Hyperspectral Data" by Aklil Hakimi and some other experts at the Afghan embassy in Washington DC.  Mr. Khan was assigned to cover the conference and make a three minutes report, in Pashto language.  He had 8 hours for this three minutes report. But he did not prepare the report until Friday July 20, 2012, during the evening show which airs in Afghanistan on July 21, 2013.  Mr. Stanazai was the shift editor on that day, he simply let the report go on air as a filler because it was about five days old.  By that time Ashna Radio Dari and TV Dari and Pashto has aired it along with other radio stations and the written report in Pashto appeared in several websites. The report was full of mistakes and included many English words not translated but transliterated.  Ms. Maiwandi wrote back calling the report "a fantastic report" and asked Mr. Ahad Azizzada (Managing Editor of Dari Service) to air the same report.  But Mr. Azizzada replied with that they had covered the event on Wednesday 7/18/12.  He stated that "the information of our coverage were shared last Tuesday and Wednesday with Afghanistan service and South Asia desk. The lady in charge at the DOD called yesterday late to thank Ashna TV for the coverage …" This is one example of how the mistakes are glossed over by management.  Here Mr. Azizzada was forced to tell Ms. Maiwandi that this "fantastic" report had already been covered by his service and much better too.

294.     Ms. Nazrana Ghaffar still cannot pronounce Pashto words while assigned as an MC.  She specially has problems with those words in Pashto that are borrowed from Dari or Arabic, thus by mispronunciation she changes the meanings and renders a sentence vague and meaningless. Mr. Ibrahim has forgiven these shortcomings because she is from Pakistan.  Mr. Ibrahim has targeted the seniors because they are from Afghanistan.  Mr. Ibrahim Nasar will come down very hard on a senior in public, and cause great harm and humiliation to a

defenseless senior Afghan employees, simply because he wants them to leave their jobs at the

Pashto Service.   He prefers Ms. Ghaffar and Mr. Khan (examples of younger staff from

Pakistan) to stay and be promoted, thus he treats them with great benevolence and reassurance.

He also places them in positions that will promote them and advance them over the senior staff.

295.    Most of the junior staff are favored with plum assignments, such as interviews,

music shows, and other soft topics that do not require any preparation, and production. They

were spared from news casting, and translation of news stories, features and other complex

material. These are critical skills required for GS 12. They still have very little skills in this

category.  The schedules are proof that they are rarely assigned to news translation and news

casting because it requires language and translation skills that they do not have.  Mr. Ibrahim

favorably changed the assignments of other younger.

296.    Mr. Ibrahim uses emails to target the seniors based on unfounded reasons. He has

sent Mr. Stanazai numerous emails in this category.

297.    On February 5th,  2013 Mr. Ibrahim sent another e-mail accusing Mr. Stanazai  of

refusing to an assignment, subsequently they met with Mr. Farivar (Chief of the Afghan service)

who on February 6th 2013 met with them and decided that the allegation was unfounded.

298.    Mr. Stanazai's schedule has been abruptly changed multiple times with in one

week or even during one day.

299.    Mr. Ibrahim targets the senior with surprise assignments, setting them up to fail.

For example Mr. Stanazai was assigned to cover President Obama's speech on Martin Luther

King day, 2013.  This historical event is planned well in advance and Mr. Ibrahim could have

assigned it in advance, but he waited until only an hour or so before the speech to assign Mr.

Stanazai who was scheduled to do a simultaneous translation for the Dari service.  When Mr.

Stanazai went for coverage, he was not able to get in because of heavy security surrounding President Obama's speech.  Again Mr. Stanazai was not able to fully complete the assignment because of Mr. Ibrahim's lack of preparedness and forceful harassment of the senior staff, including Mr. Stanazai.

300.     Management failed to adequately respond to Mr. Stanazai's complaints of being harassed, discriminated and retaliated against.

301.     Management instructed younger staffers not to help the senior staff members.  Mr. Ibrahim told Mr. Rahimzoy and others not to help the senior staff.  Mr. Ibrahim Nasar was not only instructing younger employees not to assist older employees but he was frowning on seeing anyone helping a senior, even another senior. In March of 2012 Mr. Stanazai tried to change Ms. Khadem assignment for that day to make sure she performs MC job rather than being a producer, but Mr. Ibrahim immediately changed it back while they were going to the studio for the show only a few minutes before the show.  Also, when Mr. Stanazai was looking for an assignment for Mr. Mohmand, Mr. Ibrahim told Mr. Stanazai not to help a fellow senior, trying to cause a rift amongst the group of seniors.  Mr. Stanazai has also told multiple younger staff, such as Mr. Ashiquillah Rahimzoy and others to stop helping the seniors, and if a senior asks for help to report them to management.

302.     The harassment, affects Mr. Stanazai's physical health, his mental health, and his confidence in his job.  Mr. Stanazai started considering leaving this job and this placed unspeakable stress on him.  He was not able to function in the same way he had always been. Mr. Stanazai was harmed and damaged by these actions.

303.     Notices to upper management always went unheard and nothing ever changed by way of putting a stop to harassment of the seniors.  Mr. Stanazai reported this event to Ms.

Maiwandi, and explained to her the preferential treatment of new employees verses senior employees.

304.     During one of the first meetings held by Mr. Ibrahim as Managing Editor, he stated "I am the law" to the seniors who were discussing or debating their schedule, as that is what the meeting was designed to do.

305.     Mr. Stanazai was again targeted on August 28, 2013. Mr. Stanazai was targeted and retaliated against by being set up to fail in his coverage of the President Obama's speech on Martin Luther King and failing to give him advance notice to cover the event, an event that had long been planned.

306.     Mr. Ibrahim refuses to keep the seniors informed.  He fails to inform them of who is on leave and who is covering events.  This leaves the seniors, who he has marginalized into standby to be wondering, what it is he or she is supposed to be doing each day they come to work.  For example, during the months of November and December 2013, Abid Noor was on leave but Mr. Ibrahim did not send them an email which is customarily sent to inform the team who will be doing their assignments.  As a result Mr. Stanazai happened to be doing almost four days of news casting and news writing.   When Shafia Sardar was on leave, Mr. Ibrahim did not send any email assigning her show to someone that can prepare for it a head of time.  As a result Zeba ended up doing the show in the last minute on Saturday, January 4, 2014.

307.     While Mr. Stanazai has a proven record  of news casting, he has removed him from news casting, and assigned me to be MC.

308.     Mr. Stanazai's schedule has been changed four times in the past few years, but Mr. Ibrahim keeps his favorites such as Abid Noor on the same schedule as of April 2010.

309.    Mr. Farivar promised that schedules will be made by the team and Mr. Ibrahim would approve it.  This has not happened in the last schedule of February 2014, and the one time it did happen, when the staff helped make the schedule, as far as Mr. Stanazai is concerned, Mr. Ibrahim changed it back to achieve his discriminatory ends.  In the service, it used to be that news casters were given the days of their choice or they were rotated if two employees wanted to have the same days and assignment.  The un-wanted schedules were rotated in order to be fair and to eliminate favoritism.  This is not what Mr. Ibrahim does,  he does the opposite by targeting the seniors in the schedules.

310.    On August 19, 2013 in the first 3.5 hours while Mr. Stanazai translated 1700 words from English into Pashto. Abid Noor copy pasted only two "intros" with so many grammatical mistakes that they would need to be re-written. When Mr. Stanazai and Ms. Khadem asked him why "are you copy pasting Stringers intros, full of factual mistakes, and errors in terms of grammar, you are imposing this on MC to edit there in studio" he said I told Mr. Ibrahim "the stinger is supposed to send me a correct and full report if they do not I cannot fix it from here." This was his response.  When creating the schedule Mr. Ibrahim only uses his favoritism and ignores who is best suited for the job and for how long, and ignores fair distribution of the work load.

311.    Noshaba Ashna  is assigned to do the call-in show. When she was on leave on August 19, 2013 instead of assigning Mr. Stanazai to do the her show, Mr. Ibrahim assigned Ashuqullah Rahimzoy to cover for her removing him from the news.

312.    Mr. Stanazai's copy of news file was 3170 words, Mr. Ibrahim's supporters had not even produced 40% of their air time, still Mr. Stanazai was not permitted to do the call-in-show.

313.    Scheduling is supposed to meet VOA programing needs, and distribute equal work load as much as possible between the employees. VOA needs almost all employees to be able to do any critical skill related assignments, such as news-casting, news selection and translation at least for ten minutes of air time. To this end employees should have schedules that give them opportunities to do assignments such as interviewing, call-in shows, production and news-casting and news translation. Well rounded staff is needed because most of the time when there is shortage of staff these individuals can perform any assignment necessary.  However, Mr. Ibrahim's schedules only reflect his harassment of the senior staff.

314.    Mr. Ibrahim makes every effort to isolate seniors by pushing them only to translation oriented tasks. For example, on August 26, 2013 there were six employees on the schedule that day: Abid Noor, Zeba Khadem, Hasib Alikozay, Ghorzang, Ashiqullah Rahimzoy and Mr. Stanazai.  Mr. Ibrahim assigned two individuals to do only thirty minutes production: Abid Noor, and Ghorzang.  But he assigned Naseem Stanazai to select, summarize and translate 7-10 minutes news, ranging around 1700 words along with a correspondence report from Islamabad by Ayaz Gul about President Karzai trip to Pakistan.

315.    Mr. Stanazai's schedule has been changed more than three times and now on a weekly and daily basis and whenever anyone who is absent there is an excuse for Mr. Ibrahim to change Mr. Stanazai or the other senior's schedules.

316.    Mr. Nasar is making every effort to sabotage the news writing and copy editing process at the Pashto Service.  He does not allow Mr. Stanazai to do his work based on his schedule, regardless who is not coming in to work. Mr. Ibrahim simply assigns Mr. Stanazai no matter what he is assigned on the schedule. If a newscaster is absent it will make sense Mr.

Stanazai covers for them, but Mr. Ibrahim assigns the programing to others and sabotages the schedule.

317.     When Mr. Stanazai informed Mr. Farivar, about the changes on the schedule and showed him examples of the logs, he said in a next meeting we will openly discuss this.  Mr. Farivar also said "it is my job to protect Ibrahim, we need to accept this."  Mr. Stanazai told him, "it is also your job to be fair to the rest of the team and work load should be fairly divided among the employees."  Mr. Farivar also said "yes this is also his responsibility" and he does not want to know "that some people are not working."

318.     While Mr. Farivar knows about Khalil Khan's lack of ability in translation. Mr. Tahir Achagzai provided him with numerous intros of Mr. Khan's translation, which is at times at a very elementary level in terms of spelling, usage and choice of words, Mr. Farivar still agreed to detail Khalil Khan to Ashna TV, for over three months, ending on April 9, 2014.  This shows management's lack of credibility in allowing this to continue while at times pretending that they understand the level of incompetence that some of the junior employees have.  While Mr. Khan and Mr. Ibrahim are uniting their efforts to forge a resume for him that he has worked in Radio and TV, thus he is more qualified to stay and someone else should be terminated when the work force reduction is implemented.

### BACKGROUND FACTS
### Mr.  Syed B. Shah
(Attached Exhibit: Broadcasting Board of Governors Report of Investigation
& Exhibits Case Number:  OCR: 13-05)

319.     Plaintiff repeats and re-avers each of the foregoing paragraphs as if they were specifically restated herein.

320.    Mr. Shah is an International Broadcaster (GS-12) at Voice of America (VOA). He is assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.

321.    Mr. Shah has been an International Broadcaster at VOA for the last 32 years.  He was hired as a Purchase Order Vendor (contractor) in 1983 and was promoted to full staff in June 1989.

322.    Mr. Shah was hired at the Pashto service only a couple of years from its inception and has had a leading and critical role in helping establish Pashto language programing.  In fact, Mr. Shah has been dubbed the golden voice of VOA Pashto broadcasting.

323.    Mr. Shah is 66 years of age, (DOB: 9-04-1947).  He is a naturalized United States citizen who is originally from Afghanistan and is a native Pashto and Dari speaker, two of the main languages spoken in Afghanistan.

324.    The requirement for an International Broadcaster (GS-12) at the Pashto Service is fluency in both Farsi and Pashto languages that are spoken in Afghanistan.  Plaintiff's duties include; Editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CRs, backgrounders, editorials, press reviews and feature programs.

325.    Mr. Shah has never before brought a claim against VOA or any other employer.

326.    Plaintiff's immediate and second level supervisors, managers or persons responsible for his work assignments, as well as management during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.    Mr. Mohammad Ibrahim (Nasir or Nasar) is the current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.   Mr. Ghilzai Amanullah, was former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

c.   Ms. Beth Mendelson, was the former chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from  August 2006 to May 2013;

d.   Mr. Masood Farivar, is the current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

e.   Ms. Spozhmai Maiwandi, GS-15, was the former, Director, South Asia Division, who held this position from 2007 to April 2013;

f.   Mr. Ismail Dahiyat, is the current Director, South & Central Asia Division.

327.   Plaintiff, has been deliberately, maliciously, and constantly targeted by management to force him to retire and leave his job of 30 years, when Plaintiff refused to succumb to the hostilities and discriminatory acts based on his age and national origin, he has been and continues to be discriminated against and subjected to a hostile work environment, and in reprisal for reporting harassing behavior.

328.   Mr. Shah has been and is continuously discriminated against and subjected to a hostile work environment, based on his age (09-04-1947) and in reprisal for reporting harassing behavior starting 2010 and ongoing.  His supervisors began subjecting him to acts that made productivity nearly impossibly and which prevented him from being able to successfully perform his duties, including: taking away assignments; switching up his assignments; removing him from his position as shift editor; assigning him tasks that are beyond his job, such as production; assigning him jobs for which he is not trained and for which he has not received formal training; failing to send him to training; failing to give him the necessary training; failing to provide him with adequate training; excluding him from training; humiliating him by making false accusations against him; treating junior  staff more favorably by offering them computer training, a variety of assignment privileges, covering up their mistakes and promoting them regardless of their lack of language skills  and constant mistakes; failing to provide him with the proper

equipment to perform his job; failing to provide him password for Dalet Plus; affirmatively, maliciously, and intentionally instructing junior staffers not to help him or the senior (aged) workers; telling him he should retire; and changing his performance standards to justify a lower rate of performance; changing his yearly evaluations in reprisal to his complaints without telling him; failing to provide him copies of his evaluations; failing to respond to his e-mail inquiry and in person follow-up about his yearly evaluations; ignoring his request for help; ignoring his notices of discrimination, reprisal, harassment and hostile work environment; falsely giving him information about the closing of the Pashto Service; putting a gag on his work related e-mails; exposing him to his manager and co-workers in a group meeting that he is a complainant, a troublemaker; excluding him from meetings; not including his input with scheduling; not acknowledging him in public.

329.    Mr. Shah's annual evaluations for the last 31 years have been stellar.  He is a journalist known for his integrity, expertise in the Pashto language, and most notably for his even temperament and professionalism, patience and commitment to the team of professionals and journalists with whom he has worked in the past three decades.  His most notable feature is his golden voice as recognized around the world and by VOA's management (up until the time when management decided to target him in effort to force him to retire, by making his work environment hostile, by harassing him, by discriminating against him all in an effort to replace, Plaintiff and other senior Afghan staff members, with junior staff from Pakistan).

330.    Mr. Shah was promoted to Evening News Shift Editor on or about 2002. However, after he was targeted for forced retirement,  his position of evening reports editor was reduced and his duties were transferred to a junior employee, Mr. Ashiqullah Rahimzoy, whose

is thirty two (32) years of age and also a relatively recent hire of sometime after 2005, as well as a contractor (Purchase Order Vendor).

331.    Upon information and belief, Plaintiffs' last two Managing Editors, Mr. Ghilzai Amanullah (former) and Mr. Mohmand Ibrahim (current Managing Editor) are from Pakistan.

332.    Upon information and belief two of the relatively new staff members hired, Mr. Khalil Khan (age, 35) and Ms. Nazrana Ghaffar (age, 34) are from Pakistan.  They have been favored consistently by management based on their national origin and their personal relationship with the current Managing Editor, Mohmand Ibrahim.  Although they lack the necessary core language skills (Pashto language and Dari language) necessary and required for their job as an international broadcaster in the Pashto Service, they have been given privileges, plum shows and assignments, and they have been hired at GS-12, thus not required to take the Pashto language test.  This test is not necessary for GS-12, simply because those hired at this grade must already have the requisite requirements for the language and solid evidence that they are able to do their job.

333.    Similar to Mr. Khan and Ms. Ghaffar, who lack the necessary language skills amongst the incompetent junior  staff continue to replace senior staff, in a deliberate and clear effort by management to harass the senior staff and create a hostile work environment as to discriminates against the older Afghan employees, and intentionally and with malice force them to retire.   Once the seniors have been forced to retire, the managers would have succeeded in making room for more of their own friends and those who are also from Pakistan (not from Afghanistan), similar to Mr. Khan and Ms. Ghaffar. Meantime the senior staff have suffered through great deal of harassment and have worked in a employment environment that is hostile

and discriminatory towards them.  As a result their physical and emotional health has been

compromised.

334.    Ms. Ghaffar was hired at VOA, GS-12, with management waiving the Pashto

language test and hiring her, and possibly other members of the staff, at a higher grade.  Once

hired they were treated to her pick of assignments and shows, given accolades, at which point

they took over shows that had been run by seniors for years, whose voices were synonymous

with the shows.  Rather the seniors were transferred to production duties, duties that were not

part of their job assignments, and relegated to mere translator, or a standby or substitute or

anyone who was not at work.

335.    Beginning in 2010 and and ongoing, Mr. Shah's supervisors began subjecting

him as well as other senior staff in the Afghan services to heightened levels of discrimination, to

acts that made productivity nearly impossible and which prevented Mr. Shah from being able to

successfully perform his duties, including.  Also Mr. Shah was removed him from his position as

editor at first and later once he complained he was given a token day of editorial responsibilities.

However, while Mr. Shah was the editor, he was ignored by the Managing Editor who went over

Mr. Shah's responsibility and communicated with the staff directly as though there was no editor

on shift for that evening.  The Managing Editor, Mr. Mohmand Ibrahim intentionally ignored

Mr. Shah as the shift editor to harass him that evening.

336.    Plaintiff was subjected to constant humiliation by his Managing Editor and when

he made complaints or gave notices to management, at best his complaints were ignored, or

management told him to retire and at worst management simply retaliated against him by putting

a gag on his work related e-mails and exposing him to his co-workers as one of the complainants.

All of these actions were designed to maliciously and intentionally force Mr. Shah to retire from a job that he had held for over thirty (30) years.

337.    Plaintiff's Managing Editor created inaccurate and accusatory emails regarding Plaintiff's performance.

338.    Plaintiff's Managing Editor deliberately and intentionally interfered with Mr. Shah's ability to successfully prepare and deliver the reports, by giving him assignments for which the manager knew Mr. Shah had not been trained.  For example Mr. Ibrahim assigned Mr. Shah to be on production and handle the phones for a live call-in show.  Mr. Shah had not been trained in that task. When Mr. Shah explained this to his co-worker, Mr. Roshan Noorzai, Mr. Noorzai volunteered to either go in his stead or to train Mr. Shah, something to which the Mr. Ibrahim agreed.  However later Mr. Ibrahim humiliated Mr. Shah, in front of his colleagues by pointing at him and telling him that he must go and be on the phones, regardless of his lack of training.  The manager did this in public and with malice to humiliate Mr. Shah, knowing Mr. Shah is a mild mannered and considerate person who would not want to get into a verbal altercation by reminding the manager that only moments ago he had agreed to allow Mr. Shah to complete his own assignments and permit Mr. Noorzai to be on the phones.  Mr. Noorzai had verified that he was not busy at that time and had completed all his tasks and was idle at the time when he would be able to help out on the phones, and also help train Mr. Shah.  But the manager did not want Mr. Noorzai to help.

339.    Upon information and belief, Mr. Ibrahim, the Managing Editor told several of the junior staff not to help the senior staff.  He said this to Ashiqullah Rahimzoy who later told Mr. Shah that he was told by management not to help the seniors.   Mr. Ibrahim also told Mr. Stanazai (himself a senior) not to help other seniors.  Mr. Ibrahim also told several other junior

employees not to help the senior staff.  This is especially damaging since he sent the junior staff for computer training, such as Dalet Plus and the senior were required to rely on the junior staff, but could not because Mr. Ibrahim also told the junior staff that if the senior staff asks for help to report them to him, as though it was a crime.  As a result the senior staff suffered in performing their duties.  This was especially harsh since running a radio station is a team effort, particularly when every senior helps the junior staff anytime and all the time, because news is a team effort.

340.    Upon information and belief, Mr. Ashiqullah Rahimzoy, who became a witness to the harassment and discrimination and who admitted to Mr. Shah that he had been told by Mohammad Ibrahim not to help the seniors was later influenced by management so as to stop him from telling the truth about Mr. Ibrahim's directions to him.  Sometime in January or February 2014, Mr. Ibrahim, permitted Mr. Rahimzoy to work double shifts before Mr. Rahimzoy traveled overseas to help him get paid for shifts.  In the new schedule Mr. Rahimzoy is again favored again in his assignments, to prevent him from speaking out against Mr. Ibrahim.

341.    Upon information and belief Ms. Maiwandi, told Mr. Rahimzoy that she would help him get a translation job at the State Department.  She promised him that she would use her contacts at the State Department to get him the assignments.  These assignments are well paid and competitive and Ms. Maiwandi's purpose in making such promises was to influence Mr. Rahimzoy as a witness.  In fact, Mr. Rahimzoy was eventually preferred over other applicants by the State Department and hired for contract translation jobs.  Both Mr. Ibrahim and Ms. Maiwandi arranged to give more opportunity to Mr. Rahimzoy for making additional income to influence his eyewitness testimony.

342.    Plaintiff's Managing Editor made unreasonable demands, such as the use of a male voice when no males were available during that shift.  These critics were designed to point

out incompetence and inability in Mr. Shah's work product. This was a farce created and pursued by management to create a hostile work environment forcing Mr. Shah to retire.

343.    When Mr. Shah and other seniors complained they were told by Director of South Asia Division, Ms. Maiwandi, to "retire" or even further she told him, that the Pashto language service was "closing anyway" and there wouldn't be any point in continuing his job, knowing full well that the Pashto language service would not be shutting down anytime soon when American troops were in Afghanistan and that the Pashto language programing was of great importance to United States success in Afghanistan.

344.    Plaintiff's manager, Mr. Ibrahim harassed him and rather than engaging with Mr. Shah to go over assignments or possible changes in assignments he would send junior colleagues who lack the authority to make such changes, inform Mr. Shah and other senior employees, of assignment changes, for example, that Mr. Shah would be working as a producer that day.

345.    Plaintiff's Managing Editor, Mr. Ibrahim bombarded him with assignments, making it impossible for him to complete them all in the allotted time.  Mr. Ibrahim ignored the fact that other non-senior staff members were available to do the assignments.  Plaintiff's manager instructed junior  staff members not to help the seniors.

346.    Plaintiff's managers changed his performance standards and annual evaluations in secret without informing him, or any of the other seniors who are party to this suite, of the changes.

347.    Plaintiff's performance evaluations were changed on or about 2011-2012.  The changes were made to target Plaintiff and designed to harass the seniors and force them to retire from their jobs.

348.     Plaintiff's performance evaluations were changed on or about 2011 to target him (and other seniors in his circumstances, party to this complaint) in retaliation for having complained about harassing behavior by management.

349.     Plaintiff's managers failed to provide him a copy of his previous annual evaluation.  Plaintiff's Managing Editor, Mr. Mohamad Ibrahim sent Plaintiff to speak with someone at human resources.  When Plaintiff went to human resources, Ms. Yoko Hoffman told him that the copies of evaluations that had been submitted by Mr. Mohamad Ibrahim were incomplete.

350.     On or about April 2012, Plaintiff's Managing Editor, in an effort to harass him and discriminate against him removed him from some of his evening shift editor duties.  This change was made abruptly and without any reasonable explanation of the demotion.  Plaintiff was replaced with Mr. Ashiqullah Rahimzoy, a junior contractor or POV (purchase order vendor).  This is unprecedented, where a staff member is removed from an editing position and replaced with a contractor without any explanation or any reason for the decision.

351.     Mr. Ibrahim, the Managing Editor changed Plaintiffs schedules multiple times, where Mr. Shah was not informed of the changes made in order to harass him and force him to retire. Typically, schedules would only change based on needs of the service, such needs were not often. However, under Mr. Ibrahim's discriminatory agenda against the seniors, he changed schedules and assignments in an effort to harass the seniors and Mr. Shah, to force them/him to immediately retire. The last schedule change January 2014, was again without notice, and discriminatory, biased and imbalanced and hostile towards the seniors.

352.     On or about May 2012, Plaintiff requested the office of Human Resources to investigate the purpose of such discrimination against himself and the seniors of the Pashto

service.  However, as well as result the harassment and retaliation continued and further caused

the seniors great deal of harm and suffering.

353.    On or about July 2012, Ms. Ain Munn of HR, scheduled individual interviews for

the four seniors including, Mr. Shah. Ms. Munn interviewed Mr. Shah for hours as well as the

other seniors.  Rather than trying to gather facts to inquire about possible discriminatory policy,

Ms. Munn in the presence of Sheryl Williams Jones (acting director of HR) conducted the

interviews in a combative and defensive manner, more geared towards litigation and deflecting

responsibility and covering up issues and actions of first and second tier management, than

trying to resolve a very serious policy and management violation of a pattern and practice of

discrimination against the senior staff not only in the Pashto language service but throughout the

language services.

354.    Mr. Shah had made it clear during HR interviews that he was not interested in

taking this issue any further, if HR were to resolve the matter amicably and in a timely fashion,

considering the length of time (since 2010) that the seniors had been made to suffer through this

a hostile and discriminatory work environment.

355.    On August 13, 2012, about a month after the complaints to HR, the Managing

Editor continued to harass the seniors, the environment continued to be hostile, and

discriminatory behavior continued as before, and finally it culminated with second tier manager,

Ms. Maiwandi (Director, South Asia Division) calling everyone into her office and scolding the

seniors.  On August 13, 2012, after having complained of harassment and discriminatory

behaviors the former Director of South Asia Division, Ms. Spozhmai Maiwandi retaliated against

the Plaintiffs by exposing them during a staff meeting  for complaining of unfair treatment and

placing a gag on their work related e-mails.

356.    On or about April, 2013 Ms. Spozhmai Maiwandi was replaced by Mr. Ismail Dahiyat, who is the current Director of South Asia Division.

357.    Plaintiff's Managing Editor Mohamad Ibrahim, failed to send Mr. Shah, to the required computer training sessions.  The Managing Editor e-mailed list of names to schedule training he would schedule Mr. Shah during Mr. Shah's days off from work.  Mr. Mohmand Ibrahim, knew or should have known Mr. Shah's days off from work, but deliberately scheduled him on those days, so as to prevent him from going to the classes and also cover up his malicious intention of keeping Mr. Shah and the other seniors in the Pashto service deprived of computer training.  He would treat the junior staff differently by sending them to computer training whenever available.  As a result, the junior staff became more trained compared to the seniors simply because Ibrahim would give them greater opportunities.

358.    Two of the junior staff were sent to Dalet Plus training.  Mr. Khalil Khan was one of the individuals sent to receive Dalet Plus training.  When he returned he was told by Mr. Ibrahim to train the seniors, but it was obvious he knew very little and the seniors who had not been to the training session knew more and obviously required more training that was never provided.

359.    Plaintiff's Managing Editor, not only tried to prevent Mr. Shah from receiving computer training, but also when possible interfered in Mr. Shah's attempts to receive computer training on his own initiative.  After Mr. Shah realized that he had been excluded from the new and advanced computer programs, he was left behind because of his manager's deliberate acts of interfering with Mr. Shah and the seniors computer training.

360.    Plaintiff was/is one of the seniors at the Pashto service who had been excluded from computer training and thus fallen far behind.  Mr. Shah took it upon himself to work with

the organizers of the training sessions to schedule himself for computer training. For example on January 14, 2013 a session was offered for 01/17/2013 for Dalet plus training. Mr. Shah told Mr. Ibrahim, the Managing Editor that he had to at least contact the organizer by calling or e-mailing them as they had requested. Mr. Ibrahim assured Mr. Shah that he would contact them and put Mr. Shah's name on the list. However, on January 17, 2013 before the training session started at 3:30 PM, Mr. Shah called the organizer Ms. Maime Levich ext. 4283 at 12:30 pm to confirm, but she told Mr. Shah that he was not on the list. On that day Mr. Shah was not permitted to receive training and had to the session because Mr. Ibrahim had failed to put Mr. Shah's name on the list as he had promised. This is an example of how Mr. Ibrahim simply would not allow or make it feasible for seniors to get training, especially computer training.

361.    On or about January 24th, 2013, again Mr. Shah received a schedule for computer training. He registered himself and again he went to Mr. Ibrahim to sign him up. Mr. Ibrahim e-mailed Mr. Shah back on January 22nd 2013 with an e-mailed addressed to Liza (the organizer). It is not clear if Mr. Ibrahim ever actually sent the e-mail to Lisa. However, on January 24th, 2013 when Mr. Shah arrived at the training session, once again his name was not on the list. But this time the instructor said Mr. Shah could stay and that she would add his name to the list, even though his Managing Editor Mr. Ibrahim had not scheduled him to be there.

362.    Plaintiff was also excluded from other training required to succeed at this job. Computer training is not the only type of training required to succeed at this job. For example, he needed training for telephone intake during live literature shows, he needed training in production (the updates are necessary for their continued ability to work as producers). Without any previous training Mr. Shah was forced to conduct production of literature show which required training with the telephone intake. While Mr. Shah is trained in production, he is not

trained in the telephone intake which typically takes about 20 minutes of training before one is required to conduct shows with use of telephones.  But Mr. Ibrahim purposefully assigned Mr. Shah for production with use of telephone, knowing Mr. Shah was not trained on the phones. He set him up to harass him, for him to fail and for Mr. Ibrahim to have a reason to send degrading e-mails about Mr. Shah's job performance and create a record of incompetence to support his and managements' goal of forcing the senior to retire.

363.     Mr. Ibrahim, the Managing Editor repeatedly instructed some of the junior staff not to help the senior staff.  Mr. Ibrahim's direction was going against the standard that most radio programing is prepared by a team.  The seniors were left on their own to do the show and in fear that if he does make a mistake, he will be targeted by the manager who sits in wait to harm the seniors the seniors were targeted and placed under undue duress.

364.     On April 1, 2012 at about 5:15 PM, Mr. Ashiqullah Rahimzoy told Mr. Shah that he was willing to help Mr. Shah although Mr. Ibrahim had directed him to "not to help seniors" in the Pashto service and further "if you do help them, write up a report [i.e. keep a record] on them or report them to me." Mr. Rahimzoy said that he told Mr. Ibrahim, "no, I believe in team work and news requires this." Mr. Rahimzoy also told Ibrahim that, "in fact, I will tell you that even if they need help in the Dari service I would help them" meaning to state that he is a person who believes in teamwork and will not ignore a request for help regardless of who asks for it, even if one of the seniors asks for help, that he will help them.

365.     Upon information and belief, Mr. Mohamad Ibrahim has instructed and commanded employees on many different occasions not to help any of the seniors.

366.     Mr. Mohamad Ibrahim did not provide password for Dalet Plus to the seniors, including Mr. Shah, while he gave the junior staff his own passwords.  The senior staff would

have to ask help from one of the junior employees.  Mr. Ibrahim was forcing the senior staff in a

compromising situation, because he had also told the junior staff not to help the seniors.

367.    The Managing Editor, Mr. Ibrahim, made unreasonable changes in the schedule to

accommodate those with whom he shared an animosity towards the seniors, and those who were

simply his allies against the senior staff.  For example, on 4/12/12(Thursday) when Mr. Shah

arrived at work Mr. Sayed S. Shah told Mr. B. Shah (Plaintiff) that his request to be moved to the

morning shift was granted by the Managing Editor, Mr. Ibrahim.  Mr. Sayed S. Shah is also one

of the employees at the Pashto service who has close ties outside of work, with the Mr. Ibrahim.

In a trade off, Mr. Sayed S. Shah's schedule reflects whatever he desires, especially at the

expense of the five senior complainants.  Mr. Ibrahim knew that allowing Mr. Sayed S. Shah's

move from the evening shift would leave the evening shift in peril, but he made the change

anyway to accommodate.  This change left two staff members to run the evening show, again

causing chaos in the schedule.

368.    Mr. Ibrahim's decision to remove staff from the evening shift was to intentionally

target the senior shift editor on duty, Mr. B. Shah.  Mr. Ibrahim did not acknowledge that there

were only two staff members for the whole evening show.  Mr. Ibrahim tries to interfere with the

shows and programming to continue to prove his discriminatory position that the senior

employees are suddenly stupid, useless, and incompetent who must either leave on their own, or

be forced into retirement.  As upper management continued to support this notion, any

complaints made by the Plaintiff and the other seniors in the service were purposefully,

intentionally, and maliciously ignored.

369.    Upper management and Mr. Ibrahim continue to fail to check the work logs,

where it is clearly recorded on a daily basis, that the seniors work product outweighs the junior

staffs' work volume, before accusing the senior staff of not working or of incompetency simply to force them to retire.

370.    Plaintiff's manager allowed the junior staff to manage their own schedules and make their own assignments compared to the senior staff.  For example, On October 9, 2012, at about 2:50 pm, Khalil Khan came back from coverage, while Mr. Shah was the editor on staff that day.  After 4:20 pm, Mr. Khan rather than communicating with Mr. Shah, called his friend Mr. Ibrahim to tell him he was not doing the piece from the conference.  Mr. Khan told Mr. Shah, "I spoke with Ibrahim, and I told him the conference was not much of conference to make a report about.  Ibrahim said, fine, don't do the piece." Mr. Khan is a good friend of Mr. Ibrahim, and also a junior employee who has a personal relationship with Mr. Ibrahim, thus he does or does not do whatever suites him.  Mr. Khan simply overlooked Mr. Shah as the shift editor and directly called Mr. Ibrahim and they decided that because Khalil Khan is not interested in that report that Mr. Khan will not be required to do the report.

371.    Mr. Khan supports Mr. Mohamad Ibrahim in an assortment of ways.  For example, in October 2012, Mr. Khan was using his work hours, to rally and petition for Mr. Ibrahim to receive the annual award, the Gold Medal. Thereafter or on or about the time of September or October or November 2012, Mr. Ibrahim sent Mr. Khan on a weekend trip to New York, to cover United Nations.  Mr. Khan has also been sent to Tokyo and other trips for which he is not qualified.

372.    Mr. Ibrahim will keep it a secret from the senior staff, when he sends junior staff on assignment or gives them shows and changes their schedule to promote them.

373.   At times the junior staff and Mr. Ibrahim meet without inviting the senior members of the staff to the meeting.  The senior staff members are excluded from these important office events, which directly affects their job.

374.   Plaintiff's manager allowed the junior staff to manage their own schedules and compared to the senior staff.   On Sunday, 2/10/2013, at about 2:30 pm, Mr. Khan seemed to just have arrived in the last 30 minutes, Mr. Shah gave him an assignment called: US Lawmakers speak out ahead of the key Obama address CR # 4207554. Mr. Shah followed up at 5:30 pm pursuant to his duty as the shift editor, whether he had completed that assignment (which should have been done in about one and one half hour).  In response to Mr. Shah's inquiry, Mr. Khan got up from his seat came over to Mr. Shah and said "your generation's work style is different from us, the youth!"  Mr. Shah was shocked by this outburst and asked him, "do you mean that we old folks work differently?"  Mr. Shah further added, "this is the radio, we might get another piece, and possibly more important and updated material, one should complete work on time." Mr. Khan responded with, "us youth work in a revolutionary way, I'll get it done." Mr. Khan also added, "what if don't get it done? world will go upside down?"  Mr. Shah said "there is no harm in getting it done on time." Two other employees, Mr. Hasib D. Alikozai and Mr. Sayed S. Shah, were also there but doing the news.  Sayed S. Shah said "your talking is interfering with my work."  Mr. Shah did not want to escalate the situation, and simply stopping talking.  Khalil Khan said "I am leaving to get a sandwich and after I get back, I will work."  This outburst is also a clear example of the discriminatory culture of VOA Pashto Service, under the leadership of Mr. Ibrahim, who encourages and fosters such behaviors of divisiveness between the junior and senior staff.

375.    Plaintiff's Managing Editor, Mr. Mohamad Ibrahim, created inaccurate and accusatory emails regarding Plaintiff's job performance in an effort to harass him, create a hostile work environment and force him to retire from his job. On or about the first week of March 8th 2012, Mr. Ibrahim sent an email to Mr. Shah's work address stating:  "I had assigned you an assignment on Saturday to prepare an original package on Syria. But it was not done. Please read work related e-mails look for your assignments and complete them on time." However, this assignment was sent on or about the time Mr. Shah returned form sick leave and as soon as he returned he discussed this assignment with Mr. Ibrahim and explained that he had started work on Syrian Diplomacy piece already.  There was no need to further create an e-mail record against Mr. Shah, who had not done anything wrong.  But Mr. Ibrahim took these circumstances and manipulated it and sent him an e-mail immediately after agreeing on the assignment to show Mr. Shah as incompetent or someone who is not caring individual about the details of his responsibilities.  There was no other need to write this e-mail, besides Mr. Ibrahim's need to harass Mr. Shah.  Mr. Shah responded to the e-mail and stated that he found this accusation highly inaccurate and that Mr. Ibrahim bullying him as he does all the senior staff.

376.    Plaintiff's Managing Editor Mr. Ibrahim intentionally and maliciously retaliated against Plaintiff by interfering with his job, after the March 8th, 2012 e-mail accusations and Mr. Shah's response.  Pursuant to his predictably retaliatory manner, the next day, on or about March 9th, 2012 Mr. Ibrahim wrote an e-mail telling Mr. Shah to attend an event called "Enemy of my Enemy" on March 14, 2012.  Mr. Ibrahim knew Mr. Shah has had health concerns that disable him from attending such long events. But, he was sending Mr. Shah to punish him for defending his rights against being harassed, on March 8th, 2012.

377.    Plaintiff's Managing Editor, Mr. Ibrahim, deliberately, maliciously, and intentionally retaliated against Mr. Shah by interfering with Mr. Shah's ability to successfully prepare and deliver the news. On March 13, 2013, Mr. Ibrahim not only created a hostile work environment, but deliberately interfered with the news preparation and timely delivery, while Mr. Shah was shift editor.  He retaliated against Mr. Shah for not being able to go on assignment due to medical reason on March 14, 2012. On March 13, 2012, Mr. Shah arrived about at 11:45 AM.  He was the shift editor that evening.  Mr. Ibrahim had assigned the other staff (Mr. Achagzai, Mr. Mohmand and Ms. Shafia Sardar) to work on assignments for the next day which were unrelated to the evening show. In the meantime there were many high priority news pieces that needed to be a part of the evening report, including:

     i.      Obama Afghanistan, CR2156983
    ii.      Afghanistan US police VP2048193
   iii.      Afghani Taliban CR2154502
   iv.      Afghanistan  photo gallery VWEB2154824
    v.      Afghanistan VO 2154190
   vi.      Afghanistan military law
  vii.      Afghanistan Taliban

At about 2:10 PM Mr. Ibrahim was standing next to Shafia Sardar idly chatting, while Mr. Shah was getting copies from the printer. Mr. Shah informed Mr. Ibrahim that unfortunately Mr. Ibrahim had busied everyone with other materials, not due until tomorrow, when there would be a whole new shift to work, in the meantime the evening news was undone and incomplete and needed everyone on shift to work together, that is why they were scheduled for the evening shift. But Mr. Ibrahim responded and said "does not matter" and that the new urgent news mentioned above was not important. He stubbornly insisted that the evening shift must work only on assignments he had assigned them for the next day, some of which were not as time sensitive as the news coming in for that evening. Mr. Ibrahim also knows that Mr. Shah takes his job and his

responsibilities as editor particularly seriously, and that this type of action would cause him great deal of pain and suffering, enough so that Mr. Shah would simply retire rather than take the abuse. On that day, while Mr. Shah did not agree with him, he had no choice but to do as he was told or else Mr. Shah was afraid of further retaliation from Mr. Ibrahim. Mr. Shah also knew that continuing to complain would not be of any help, considering at this point it was pretty clear that upper management was also in agreement with Mr. Ibrahim to force the seniors to retire. But, an equal or greater harm was that Mr. Ibrahim for his purposes of harassing the seniors had once again used his malicious motives to subdue a senior but also result in ruining the news.

378.    Plaintiff's manager deliberately, intentionally and  maliciously interfered with his ability to successfully prepare and deliver the news on June 28, 2012, Thursday at 5 pm. While Mr. Shah was the shift editor Mr. Ibrahim called Mr. Ashiqullah Rahimzoy and told him that if there is a piece on the Obama Health Care, to include it in the news. While Mr. Shah, as the shift editor understood the importance of Obama Health Care piece and knew to include it, but as the shift editor on duty that evening, in his judgment he chose to  assign Mr. Ashiqullah Rahimzoy a piece on India/Afghanistan. By assigning reports to Mr. Rahimzoy, for the evening shift, Mr. Ibrahim was deliberately ignoring Mr. Shah as the shift editor and he was deliberately and maliciously interfering with the evening show. As a result of Mr. Ibrahim's interference, Mr. Rahimzoy was given two different assignments, one by Mr. Shah and the other by Mr. Ibrahim. It was causing confusion, divisiveness and undermining the authority of the shift editor, Mr. Shah, to belittle him and show him that he was the boss.

379.    Plaintiff's Managing Editor, Mr. Ibrahim, deliberately, intentionally and maliciously interfered with Mr. Shah's ability to successfully prepare and deliver the news.  On December16, 2010 at 2:05 PM, Mr. Ibrahim again discussed the programming with Ashiqullah

Rahimzoy and while Mr. Shah was sitting right next to them. Mr. Ibrahim carried on a long conversation about the pertinent news and programing while poignantly ignoring Mr. Shah.

380.     Starting on or about December 2010, Mr. Shah was specifically and seriously asked by co-workers when he was going to retire. Mr. Shah had not been planning on retiring. The questions about his retirement came after everyone at the service could see the directed way in which Mr. Ibrahim was marginalizing Mr. Shah, so as to show that Mr. Shah was no longer a full member of the service. Abid Noor, specifically asked Mr. Shah when he was retiring.

381.     The harassment and discrimination by Mr. Ibrahim against Mr. Shah and the seniors at the Pashto Service was having an impact on his health. Mr. Shah has had drastic health problems since being subjected to directed, malicious, and at times aggressive harassment, hostility and discrimination at his place of employment.

382.     Plaintiff's manager creates a hostile work environment. Mr. Ibrahim changed the schedule far more often than is necessary. The schedules he did put together were biased and discriminatory against the seniors at the Pashto service. In one of his schedules, Shafia Sardar was a producer; Mr. Shah an MC and Mr. Achagzai as the news caster. This should have been Shafia as MC, Shah as producer, to have male and female voices on the air. But Mr. Ibrahim typically ignores these types of protocol and discriminates against the seniors.

383.     Mr. Ibrahim intentionally bombarded Mr. Shah with assignments making it impossible to successfully complete them all in the time given. On March 14, 2012 at 1:30 PM, Mr. Shah received an e-mail from Mr. Ibrahim to start working on Simon Gass, NATO Senior Civilian Representative. Mr. Shah replied at 7:05 PM, that the interview is ready and prepared and it is 11:35 minutes. On same day Mr. Shah had completed Syria Amnesty 2:25. On the same day Mr. Shah was the shift editor, producer in addition to the completed assignment above. Mr.

Ibrahim was deliberately targeting Mr. Shah to create an impossible situation with the amount of work he bombarded Mr. Shah with on that day. Mr. Ibrahim was expecting Mr. Shah to not complete the assignments.  Mr. Ibrahim was creating a situation in which ensnare Mr. Shah with proof to later use against him as a senior employee, and to point fingers at this example as how the senior employees are slow.  Mr. Shah is excellent at his job, consequently Mr. Ibrahim was finding it difficult to create fault, but he was trying and as a result causing harm to Mr. Shah's health, his reputation and his peace of mind.

384.    Mr. Ibrahim intentionally and deliberately bombarded Mr. Shah with assignments making it impossible to successfully complete them all in the time permitted.  Another example was on March 15, 2012. Mr. Ibrahim wrote an unreasonable and unrealistic e-mail saying that Ms. Shah should have used a different voice during an interview. Mr. Ibrahim did not write this e-mail in good faith.  While it was obvious, Mr. Shah still had to explain to Ibrahim that on this day there were only 3 people, Mr. Achagzai (who was doing the news and also an interview) he was not available for a whole segment – he was the only male voice. Mr. Shah could obviously not use the other person on shift, Shafia Sardar who is female and the interviewee was male. When Mr. Shah told this to Mr. Ibrahim, after he had received the e-mail Mr. Ibrahim, simply chose to ignored him, rather than admit that the request he had made was unreasonable. Mr. Ibrahim ignored Mr. Shah's response. It was clear that Mr. Ibrahim's only intent was to find something against Mr. Shah and to harass him to force him to leave his job, even though he knew that he himself had assigned Mr. Achagzai two assignments (news and interviews) and Shafia Sardar was a female voice.  The e-mail he sent was unnecessary, but only to make a written record against Mr. Shah, frighten Mr. Shah, show Mr. Shah that he makes mistakes, and create a seeming oversight on part of Mr. Shah.

385.     Mr. Ibrahim targeted Mr. Shah for the wrong reasons.  The work logs will show that Mr. Shah is required to work more than the other junior employees on shift.  For example on October 25th, 2012, Mr. Shah completed 4 assignments while Shafia Sardar did not translate or produce and Ashiquillah Rahimzoy translated one piece on Pakistan and women.

386.     Plaintiff personally gave multiple notices to Ms. Spozhmai Maiwandi (Director, South Asia Division), of the harassment, discrimination and hostile work environment created by management and especially by Mr. Ibrahim.   One of the times Mr. Shah complained was on November 23, 2011.  Mr. Shah spoke with Spozhmai Maiwandi about Mr. Ibrahim and his use of scheduling as harassment of the seniors in the Pashto Service. Mr. Shah discussed that under Mr. Ibrahim's leadership the schedule was biased against the senior staff.   While the evening shows would often require as few of them to either work without full staff or just be at a loss of how to manage a program without anyone there to work.

387.     On or about November 23, 2011, Thanksgiving, a day one can leave early if there is no other assignment.  On that day Ashiqullah Rahimzoy did not come to work, Mr. Ibrahim had left work at 1:00 PM that afternoon, leaving behind a mess, knowing that Mr. Shah was the editor on shift that evening. There were only two people left to do the evening show, Shafia Sardar and Mr. Shah. Mr. Shah realized that this was a desperate situation.  He asked Mr. Adil and Mr. Abid Noor for material because there was no one there to work in the evening shift.  Mr. Shah was extremely concerned.  But both know that Mr. Ibrahim targets Mr. Shah, they were not going to help Mr. Shah either.  In response to Mr. Shah's request, they scoffed at Mr. Shah and said – NO, and told him that since Mr. Ibrahim was not there to tell them to work, they were going home.  Abid Noor is also involved in Mr. Ibrahim and management's pressure-cooker plot to force the seniors to leave their jobs.

388.    Mr. Ibrahim should have known that on a holiday, such as Thanksgiving, schedules change and staff typically leave early.  He should have prepared and adjusted the schedules to prevent such hardship to Mr. Shah.  But Mr. Ibrahim took this as an opportunity to create a chaotic situation, to the extent that Mr. Shah would start thinking about retirement, that very day. Again this is a clear example of Mr. Ibrahim's disregard to the service.  If one of his friends, the junior editors were on schedule, he would have managed this situation with more regard to the needs  of the service, by scheduling another person for the evening or possibly giving them material to enable the show to run smoothly, as is the standard protocol.

389.    This time Mr. Shah went to Ms. Maiwandi and told her of what had just happened and of Mr. Ibrahim's constant harassment at every single chance and opportunity he gets to harm Mr. Shah and anyone of the five senior complainants.  It either did or should have, became obvious to Ms. Maiwandi that Mr. Shah was now directly asking her to intervene, as it had become too much to handle.  Ms. Maiwandi took notes, but to this day Ms. Maiwandi has not done anything to try to help the situation.  Until she was removed from her position as Director of the service on or about February 2013, she continued to support Mr. Ibrahim's discriminatory acts and harassment of the senior staff.

390.    After Mr. Shah's multiple complaints, the situation become more drastic, Ms. Maiwandi joined in more directly in management's pursuit to force the senior staff to retire.

391.    Upon information and belief, on or about November 24th, or 25th or 26th, 2012 Mr. Ibrahim had a Thanksgiving party at his house, to which he had invited everyone from the service except the five complainants.  During this party Mr. Ibrahim asked the junior staff to help him find a way to force the seniors to retire, to leave this job, leave VOA.  Mr. Ibrahim was asking them for help for harass the seniors into forced retirement.

392.     Mr. Ibrahim deliberately ignored the seniors.  When it was part of his job to interact with anyone of the senior staff, to give them assignments or to change assignments, he simply allocated that task to a staff member who does not have the authority to make the changes.

393.     On March 15, 2012 at about 2:05 PM, Shafia Sardar told Mr. Shah that Ibrahim had changed the schedule and assigned him producer for the 2:30 PM, literature show (which requires the use of telephones, for the call-in portion of the show).

394.     Khalil Khan often tried and sometimes succeeded in changing the schedule.  On October 05, 2012, Mr. Shah was the shift editor in the evening and Khalil Khan who is not the Managing Editor sent an e-mail about the evening show and he changed the press and editorial. This change is important because, as long as Mr. Shah has known VOA policy, there has been great emphasis on editorials which are highly valued by VOA and the listeners.  Editorials are unique to the shows and highly valued, while the press would have been covered anyway.  To make this change even Mr. Ibrahim would have had to consult the editors on the evening shift and make a decision based on these recommendations.  Mr. Khan does not have any authority, whatsoever to change the programming but he did often targeting the seniors, as he was authorized to do by Mr. Ibrahim.

395.     Mr. Shah became extremely disappointed and distraught, and physically and emotionally upset over this constant humiliation, and harassment from all different directions, essentially making him and the seniors seem incompetent.  Mr. Shah was forced to take annual leave from the March 19 to 22, 2012.  However, on March 18, 2012 the day before Mr. Shah's leave started he was in the hospital, receiving medical treatment.  The harassment had taken a toll on his health, his immune system shut down due to the extreme stress placed on him at his

job as a form of discrimination. Mr. Shah was unable to return to work for several weeks and went to emergency care multiple times.  He was out of work sick from March 18 to March 30, 2012.

396.    Mr. Shah's heart condition has often been exacerbated due to the stress as a result of the unnecessary stress from Mr. Ibrahim's constant harassment and discrimination and retaliation against him as a senior member of the staff.

397.    On October 07, 2012 Mr. Shah was the shift editor.  At 6:20 PM, (Sunday) Khalil Khan told Mr. Shah that he will not prepare the weather report during the first half of the show. He was again making changes to the shows without authorization.  Mr. Shah asked him if Mr. Ibrahim would allow the change that Mr. Khan was making.  Mr. Khan said no, it is not necessary to ask Mr. Ibrahim, because Mr. Khan (Mr. Ibrahim's friend and countryman) was making the changes.  It is not clear why Khalil Khan and a few others had the authority to make changes. It seems that because Khalil Khan and Mr. Ibrahim are friends and because of the discriminatory policy of VOA against the seniors and management's agenda to replace the seniors by forcing them to retire, they were even willing to promote the junior staff without any knowledge, training or language skills.

398.    On August 13, 2012, Mr. Shah was retaliated against when the Director of South Asia Division, Ms. Spozhmai Maiwandi exposed him to his manager as having made a formal complaint and put a gag on his future work related e-mails to his Managing Editor.

399.    A few days after the meeting of November 23, 2011, at 2:45 PM, when Mr. Shah went to Ms. Maiwandi's office and told her that he has complaints about being discriminated against and forced to retire, Mr. Shah went to Mr. Ibrahim and told him that "this schedule is a problem for me."  Mr. Ibrahim listened and said that he was going to look into the schedule.

Rather Mr. Ibrahim retaliated and removed Mr. Shah from his position as shift editor and replaced him permanently with Mr. Ashiqullah Rahimzoy a contractor (POV).  Mr. Shah was replaced because he complained that he was being targeted as a senior member of the staff.

400.    Mr. Ibrahim retaliated against Mr. Shah because he had expressed his belief that he was being targeted as a senior.  He told Ms. Maiwandi during the meeting of November 23, 2011 that during the evening shift there was only two staff members scheduled.  A schedule deliberately put into place by Mr. Ibrahim.  He had scheduled Ms. Shafia Sardar, for the evening shift.  Everyone knows that she is not able to do all the different tasks.  On Mondays Mr. Ibrahim removed Khalil Khan to TV which caused Mr. Shah an even bigger scheduling problem during the evening shift.  Mr. Shah complained to Mr. Ibrahim who said he will replace Mr. Khan but never did.

401.    During Mr. Shah's discussion with Ms. Maiwandi on November 23, 2011, she also said, the new staff members are creating the new programming and the "seniors are not able to do this and to reach the level of technology."  Mr. Shah said to Ms. Maiwandi, "whatever junior staff need to do, or know how to do, just do it, but please don't harm the show, by targeting the seniors."  Mr. Shah told her "this is my last time, I will not come back to discuss these problems with you anymore because there is no benefit in discussing it with you."

402.    On November 23, 2011 Ms. Maiwandi promised to follow-up (which she never did).  She also said "these people want to bring youth (to the Pashto Service) who are acquainted with the modern technology. They (management) say that the seniors cannot do it." Mr. Shah said, that "we have a clock (meaning all the parts of the show) and we do and can follow that." Mr. Shah also stated that the seniors are capable of doing the work and do the work that is

necessary and he also reminded her to "also please consider the amount of production by the seniors compared to the youth and you will realize how much work is done by whom."  Ms. Maiwandi did not want to hear about the work by the seniors, she stopped Mr. Shah from speaking any further.

403.    On a different occasion when Mr. Shah complained to Ms. Maiwandi about the schedule, she told him that management has asked and decided to replace Mr. Shah with Mr. Ashiqullah Rahimzoy who is a contractor.  Mr. Shah responded that, he is not asking about whether a POV contractor can become a shift editor, but that "I simply want to ask (request) that we seniors are not harmed."

404.    Mr. Shah was told by his colleagues, that Ms. Maiwandi says that the senior staff should retire.  Mr. Shah believes this to be true because the same situation of harassment had occurred with his other colleagues with whom Mr. Shah had worked for several decades and who were harassed until they could not take it anymore and had to leave the service and retire.  This was a pattern that was now repeating with the current batch of the last set of seniors at the Pashto Service.

405.    Plaintiff's supervisors and managers changed Mr. Shah's performance standards without telling him and made the unnecessary changes in order to target the seniors.  On January 14, 2013, Monday at 1:00 PM, Mr. Ibrahim told Mr. Shah that Mr. Michael Collins (acting chief of the Afghanistan Branch/Pashto Service) wanted to meet with him to speak about "the note you have added under you signature line in the last yearly performance reports." Mr. Shah asked whether Mr. Collins wanted to set up a time and if an e-mail had been sent.

Mr. Ibrahim said "no" Mr. Collins just wants to speak with you in person. Mr. Shah went to Mr. Collins office and Mr. Ibrahim was also present.  Mr. Collins said "the note you have

stated (added) on the performance report, should have been added after the evaluation process was completed." Mr. Shah expressed his concerns about the changes in the performance reports. Mr. Shah told Mr. Collins that if he had any concerns to please put in writing and I will respond in writing. Mr. Shah also stated, you should have given me time, if you want to discuss substance of the evaluations. Mr. Collins said "this was my mistake" and not Mr. Ibrahim's mistake, I wanted to solve this problem unofficially."

406.    During this meeting with Mr. Collins on January 14, 2013, Mr. Ibrahim "said I do not have a role in the changes of the performance evaluation." Mr. Ibrahim further added, "Beth Mendelson had a lot of comings and goings in an effort to make these changes." He also said that he acknowledges that there are terms in the changed evaluation which were/are unclear and vague.

407.    During this meeting with Mr. Collins on January 14, 2013, Mr. Shah told Mr. Collins, that "when you have made changes to my job you must inform me." Mr. Shah added that "in the past we trusted our Managing Editor but now the situation has changed." Mr. Shah also told Mr. Collins, that "here there is yet another matter that you must be aware of, which is, that this matter is not personal but to protect my self." Here Collins asked, "do you see the difference in the performance evaluations?" Mr. Shah said "yes, I do." Mr. Collins said that is all he wanted to know and said "I wanted to know this for myself." The meeting came to a close.

408.    As the meeting with Mr. Collins on January 14, 2013, was coming to a close, he also added that he will follow-up with an e-mail. At the same time Mr. Collins said, "I have no role your previous ongoing complaints." Mr. Collins never met with Mr. Shah again regarding the secret changes made to the annual evaluations, targeting the senior staff, in addition to adding

vague language, giving Mr. Ibrahim discretion to damage the seniors' evaluations with inaccurate evaluations.

409.    The language, standards and categories of the annual performance evaluations have been altered.  The fact is the yearly performance evaluations were altered without any notice to the seniors in the service.  The evaluations were altered in retaliation to the seniors' ongoing complaints about senior discrimination in the service and the changes are biased against the seniors.  The evaluations even include areas of performance that would not be part of the seniors' job description, such as production.  The language of the altered evaluations are vague, biased and give discretion to Mr. Ibrahim (against whom the seniors had and continue to complain).

410.    All the changes to the annual evaluations were made without any notice to the seniors when there is a protocol that needed to have been followed before such major changes in the evaluations were permitted to take place.  Since not any of this was done, the changes are greater evidence of management's malicious intent to discriminate against the seniors and to force them into retirement.

411.    On November 25, 2013, Mr. Ibrahim asked Mr. Shah to sign the current annual evaluations.  At 2:10 PM, Mr. Shah went to his supervisor, Mr. Ibrahim's office to get a copy of his previous annual evaluation particularly 05-01-2012 to 04-30-2013.  Mr. Ibrahim told Mr. Shah that he will search for the copies and provide them.  At 2:30 PM, Mr. Ibrahim called Mr. Shah at his desk, and told him I do not have a copy of the previous annual evaluations and that Mr. Shah should go to HR and get a copy of the annual evaluations.  He instructed Mr. Shah to speak with Mr. Perry Roger.  Soon thereafter, Mr. Shah went to meet Mr. Roger, who told him that Ms. Yoko Hoffman, who is a program specialist at HR, should have his evaluations.

412.     Ms. Hoffman came to the HR office waiting room and told Mr. Shah that she was in a meeting and asked him to come the next day at 3:00 pm, or she said "I will reach you by e-mail."

413.     On or about November 26th, 2013 at about 3:00 PM, Mr. Shah went to HR and met with Ms. Yoko Hoffman.  She was responsible for proving the back copies of the evaluation to Mr. Shah.  She gave a copy of 05-01-2012 to 04-30-2013, annual evaluation to Mr. Shah.  However, she said that the annual evaluation that she has on record is incomplete.  Ms. Hoffman promised to discuss this with Mr. Ibrahim.  Ms. Hoffman went to Mr. Ibrahim's office soon after meeting with Mr. Shah.

414.     During the meeting of on or about November 26, 2013, with Ms. Hoffman, Mr. Shah suggested that he would come back the next day about 3:00 PM that Friday to pick up a completed evaluation.  Ms. Hoffman said no, you should not come at 3:00 PM, but "when I have the completed evaluations I will call you or e-mail you." She also confirmed that she had Mr. Shah's telephone extension number at x5009.

415.     The next day, on November 27, 2013 at 12:20 PM, Mr. Shah called Ms. Hoffman at extension x7500 to follow up on picking up his completed evaluations.  However, Ms. Hoffman was not at the office on that day.

416.     On or about December 2, 2013 Mr. Shah went to HR to get a copy of his evaluations form Ms. Hoffman. She again told Mr. Shah that she did not have the completed evaluations.

417.     Ms. Hoffman never called or wrote Mr. Shah, to date.  Mr. Shah still does not have his completed annual evaluations.

418.    On December 6th, 2013, Mr. Ibrahim wrote Mr. Shah to ask him to sign the next set of evaluations which was for year 2013.

419.    Mr. She returned form annual leave on December 15, 2013.  On December 16, 2013, Mr. Shah responded to Mr. Ibrahim's e-mail of December 06th, 2013.  He explained that although he was uncomfortable signing this evaluation without having a copy of his previous completed evaluation, he had signed it and placed it under his door.

420.    Mr. Shah is still waiting to receive a complete copy of his previous annual evaluations.

421.    Starting 2010, Mr. Shah in an effort to prevent further harm gave notice of discrimination and harassment to Ms. Maiwandi, Ms. Mendelson, Mr. Ibrahim, the ombudsmen and finally to HR and OCR, without avail and harm is ongoing and continuous.

422.    After the complaints made by Mr. Shah, the harassment continued and Mr. Shah was also retaliated against.  His position as editor during the evening shift was reduced.  Some of his evening editorship was switched to Mr. Ashiqullah Rahimzoy (who is a Purchase Order Vendor or contractor); his evaluations were changed and made more biased against him, and his complaints were ignored, and Ms. Maiwandi (former Director, South Asia Division) exposed him to the staff and his manager and also put a gag on his work related e-mails.  The pattern and practice of harassment, hostile work environment and discrimination is ongoing and continuous against Mr. Shah and the seniors at the Pashto Service.

423.    Defendant's pattern and practice of discrimination, harassment and hostile work environment has been and continues to be the cause of the adverse effect on the Plaintiff and as a result on his job as well as all aspects of his life and health. The adverse impact of the harassment had a very large negative impact on Plaintiff's health, just to give a few examples:

11/09/12 at 10:23 am, Plaintiff was forced to call Kaiser Permanente about stress and other related illnesses and visited his doctor. In March of 2012, Plaintiff was highly stressed after the "phone incident" with Mr. Ibrahim that his system gave out and he was not able to return to work for 2 weeks, during which time he went through great pain and suffering.  Again, after the Thanksgiving incident, on 11/24/2012,  Mr. Shah developed bronchitis; again he was in the doctor's office on 11/26/2012.  Plaintiff's health has been compromised as a result of several years of continuous deliberate and malicious discrimination against him by VOA management.

424.    Since 2010 and ongoing it was the intent of VOA management, Mr. Ibrahim, Ms. Beth Mendelson, Ms. Spozhmai Maiwandi, and other member of management and Human Resources to somehow through an assortment of harassment to pressure the seniors to have no other choice but to retire or resign, as was the case with several of their colleagues such as Abdul Bari Jahani, and Dr. Amin Walkman as well as other seniors in the Afghanistan Service both Pashto and Dari, who were forced into retirement.

425.    In March of 2012, Mr. Ibrahim said that he was following recommendation of the higher ups to get rid of the seniors in the Pashto Service.  Still, the seniors continued to copy their e-mails in response to the harassment to e both Beth Mendelson and Spozhmai Maiwandi. However, they deliberately and maliciously did nothing to remedy this situation, even after Mr. Shah and his senior colleagues gave multiple notices of harassment and discrimination and the hostility against the seniors resulting in a hostile work environment.

426.    On or about May 2012, Mr. Shah discussed an e-mail with Mr. Ibrahim a few moments later he sent Mr. Shah  another e-mail telling him to "do your job"  after having had a normal discussion with Mr. Shah about the assignment.  Mr. Ibrahim would say one thing in front of Mr. Shah and immediately say the opposite by e-mail (where it seemed that Mr. Ibrahim

was simply putting evidence into writing or following higher-ups directions in harassing Mr. Shah).

427.    Mr. Ibrahim was orchestrating a string of inaccurate accusations by e-mail as a basis to give Mr. Shah poor performance reports.  Mr. Shah and the other seniors copied management in their responses to these e-mails.  It is here that it became more obvious that both Beth Mendelson and Spozhmai Maiwandi and David Ensor had intentionally ignored all of seniors' e-mails with the malicious intent to force the seniors to retire.

428.    Management also targeted Mr. Shah, by giving him overwhelming assignments when there were other junior staff available and also capable of doing the work.  However, Mr. Shah continued to perform his job well, even under extreme pressure from management for him to retire.  On the day of March 14, 2012, Mr. Shah was also a producer, and had done another piece and 11.5 minute report on an interview with Simon Gass. The next day, Mr. Shah was not expecting to be unfairly accused of a mistake that he did not make, and harassed and made to feel as though all his work of these thirty years was useless and he was incapable.  Mr. Ibrahim accused Mr. Shah of not using a different voice in the actualities.  However, Mr. Ibrahim knew or should have known that there was no other possibility to have another male voice.  Mr. Ibrahim took this opportunity to create a hostile situation in which he harassed Mr. Shah and further pressured him to leave his job.

429.    Very often, Mr. Ibrahim would use a third person to communicate with Mr. Shah, which was completely unnecessary.  For example, he would come by or telephone to discuss the evening shift with Mr. Ashiqullah Rahimzoy, or other junior staff, knowing that at the time Mr. Shah was the shift editor and sitting a few feet away from Mr. Rahimzoy.  Later, Ashiqullah Rahimzoy would have to take time to come and tell Mr. Shah what Mr. Ibrahim had told him.

Mr. Ibrahim would and continues to interfere with Mr. Shah's tasks and his job and his ability to work with his co-workers in a non-divisive work environment.  Mr. Ibrahim has destroyed the team element of the Pashto service.  Teamwork is a vital part of broadcasting.

430.    VOA management went about deliberately harassing the seniors by isolating them, by telling the junior staff not help the seniors in work related tasks, while knowing that radio is a group effort.  He was constantly dividing the service between the junior and the senior staff which in turn was harming the shows and ultimately VOA, as well as damaging the health and well being of the complainants. All notices to management regarding this damaging and dangerous situation was intentionally ignored by them.

431.    Mr. Ibrahim replaced Mr. Amanullah Ghilzai as the Managing Editor.  Mr. Ghilzai had left this post partially because of a tacit or overt agreement amongst VOA management to get rid of the seniors at the Afghanistan Services. After Mr. Ghilzai disagreed several times over these matters with management, he left the job.  In one of the first meetings in which Mr. Ibrahim was transitioning into his new post, he stated "I am the law" to one of senior staff.

432.    Mr. Ibrahim pursued management's goal to get rid of the seniors by harassing them and pushing them out of their jobs, reducing their shows, changing their schedules, humiliating them, harassing them and blocking their complaints and worse of all constantly retaliating against them.  In step with management's mandates Mr. Ibrahim took the lead and began with declaring himself the LAW, (soon after he started on April 2010) and from that day, not hesitating for a moment to retaliate against the seniors but mostly the five complainants of the Pashto Service.

433.    Mr. Ibrahim removed Mr. Shah from shift editor, in retaliation to Mr. Shah's complaints of harassment.  He switched the seniors to tasks that were not their job, he put them on production, he refused to accommodate them, he refused to allow them the necessary training for the new tasks and later humiliated them and blamed them, laughed behind their backs, told others in the service that it was his intention to keep the junior staff and get rid of the senior staff.

434.    Sometime in the year 2011, Mr.  Ashiqullah Rahimzoy went to Pakistan for his wedding and he was gone for 2 months, at this time Mr. Shah was forced to be both producer and shift editor.  Although it was a lot of work, Mr. Shah was afraid to speak with Mr. Ibrahim about it, but when he saw Mr. Ibrahim standing around chatting with Shafia Sardar, as he often does, at her cubicle, Mr. Shah said to  him, "hope Ashiqullah returns soon since I have done lots of production in his absence."  Mr. Ibrahim responded by saying "it is not Ashiqullah's job to be *your* producer." Clearly Mr. Ibrahim was making the work environment personal and dividing the work and making decisions based on his own personal biased discriminatory views rather than needs of the service, job descriptions and qualifications, further in this situation, Mr. Rahimzoy is a contractor.

435.    When Ashiqullah returned, Mr. Ibrahim made him the editor and Mr. Shah was the producer as punishment and retaliation against Mr. Shah for complaining.  But, Mr. Ibrahim knew or should have known as the Managing Editor that production was not Mr. Shah's job, that Mr. Rahimzoy is a Purchase Order Contractor, that Mr. Shah was doing production as a matter of teamwork, a way of helping the whole team.  Regardless, when Mr. Rahimzoy, returned Mr. Shah's shift editor position was reduced and he became a producer for that time.   This was direct harassment of Mr. Shah forcing him to retire.

436.    The junior staff such Ashiqullah Rahimzoy, Roshan Noorzai, Hasib Danish

Alikozai, just to name a few have all stated that the senior staff were targeted by Mr. Ibrahim,

while Ms. Nazrana Ghaffar and Mr. Khalil Khan both form Pakistan, as is Mr. Ibrahim and in

personal relationship with him, have deliberately made false statements in support of Mr.

Ibrahim, to Office of Civil Rights investigator.

437.    Before Ms. Maiwandi (former Director of South Asia Department) was removed

from her position on or about January/February 2013, Mr. Shah would go to Ms. Maiwandi and

explain the discriminatory acts against the seniors. Ms. Maiwandi's response was "this office

will close anyway and we will merge with radio free Europe." She further stated, "they will get

rid of you anyway."  This was her reaction to the seniors need for intervention to prevent further

harassment or to mediate the harm of when Mr. Ibrahim removed Mr. Shah from from position

as an editor without any reason, or when Mr. Ibrahim failed to send Mr. Shah to computer

training, and when he verbally told the other junior employees to not help Mr. Shah (because of

his age).

438.    The incident of December 12, 2013, is an example of the hostility in the work

environment created by Mr. Ibrahim.  On this day, Noshaba Ashna who is one of Mr. Ibrahim's

confidants argued with Asib Alikozay.  After the argument she came by Mr. Shah and Mr.

Mohmand's cubicles and said, "if you guys have a problem with Ibrahim, *go grab him by the*

*throat*." Mr. Mohmand and Mr. Shah were very surprised, as to why she was attacking them.

Mr. Mohmand and Mr. Shah told her it is not any of her concern.  They told her, "you should do

your own job."

439.    On January 7th, 2014, Mr. Noshaba Ashna, ignored Mr. Shah who was the shift

editor and discussed her interview about the 10th Anniversary of Afghanistan's Constitution  with

Mr. Ashiqulla Rahimzoy.  The next day, she was angry with Mr. Shah and accused of not airing her show.  Mr. Shah checked with Mr. Rahimzoy who confirmed that the interview that Ms. Ashna was referring to was for the web.  There was not any reason for Ms. Ashna to make accusations against Mr. Shah and his ability to do his job.  She is very close to Mr. Ibrahim and is favored by him for her loyalty to him against the senior staff.

440.    Mr. Noshaba Ashna is favored in the schedule.  She is permitted to make her own schedule as to when she comes to work and leaves.  She is assigned her own show.  On Sundays and Tuesday she is only assigned to do an "original piece" while when a senior is assigned, the "original piece" they also have to do MC job.  On Mondays, she is only a host, no other responsibilities.  Generally she is favored with a lighter work load.

441.    On January 2014, Mr. Ibrahim changed the schedule again, this time, failing to follow the protocol he had agreed to allow staff to help in preparing a balanced and fair schedule. Again this new schedule is biased against the five seniors, and unfair and imbalanced.

442.    On March 26, 2014, Mr. Shah was the shift editor during the evening.  He was working on a piece entitled "Kerry Mid-East" and a report on "Afghanistan election effect on the future of Afghans."  Mr. Jaffer Hund who is a junior and a new hire, was talking with Mr. Ayub Khawreen about his assignment.  Mr. Roshan Noorzai told Mr. Hund that Mr. Shah is the shift editor.  Mr. Hund told Mr. Shah that he did those pieces, without taking the time to go over assignments.  Mr. Shah welcomed him and said "good to have you in the evening" to which he responded "God forbid, for me to work here in the evening."

443.    About 3:00 PM, Mr. Shah asked Mr. Hund to translate a piece, for the evening show.  He said no. He said give me the news.  He wanted Mr. Shah to take the news from Mr. Achagzai (another senior) and give it to him. Mr. Shah said, fine, if you don't want to the

assignment I've asked you to do, that is fine, as for your request for me to take the news from

Mr. Achagzai and give it to you, you will need to discuss that with Mr. Ibrahim.  Mr. Hund said

"I will when I want to."  After this discussion, he went to report this to Mr. Ibrahim, who at 3:26

PM, retaliated against Mr. Shah by bombarding him with more work, two additional interviews

from the Dari service.

### BACKGROUND FACTS
### Mr.   Mohammed Zamen Mohmand
(Attached Exhibit: Broadcasting Board of Governors Report of Investigation
& Exhibits Case Number:  OCR: 13-04)

444.    Plaintiff repeats and reaver each of the foregoing paragraphs as if specifically

restated herein.

445.    Mr. Mohmand is an International Broadcaster (GS-12) at Voice of America

(VOA).  He is assigned to South Asia Division, Afghan Service (Pashto Language), located at

330 Independence Ave. Washington DC.

446.    Mr. Mohmand has been an International Broadcaster at VOA for the last 29 years.

Plaintiff was hired on September 21, 1985.  His position is currently GS-12 with editorial

responsibilities.

447.    Mr. Mohmand was hired at the Pashto service only a few years from its inception

and he has had a leading and critical role in helping establish Pashto language programing.

448.    Mr. Mohmand is 65 years of age, (DOB: 12-29-1947).  He is a naturalized United

States citizen who is originally from Afghanistan and is a native Pashto and Dari speaker, two of

the main languages spoken in Afghanistan.

449.    The requirement for an International Broadcaster (GS-12) at the Pashto Service is

fluency in both Farsi and Pashto languages that are spoken in Afghanistan.  Plaintiff's duties

include; Editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CRs, Backgrounders, Editorials, Press Reviews and Feature Programs.

450.    Mr. Mohmand has never before brought a claim against VOA or any other employer.

451.    Plaintiff's immediate and second level supervisors, managers or persons responsible for his work assignments, as well as management during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.    Mr. Mohammad Ibrahim (Nasir or Nasar) is the current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;
b.    Mr. Ghilzai Amanullah, was former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;
c.    Ms. Beth Mendelson, was the former chief of the Afghanistan Branch/Pashto Service, GS  Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from  August 2006 to May 2013;
d.    Mr. Masood Farivar, is the current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;
e.    Ms. Spozhmai Maiwandi, GS-15, was the former, Director, South Asia Division, who held this position from 2007 to April, 2013;
f.    Mr. Ismail Dahiyat, is the current Director, South & Central Asia Division.

451.    Mr. Mohmand, has been deliberately, maliciously, and constantly targeted by management to force him to retire and leave his job, when Plaintiff refused succumb to the hostilities and discriminatory acts based on his age and national origin, he has been and continues to be discriminated against and subjected to a hostile work environment, and in reprisal for reporting harassing behavior.

452.    Mr. Mohmand has been and is continuously discriminated against and subjected to a hostile work environment, based on his age (12-29-47) and in reprisal for reporting harassing behavior in early 2006 and ongoing, his supervisors began subjecting him to acts that made

productivity nearly impossibly and which prevented him from being able to successfully perform his duties, including: taking away assignments; switching up his assignments; removing him from his position as shift editor; assigning him tasks that are beyond his job, such as production; assigning him jobs for which he is not trained and for which he has not received formal training; failing to send him to training; failing to give him the necessary training; failing to provide him with adequate training; excluding him from training; laughing at him when he tries to participate in meetings;  belittling him in front of his  colleagues; humiliating him by making false accusations against him; treating junior  staff more favorably by offering them computer training, a variety of assignment privileges, covering up their mistakes and promoting them regardless of their lack of language skills  and constant mistakes; failing to provide him with the proper equipment to perform his job; failing to provide him password for Dalet Plus; affirmatively, maliciously, and intentionally instructing junior  staffers not to help him or the senior (aged) employees; discussing his mistakes with his colleagues instead of with him; telling him he should retire; and changing his performance standards to justify a lower rate of performance; changing his yearly evaluations in reprisal to his complaints without telling him; failing to provide him copies of his evaluations; failing to respond to his e-mail inquiry and in person follow-up about his yearly evaluations; ignoring his request for help; ignoring his notices of discrimination, reprisal, harassment and hostile work environment; falsely giving him information about the closing the Pashto Service; putting  a gag on his work related e-mails; exposing him to his manager and co-workers in a group meeting that he is a complainant, a troublemaker; excluding him from meetings; not including his input with scheduling; not acknowledging him in public and humiliating him in front of guests who come to the Pashto service for interviews.

453.     Mr. Mohmand's annual evaluations for the last 29 years have been very good.  He is a journalist known for his integrity, expertise in the Pashto language, and most notably for his professionalism, patience and commitment to the team of professionals and journalists with whom he has worked in the nearly three decades he has spent making VOA Pashto programing. Mr. Mohmand's voice is recognized and respected by the Pashtun speaking audience, until he was replaced.  Mr. Mohmand's notable contributions have been his editorial translations and his team support (up until the time when management decided to target him in an effort to force him to retire, by making his work environment hostile, by harassing him, by discriminating against him all in an effort to replace, Plaintiff and other senior Afghan staff members, with junior  staff from Pakistan).

454.     In reprisal and discriminatory action against Mr. Mohmand, Mr. Ibrahim the Managing Editor changed his schedule and took away his position as shift editor. On November 8th, 2011, Plaintiff was removed from the position of shift editor which he had held for 10 to 12 years.  On Fridays and Saturdays Plaintiff was replaced with Mr. Ashiqullah Rahimzoy and Mr. Hasib; both are junior staffer and Ashiqullah Rahimzoy is a P.O.V (Purchase Order contractor).

455.     Mr. Mohmand was not given notice before his demotion.  His Managing Editor did not give notice that Plaintiff was being removed from his position as Shift Editor. Mr. Mohmand states, that when he asked Mr. Ibrahim why he removed him, or what was his fault and what was the reason, Mr. Ibrahim's response was, "just go and relax, this is the time for you to go and relax." Mr. Ibrahim said this to Mr. Mohmand in the presence of his colleague.  He made this statement meaning that it was time for Mr. Mohmand to retire and that is why he had removed him from his position as shift editor and replaced him with a junior contractor (Ashiqullah Rahimzoy).

456.     In reprisal and discriminatory action against Mr. Mohmand, he was not only removed from Shift Editor, but his responsibilities were replaced with production.  While he does not mind production, he has done production before during emergency situations it is not something in which he has had any formal training.  Further production is outside the Mr. Mohmand's job description.

457.     On March 28, 2013 Mr. Ibrahim wrote an e-mail to Mr. Mohmand about his production skills.  However, Mr. Ibrahim knew or should have known that production is not part of Mr. Mohmand's job description.  After harassing Mr. Mohmand about production, causing Mr. Mohmand humiliation, and suffering, on or about July 17, 2012, Mr. Ibrahim wrote another e-mail, that production was not part of Mr. Mohmand's job, and that he should not be assigned production.

458.     The Managing Editors' actions towards Mr. Mohmand were and continue to be hostile and based on his national origin and his age.  If it were not for his national origin or his age Mr. Ibrahim would not have targeted Mr. Mohmand to harass.  Mr. Ibrahim created a hostile work environment and took away his position as shift editor to force him into production and cause Mr. Mohmand to leave the service.

459.     The Managing Editor has constantly changed schedules, since he started this position in April 2010. Mr. Ibrahim has changed the schedule formally at least three times and has made unfair adjustments constantly.  The schedule changes have been mostly unnecessarily and biased against the seniors, unfair and highly prejudicial, in an effort to force Mr. Mohmand and all the seniors to retire.

460.    The biased schedules are used by Mr. Ibrahim as a means of intentional, deliberate and discriminatory tool to serve his goal of forcing the seniors in the staff to leave the service.

461.    Mr. Ibrahim also uses the biased schedules to showcase the work of the junior staff and those who support him in his harassment of the seniors, to cover-up their short-comings and inadequacies in language and other skills while deliberately creating circumstances to set up the seniors to fail.  For example he knew Mr. Mohmand was not trained in production, but still he placed Mr. Mohmand in production and later attacked him for his production skills.

462.    The schedules are also against VOA standards of equality and opportunity and has resulted in countless mistakes in the development of the shows and creation of programing and hosting.

463.    In the last schedules created by Mr. Ibrahim, he has again targeted the senior staff, including Mr. Mohmand.

464.    Mr. Mohmand's supervisor harassed and targeted him in front of his colleagues in an effort to force him to leave his job.

465.    Mr. Mohmand has had physical and psychological reaction to the chronic and long term harassment by management and being forced to work in a hostile work environment. He has had trouble sleeping and his relationship with his family has become strained due to the stress he has to handle on a daily basis in the hands of his Managing Editor, Mr. Ibrahim.

466.    Mr. Mohmand's Managing Editor, Mr. Ibrahim harassed him with false accusations and misinformed upper-management about Mr. Mohmand's work product in an effort to harass him, create a hostile work environment and to force him to retire. Mr. Ibrahim humiliated and harassed Mr. Mohmand by misinforming Ms. Mendelson (Chief of Afghanistan

Service, at the time) on November 12, 2010 when he falsely accused Plaintiff of not working.
Mr. Ibrahim dragged Mr. Mohmand to Ms. Mendelson's office to humiliate him, when in fact
Mr. Ibrahim had failed to check the logs which would have clearly shown him how much more
Mr. Mohmand had worked, compared to the other staff.  Mr. Ibrahim was humiliating Mr.
Mohmand to show Ms. Mendelson that Mr. Mohmand as a member of the senior group of the
staff was not working.

466.    Plaintiff's supervisor harassed Plaintiff with false accusations in an effort to
create a hostile work environment and force him into retirement.  During a staff meeting when
Mr. Mohmand was not present and Mr. Ibrahim knew that Mr. Mohmand was not in that
meeting, he opened the floor for discussion and said "people are complaining about Mohmand."
Mr. Mohmand should have been informed, if an accusation was made behind his back,, and
given an opportunity to defend himself.  But, Mr. Ibrahim just wanted to have a staff meeting
about Mr. Mohmand when he was not present, to collect enough consensus to fire Mr. Mohmand
from his job.

467.    In order to escalate the hostile work environment, Mr. Ibrahim knew or should
have known that production was/is not part of Mr. Mohmand's job, but sent him to do production
anyway.  On March 27, 2012, Mr. Mohmand went to produce the poetry show. When he was
producing Mr. Ibrahim came without telling him and without having trained Mr. Mohmand,
stood over him to find fault in the way Mr. Mohmand was producing the show. In light of being
targeted by Mr. Ibrahim, this made Mr. Mohmand extremely nervous.  Mr. Ibrahim did this for
two reasons – first to catch Mr. Mohmand in mistakes without having given him an opportunity
for training, and second to create a false and accusatory e-mail against him and to make it seem
as though Mr. Mohmand is incompetent at his job.

467.    After humiliating and harassing Mr. Mohmand about his production skills, and after Mr. Mohmand filed a formal complaint with HR in May 2012, on July 17, 2012, Mr. Ibrahim wrote an e-mail that Mr. Mohmand was not required to do production because it was not part of his job.  Mr. Ibrahim as the Managing Editor with close ties with HR, knew or should have known before he caused Mr. Mohmand such pain and suffering by targeting him with production to force him to retire.

468.    Plaintiff's Managing Editor harassed Plaintiff by failing to send him to training and later blaming him for not being trained.  In a misinformed e-mail on March 28, 2012, Mr. Ibrahim states that Mr. Mohmand had multiple opportunities for training, while he fully understands that this is not true.  Plaintiff states, "I am upset at the unfair and undermining way in which he targets me and tries to belittle me in front of others."

469.    . On February 24th, 2013, Mr. Abid Noor told Mr. Mohmand that Mr. Ibrahim asked him to bring Mohammed's Monday news translations for him to go over.  Mr. Ibrahim was trying to make Mr. Mohmand seem incompetent in front of his colleagues or show Abid Noor that he was in power and could check on others work. While Mr. Mohmand does not mind him checking his work, he minds having to answer to Mr. Noor for his translations.  Mr. Mohmand was there that day, and available and knew what Mr. Ibrahim was asking for, but Mr. Ibrahim asked Mr. Noor and not Mr. Mohmand for Mr. Mohmand's translations.  Mr. Ibrahim in his hatred of the senior staff, stayed clear of them while harassing them from afar.

470.    Mr. Ibrahim treats the junior staff more favorably and discriminates against the senior staff.  Mr. Ibrahim creates schedules in which the differential treatment is apparent, where the junior staff receives shows, interviews, and other plum programing while the five seniors are marginalized, harassed, disregarded for training and forced to work in a hostile environment.

471.    On November 8, 2011 Mr. Ibrahim, removed Mr. Mohmand from the schedule as Shift Editor on Fridays and Saturdays and replaced him with Ashquillah Rahimzoy and Hasib Alikozai.  Both are junior staffers and Mr. Rahimzoy is a contractor, Purchase Order Vendor, and with far less experience compared to Mr. Mohmand.

472.    Mr. Ibrahim consistently gives junior staff opportunities to travel without informing the staff.  For example, Mr. Khan campaigned for Mr. Ibrahim to receive the Gold Medal award, and on or about the same time Mr. Khan was sent to New York for the weekend to cover the United Nations.

473.    Mr. Ibrahim assigns junior staff to train senior staff in materials with which the junior staff is not familiar.  For example, Mr. Khalil Khan was told to teach the senior staff Dalet Plus.  While Mr. Khan had already been given the opportunity to train in Dalet plus he knew less than the seniors he was trying to train.

474.    Mr. Ibrahim in his professional capacity, as the Managing Editor takes away opportunities from the senior staff and transfers it to junior staff.

475.    Management and Mr. Ibrahim aggressively ignore the senior staff most of the time, failing to acknowledge seniors requests for help.  Mr. Ibrahim makes sure the senior staff members are fully aware of his biased behavior towards them, especially reflected in his behavior.  This is as a form of harassment to force the seniors to retire, which is management's goal and has been since on or about 2006.

476.    Senior staff did not have the password to Dalet Plus. The junior staff had the password, because Mr. Ibrahim gave them his own password. However, the junior staff was told not to help the senior staff.  This put the seniors in a terrible situation, causing them and Mr. Mohmand great anxiety on a daily basis.

477.    Plaintiff's Managing Editor, Mr. Ibrahim allowed junior staff to give assignments to the senior staff.

478.    Plaintiff's Managing Editor, Mr. Ibrahim discriminated against the senior staff, including Plaintiff when he did not send them to computer training and put an incompetent junior staff to teach them the new computer programs such as Dalet Plus.

479.    Mr. Ibrahim, the Managing Editor has been and continues to be in a relationship with staffer members who support his discriminatory acts against the seniors.  Those staff members receive better programming and are given greater opportunity for training are sent on trips and given overall acknowledgements and promotions without any deference to their merit or lack thereof.  They are also permitted to come and leave as they want during the shifts.

480.    Plaintiff's Managing Editor, Mr. Ibrahim exclaimed in one of the first meeting he had with the staff, when he first started this post, that he "is the law."  Since that day, Mr. Mohmand was directly targeted and intentionally harassed by management to force him into retirement and all his complaints to management have been ignored.

481.    Plaintiff's Managing Editor, Mr. Ibrahim, created a hostile work environment and targeted him in the schedule, demoted him, gave him assignments that were not part of his job description, secretly changed his yearly job evaluations, failed to send him to computer training, failed to provide him adequate computer training, excluded him from meetings, told him to "go relax," instructed other employees not to help him in particular and other seniors in general. Further Mr. Ibrahim targeted and continues to target Mr. Mohmand by insulting him in public; by refusing to acknowledge or greet him; by gossiping about him and his work and generally creating a divisive environment, in an effort to create a hostile work environment to force Plaintiff into retirement.

482.     Mr. Ibrahim has clearly portrayed to the junior staff that, when there are budget cuts in the service their jobs would be in jeopardy unless the seniors are eliminated first.  During his Thanksgiving party in 2012, Mr. Ibrahim only invited the junior members of the staff, and during that party he asked the junior staff to show him a way to keep them and not the seniors, because during budget cuts, members of one or the other group would have to go.

483.     Plaintiff's Managing Editor, Mr. Ibrahim very often only communicates with the junior staff, to the extent that he completely ignores the senior staff.  Plaintiff states, when he said hello to Mr. Ibrahim in a situation where he was right in front of Plaintiff in the hall or in the office he would not acknowledge Plaintiff and he would turn his face away.  Mr. Mohmand found this consistent behavior highly unprofessional, disturbing and an abuse of his power towards him personally.

484.     When a delegation of Afghans came to visit United States during 2013, Mr. Ibrahim was meeting them and talking with them very close to where Mr. Mohmand and Ms. Khadem were standing, and he refused to introduce the seniors to the delegation.

485.     Management retaliated against Plaintiff by exposing him during a staff meeting for complaining of unfair treatment.  On August 13, 2012 Ms. Maiwandi called everyone to her office for an urgent meeting.  Mr. Ibrahim was also there.  Ms. Maiwandi was very angry that the seniors had been responding to Mr. Ibrahim's false accusatory e-mails, written to harass the seniors and force them into retirement.  Ms. Maiwandi said "no more e-mails."  She was pointing at the seniors and saying she does not have time to help them, to solve their problems.  She put a gag on future e-mails.  She asked Mr. Mohmand if he had a problem. She said she had seen Mr. Mohmand's e-mails and Mr. Shah's e-mails but not Ms. Khadem's.  All this was done in the presence of Plaintiff's colleagues and Managing Editor (Mr. Ibrahim).

486.     Management placed a gag on seniors' work related e-mail responses and said for them to stop e-mails in response to their supervisor.  This was extremely upsetting to the seniors because the e-mails that Mr. Ibrahim was writing to them were designed to harass them.  Mr. Mohmand and all the Plaintiffs were extremely distraught that the Director of the department would single them out for engaging in the protected activity of filing a complaint with Human Resources about the harassment and discrimination that has continued at the Pashto Service.

487.     Mr. Mohmand's Managing Editor, Mr. Ibrahim had un-authorized colleagues assign him duties outside his position.  On March 12, 2012 Plaintiff received an e-mail from Khalil Khan (junior staff and friend, and possibly related family of Mr. Ibrahim) who was the shift editor that morning.  Although Plaintiff was scheduled for the evening, Mr. Khalil Khan wrote to give Plaintiff an assignment, telling him to be producer.  The supervisor was authorizing junior staff to make unauthorized assignments and control scheduling, without any authority.

488.     Plaintiff's supervisor Failed to provide Plaintiff with the proper equipment to perform his job.  On March 20, 2012 Plaintiff was assigned to cover the Cherry Blossom Celebration in Washington DC.  When he went back in to the office with the recordings, the cable was missing and even the engineers could not help him transfer the information, because Mr. Mohmand's wire was faulty.  Before leaving Mr. Mohmand asked Mr. Ibrahim for the equipment and that was the equipment he gave Mr. Mohmand.  A manager must know that sending someone to do coverage means they should be sent with the right equipment.  Mr. Ibrahim purposefully sends the seniors on assignment and sabotages their work by either giving them the wrong equipment as he did here or sending them out at the wrong time or not giving them enough time to complete the assignment.  On all these occasions, even when the senior is

not at fault, he or she is later blamed by Mr. Ibrahim.  This is one of Mr. Ibrahim's patterns of practice in targeting the senior staff, particularly the five senior complainants.

489.    Mr. Ibrahim instructed the junior staff not to help the senior staff.  Ashequillah Rahimzoy, among others, have been told by Mr. Ibrahim to not help the the seniors and if they do get help from them to report the seniors to management.  This is very disturbing and highly unprofessional for a manager to discourage teamwork.

490.    Plaintiff's Managing Editor, Mr. Ibrahim in an ongoing effort to humiliate him discussed Plaintiff's mistakes with his colleagues instead of with him.  Mr. Ibrahim would walk around the booths of the junior staff and gossip about Mr. Mohmand and his skills.  Mr. Ibrahim used his position of authority to insult Mr. Mohmand, and has made it very difficult for Mr. Mohmand to face his colleagues in light of this behavior.

491.    The Director of South Asia Division, Ms. Spozhmai Maiwandi, told Plaintiff that he should retire in his complaints about discrimination.  Plaintiff state "she told me that four seniors were going to likely not be retained.  She said our names: B. Shah, Zeba Khadem, M. Achagzai and myself.  She said its time to go. I left her office sorry I had ever approached her.  I was asking her for help and she was telling me to leave my job."

492.    Plaintiff's Managing Editor, Mr. Ibrahim, changed Plaintiff's performance standards, without telling him or discussing the changes. The new evaluations were directly designed to target the seniors and create future bad evaluations.

493.    In 2014, Plaintiff went to get copies of his evaluations from Mr. Ibrahim, who sent him to HR, where Ms. Hoffman produced an incomplete evaluations submitted by Mr. Ibrahim.  To this day, Ms. Yoko Hoffman has refused to provide evaluations submitted by Mr. Ibrahim.

494.    Management deliberately altered Plaintiff's evaluations and failed to provide a copy after he requested to see a copy of his previous years' evaluations.  Ms. Hoffman stated that she does not have completed evaluations and would try to resolve the problem with Mr. Ibrahim. She responded the same to the other complainants who attempted to get copies of their evaluations.

495.    In a meeting with Mike Collins (Temporary Chief of Pashto Service) where he requested Mr. Mohmand to meet with him, regarding the changes in the evaluation, Mr. Collins agreed that the evaluations had been changed and that the language was vague and biased giving Mr. Ibrahim discretion to make seniors seem incompetent.

496.    From when Plaintiff started work with VOA, to the best of his knowledge he has never received a negative evaluation, to the best of his knowledge.  But management changed the evaluations to make the seniors seem "suddenly stupid" when in reality what was happening at the service was that those junior staff who lacked Pashto language skills were ruining the shows and the reputation of the service.

497.    Plaintiff's Managing Editor, Mr. Ibrahim deliberately interfered with team work in the service.  Teamwork was destroyed when Plaintiff told the junior staff not to help the seniors and when he directed the junior staff to write up and report the senior staff if they ask for help, or if the junior staff end up helping the seniors, to record the incident, as though it were a crime scene.

498.    When Mr. Ibrahim bombarded Mr. Mohmand with work, he confided in this colleague Mr. Abid Noor, to say "this is too much for one person no one in the service does this much work."  Mr. Noor however told Mr. Mohmand, "if you do not do it then I have been told that I have to report you to Ibrahim."

499.     Plaintiff started giving notice of discrimination to management starting 2010.  He complained to Ms. Spozhmai Maiwandi (who was the Director of South Asia at the time of the complaint); he complained to Ms. Beth Mendelson (who was the Chief of the Afghanistan service); he complained to Mr. Ibrahim, he also complained to Human Resources (where he was interviewed as though it was his fault for making the complaint); Plaintiff also complained to to the Ombudsman and to Office of Civil Rights and have tried to get help in an attempt to prevent further harm to his health and his job.

500.     As a result of being a victim of discrimination and desperately trying to get help, Mr. Mohmand now suffers from anxiety, Plaintiff states: "I have been unable to travel and been forced to cancel trips.  I am afraid all the time.  I think I am being abused and that makes me very upset and angry.  I feel worthless and ashamed and I feel a victim of lies.  I feel voiceless and taken advantage of and I feel betrayed for my decades of service to VOA."

501.     Beth Mendelson (former Chief of the Afghanistan service) in a general meeting in which Pashto and Dari staff were participating, said about the seniors that if they lose this job, they can't even work in McDonald's (because of their age).  She intended on humiliating the seniors and Mr. Mohmand.  In another meeting Mr. Mohammad Ahmadi (Farsi service) said that old staff members are like those old cars and their parts old and they don't work.

502.     Ms. Mendelson generated this atmosphere of humiliating the senior staff.  She allowed it to happen in her meetings, she welcomed these comments she smiled and accepted them as true when they were said in her meetings.

## BACKGROUND FACTS
### Mr. Taher Achagzai
(Attached Exhibit: Broadcasting Board of Governors Report of Investigation
& Exhibits Case Number:  OCR: 13-02)

503.    Plaintiff repeats and re-avers each of the foregoing paragraphs as if they were specifically restated herein.

504.    Mr. Achagzai is an International Broadcaster (GS-12) at Voice of America (VOA).  He is assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.

505.    Mr. Achagzai has been an International Broadcaster at VOA for the last 26 years. He was hired as a contractor or Purchase Order Vendor in November 1988 and was promoted to full staff in November 2001.  He was promoted to GS-12 in 2013 after he filed a complaint with Office of Civil Rights and Office of Human Resources at VOA.

506.    Mr. Achagzai is 76 years of age, (DOB: 11-12-1938).  He is a naturalized United States citizen who is originally from Afghanistan and is a native Pashto and Dari speaker, two of the main languages spoken in Afghanistan.

507.    The requirement for an International Broadcaster (GS-12) at the Pashto Service is fluency in Pashto language, spoken in Afghanistan.  Plaintiff's duties include; Editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CRs, Backgrounders, Editorials, Press Reviews and Feature Programs.

508.    Mr. Achagzai has never before brought a claim against VOA or any other employer.

509.    Mr. Achagzai has worked all his work life as a journalist in the field of broadcast radio.  He was one of the first to launch a Pashto language air show in Radio Peking, China (1973); and before that from 1967-68 in London for BBC.  For many years he worked for the

radio and TV in Kabul, Afghanistan.  Mr. Achagzai is well known and respected for his 50 years

of service in Pashto language radio through-out the world, by the Pashtun community not only in

Afghanistan but by the diaspora around the world.

510.    Plaintiff's immediate and second level supervisors, managers or persons

responsible for his work assignments, as well as management during the pertinent times related

to the claims of this complaint include but are not limited to the following individuals:

a.    Mr. Mohammad Ibrahim (Nasir or Nasar) is the current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.    Mr. Ghilzai Amanullah, was former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

c.    Ms. Beth Mendelson, was the former chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from  August 2006 to May 2013;

d.    Mr. Masood Farivar, is the current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

e.    Ms. Spozhmai Maiwandi, GS-15, was the former, Director, South Asia Division, who held this position from 2007 to April, 2013;

f.    Mr. Ismail Dahiyat, is the current Director, South & Central Asia Division.

511.    Plaintiff, has been deliberately, maliciously, and constantly targeted by

management to force him to retire, he has been and continues to be discriminated against,

subjected to a hostile work environment, and harassed in reprisal for reporting harassing

behavior.

512.    Mr. Achagzai has been and is continuously discriminated against and subjected to

a hostile work environment, based on his age (DOB: 11-12-1938) and in reprisal for reporting

harassing behavior, his supervisors began subjecting him to acts that made productivity nearly

impossibly and which prevented him from being able to successfully perform his duties,

including: taking away assignments; switching up his assignments; assigning him tasks that are

beyond his job, such as production; assigning him jobs for which he is not trained and for which

he has not received formal training; failing to send him to training; failing to give him the

necessary training; failing to provide him with adequate training; humiliating him by making

false accusations against him; treating junior  staff more favorably by offering them computer

training, a variety of assignment privileges, covering up their mistakes and promoting them

regardless of their lack of language skills  and constant mistakes; failing to provide him

password for Dalet Plus; affirmatively, maliciously, and intentionally instructing junior  staffers

not to help him or the senior (aged) workers; changing his yearly evaluations in reprisal to his

complaints without telling him; failing to provide him copies of his evaluations; ignoring his

notices of discrimination, reprisal, harassment and hostile work environment; falsely giving him

information about the closing the Pashto Service; putting  a gag on his work related e-mails;

exposing him to his manager and co-workers in a group meeting that he is a complainant, a

troublemaker; excluding him from meetings; not including his input with scheduling; not

acknowledging him in public.

513.     Mr. Achagzai's annual evaluations for the last 26 years have been stellar.  He is a

journalist known for his journalistic integrity, his mild manner, his professionalism, his

commitment to teamwork and for going above and beyond what is necessary to achieve the best

radio programing.  He is an expert in both English and Pashto languages.  He is also recognized

worldwide for his poetry show (up until the time when management decided to target him in an

effort to force him to retire, by making his work environment hostile, by harassing him, by

discriminating against him all in an effort to replace, Plaintiff and other senior Afghan staff

members, with junior  staff from Pakistan).

514.    Defendant continues to retaliate, discriminate and subject Mr. Achagzai and all the Plaintiffs included herein to a hostile work environment, based on their age and national origin.

515.    During one of the very first staff meetings held by Mr. Ibrahim, with the staff, in response to Ms. Zeba Khadem, Plaintiff's senior colleague's legitimate concern regarding the schedule he stated "I am the law."

516.    Plaintiff's manager took away his regular programming without cause, reason or warning. The manger created a hostile work environment and used his position to change schedules and assignments as a form of harassment of the senior staff based on their national origin.  The Managing Editor also sent the senior staff inaccurate e-mails regarding assignments to create a conflict in the work place.   He also told the junior staff not to help the seniors.

517.    On or about the beginning of 2012 when the news about budget cuts at the Voice of America was spreading, Mr. Ibrahim, the Managing Editor became worried that some of the junior staff would have to be subjected to budget cuts.  He was worried about the junior staff and especially two staff members (Khalil Khan and Nazrana Ghafar) both of whom he supported in hiring at GS-12 without language tests and who don't have enough knowledge of the required language Pashto, and don't have any knowledge of Dari, the other main language in Afghanistan.

518.    The assignments that Mr. Ibrahim took away from the Plaintiff were transferred to those who are less qualified. The result of such discriminatory acts not only harmed and damaged the Plaintiff but also greatly damaged VOA programing.  At no time has there been this type of poor quality and quantity of Pashto language programing in the Pashto Service.

519.    After Mr. Achagzai filed  a complaint with the Office of Human Rights in May 2012, he was further targeted.  Plaintiff was harassed and retaliated against in an e-mail on

August 12, 2012.  Mr. Ibrahim states, "Mr. Achagzai, you are of the 70s and 80s" insinuating the

Plaintiff's age is a hindrance to his job. While Mr. Achagzai has been doing radio broadcast

translating and voicing the news which is the backbone of the whole air show at 5:00 pm; 7:00

pm; 8:30 pm, and 9:30 pm every day five days a week.  When Mr. Ibrahim uses these words and

throws around these false e-mails and makes the environment of the service hostile, it is clearly

an intentional act of harassment to force Mr. Achagzai into leaving the service and retiring.

520.    Mr. Ibrahim scheduled Mr. Achagzai to do production when he knew or should

have known that production is the one area in which Mr. Achagzai did not have most up-to date

training.  According to Mr. Ibrahim's illogical reasoning, it was inexcusable for Mr. Achagzai

not to know production, while it was acceptable for junior staff who fail to learn the standard

language of the service and even be rewarded with plum assignments, travel, and shows.

521.    In retaliation to the seniors' complaints about discrimination and harassment, Mr.

Ibrahim and management changed the annual evaluations with vague and biased language,

giving himself the discretion to criticize the seniors and give them negative evaluations.  Further,

management did not go through the proper process to make the necessary changes, such as

consulting the employees or giving them notice of the changes.

522.    Michael Collins, Acting Chief of the Afghanistan Service met with Plaintiff to

discuss the changes made to the evaluations and agreed that the changes were not made

constructively and the language of the changes is vague and unfair to the senior staff.

523.    Defendant's discriminatory acts are based on reprisal for reporting harassing

behavior.  Plaintiff reported the nature of the discriminatory behavior by Mr. Ibrahim to Ms.

Mendelson, the Ombudsman, Human Resources and finally OCR.

524.     Plaintiff's Managing Editor, Mr. Ibrahim, unnecessarily changed Plaintiff's assignments; wrote e-mails with false accusations when he knew that what he was writing was not accurate, but he did it anyway to harass the Plaintiff, and force him to retire; and when Plaintiff responded, his supervisor wrote back accusing him that he is from the "70s" and "80s," thus unable to understand or do his job well.  According to management Plaintiff is a senior and because he is a senior the supervisor had every right to to attack him with such e-mails (sent at 1:00 am), discriminate against him, harass him, and retaliate against him.  Worst of all, Plaintiff's supervisor falsely accused him of not doing his job, a job Mr. Achagzai has and will continue to  succeeded in all his career and particularly at VOA.

525.     According to Mr. Ibrahim, Plaintiff was "suddenly" unable to perform his job, and  continue hosting the poetry show.  Mr. Ibrahim took the poetry show from Mr. Achagzai under pretense and gave it to Noshaba Ashna, his friend and supporter in his harassment of the seniors.  In the new schedule of February 2014, Mr. Ibrahim has assigned Ms. Ashna a lighter work load, compared to the seniors.

526.     Mr. Ibrahim wanted to take Mr. Achagzai's poetry show from him and give it to Ms. Ashna. He created a pretence and criticized Mr. Achagzai, wrote an inaccurate and false e-mail about the poetry show and targeted Mr. Achagzai.  In retaliation to Mr. Achagzai trying to defend his position against Mr. Ibrahim's discriminatory targeting of him, Mr. Ibrahim without any reasonable notice, reasonable discussion or consistency took away the poetry show and gave it to Noshaba Ashna.

527.     Mr. Ibrahim continues to target Mr. Achagzai by unfairly overburdening him with additional assignments to force him to give up the "news translation."  Mr. Ibrahim targets Mr. Achagzai by giving him more assignments, increasing four (4) news assignments daily during

the week, far more compared to others. After Mr. Achagzai complained of discrimination, his

manager continued to target him and wrote him an e-mail telling him that since Mr. Achagzai is

from a different era "70s" and "80s" he was incompetent and deserving of punishment. After Mr.

Achagzai complained, his manager increased his assignments compared to the others to make his

work burdensome. He was making the environment hostile to force and bully Mr. Achagzai out

of his job.

528. On October 09, 2012, Mr. Ibrahim, wrote Mr. Achagzai telling him to bring a

doctor's note if he is not coming in the next day, when he knows that Mr. Achagzai is a very

responsible employee and would never come to work without a note. Mr. Ibrahim was using this

opportunity to record that Mr. Achagzai is missing days or that he has a habit of irresponsibility.

None of Mr. Ibrahim's insinuations are true, he was intentionally targeting Mr. Achagzai in any

possible way to cause him to retire, by making his job environment hostile from the details of

accusing him of not brining a doctor's note to taking away his poetry show. At the same time,

Mr. Ibrahim was actively making the whole service divisive, telling the junior staff not to help

the seniors, etc.

529. The discriminatory actions started sometime when Ms. Mendelson started and

was heightened during the time Mr. Ibrahim started and was even more severe during part of

2012-2013 and is currently continuing with Mr. Ibrahim's latest schedule updates. Further

Plaintiff's annual evaluations were changed without notice to the seniors, and the evaluations are

biased against the seniors, designed to set them up to fail. Yoko Hoffman of human resources

office is not able to provide the seniors with a completed set of evaluations. The evaluations

seemed to have been incomplete and altered again, once the seniors signed them. The seniors

have not received a completed copy of their evaluations.

530.    Ms. Mendelson and Ms. Maiwandi discriminated against Mr. Achagzai by failing to promote him to GS-12.  They failed to promote Mr. Achagzai in a timely manner because Mr. Achagzai is a senior.

531.    When Mr. Mohmand visited Ms. Maiwandi in her office to complain of discrimination on behalf of himself and of the senior staff at the Pashto service, she mentioned Mr. Achagzai's name and said because of the old age "you" (Mohmand) and Mr. Achagzai and Mr. B. Shah and Ms. Khadem will be let go.  Ms. Maiwandi's comments were directly related to the complainants' age and she was basing her decision and her comment on their age.

532.    On August 13, 2012 Ms. Spozhmai Maiwandi called an emergency meeting of all those present.  Mr. Achagzai was the only senior not in attendance, it was his day off.  But he had been the senior who was writing the e-mails in response to Mr. Ibrahim.  In that meeting she said stop the e-mails.  She was upset because she said some of you are using "my name" in your e-mails.  No one else had used her name except Mr. Achagzai, she knew it was Mr. Achagzai, because he had copied her on that e-mail.  Mr. Achagzai sent the e-mail to David Ensor (Director of VOA).  Also since Mr. Ibrahim's friend Nazrana Ghaffar saw Mr. Achagzai and his attorney waiting and walking to the back room for interview with the interview with HR, Mr. Ibrahim had became particularly more hostile.  He started writing itemized accusations to cover his own behavior or possibly to create a false defense for himself.  Regardless, when HR also failed to help Mr. Achagzai  and interviewed him as though he was the aggressor, he was ready to leave his job and end his career because his health was being compromised. Without any other recourse, Mr. Achagzai sent Mr. Ensor his e-mail responding to Mr. Ibrahim's accusations.  In that e-mail Mr. Achagzai mentioned Ms. Maiwandi.  Soon thereafter, on August 13, 2012 Mr.

Maiwandi held the meeting and exposed all the seniors as the complainants and also put a gag on their future e-mails.

533.    Since 2006 management has been aware of senior complaints regarding, hostile work environment, harassment and discrimination based on age, as well as favoritism between Managing Editors and those members of the staff who support them in their efforts to force the senior into retirement.  On or about March 20th 2012, Mr. Achagzai visited Ms. Mendelson's office together with Mr. Ibrahim and showed her the false and harassing e-mails from Mr. Ibrahim to Mr. Achagzai.  Management knew that the seniors had filed a formal complaint with Human Resources on or about May 2012 that Mr. Achagzai was being harassed based on age. But the harm continued and nothing changed, and occasionally became much worse.

534.    Mr. Achagzai's co-workers who were treated favorably include, Khalil Khan, Nazrana Ghafar, and Abid Noor.  Khalil Khan and Nazrana Ghafar have been hired at GS-12. They have been exempt from doing the news, because their Pashto language skills are not at the level required for this position of international broadcaster.  They have been exempt from doing the news, the most important and most difficult job in broadcast radio.  While Mr. Achagzai was assigned five days a week and four different broadcasting shifts.

535.    Khalil Khan who does not have the necessary training or language skills to be an editor is at times scheduled as a shift editor.  Abid Noor who also does not have any translating and editing skills and is unable to copy edit was promoted by Ms. Maiwandi to GS-12 and he is now some type of advisor to Mr. Ibrahim who in turn has assigned him shift editor for five days a week on certain weeks.

536.    Mr. Achagzai was subjected to acts that negatively impacted his ability to successfully perform his duties.  Mr. Ibrahim discriminated against Mr. Achagzai at every single

opportunity and deliberately set him up to fail and later wrote scathing e-mails, as though to keep a record of Mr. Achagzai's alleged mistake.  On August 12, 2012, Mr. Achagzai got an e-mail from Mr. Ibrahim, sent in the middle of the night, at 1:00 AM.  Mr. Ibrahim seemed furious at Mr. Achagzai without any reason.  In fact, Mr. Ibrahim in part stated:  "… I am sorry to say you are stuck in the 70s and early 80s and still think that the time has not moved a day forward ever since and ten minutes news is good enough for the entire eight hours shift."  He is blaming Mr. Achagzai for his age, not necessarily discussing the issue of "ten minutes of news" because he knows his request is unreasonable and designed to harass Mr. Achagzai. This is a request Mr. Ibrahim would never make of other junior  staffers, such as Khalil Khan or Nazrana Ghaffar, or anyone of those who support him in his discrimination against the seniors.  It was unfair and caused Mr. Achagzai great anxiety and interrupted his work and his ability to successfully perform his job.

537.    Mr. Ibrahim ignores the news, while he knows or should know that the news is always a very important part and the backbone of the airshow.  Ten minutes news that he points out in his e-mail of August 12, 2012, is in fact part of a thirty minutes airshow for which the morning shift team is working (Mr. Ibrahim conveniently fails to check the logs when the seniors are concerned).  Mr. Achagzai did and does the news five days a week for two main airshows each 10 minutes plus 5 minutes at 5 pm and 5 minutes at 7 PM, by himself, alone.  During the morning shift four or five people work on twenty minute show.  However, in Mr. Ibrahim's schedules he has retaliated against Mr. Achagzai again, and has assigned Mr. Achagzai an additional 10 minutes news at 2:30 PM.  This was the job of the morning shift newscaster, which he wanted to dump on Mr. Achagzai.  Later he dropped the 2:30 PM news from Mr. Achagzai's schedule.  The junior  staff and those who support Mr. Ibrahim in his discrimination against the

seniors are not assigned this intense of a schedule.  The schedule is unfair and it is used to force

Mr. Achagzai to retire while being harassed and called an incompetent because he is from the

"70s." Mr. Achagzai does not deserve such treatment.

538.    Mr. Achagzai's daily tasks includes ten minutes news each or (10+10+5+5 = 30)

total of thirty minutes of news and with updates which is always Mr. Achagzai's job, it adds up

to even more than 30 minutes, which he does with an expert level qualification in Pashto

language proficiency, as well as professionalism and speed.  Mr. Achagzai's work, does not

compare with the 3 or 4 minute CR or backgrounders or a few moments interviews by some of

the junior staff, Ms. Ghaffar or Mr. Khan.  Mr. Ibrahim both overlooks their lack of productivity

and also will not assign them the news or other difficult tasks.  Sometimes, the junior staff

pretend to be busy with work such as an interview etc. and later the work is never provided, no

one knows where that work is or whether it was even completed.  Other times the assignment is

average and Ms. Maiwandi and Mr. Ibrahim send out service wide e-mails stating "fantastic" or

great job.   At the same time while Mr. Achagzai does a the bulk of the work, he is harassed and

told that he is from the "70s" and there is no place for Mr. Achagzai to work at the service.  This

is simply because he is a senior who has complained against Mr. Ibrahim's discriminatory

actions.

539.    Mr. Ibrahim tries to distort the facts against seniors and in favor of some of the

junior staff members who have been hired by him or through his support and who are also from

Pakistan.  Some of these individuals were hired without taking the mandatory language tests and

who cannot translate from English into Pashto which is the broadcast language.

540.    In the e-mail of August 12, 2012, sent at 1:00 AM, from Mr. Ibrahim to Mr.

Achagzai, Mr. Ibrahim has given a list of 12 items to target and harass Mr. Achagzai.  Mr.

Ibrahim clearly admits that age is a factor in his harassment of Mr. Achagzai.  Mr. Ibrahim has

failed to consider Mr. Achagzai's expertise in radio-broadcasting.   Mr. Achagzai was attacked in

this e-mail in such an aggressive manner that caused him mental and physical trauma.  In

combination with the daily hardship he has to endure while at work, it affected his sleep for

months.  Mr. Achagzai continues to suffer from insomnia for which he has had no choice but to

get prescription medications. That has affected his health and overall well-being.

541.    There is no other reason for Mr. Ibrahim to write this e-mail of August 12, 2012

sent at 1:00 AM but to target Mr. Achagzai.  Mr. Ibrahim tried to give the news to Khalil Khan,

who is constantly promoted by both Mr. Ibrahim and Ms. Maiwandi, but he failed in doing the

news and later Mr. Ibrahim wrote the whole service to say – please do not give Khalil Khan the

news anymore.  But Khalil Khan only does the assignments he enjoys in exchange for supporting

Mr. Ibrahim in his efforts to harass the seniors in the service.  Sometimes Khalil Khan acts as a

manager and writes e-mails, changing shows and assignments.  Thus, it is unclear why Mr.

Ibrahim has a problem with Mr. Achagzai doing the news at an expert level and calls him a relic

from the 70's and being angry with him all the time, and harassing him for doing the bulk of the

work, the news.  The e-mail sent by Mr. Ibrahim on August 12, 2012 at 1:00 AM, was designed

to harass Mr. Achagzai and in combination with managements continued and persistent

harassment would cause Mr. Achagzai to leave his job.

542.    Even after many notices by the seniors to upper-management warning them that

Mr. Ibrahim is attacking five of the seniors in the Pashto service, nothing was done, management

did not hold a meeting, or send out a memorandum about the standard policy or BBG's policy

against harassment.  On the contrary, management encouraged Mr. Ibrahim's discriminatory

actions.  As a result Mr. Ibrahim has become more emboldened in his harassment and has caused

greater damage to the seniors in the Pashto service, with his biased remarks, unfair schedules and continued efforts to maintain a divisive service where the senior and junior staff were and continue to be kept apart and the seniors are treated as the inferior. Mr. Ibrahim has been given free rein to harass the seniors as he sees fit, to say whatever he wants without any repercussions, oversight, standard or policy against such discriminatory conflict.

543.    Mr. Ibrahim simply finds his lies justified because he is in a position of power and according to his own words, as he said in one of the first meetings when he took over this position of Managing Editor, that "I am the law." Mr. Ibrahim's actions have harmed the seniors' health both emotional and physical as well as their family relations and overall well-being, by interfering with their life plans and their future.

544.    Mr. Achagzai's ability to successfully perform his duties was negatively impacted by being ordered to produce shows without being provided adequate training to perform. On Thursday, March 22, 2012 Mr. Ibrahim sent an e-mail assigning Mr. Achagzai to production. This was a sudden and abrupt change in Mr. Achagzai's daily work schedule. Mr. Ibrahim was targeting Mr. Achagzai again and harassing him with sudden changes in Mr. Achagzai's schedule, and assigning him to a task which he had not done in a while and which would need at least a refresher course before putting a person to handle a live show. Mr. Ibrahim knew that Mr. Achagzai typically prepares the news and not production. Mr. Ibrahim should have at least briefly discussed Mr. Achagzai's preparation for production before forcing him to handle production. But since he was simply setting him up to fail, as form of harassment, he suddenly put Mr. Achagzai on for production as a "sneak attack."

545.    Mr. Ibrahim would and has not stopped at anything, including putting the Pashto service programing in jeopardy in order to pursue management's agenda to harm and humiliate

the seniors and to force them to leave, resign, retire, or even be terminated.  In fact this sudden change of Mr. Achagzai schedule by Mr. Ibrahim was unnecessary, because later that same day upon Mr. Achagzai request, Mr. Ashiqullah Rahimzoy and Shafia Sardar followed the already set schedule, in which Shafia Sardar was MC, Mr. Achagzai did the news and Mr. Rahimzoy was producer.  The show was done successfully. There is absolutely no doubt that the reason Mr. Ibrahim changed the schedule was to harass Mr. Achagzai and also ruin the show and promote Mr. Rahimzoy (POV who was promoted to shift editor to replace two other seniors, Mr. Shah and Mr. Mohmand).  This situation was devastating for Mr. Achagzai.  In the context of the additional harassment and discrimination against him, he became upset and emotional at the lack of justice and continued harm.  He was anxious and depressed and this affected his health and his home life and his family.

546.    A few days later Mr. Achagzai complained to Beth Mendelson about this misleading and hostile behavior.  Mr. Achagzai complained in the presence of Mr. Ibrahim and showed a hard copy of the e-mail to her and asked for an explanation.  Mr. Ibrahim wrote Mr. Achagzai an e-mail, stating: "you don't know production when I say 'don't know' I mean zero skill in production."  Instead of giving Mr. Achagzai the opportunity for training, and a chance to be trained instead, Mr. Ibrahim used this as an opportunity to harass Mr. Achagzai.  Mr. Ibrahim intentionally and knowingly used aggressive language against Mr. Achagzai just to harass him and create a hostile work environment for him.

547.    Mr. Ibrahim's plan was to force the seniors into production and from there simply push them out of the news altogether.  While Mr. Achagzai does not mind learning production, he has been damaged by management's use of production as an underhanded tactic to harass and intimidate and force senior employees to resign.

548.    Although Mr. Achagzai continued to respond to the false e-mails by Mr. Ibrahim,

after Ms. Maiwandi's meeting with the 3 other seniors on August 13, 2012, he was very scared,

as she had put a gag on work related e-mails.  Supra ¶ 532.  In fact some months before, when

Mr. Mohmand one of the senior complainants had told her about the harassment, Ms. Maiwandi

told him that the seniors (including Mr. Achagzai) were going to be let go.  Ms. Maiwandi would

support Mr. Ibrahim regardless of his actions to prove that Mr. Ibrahim, her hand-picked editor

in chief was actually "the law" as he had claimed during one of his first meetings with the staff

of the Pashto service.  Needless to say Mr. Achagzai felt a great deal of pressure from

management to leave his job, his career, and fail in a career he had spent fifty (50) years

perfecting and in which he continues to excel.

549.    Mr. Achagzai's ability to successfully perform his duties were negatively

impacted by having his performance standards changed.  The standard categories of the annual

evaluation are generally the same and it captures the basics of the job. Since the year 2012

because of Plaintiff's complaints of discrimination, the annual evaluations were changed by

management without informing the staff, particularly the senior staff.  When Mr. Achagzai

looked through the annual evaluation carefully he realized that the criteria had changed to

include vague and biased items that Mr. Ibrahim could easily manipulate to target the seniors.

For example where Mr. Ibrahim did not allow the seniors proper training and was now going to

evaluate them in that category, such as production.  The language left much to Mr. Ibrahim's

discretion, a discriminatory manager who believes he is the law and against whom five senior

staff members had complained.  Plaintiff's evaluations were changed without his consent or

knowledge, when it clearly states on the evaluations that notice must be given when such

changes are made. Plaintiff did not have any notice of these material changes to the evaluation of his job.

550.     Plaintiff's ability to successfully perform his duties was negatively impacted by attempts to force constructive discharge by making negative reports against him. For example the 50 Minutes poetry show hosted by Mr. Achagzai and Shafia Sardar for many years was very popular and the audience loved this show because it had its own style. Typically during the show poetry was presented and at times the hosts included some of their own works (quatrains, poems, short stories, etc.). The show also invited the audience to share their own with the host and greater audience. This show mostly did not have any guests. But on particular occasions they would have one or more guests who would be included based on their fit into the programming and design of the show.

551.     On or about March 13, 2012 Mr. Achagzai had arrived for the show at about 1:00 pm. He and Shafia Sardar started the preparation for the poetry show, which was scheduled at 2:30 pm. But Mr. Ibrahim called them to his office and told them that "today is the 16th death anniversary of the poet Ghani Khan, and you do the show about him." Ghani Khan, was a poet who lived and died in Peshawar the capital of North – West Pakistan, recently called (Khyber Pashtun Khwa). Mr. Achagzai and Ms. Sardar accepted his order even though that was not enough notice to change the topic of the whole show, literally before the show was to start. Mr. Achagzai only had time to choose some of Ghani Khan's poems and some of the information about him on the internet. That day they also had a guest, Mr. Ali Tacker who works with Radio Dewa of Voice of America which broadcasts in Pashto for Pakistan. This guest was chosen by Mr. Ibrahim himself to be the guest. Moreover, Mr. Ibrahim printed information off the internet

about Ghani Khan and gave it to Mr. Achagzai.  The show went very well, in spite of Mr.

Ibrahim's interruptions and interferences.

552.     When Mr. Achagzai and Ms. Sardar left the microphones and entered the

production room, they ran into Mr. B. Shah and Roshan Noorzai who were listening to the live

show, and who know and understand and have experience with such shows, were applauding Mr.

Achagzai and Ms. Sardar and called that "an award winning show."

553.     After the show was very well done.  Mr. Ibrahim was waiting for Mr. Achagzai

and Ms. Sardar to return from the studio and as soon as they got back he engaged Mr. Achagzai

and Shafia in front of other members of the Pashto service including B. Shah and Roshan

Noorzai.  Mr. Ibrahim attacked Mr. Achagzai and Ms. Sardar with unfair accusations of not

doing the show the way he wanted it to be done. Mr. Ibrahim seemed excited, agitated, and the

accusations  surprised everyone in the room.  He was simply gasping to come up with mistakes

and trying to make the hosts of the show especially Mr. Achagzai feel badly about the show and

his skills and about his job and even his ability to work in radio.  It was shattering, for Mr.

Achagzai to hear a Managing Editor target him in this way, when it was Mr. Ibrahim who was at

fault.

554.     But Mr. Ibrahim was not letting go, he thought that the harsh critic of Mr.

Achagzai's show was enough to get rid of Mr. Achagzai.  He continued to harass Mr. Achagzai,

with an e-mail on March 15th, 2012 containing more accusations and wrong statements blaming

Mr. Achagzai for not knowing the anniversary of Ghani Khan's death.  While Mr. Ibrahim

knows that Ghani Khan is a Pashtun Poet, but he is mainly known in Pakistan Pashtun area for

which Radio Dewa is broadcasting not Radio Ashna.  Radio Ashna broadcasts for Afghanistan

and Ghani Khan is not well known throughout Afghanistan.

555.     Mr. Ibrahim who is not from Afghanistan and who himself is not aware of the poets that are revered in Afghanistan, and ignores all their anniversaries, took an opportunity to harass Mr. Achagzai for allegedly not knowing the anniversary of a Pakistani poet's death.  Also, if Mr. Ibrahim was aware of this anniversary why did he not say anything, either the day or week before the show, why did he have to spring it on Mr. Achagzai?  He waited until the very last moment to harass Mr. Achagzai, an Afghan who may not have been aware of a Pakistani poet's anniversary.

556.     Mr. Ibrahim's attack on Mr. Achagzai's poetry show greatly impacted Mr. Achagzai's well being and ability to continue his work.  It impacted his physical health as well as his emotional health.  After Mr. Ibrahim's outburst, a few days later he, retaliated and punished Mr. Achagzai and changed the schedule again and gave the poetry show to Noshaba Ashna and didn't tell Mr. Achagzai or Ms. Shafia Sardar about this change.  His target was Mr. Achagzai and he successfully removed him from the poetry show.  The person who replaced Mr. Achagzai is a new hire, and a supporter of Mr. Ibrahim's harassment of the senior staff.  In acknowledgement for Ms. Noshaba Ashna's loyalty he gave her the poetry show.  This was to show Mr. Achagzai that he is no longer needed in the service that his work is poor that he must retire or he will be fired.  When in reality, Mr. Achagzai's show should not have been taken from him.  There was no legitimate reason to target Mr. Achagzai and take his show from him and Ms. Sardar.

557.     Mr. Ibrahim also tangled with Mr. Achagzai over ethnic differences and for that reason targeted him to harass.  For example the use of a Pashto word *Chopar* means service and if used with a nation or people it has a positive sense or meaning.  But in the view of some Pakistani linguists it is always used in a negative sense.  The difference again is in the Pashto

Language spoken in Afghanistan and in Pakistan.  Mr. Achagzai was appropriately translating the word for Radio Ashna (for an Afghan audience) not Radio Dewa (Pakistani audience).  Mr. Ibrahim used his position of power to favor those from Pakistan and harass those not from Pakistan, and took it even farther with senior Afghan staff.  He consistently, considered it part of his job to force the senior Afghans out of the Pashto service and replace them with Pakistani nationals or Pakistani-Americans.

558.    On or about August 27, 2013, Mr. Masood Farivar, the current Chief of the Afghanistan Service, solicited Mr. Achagzai to please create a list of words commonly used in Pashto, spoken in Afghanistan.  Mr. Achagzai compiled a list of 19 pages.  These are words that one would use in Afghan Pashto.  On August 27th, 2013,  Mr. Farivar wrote Mr. Achagzai an e-mail and told him that he is an asset to the Pashto Service.  Further he added that "I greatly respect your view."

559.    Mr. Achagzai states in his Office of Civil Rights Complaint that such acts contributed to a hostile work environment because it caused him to work in fear: "I was very upset and wanted to explain my side and had to stop and simply didn't want Mr. Ibrahim to harm me anymore.  I found his interaction with me disturbing and simply a shock to my system because I could not trust him to tell the truth.  As you may know a person can only handle so much lying before their own nervous system starts to react in negative way by becoming depressed or hopeless that they are not able to overcome the power that their boss who is also lying is wielding over their heads.  I felt hopeless and scared of what Nasar [Mr. Ibrahim] would do next."

560.    Mr. Achagzai's ability to successfully perform his duties was negatively impacted by management's attempts to constructively discharge him by sending threatening and inaccurate

e-mails about work violations, changing his yearly evaluations and putting a gag on work related e-mails.  In one of the e-mails sent to Mr. Achagzai, his manager states, "you do not even know how the web operates, let alone contribute to it." This is another distortion of the facts and a frank lie by Mr. Ibrahim.  Mr. Achagzai does know how the internet works and does contribute to the Pashto website, probably more than others and most importantly in grammatically correct Pashto language in 8-10 pages of the most updated house news on a daily bases and some-days with CRs and backgrounders, etc.

561.    Mr. Ibrahim's junior staff (his friends and favorites) put material on web which contain substantive and linguistic mistakes both in grammar and dictation to such an extent that those who read it found it comical.  Some local area schools use the website for teaching purposes.  Some parts of the published material are also difficult to understand.  Of the 13 employees in the Pashto service, Mr. Achagzai contributes more on the web compared to any other, both in quality and quantity.  This is another clear example of Mr. Ibrahim's using his position of power to simply make up lies and false conclusions about Mr. Achagzai because he is targeting Mr. Achagzai based on his age.

562.    Mr. Achagzai has been injured and harmed by the discriminatory and retaliatory actions referenced in this complaint and Office of Civil Rights Investigation file. It has damaged his health.

563.    Mr. Achagzai had complained to Ms. Mendelson and also Mr. Ibrahim as well as Human Resources and later to Office of Civil Rights (investigation report included herein).  Mr. Achagzai also contacted the Ombudsman in hopes that they could help.  He also copied e-mails to upper management in hope that they would stop these circumstances from escalating.  These

harms could have been alleviated and the problem could have easily been resolved, but for VOA management's malicious intent to harm the seniors.

564.    Mr. Ibrahim and management were "going after" the seniors on the staff. Everyone could see that only the senior staff was being ridiculed and harassed in public and treated like second class citizens. They were taken off the shows, off the air, Mr. Achagzai was taken off the poetry show, schedules were being changed seniors were not receiving training, or necessary equipment. Seniors were and still are excluded from meetings and meaningful suggestions for radio programming.

565.    At least five or six new shows were created, however, not one senior was given any of these shows.  When the accusations by Mr. Ibrahim became more outrageous and became more untrue with each sent e-mail, Mr. Achagzai states "I saw that it was really going after me and I heard my colleagues (seniors) also very distraught."  Mr. Ibrahim and his supporters were basically forcing out the five senior complainants.  Mr. Ibrahim even told junior employees to not help the seniors or to report them if  they ask for help or get help.  Mr. Ibrahim told everyone "I am the law."  On August 13, 2013, Ms. Maiwandi, former Director of South Asia Division, put a gag on work related e-mails.  All the schedules except for one schedule that was created by the staff but change back by Mr. Ibrahim have been unfair to the senior staff.

**BACKGROUND FACTS**
**Ms.  Zeba Khadem**
(Attached Exhibit: Broadcasting Board of Governors Report of Investigation
& Exhibits Case Number:  OCR: 13-03)

566.    Plaintiff repeats and re-aver each of the foregoing paragraphs as if they were specifically restated herein.

567.    Ms. Zeba Khadem is an International Broadcaster (GS-12) at Voice of America (VOA).  She is assigned to the South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC.

568.    Ms. Khadem has been an International Broadcaster at VOA for the last 30 years. She started her VOA career in October 1984.

569.    Plaintiff stated her job at the Pashto service only a couple of years from its inception and has had a leading and critical role in helping establish Pashto language programing, style of interviewing and preparing highly recognized radio programing.  In fact, Ms. Khadem has been dubbed the Barbara Walters of VOA Pashto programing.

570.    Ms. Zeba Khadem, is a 63 (DOB: 3/3/1951).  She is a naturalized United States citizen who is originally from Afghanistan and a native Pashto and Dari speaker, two of the main languages spoken in Afghanistan.

571.    The requirement for an International Broadcaster (GS-12) at the Pashto Service is fluency in both Dari and Pashto languages that are spoken in Afghanistan.  Plaintiff's duties include; Editing, transcribing and translating various materials for radio; such as interviews with variety of subjects, preparation and presentation of news, CRs, Backgrounders, Editorials, Press Reviews and Feature Programs.

572.    Ms. Khadem has never before brought a claim against VOA or any other employer.

573.    Plaintiff's immediate and second level supervisors, managers or persons responsible for his work assignments, as well as management during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.    Mr. Mohammad Ibrahim (Nasir or Nasar) is the current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.    Mr. Ghilzai Amanullah, was former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

c.    Ms. Beth Mendelson, was the former chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from  August 2006 to May 2013;

d.    Mr. Masood Farivar, is the current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

e.    Ms. Spozhmai Maiwandi, GS-15, was the former, Director, South Asia Division, who held this position from 2007 to April  2013;

f.    Mr. Ismail Dahiyat, is the current Director, South & Central Asia Division.

574.    Plaintiff, has been deliberately, maliciously, and constantly targeted by management to force her to retire and leave her job, when Plaintiff refused to succumb to the hostilities and discriminatory acts based on her age and national origin, she has been and continues to be discriminated against and subjected to a hostile work environment, and in reprisal for reporting harassing behavior.

575.    Ms. Khadem has been and is continuously discriminated against and subjected to a hostile work environment, based on her age (DOB: 3/3/1951) and in reprisal for reporting harassing behavior and ongoing, her supervisors began subjecting her to acts that made productivity nearly impossibly and which prevented her from being able to successfully perform her duties, including: taking away assignments; switching up her assignments; keeping her on standby; assigning her tasks that are beyond her tasks or duties, such as production; assigning her jobs for which she is not trained and for which she has not received formal training; failing to send her to training; failing to give her the necessary training; failing to provide her with adequate training; cutting her off when she tried to participate in meetings;  belittling her in front

of his colleagues; humiliating her and the senior group by telling the junior staff not to help senior staff or to report them to management if any of them ever ask for help; treating junior staff, or those who support Mr. Ibrahim, more favorably by offering them a variety of assignment privileges, covering up or overlooking their mistakes and promoting them regardless of their lack of language skills  and constant mistakes; failing to provide her a password for Dalet Plus; her Managing Editor affirmatively, maliciously, and intentionally instructing junior  staffers not to help the senior (aged) workers; and changing her annual performance evaluations in reprisal without telling her of the changes; failing to provide her copies of completed evaluations; failing to respond to her e-mail inquiry; ignoring her request for help; interfering with her assignments such as interviews; ignoring her notices of discrimination, reprisal, harassment and hostile work environment; falsely giving her information about closing the Pashto Service; putting  a gag on her work related e-mails; exposing her to her manager and co-workers in a group meeting that she is a complainant, a troublemaker; excluding her from meetings; not including her ideas or suggestions with scheduling; not acknowledging her in public and humiliating her in front of guests who come to the Pashto service for interviews by turning away and ignoring her; lying to her and telling her for several years that she should wait and this discriminatory behavior will subside, when management never intended on changing the schedules and giving Ms. Khadem a fair and balanced schedule; removing her voice off the air, taking away her shows (of 15 shows that air per week, Ms. Khadem was not formally scheduled for even one).

576.     Ms. Khadem's annual evaluations for the last 32 years have been stellar.  She is a journalist known for her integrity, expertise in the Pashto language, and most notably for her professionalism, patience and commitment to the team of professionals and journalists with whom she has worked in the past three decades.  Ms. Khadem is well recognized through-out the

world for her intelligent interviews and for her interview style. She was dubbed by both audiences and management alike as the Barbara Walters of Pashto language programing (up until the time when management decided to target her in an effort to force her to retire, by making her work environment hostile, by harassing her, by discriminating against her all in an effort to replace her and other senior Afghan staff members, with junior staff preferably from the Pashto speaking regions of Pakistan).

577.    Ms. Khadem holds celebrity status with Afghan listeners in Afghanistan and the Afghan diaspora throughout the world.

578.    Ms. Khadem started her career in radio as a young woman working on children's programming for radio broadcasting in Afghanistan.  After leaving Afghanistan because of political reasons and war, she moved her family to India, where she continued to work in radio. From India, Ms. Khadem was selected for the Pashto language service at VOA.  She came to the United States to work for VOA.  She has been a journalist with VOA, Pashto service since that time in 1984, only a few years after the inception of the Afghanistan service.

579.    On or about April 2013, when Mr. Masood Farivar, the current Chief of the Afghanistan Branch/Pashto Service started his position, he requested to meet with Ms. Khadem. Within one of the first few meeting with Ms. Khadem, Mr. Farivar confided in her, that he "grew up with her voice," that to him Voice of America is synonymous with Voice of Ms. Zeba Khadem (the Plaintiff).   Mr. Farivar also stated that since he has started he sees there are a lot of problems in the Afghan services.

580.    Mr. Ismael Dahiyat, (current Director of South Asia Division) has told Ms. Khadem and others that Ms. Khadem has been and continues to be an invaluable asset to the

service to this day and that her work and contributions, her on air programing has been

invaluable to the reputation of VOA Pashto programing for the last three decades.

581.    Plaintiff was continuously discriminated against and subjected to a hostile work

environment, based on her age (03/03/51) and in reprisal for reporting harassing behavior.

582.    Since on or   about 2010 and ongoing, her supervisors began subjecting her to

acts that damaged her professional ability; her professional reputation as an award winning

Journalist and prevented her from being able to successfully perform her duties.

583.    Plaintiff's Managing Editor Mr. Ibrahim sent her accusatory e-mails that

misstated circumstances and inaccurate facts regarding her performance.

584.    Plaintiff's Managing Editor Mr. Ibrahim required her to perform duties outside

her position description, but at the same time was not giving her the appropriate training

necessary to perform assignments in production.

585.    On or about May 2012 when Plaintiff's Managing Editor Mr. Ibrahim assigned

her production, he knew or should have known that production is not part of Plaintiff's job.

Although she would do production if she were trained, but he never gave her substantial training.

After setting her up to fail by forcing her to do production, he wrote her an e-mail telling her she

failed and she is a failure.  Mr. Ibrahim was forcing her retire.  He was creating a hostile work

environment and harassing her and continues to do so.

586.    On or about August 2012, Mr. Ibrahim wrote an e-mail to the Plaintiff telling her

that production is not part of her job and that she would not be asked to do production again.

This e-mail came after Mr. Khadem was harassed, humiliated and caused to suffer by Mr.

Ibrahim, specifically for not knowing how to do production.  As the Managing Editor he knew or

should have known that Ms. Khadem had not been required to do production, that she had not

been trained and that he should have at least discussed this with her before assigning to

production, risking ruining of the afternoon show, which is the most important news of the day.

587.    Plaintiff's Managing Editor Mr. Ibrahim reduced her 15 shows per week to only

one program per week or none at all.  He transferred her responsibilities and her tasks to

inexperienced junior staff, and new hires who are his friends and come from the same country as

he (Pakistan) and who support him in his efforts to force the Afghan seniors to retire, by

harassing them and making their work environment hostile.

588.    When Plaintiff complained about the discrimination, to Beth Mendelson who was

the Chief of the Pashto service form 2006 - 2013, she told her it was temporary, knowing that it

was not temporary and the seniors were being weeded out, their schedules reduced as though

they were about to retire, and when they resisted retirement, when it was brought up to them

through co-workers, the harassment became more pronounced and continues to this day, for the

remaining five senior complainants.  The more management told her to wait the less they tried to

help resolve the situation.  This caused Ms. Khadem, great damage and finally she was

hospitalized for surgery.

589.    Plaintiff's complaints to management included giving notice of discrimination

and harassment to Ms. Maiwandi, Ms. Mendelson, Mr. Farivar, and Mr. Dahiyat, as well as the

Ombudsman, Human Resources and Office of Civil Rights, up to the time of this complaint,

have all been ineffective in finding Plaintiff any resolution to the harassment.

590.    Plaintiff's Managing Editor Mr. Ibrahim bombards her with assignments,

switches her assignments without allowing her the necessary and sufficient time to complete

them. While giving the junior staff plenty of time to complete their tasks and not rush them or

bombard them with assignments in the last minute. For example even when the piece of

programming on which Plaintiff is working is not time sensitive, Mr. Ibrahim will give her very little time to complete, counting down the minutes.

591.    Plaintiff's Managing Editor, Mr. Ibrahim treats Plaintiff far less favorably than other staff.

592.    On or about middle of March, 2012, the service was short staffed and required some changes in the assignments.  For one day, Mr. Stanazai changed Ms. Zeba Khadem from a producer to MC, and Mr. S. Shah to producer.  But Mr. Ibrahim changed it back while the team was on their way to the studio.  Mr. Ibrahim wanted to force Ms. Khadem into production.  Ms. Khadem was not trained in production.  He considered Mr. Stanazai's decision to change assignments as a way of helping Ms. Khadem, but missing the real point, that the only concern the team had on that day, was to have a smoothly run show.

593.    In retaliation for complaining about the harassment and discrimination, management took actual, and affirmative steps to prevent her from further defending protected rights against the harassment, discrimination, hostile work environment, based on her age and national origin, by retaliating against her by humiliating and exposing her during a staff meeting and also putting a gag on her future work related e-mails.  On August 13, 2012, during a staff meeting, the Ms. Maiwandi, Director of South Asia Division placed a gag on possible continuation of work related e-mails and any further effort to protect herself.  Ms. Maiwandi is no longer the Director she was removed to a different position sometime in early 2013.

594.    Plaintiff's Managing Editor Mr. Ibrahim instructed her colleagues not to "help the seniors" the group of which Plaintiff is a member.  Mr. Ibrahim told Mr. Rahimzoy and others not to help the seniors.  In their efforts to harass and retaliate against the seniors, management

deliberately created a hostile work environment that was divisive and chaotic, in which to harass the seniors and force them into retirement.

595.    In particular Mr. Ibrahim told Mr. Sulaiman Shah not to help Ms. Khadem with production in the studio.  In May 2012, Mr. Ibrahim lied to Ms. Khadem and told her that one of her colleagues  would be in the studio to help train her, when she went to the studio, Mr. Ibrahim came to watch her, and Mr. S. Shah did not help her.  He stood behind her with his hands folded under his arms and refused to help Ms. Khadem, humiliating her, as she was not trained to do production.  After this incident Mr. Ibrahim wrote Ms. Khadem an e-mail telling her she has failed.  A few weeks after that incident Mr. S. Shah came to Ms. Khadem and apologized to her for not helping her that day in the studio but that he couldn't help her because Mr. Ibrahim was there.  Mr. S. Shah supports Mr. Ibrahim's campaign against the five seniors who have complained.

596.    Plaintiff's Managing Editor, Mr. Ibrahim, intentionally and maliciously created a hostile work environment when he sent accusatory e-mails which misstated circumstances and inaccurate facts regarding Plaintiff's job performance.  On February 2, 2014, he e-mailed the Plaintiff making a correction of her assignment/interview.  But Plaintiff had not selected the interviewee, as far as she knew the Managing Editor himself had selected the person to be interviewed. True to form, his accusation was false and based on his own creation of inaccurate and misleading information causing the Plaintiff great distress, at being targeted in this way and continuing to be a victim of management's continued harassment designed to force her to retire.

597.    Plaintiff complained to higher management about the harassment, hostile work environment and discrimination.  She also complained to the Ombudsman, Human Resources

and Office of Civil Rights.  Despite these complaints Mr. Ibrahim (Managing Editor); Beth

Mendelson (former Chief of Afghanistan Service) and to Spozhmai Maiwandi (former Director

of South Asia Division) and later Human Resources and Rebecca McMenimen (Director of

Language Programming) nothing was done, and her complaints were blocked by retaliation. Ms.

Khadem, who was once considered the Barbara Walters of the Pashto Service, had been taken

off the air, her voice silenced, and she was thrown into a situation that compromised her job.

This caused her great pain and suffering.  Despite the ongoing discriminatory acts Ms. Khadem

continued to perform her duties.

598.    On or about March 2012 when Ms. Khadem arrived at the office she was handed

an assignment to complete.  She did the coverage, wrote, edited, and recorded the piece.  The

editor told her to do that report for the next day.  However when she come in to work the

following day at or about 8 AM, she was told to leave that report and immediately prepare to

translate the news.  She translated, wrote and completed the news report, even though the time

provided to her was not sufficient and she was not on the schedule to do the news and there were

others on the schedule who could have been assigned for the news.

599.    When Ms. Khadem finished with the 10:30 AM live show, she had been handed

last minute, and after a very disturbing morning in which there was already two different and

sudden changes in the schedule, she was told by Mr. Stanazai, the team leader, that per Mr.

Ibrahim's request Ms. Khadem was to prepare a new assignment for the Heritage Foundation.

But, Mr. Ibrahim knew that Ms. Khadem was already scheduled to be an MC for the 12:30 PM

show, for which she needed to prepare, which left her very little time, just over an hour to

complete this new assignment and task that had been handed to her. But how could she possibly

prepare a complete show, write, edit find the right voice overs, give it meaning and voice, etc. in

less than one hour?  She said this cannot be possible at such short notice.  However, there was no time to reason with anyone.

600.    She had to deliver and do what she was told because she was afraid of Mr. Ibrahim's retaliation and the way he would try to possibly make her work environment even more difficult.

601.    Mr. Ibrahim had bombard Mr. Khadem with these assignments and pulled her in all different directions.  Mr. Ibrahim had created chaos and confusion in the shows. Still, under Ms. Khadem's experienced hand, the shows were completed well and she was trying to deliver an impossible task with little time and to do the best with what she had in the small window of time provided. By the end of the day, the show went on and the necessary tasks were completed.

602.    After having created this set of impossible circumstances, forcing Ms. Khadem to fail, and waiting for her to fail.  When she did not fail, Mr. Ibrahim again put on record in an email telling Ms. Khadem that her work was "unprofessionally done."  This was not only untrue but Mr. Ibrahim had purposefully bombarded Ms. Khadem to harass her when knowing that no one could accomplish what he requested, he again harassed her and told her she was bad at her job.  He was forcing her to retire by falsely setting her up to fail and when she did not fail he still managed to harass her.

603.    Mr. Ibrahim knew, or should have known that Ms. Khadem had been highly successful at the VOA for the last 30 years.  He planned on shamming her into retirement.  This is a pattern he followed with the five seniors who were complaining against him.

604.    The following day, in March 2012 Ms. Khadem was targeted to do production assignments, while production was and is not part of her job.  When Ms. Khadem was leaving from reading the 10:30 AM news, she was unexpectedly told that now she must be the producer

on the very important 12:30 PM, live show.  A task she knew nothing about, in which she had

been briefly trained some time ago.  In fact she was only trained for two days in production

during the two years that Mr. Ibrahim was at VOA. Mr. Ibrahim knew Ms. Khadem did not have

the training that everyone else had had as they practiced to learn production.  On this day when

Ms. Khadem was assigned production the team leaders Mr. Abid Noor and Mr. Stanazai insisted

that this was a mistake that Ms. Khadem's talents would be better served in other areas of the

show.  This did not make sense, especially since production was not part of Ms. Khadem's job.

But, due to Mr. Ibrahim's intentional harassment against the seniors, he decided to force Mr.

Khadem to be humiliated as she fumbled through production.

605.    Ms. Khadem knew that production was completely outside her skill set and

expertise.  She would not mind getting further training, but she told Mr. Ibrahim that she did not

feel comfortable suddenly being hurled into forced production.  He told her that another

colleague Sulaiman Shah will be training her. However when they reached the studio, seconds

before the show was about to go on air, suddenly Ms. Khadem was given the thumbs up signal to

begin, Mr. Ibrahim was pointing at her to go on, she looked at Mr. Sulaiman Shah for help, but

he took a step back against the wall with Mr. Ibrahim, folded his hands under his arms and stood

there silently, next to Mr. Ibrahim.  Mr. Ibrahim had lied to Ms. Khadem that Mr. S. Shah would

help her at the studio, but in fact had told him behind her back to not help her during production.

This was a nightmare for Ms. Khadem, to be put in production chair and told to *go,* during the

most important show of the day and without having training and the person who was there to

help stepping back to watch her fail.

606.    The two team leaders, Mr. Stanazai and Mr. Noor argued with Mr. Ibrahim that the way that these assignments were allocated by Mr. Ibrahim was truly "not a workable schedule."

607.    The production assignment was a last minute assignment, a skill that Ms. Khadem was not trained in, and Mr. Ibrahim knew this not just by looking at previous schedules, or knowing that this was not part of Mr. Khadem's job and also since she had told him. The only reason Mr. Ibrahim created this situation was to send a negative e-mail to Mr. Khadem in support of his greater agenda to force her to retire.  This is exactly what he did, the next day he wrote Ms. Khadem a scathing e-mail about her performance.  There is no conceivable reason for Mr. Ibrahim to do this to Ms. Khadem, one of the language service's best journalists and talents, unless he was trying to fire her or force her out the agency.

608.    On March 13, 14, & 15, 2012 Mr. Ibrahim sent Ms. Khadem three false and accusatory e-mails, forcing her to believe she was not good at her job and later giving her a poor evaluation.  Mr. Ibrahim and management with the help of Human Resources had secretly altered the annual evaluations and forced the seniors to sign them before they became aware of what managements' plan against them had been and continues to be.  The evaluation had already altered without telling the seniors.  The yearly employee evaluations had been altered by management, secretly, as a kind of trap for which Mr. Ibrahim was collecting evidence, when forcing Ms. Khadem and the other seniors into impossible situations, and following it up with humiliating e-mails to which he could later point to as a source of poor evaluations, thus forcing the seniors to retire.

609.    The e-mail of March 13, 2012 by Mr. Ibrahim was a scathing e-mail about how the show was "unprofessionally done" and that the "package was not pre-recorded or edited."

This, as Mr. Ibrahim knows was not Ms. Khadem's fault.  She went to coverage and recorded the piece that afternoon.

610.    On March 14, 2012, Mr. Ibrahim wrote another scathing e-mail about her production skills.  When Mr. Ibrahim knew that production was not part of Ms. Khadem's job, she had not been trained to do productions and that he had lied to her and had told her that Mr. S. Shah would be there to help her.

611.    On March 15, 2012 Mr. Ibrahim sent another e-mail about Ms. Khadem's March 13, 2012, 12:30 PM, news hour.  He gave a list of mistakes that Ms. Khadem allegedly made. He had placed such extreme stress on Ms. Khadem's work that her work was becoming impossible.  He only used these opportunity again to harass her into retirement.  He could tell he was wearing her down, because she was upset and crying and just lost at a job she was stellar in for 30 years.  Mr. Ibrahim had created this situation intentionally as a result he harmed and damaged Ms. Khadem's reputation, her health, peace of mind and ability to do her job.  He also damaged her reputation with the millions of listeners worldwide.

612.    On or about July 2012, Mr. Ibrahim wrote another e-mail to the whole service that Ms. Khadem was not to be assigned production.

613.    Mr. Ibrahim reduced Ms. Khadem's 15 shows per week to only one program per week and sometimes to no shows at all.

614.    Shortly after Mr. Ibrahim started his post on or about April 2010, he changed the schedule, without any legitimate need for making such drastic changes against the five seniors in the service.  The additional schedules that have followed, through the last schedule of January and February 2014, all have mismatched staff qualifications with assignments.  Ms. Khadem is a broadcaster with 30 years of experience, everyone knows that Ms. Khadem is well-respected and

widely known for her interviews, talk shows, poetry shows, news casting, MC, and gathering

fresh new ideas for programming, which is why she was an on air talent.  Her audiences know

her for her voice and qualities of being an excellent journalist.  But Ms. Khadem's voice was

silenced because she is a senior and management wanted to get rid of the senior staff.

615.    In the schedules prepared by Mr. Ibrahim, shockingly Ms. Khadem was taken off

the air, and her shows, were reduced dramatically.  None of this made any sense since everyone

else pointed out to Mr. Ibrahim that what he is doing is a mistake since Ms. Khadem is the best at

this job. Ms. Khadem also voiced her opinion about how this just didn't seem to have any logic,

and wanted to know the reason for this act.  Ms. Khadem was told, and that these were the

"orders" that were handed down to Mr. Ibrahim from upper- management.

616.    When Ms. Khadem complained to upper management including, Ms. Maiwandi

(Director of South Asia Division), and Ms. Mendelson (Chief of Afghanistan Service) and even

asked them "why do you hate me" they told her to wait, "this will change" they said.  Mr.

Khadem has waited until now and the harassment has become more prevalent and Mr. Ibrahim

and management have become more bold in their acts against the five senior complainants.

617.    Since Mr. Ibrahim started at the Pashto Service, he has been adverse towards the

five seniors, including Ms. Khadem, from the very first meeting when he told her in an open staff

meeting in front of her colleagues that he was/is the law, in response to her question regarding

scheduling.

618.    After Ms. Khadem was told that the reductions in the schedule tasks were

temporary, Mr. Ibrahim, reduced her air time again, and in the consequent schedules her

assignments have been either reduced or she has been assigned unfairly.  The schedules all the

way through to the last schedule of February 2014, have been neither fair to Ms. Khadem or to the quality of programming.

619.   Mr. Ibrahim's agenda to harass and marginalize Ms. Khadem, who is a senior employee of the Pashto Service, was apparent from the first meeting when he took on the position of Managing Editor, on or about April 2010, and told everyone that he is the law. This has created stress and caused Ms. Khadem harm and damaged her work performance and her reputation.

620.   Mr. Ibrahim harassed Ms. Khadem in an effort to force her into retirement by abruptly switching her assignments without providing her with adequate time to complete them. The new schedule created a chaotic situation and divided the five senior complainants from the rest of the staff.  The junior and inexperienced staff who had replaced the seniors, specifically Ms. Khadem, were unable to perform their duties, and the seniors were constantly being handed shows to do without much notice.

621.   The seniors were required to do the work of the junior staff, because they were assigned similar types of shows that were taken from the seniors and when it was time to do the show, the junior staff for one reason or another could not do the show, the show would be handed to a senior member of the staff, thus placing the senior staff in a compromising, stressful and even dangerous situation.  Normally a quality show takes a day or two to prepare, starting with picking a topic that is timely, and in line with what is going on in the news. Later the person doing the show has to find the right contacts in Afghanistan who would be willing to go on air to talk about the topic, one must then take these actualities, and sound bites, and compose the whole piece and edit voice overs and add the music and create a show that is captivating and moves the audiences. But when Ms. Khadem or the seniors were asked to take on these assignments in

addition to their own scheduled work, they were not given any time. Mr. Ibrahim used this situation to harass the seniors, and force them to retire. He blamed them for others mistakes and bombarded them with assignments, while the junior staff were idly standing around working on their creative projects for which they had, it seems infinite time. When Ms. Khadem complained, at first she was told to wait, later she was basically intimated into forced retirement.

622.     Unlike Mr. Ibrahim's opinion, by most accounts, being an MC and a broadcaster is not simply sitting in front of microphone and reading sound bites. However when the seniors duties were mixed up, with no one knowing what to do, they were being handed assignments sometimes with a few hours or even within one hour before the show. They were expected to do the interview, write, edit and prepare it in time for the broadcast. Mr. Ibrahim's goal was to simply harass the seniors in whatever way he could (and still does). On March 13, 2012 he wrote a scathing e-mail about how the show was "unprofessionally done" and that the "package was not pre-recorded or edited." Mr. Ibrahim knew or should have known that first the show was done well and second the circumstances he had created with the schedule would not allow Ms. Khadem to pre-record the show. However he still used this opportunity to harass Ms. Khadem.

623.     Mr. Ibrahim uses a different standard by which to judge the senior staff compared to the junior staff or those in the service who support his harassment and discrimination of the five senior complainants. On March 15, 2012, Mr. Ibrahim sent another e-mail about Ms. Khadem's March 13, 2012, 12:30 PM news hour. He gave a list of mistakes that she had allegedly made. However, under his management these should not even be considered mistakes based on the accepted mistakes made by the junior staff. One of the items Mr. Ibrahim claimed was a mistake was about Ms. Khadem's intro, that she had not brought it with her to the studio.

He only used this opportunity as another example of harassment.  It is frequently the case that an intro may be left behind on occasion.  For example, on March 19, 2012, during the 12:30 PM show, when Ms. Khadem was the MC, Nazrana Ghaffar (a junior staff member), had not provided an intro and when asked, she did not even remember her topic which was India and Sri Lanka.  Again on April 29, 2012 during the 10:30 AM show, Abid Noor (junior staff, who is one of Mr. Ibrahim's "right hand men" in harassing the seniors) had forgotten to bring his intro to the studio. It was not necessary for Mr. Ibrahim to attack Ms. Khadem with his e-mail, with such language, simply because she is a senior employee and not from Pakistan and not his friend.

624.    Mr. Ibrahim's daily interaction and relationship with Mr. Khadem is strained (to say the least) and he does not treat her as well as he treats other members of the staff.  He ignores her on purpose, while at the same time he spends extended amounts of time interacting and mingling with other staffers.  The interaction he does have with Ms. Khadem is only to harass her and force her decide to retire.

625.    One of the senior complainants Mr. Mohmand went to Spozhmai Maiwandi's office to complain about the harm that he was suffering as a result of the senior discrimination. He told Ms. Khadem soon thereafter that Ms. Maiwandi said that 4 of the members of the Pashto Service and she named them all: Shah, Mohmand, Achagzai and Zeba,  were going to be let go and only the junior employees would be retained, and that the seniors should retire.  Mr. Mohmand told Ms. Khadem this because he has worked with her for many years and they have known each as respected colleagues, and he wanted to let her knew to get her financial affairs in order, and retire, because even the Director of the South Asia Division (higher level management) had told him that if they don't retire their positions will be terminated.

626.    Ms. Khadem's yearly evaluations were changed without her knowledge.  The evaluations were changed to target the seniors and force them to retire. During December 2012 Mr. Ibrahim gave everyone the yearly evaluations to sign.  Since Ms. Khadem did not trust that management had her best interest in mind, she reviewed the evaluation very closely and realized that the changes that had been made in the evaluations were biased against the seniors.  She signed the evaluation but also wrote that she did not agree with its content.  Mr. Mike Collins (acting Chief of Afghanistan Service at VOA) called her into his office with Mr. Ibrahim also in the meeting to ask why she had written that she did "not agree with the contents of the evaluations."  Ms. Khadem told him that the evaluation was biased.  For example the evaluation included "production" as an area of assessment.  It was the same production that in March of 2012, Mr. Ibrahim had written an e-mail to Ms. Khadem that she had failed and later admitted that her job description did not include production.  Further the language of the evaluation is vague and gives discretion to Mr. Ibrahim to force the five complaining seniors to retire.  Ms. Khadem discussed some of the drawbacks of the changes in the yearly evaluations with Mr. Collins agreed with her and said that she was right and told Mr. Ibrahim in her presence that the evaluation is not accurate since it includes production when production is not part of everyone's job requirement.  Mr. Collins also agreed that the language of the evaluation was vague.

627.    As a result of the discrimination and harassment and constantly being marginalized and targeted by management, Ms. Khadem reports that she is unable to concentrate; lost her confidence; lost her ability to do her job in the best possible; she was ashamed and felt her voice had been silenced because of the discrimination against her as a senior employee; she was shamed and defamed in front of her audience and her co-workers; she though she was not a trusted member of the team and felt marginalized at her job.  She lost her

integrity and her self-worth.  She reports, physically shaking and becoming ill at times when
Ibrahim targeted her.  Other times she ended up at the hospital.

628.     Ms. Khadem told Mr. Hasib Alikozai about how Mr. Ibrahim was targeting her,
the accusation, etc.  He said don't worry you are not alone there are a few others (seniors) he
regularly targets.  Ms. Khadem became very upset and emotional and was crying.  This happened
in the studio with Mr. Hasib on or about May 2012.

629.     All this harassment affected Ms. Khadem's self-worth; health; ability to rest and
sleep and eat and enjoy her family and spend peaceful time with her beloved husband who has
since departed.  She was unable to speak, her voice was literally silenced.  Her family was
worried as a result, it affected them.  Ms. Khadem was in a state of depression and in shock.  She
suffered headaches and back aches and insomnia and fits of extreme depression when she
thought she had wasted thirty years of her life at this job only to be sent home by Mr. Ibrahim
because she is a senior and he happens to take offense and because Mr. Ibrahim "is the law" as
he had told her from the very start, he had the power to take her job from her.

630.     Ms. Khadem's job is her life.  Anything that Mr. Ibrahim did based on his
discriminatory intent to impact her job directly impacted her as a person.  Ms. Khadem
completely identifies herself with her job, her job is her life and taking that or the threat of taking
it away from her, as a discriminatory act, was and is more than she is able to handle.  This has
had significant and devastating results on Ms. Khadem's health.  She has been irreparable
emotional harm as a result of these discriminatory acts, which continue to this day.

631.     On or about July 15, 2013, Mr. Ismail Dahiyat (current Director of South Asia
Division) requested to meet with Ms. Khadem.  In this meeting he told her that he admired her
appreciates her work and also asked her to tell him about the problems at the service.  Ms.

Khadem told him that it was not just her but all five complainants that were involved.  She told him that the issues that come to mind include the fact that the service does not have a copy editor; she also added that another major problem is the biased scheduling; Ms. Khadem also told him that there are many other issues but those issues are all included in her complaint which she is not at liberty to discuss at this time.  He said, "tell me about yourself, what do you want" to which Ms. Khadem responded that there is "favoritism" and disparate treatment in the service resulting in harm to the five seniors.  Ms. Khadem told him that "we have been punished" for no reason, and continue to be punished.  However after Ms. Khadem's conversation with Mr. Dahiyat, the schedule did not improve, the "favoritism" or discrimination did not decrease; Mr. Ibrahim did not change his approach towards the seniors; and the shows or programing did not improve; un-equal distribution of assignments was not corrected.  In fact Ms. Khadem came under greater scrutiny and was retaliated against more.

632.    On or about July 24, 2013, there was a 5:00 PM staff meeting.  Ms. Khadem pointed out that the phrase "zero option" which is not a term of art is either not translated or properly translated in Pashto language.  Those present during the meeting included, Mr. B. Shah, Ms. Shafia Sardar, Mr. Masood Farivar, Mr. Achagzai, and Ms. Noshaba Ashna and Ms. Nazrana Ghaffar, who is a close ally of Mr. Ibrahim attacked Ms. Khadem and said this is how it is on President Obama's desk.  Ms. Ghaffar was trying to prove Ms. Khadem wrong.   During that meeting it also came up again and again that it is not just one word or two that is being mistranslated, misread and misinterpreted but many words that go on the air fall into this category.  Mr. Farivar asked Ms. Khadem to please make a list of the words that she comes across and give him the list, in an effort to help educate the junior staff, who Mr. Ibrahim

promotes and advances above the seniors while some of whom are not ready or educated in the Pashto language.

633.    On or about July 27, 2013, Ms. Khadem made a list of the wrong words and language mistakes made by the service for Mr. Masood Farivar, the current Chief of the Afghanistan service.  Ms. Khadem has kept the list with her for when Mr. Farivar might ask for it, if ever.

634.    On July 30, 2013 Mr. Ibrahim sent an e-mail regarding computer training.  Ms. Khadem was busy with an assignment and would respond before the end of her shift.  On the same day there was a staff meeting.  The following staff members were at the meeting:  Mr. Achagzai, Mr. Shah, Mr. Roshan Noorzai, Mr. Ibrahim, Ms. Shafia Sardar, Ms. Noshaba Ashna and Mr. Ashiquillah Rahimzoy as well as Ms. Khadem.  During this meeting, Mr. Ibrahim targeted Ms. Khadem, in retaliation for complaining about the constant mistakes in the service and inquiring about the schedule.  The fact is Ms. Khadem was taken off her assignments and replace with those who were not able to do the tasks at a professional level, leaving the shows and assignments with multiple mistakes.  Mr. Ibrahim, targeted Ms. Khadem by complaining that the "staff don't check their e-mails," while looking at her, meaning Ms. Khadem was not checking her e-mail, trying to insinuate senior incompetence in modern technology such as e-mailing, while knowing that this is a sensitive issue with the seniors.  The seniors use e-mail and are comfortable with it and use it regularly.

635.    During the meeting of July 30, 2013, Mr. Ibrahim also targeted Ms. Khadem for signing in early.  Mr. Ibrahim never asked for the same strict guidelines of those who support him in his discrimination, especially those who support his discrimination against the seniors.

Ms. Khadem was not asking or planning on asking for overtime, she is a salaried staff member. She would sign in early as a matter of security and also to let others know she was at the office. Also, no one comes to the office begins work without signing in, but everyone receives the salary, unless they claim overtime, which has its own process. An employee cannot make up overtime without checking with their Managing Editor. Ms. Khadem was not asking for overtime, this was not her intention and Mr. Ibrahim knew this one hundred percent. There has never been an issue of compensation or overtime.

636.    During the meeting on July 30, 2013, Ms. Khadem responded to Mr. Ibrahim and said I know you are talking to me, because you already e-mailed me about this. Ms. Khadem said, I come in early to do the work and leave late when necessary. Mr. Ibrahim said "No, this is not the law." Mr. Ibrahim has permitted some staff to sign in and out as they want, whether they come in early or leave early or late, it has never been a problem. He was targeting Ms. Khadem on that day, because he was limiting her time in the office.

637.    In retaliation for speaking out during the meeting of July 30, 2013, not only Ms. Khadem but the rest of the four seniors were also excluded from the next meeting on August 1, 2013. Mr. Ibrahim scheduled the meeting on a day when the five seniors were not there to attend. Mr. Ibrahim has a habit of excluding the seniors as a way to punish them.

638.    On or about August and through September 2013, Ms. Khadem requested that her complaint at Office of Civil Rights be amended with additional facts of ongoing retaliation by Mr. Ibrahim, who continues to interfere with Ms. Khadem's position as an International Broadcaster at VOA, by harassing her and forcing to retire.

639.    Upon information and belief Mr. Ibrahim who has a close relationship with Noshaba Ashna, will allow her to come sign in early.

640.    Ms. Khadem had a rare opportunity on June 25th, 2013 to interview Mr. Ramazan Kochai.  Mr. Kochai was one of Ms. Khadem's long time contacts in Afghanistan.  Unbeknownst to her, Mr. Kochai had been imprisoned at Bagram, Afghanistan (American base in Afghanistan) for some time.  As soon as Mr. Kochai was released, he called Ms. Khadem, giving her a unique and rare glimpse of American military presence in Bagram (Afghanistan).  As it turned out, Mr. Kochai had great insights about the base and the treatment of prisoners.

641.    On June 25th, Mr. Kochai reached Ms. Khadem at her desk.  Ms. Khadem realized that this is an original piece, she did a short but very powerful interview with him.  She knew she had a great piece of news, exactly what VOA looks for in original interviews.  She convinced Mr. Kochai to stand by and she would ask permission for him to go on the air for a longer more comprehensive original interview / talk show conducted by Ms. Khadem.  She asked the coordinator on shift, Mr. Ibid Noor to please discuss this with Mr. Ibrahim to schedule a time for the interview.  Mr. Noor came back and said "Nasar said no to your talk show."

642.    This was one very unique opportunity to interview Mr. Kochai in the talk show and once missed, it was very likely that he would not contact Ms. Khadem again.

643.    Mr. Stanazai, Mr. Roshan Noorzai and other colleagues who were present, became somewhat concerned, by Ibrahim Nasar's decision to reject Zeba Khadem's request.  It was obvious that Mr. Ibrahim's reaction was based on the fact that the interview would be conducted by Ms. Khadem, a senior.  Everyone, present at the time believed the interview was timely and valuable and a truly unusual opportunity, and must be given more air time.  They witnessed Ms. Khadem's persistent pleas that the story reveals realities of current times, of American military presence in Afghanistan, an issue that is extremely important to security and democracy in the region as well as an opportunity to do an original piece.  It seemed that none of

this made any sense to Mr. Ibrahim, who had made up his mind to say refute Ms. Khadem in all and everything that is her job, including this interview.

644.    Mr. Stanazai, tried to make a last ditch effort and told Mr. Noor, that he believed this should be an exclusive program and would make a great story and it will be something  "no one has given us before" and that he should try to make Mr. Ibrahim understand the significance of this opportunity.  But, as Ms. Khadem said, "our words fell on deaf ears" Mr. Noor just stood, blankly and shaking his head –NO.  Mr. Ibrahim never left his desk to walk a few feet to follow up on this issue.  Mr. Ibrahim forcefully shut it down, and later ignored the whole matter.  He never brought it up again.  He never asked about the interview, he never discussed it with Ms. Khadem.  It was his job to shut down the seniors and here he had accomplished as much and thus there was no other reason to follow-up.

645.    Mr. Ibrahim refused Ms. Khadem's interview of July 25, 2013 with Mr. Kochai to interfere with her job.  The reason he denied this timely and most important interview was because it was Ms. Khadem's interview.  He did not want to give, even one opportunity to showcase her talent.  He had taken her off the air, as far as he was concerned she was not even part of the staff any longer, treated as secondary staff.  Ms. Khadem was very hurt by this retaliatory decision directed against her by Mr. Ibrahim, which was now having a direct impact on VOA's original broadcasting.

646.    Ms. Khadem was very upset and humiliated.  She kept a short sample interview with Mr. Kochai in her desk and decided to leave it there, but changed her mind because she could not let this original piece be wasted, just because Mr. Ibrahim has a problem with her or any of the seniors.  She wanted to do her job, she asked Mr. Roshan Noorzai (who was told by

Ibrahim Nasar not to help the seniors) to please help her put the interview on the internet.  Mr. Noorzai put the interview on the internet and it is 18 moments long.

647.    Mr. Ibrahim's retaliation against Ms. Khadem in denying her July 25th, 2013 interview resulted in greatly harming Ms. Khadem.  She was upset and distraught.  She was upset that Mr. Ibrahim's decision to retaliate and force her into retirement was costing VOA journalistic reputation and costing VOA Pashto Service an original piece.  Further, she had lost credibility with her source, Mr. Kochai, who never called or contacted her again.  She was made to seem that she was not a full employee of VOA, and in that regard not a trustworthy journalist any longer, especially in light of having her voice almost completely silenced off the air.  This ruined her reputation with her contacts in Afghanistan, contacts Ms. Khadem had spent three decades (30 years) to build.  This blow was devastating to Mr. Khadem, all her resolve started to come undone.  This is what Mr. Ibrahim was waiting to do.  She in fact started to look at retirement her health was giving out under the extreme stress placed on her by management to force her to retire.

648.    Several weeks later, on August 13, 2013, Mr. Farivar called a meeting.  In that meeting he said a "high ranking" individual, had e-mailed David Ensor (VOA Chief) to praise the interview that Ms. Khadem had put on the internet.  This high-ranking individual had called it a "masterpiece" of journalism.  In the meeting, Ms. Khadem's manner of interview and technical skills were discussed.  All the staff agreed, it was an original piece, conducted with technical skill, an interview from which others were encouraged to learn.  Everyone agreed that it is a great example of how a professional and experienced journalist can guide an on air interview to capture the genuine flow of honest and truthful rendition of reality that can touch and challenge a radio audience.  Interviews should strive to reach this level of impact on the

audience.  This is why, it was called a masterpiece and also it was the subject of the meeting on August 13, 2013.

649.     During the meeting of August 13, 2013, held in honor of Ms. Khadem's interview of Mr. Kochai, Mr. Ibrahim was visibly angry, he cut Ms. Khadem off when she said she had a point to add, he again cut her off and said he wanted to make an announcement, speaking over her voice.  After his own announcement, rather than giving a moment for Ms. Khadem to add her point, he told everyone with his hand gesture to leave, that the meeting had ended.  When Ibrahim ended the meeting everyone followed his directions and started leaving.  Ms. Khadem was forced to yell out, "OK, I'll make my point next time" because it was very embarrassing and humiliating to her, to be subjected to this type of bullying by Mr. Ibrahim.  Mr. Ibrahim continued to make his point and show everyone else in the service that the five seniors are useless and they are not full employees, they are not to be considered a staff.

650.     After the meeting, of August 13, 2013 that was held about Ms. Khadem's masterpiece interview with Mr. Kochi, which Mr. Ibrahim had refused to, put on the air as retaliation against Ms. Khadem, Mr. Ibrahim sent an e-mail entitled: "Minutes from today's meeting."  Ms. Khadem and the seniors were very surprised that Mr. Ibrahim's minutes of the meeting, failed to mention Ms. Khadem's name. In this e-mail there is no mention, or reference to Ms. Khadem, the interview, or anything that was said about her work, discussed or learned from the meeting.  It was as though Ms. Khadem and her interview did not exist.  In fact as far as Mr. Ibrahim was concerned as was reflected in his minutes, Ms. Khadem and her interview indeed did not exist.

651.     During the meeting of August 13, 2013, about Ms. Khadem's interview of Mr. Kochai, it was agreed by all present that they would air a promo for one full week and air the

interview at the end of the week. But on August 16th, on Ms. Khadem's day off, Mr. Ibrahim wrote her to tell her to prepare her own promo on Sunday and air the show on Monday.  Ms. Khadem wrote him back on or about August 16, 2013 to say that she was surprised to hear him say that because everyone agreed to have a week long promo, and asked him to reconsider.  He never wrote her back, but went around her and told the coordinator to change it back to a week promo.  Again this was Mr. Ibrahim's deceitful plan of undermining Ms. Khadem's work.  He never wrote to her to acknowledge her concern and to accept that he was wrong and that the interview must have a week long promo as agreed and that he was wrong when he prevented Ms. Khadem's original piece to air and also deprived her of a journalistic opportunity and destroyed her credibility with a contact simply because Ms. Khadem is a senior from Afghanistan.  To this day, Mr. Ibrahim has failed to acknowledge the interview as a "masterpiece."  This e-mail is in possession of Mr. Farivar and Mr. David Ensor.

652.  Mr. Ibrahim Managing Editor attempted to change the rules to cover up his own retaliation.  On September 17th, 2013, Ms. Khadem tried to schedule guests to be interviewed by the Pashto Service.  Abid Noor (designated coordinator and Managing Editor's messenger / lynch-man), denied permission immediately. After she was denied this opportunity, Ms. Khadem was forced to give the opportunity to the Farsi and Dari service.  Both the Farsi and Dari service did panels and interview of the guests Ms. Khadem had tried to schedule for the Pashto Service.  Members of the other services profusely thanked her for the opportunity.  Ms. Khadem was upset and emotional that day.  This had happened to her before only a few months ago with her previous interview with Mr. Kochai.  The cumulative effect with any resolution of constant undermining and strong arming the seniors who want to do their job caused great harm to the seniors.  The reason some of these great interviews were objected to was because it was coming

from Ms. Khadem.  Mr. Ibrahim and his supports object, put down and stop any senior progress or recognition in the service.

653.     In the meeting of September 18, 2013, Mr. Ibrahim made some poor attempts in covering his tracks of the way he had denied Ms. Khadem once again.  But, he only did this, knowing the damage was done, the interviews were gone at that point. In an attempt to hide his retribution, he made excuses about the rules for interviews.  Mr. Ibrahim had sided with Mr. Abide and allowed him to interview his guest (a football player, who had been interviewed multiple times before) but he denied Ms. Khadem's interview panel.  Ms. Khadem's panel was a limited time opportunity.  They were invited guests through a program implemented by the State Department for certain community leaders from Afghanistan and around the world to visit the United States, all expenses paid by the US government.  They were here to learn about democracy building and governance and also share their experiences about the nation building process, something to which the United States has invested millions of dollars.  These guests were essentially President Obama's invitees to DC. They were in DC only for a few days before going to NY and back to their respective countries.  But this opportunity was lost to the Pashto Service because Mr. Ibrahim selectively applies the rules only when it benefits him and harasses the seniors, and at this juncture he chose to interview a soccer player.

In his editorial judgment it was more news worthy to interview a soccer player who had been interviewed multiple times by the Pashto Service, and who could be interviewed sometime later, and refuses leaders who came to learn about democracy and who brought with them a wealth of information about nation building and security in Afghanistan.

654.     Mr. Ibrahim consistently made decision to deny of Ms. Khadem's ideas based on his discriminatory intent and reprisal against Ms. Khadem. This situation brought Ms. Khadem to

tears.  She was devastated and severely damaged by this point.  Ms. Khadem was starting to have symptoms of rash and headaches and body aches, as a reaction to what was happening to her at her job.

655.    On September 30, 2013 Ms. Khadem, had to leave work early on Saturday to go to emergency care because she broke out in severe skin rash all over her body, even under her hair follicles, eye lids, arms, legs, back, stomach, shoulders and neck etc. all stress related to her work environment.  She was not able to work on Sunday.  Her doctors prescribed medications to bring down the swelling, pain, itching.

656.    Ms. Khadem's health unraveled.

657.    After the hives cleared up, Ms. Khadem was not able to sleep for extended amounts of time. Her family was very alarmed by her health and encouraged her to leave her job that it was not worth her life.

658.    Ms. Khadem, a healthy and vivacious woman who had been in excellent health was not able to get out of her bed.

659.    In October and November of 2013 the diagnosis progressively became grim and she had to go through life threatening surgery.

## CAUSES OF ACTION

### COUNT ONE

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN
**Pattern or Practice of Discrimination –Systemic Disparate Treatment**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.**
**(On Behalf of All Plaintiffs)**

660.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

661.     Plaintiffs are all natives of Afghanistan and employees of BBG as international broadcasters within the meaning of 42 U.S.C. §2000(e) et seq.

662.     By its actions and those of its agents, as set forth above, BBG (VOA) deliberately and intentionally discriminated against each Plaintiff because of their national origin and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

663.     VOA has engaged in a pattern and practice of intentional discrimination against Afghan senior employees.  VOA management maintained and implemented uniform employment practices that discriminate against Afghan seniors with respect to terms and conditions of employment.

664.     The discriminatory practices of VOA, have denied Plaintiffs their right to equal employment opportunity in violation of 42 U.S.C. §2000(e) et. seq. in that Plaintiffs have been deprived of desirable opportunities, assignments, promotions, and have been denied promotions/career advancement opportunities that were given to equally or less qualified junior non-Afghan staff.

665.     This pattern of inequality in access to opportunities on the basis of national origin and age based on the deliberate New Format, is not a result of random or non-discriminatory factors.  Rather it is the result of an ongoing and continuous pattern and practice of discrimination led by a small group of Pakistani managers who disfavor Afghan senior employees.

666.     Defendant treated Plaintiffs differently than their co-workers. Defendant routinely treats junior Pakistani employees better compared to seniors

who are from Afghanistan.

667.    Plaintiffs did put Defendant on notice, on several occasions, that Defendant did not equally enforce the Defendants written policies.

668.    Defendant willingly, knowingly and intentionally refused to take any steps to equally enforce the Defendants written policies among all employees.

669.    Defendant condoned the discriminatory acts as well as the retaliatory acts, by of Plaintiffs' Managers, Chiefs, and Supervisors and others in position of authority over staff in all the language services, as well as the Plaintiffs.

670.    Plaintiffs suffered when Defendant refused to provide equal treatment for Plaintiffs in the application of Defendant's written policies.

671.    The unlawful employment practices complained of herein were intentional.

672.    The unlawful employment practices complained of herein were done with malice and/or reckless indifference to the protected rights of Plaintiffs and other senior employees.

675.    Defendant's discriminatory conduct caused Plaintiffs to suffer injury and emotional and physical distress.

676.    On behalf of themselves Plaintiffs request as provided in the Prayer for Relief below.

677.    On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT TWO

## EMPLOYMENT DISCRIMINATION ON THE BASIS OF AGE
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621** *et seq.*
**Pattern or Practice of Discrimination –Systemic Disparate Treatment**

**(On Behalf of all Plaintiffs)**

678.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

679.     Plaintiffs are all natives of Afghanistan and employees of BBG as international broadcasters within the meaning of 42 U.S.C. §2000(e) et seq.

680.     By its actions and those of its agents, as set forth above, BBG (VOA) deliberately and intentionally discriminated against each Plaintiff because of their national origin and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

681.     VOA has engaged in a pattern and practice of intentional discrimination against Afghan senior employees.  VOA management maintained and implemented uniform employment practices that discriminate against Afghan seniors with respect terms and conditions of employment.

682.     The discriminatory practices of VOA, have denied Plaintiffs their right to equal employment opportunity in that Plaintiffs have been deprived of desirable opportunities, assignments, promotions, and have been denied opportunities that were given to equally or less qualified junior non-Afghan staff.

683.     This pattern of inequality in access to opportunities on the basis of national origin and age based on the deliberate "New Format," is not a result of random or non-discriminatory factors.  Rather it is the result of an ongoing and continuous pattern and practice of discrimination led by a small group of Pakistani managers who disfavor Afghan senior employees.

684.     Defendant's discriminatory conduct caused Plaintiffs to suffer injury and emotional and physical distress.

686.     On behalf of themselves Plaintiffs request as provided in the Prayer for Relief

below.

687.     On behalf of themselves and other similarly situated Afghan seniors at the

Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.


**COUNT THREE**

**EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN**
**Disparate Impact**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.**
**(On Behalf of All Plaintiffs)**

688.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs

above as though fully set forth herein.

689.     VOA's managers adopted and maintained and implemented uniform employment

practices that have a disparate impact on senior employees from Afghanistan at the Afghanistan

Language Service, with respect to their terms and conditions of employment.

690.     The weeding out of Afghan senior employees from the Pashto service was not a

result of chance, rather caused by VOA management's "New Format" Policy, as admitted by

management, and their reliance and practices that had an adverse impact on senior Afghan

employees that cannot be justified by any necessity and for which alternative policies and

practices with less discriminatory impact could be utilized that equally service any asserted

justification.

691.      BBG's discriminatory practices described herein have resulted in harm to the

senior employees who are Afghan in the Pashto Service, VOA.

692.     On behalf of themselves Plaintiffs request relief as provided in the Prayer for Relief below.

693.     On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT FOUR

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF AGE
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.***
**Disparate Impact**
**(On Behalf of all Plaintiffs)**

694.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

695.     VOA's managers adopted and maintained and implemented uniform employment practices that have a disparate impact on senior employees from Afghanistan at the Afghanistan Language Service, with respect to their terms and conditions of employment.

696.     The weeding out of Afghan senior employees was not a result of chance, caused by VOA management's New Format Policy, as admitted by management, and their reliance and practices that had an adverse impact on senior Afghan employees that cannot be justified by any necessity and for which alternative policies and practices with less discriminatory impact could be utilized that equally service any asserted justification.

697.      BBG's discriminatory practices described herein have resulted in harm to the senior employees who are Afghan in the Pashto Service, VOA.

698.     On behalf of themselves Plaintiffs request relief as provided in the Prayer for Relief below.

699.    On behalf of themselves and other similarly situated Afghan seniors at the

Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.


**COUNT FIVE**

**EMPLOYMENT DISCRIMINATION ON THE BASIS OF
NATIONAL ORIGIN AND Age**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq*.**
**Hostile Work Environment and Disparate Treatment**
**(On Behalf of all Plaintiffs)**

700.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs

above as though fully set forth herein.


701.    Plaintiffs will prove that they was has been forced to work through a hostile work

environment.


702.    The hostile work environment was a result of constant unwelcomed harassment.


703.    The harassment was pervasive and with such severity that in fact it altered the

conditions of employment and created an abusive atmosphere.

704.    Plaintiffs were further and repeatedly discriminated against each time Defendant

provided different treatment to other employees of Defendant.

705.    The additional retaliation, harassment and discriminatory conduct as well as the

additional harm to the Plaintiffs, greatly contributed to the hostile work environment, causing

great harm to each Plaintiffs.

706.    The Agency was/is aware that the type of behaviors outlined above exists in

Defendant's work place.

707.     Plaintiffs did put Defendant on notice, on many occasions, that Defendant does not equally enforce the Defendant's written policies. The Defendant willingly, knowingly and intentionally refused to take any steps to equally enforce the Defendant's written policies among all of Defendant's employees resulting in discriminatory acts against the Plaintiffs.

708.     Defendant condoned managements' actions against the Plaintiffs.  The actions of the Defendant as perpetrated by their agents and as described and complained of above are unlawful employment practices in that they likely have the effect of discriminating against depriving and tending to deprive equal employment to and otherwise causing a hostile work environment for Plaintiffs because of their age, in violation of ADEA 29, U.S.C §623(a).

709.     At all times relevant to this cause of action, Defendant had a duty under the ADEA to refrain from discriminating against, harassing, retaliating against and permitting hostile work environment for Plaintiffs based on their age.  Defendant had a duty under the ADEA to prevent the ongoing hostile work environment based on Plaintiffs' age.

710.     Plaintiffs reported discrimination, unequal treatment, harassment and hostile work environment on numerous occasions to management and supervisory employees of Defendant.

711.     Plaintiffs filed a complaint with Office of Human Resources on or about May 2012.

712.     Despite knowledge of the severe and pervasive hostile work environment, discrimination and harassment based on age and despite repeated reports and complaints by Plaintiffs, Defendant refused to take action to investigate remediate, stop, prevent or otherwise address the ongoing discrimination, harassment, hostile work environment, or retaliation.

713.     Defendant not only condone but encouraged managers', chiefs' and directors' decisions to discriminate against Plaintiffs based on Plaintiffs' national origin.

714.     Plaintiffs suffered adverse employment action when Defendant refused to provide equal treatment for Plaintiffs in the application of Defendant's written policies.

714.     Defendant intentionally and willfully discriminated against Plaintiffs.

715.     The unlawful employment practices complained of herein were intentional.

716.     The unlawful employment practices complained of herein were done with malice and/or reckless indifference to the protected rights of Plaintiffs and other senior employees.

717.     Defendant believes it is above having to comply with the law.  This belief combined with the acts or failure to act by Defendant to stop the discrimination and hostile work environment creates chaos and directly contributes to the day-to-day hostile work environment.

718.     Defendant does not apply its written policies equally among all its employees and admits that its practice is directly discriminatory in nature against Plaintiffs thereby contributing to the disparate treatment of Plaintiffs.  Such action against Plaintiffs was predicated on Plaintiffs being members of protected classes.  These acts contributed to the day-to-day hostile work environment.

719.     The disparate treatment of Plaintiffs continues with the favoritism that runs rampant within Plaintiffs' work environment.  This disparate treatment of Plaintiffs has been based on Plaintiffs being member of a protected class.  The disparate treatment continues on the day-to-day hostile work environment.

720.     But for Plaintiffs' membership in the protected class, they would not have suffered the disparate treatment.

721.     Plaintiffs have several times been victim of disparate treatment and disparate impact and reserves the right to further raise and explore these issues during discovery.

722.     Defendant has failed to take meaning or lasting action, failed to take remedial actions, failed to correct employees, failed to separate the employees, and or failed to take corrective action all the while encouraging a hostile work environment.

723.     Defendant's actions were taken in reckless disregard to the law and with malice towards the Plaintiffs and those of their colleagues who fall into the same protected categories.

724.     The events outlined here in its entirety will and does establish a hostile work environment created, endorsed, supported and encouraged by the Defendant.

725.     The unlawful employment practices complained of herein were done maliciously and with reckless indifference to the protected rights of Plaintiffs and similar employees.

726.     As a result of Defendant's, actions, decisions, and conduct, Plaintiffs, and those similarly situated has suffered and will continue to suffer.

727.     As a result of Defendant's actions, Plaintiffs have suffered emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses, which have caused and exacerbated Plaintiffs' medical condition.   Because of these losses Plaintiffs seek compensatory damages and punitive damages.

728.     Defendant's actions were done with malice and with reckless indifference to Plaintiffs' protected rights.  Plaintiffs seek and are entitled to punitive damages.

729.     Plaintiff also seeks reasonable attorney's fees, court costs and including reasonable expert fees.

## COUNT SIX

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN AND AGE
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.*
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.
Systemic Harassment**

**(On Behalf of All Plaintiffs)**

730.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

731.    This is is a claim against BBG arising under Title VII as amended and ADA as amended, prohibiting harassment based on national origin and age in the workplace.

732.    Defendant created a system of harassment and hostile work environment that discriminated against senior Afghan employees based on their age and their national origin that altered the terms, conditions and privileges of their employment by exposing them to offensive unwelcome harassment.  Management perpetuated the harassment and condoned the harassment perpetrated by others.

733.    Defendant is liable for harassment because it knew or should have known of the harassment and failed to exercise reasonable care to take prompt corrective action.

734.    Defendant's actions and inactions created a work environment hostile to senior employees where harassment of senior broadcasters in the language services is the Agency's standard operating procedure.  In other words Defendant has a general policy of discrimination against the senior broadcasters in the form of forced retirement.

735.    Defendant's discriminatory conduct caused Plaintiffs to suffer injury and physical and emotional distress by constant and prolonged attempts of constructive discharge.

736.    Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT SEVEN

### WILLFUL DISCRIMINATION
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.***

737.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

738.    Defendant engaged in the acts summarized above knowing its its conduct was prohibited by Title VII, ADEA, or alternatively, it showed a reckless disregard for its employees and their protected rights.

739.    Therefore its acts violating Title VII and ADEA were willful as defined in the Acts.

740.    Defendant's failure to ensure tolerable working conditions free of discrimination, harassment, and retaliation was intentional, malicious, deliberate, willful and oppressive and was carried out with the intent to force the senior staff into retirement.

741.    Because of the intolerable working conditions Plaintiffs have been forced to consider resignation or retirement.  But being forced to continue to work under these circumstances has been intolerable and taken an extreme toll on their physical and mental health.

742.    Defendant's wrongful and illegal conduct caused Plaintiffs' loss of reputation and a career that they had long worked to maintain, and emotional distress and physical injury.

743.    Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT EIGHT

**<u>EMPLOYMENT DISCRIMINATION –RETALIATION</u>**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq*.**
**(On Behalf of All Plaintiffs)**


744.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

745.    Pursuant to Title VII and applicable federal government equal employment opportunity regulations, the Agency, as a federal government employer, is specifically prohibited from unlawful retaliation and discrimination against the Plaintiffs because they engaged in EEO activity protected by Title VII. 42 U.S.C. Sections 2000e-16a(a); and 42 U.S.C.  Section 2000e-3(a); and 29 C.F.R. Section 1614.103 (2004).

746.    The Plaintiffs engaged in Title VII protected activities; was subjected to series of direct, intentional, cumulative, and increasingly severe, adverse, tangible and discriminatory employment actions, as set forth in detail in the paragraphs above; and there exists a causal connection between their protected activity and the adverse employment actions.

747.    Defendant's retaliation against Plaintiffs through 2014 include but not limited to:

1) Management doing whatever they want regardless of the law;

2) Management doing whatever they want regardless of legal counseling;

3) Management directing staff to act contrary to written policy.  For example, Mr. Ibrahim (Managing Editor)telling other employees not to help the senior staff, or Ms. Maiwandi telling senior staff not write work related e-mails.  Threats that continued well into 2013 and ongoing to 2014.

4) Management treating some employees differently than all other employees.

5) Management conspiring to harass Plaintiffs.

6) Management conspiring to discriminate against Plaintiffs.

7) Management conspiring to retaliate against Plaintiffs.

8) Management creating events at the workplace to cause more stress and aggravation for Plaintiffs.

748.    Most of the acts complained of within this Complaint were retaliatory in nature and directed toward Plaintiffs, because Plaintiffs belong to the protected groups as outlined above, under ADEA and Title VII.

749.    It is unlawful to retaliate against an individual for opposing discriminatory employment practices or for filling a discriminatory charge, testifying or participating in anyway in an investigation, proceeding or litigation under the ADEA, and Title VII.

750.    Defendant further violated Plaintiffs' civil rights by taking adverse actions against them in response to their complaints about discriminatory working conditions.

751.    During the course of Plaintiffs' employment, Defendant acted through management in a continuous course of conduct, discriminated in retaliation against Plaintiffs in the terms and conditions and privileges of their employment.

752.    Plaintiffs further allege that Defendant discrimination and retaliatory conduct is in violation of Title VII and is willful under Title VII.

753.    The unlawful employment practices complained of herein are intentional. Defendant by and through its agents, retaliated against Plaintiff when it knew or should have known that the same were in violation of the ADEA and any alleged reasons to the contrary are pretextual.

754.    The unlawful employment practices complained of herein were done with malice and reckless indifference to the protected rights of Plaintiffs and other similarly situated seniors in language services.

755.    The Agency, by and through its managers actions and the actions of Human Resources and employees servicing beneath management in the supervisory chain of command

engaged in calculated and purposeful campaign of unlawful retaliation, unlawful, unlawful

discrimination and unlawful workplace harassment against the Plaintiffs.

756.     The Agency intentionally subjected Plaintiffs to intentional and unlawful Title VII

retaliatory discrimination.  The intentional, unlawful retaliation was created and perpetuated and

tolerated by management.

757.     The Agency is liable for the intentional and unlawful Title VII retaliation against

the Plaintiffs because management and the agency officials and managers knew or should have

known of the aforementioned unlawful retaliation and did not take immediate, appropriate and

effective corrective action.

758.     The Agency's aforementioned treatment of the Plaintiffs, considered in its totality

and in cumulative manner, as set forth in the above paragraphs of this claim and Complaint,

constitutes unlawful, direct, intentional, adverse, tangible, retaliatory and discriminatory

employment actions prohibited by Title VII.

759.     The Agency's aforementioned treatment of Plaintiffs constitutes unlawful

intentional retaliation and discrimination in violation of 42 U.S.C. Sections 2000e-16a (a) and

2000e-3(a) and (b), intentional, unlawful discriminatory practices in violation of 42 U.S.C.

Section 1981a(a)(1) and (b)(1)(2).

760.     The Agency, by virtue of the adverse actions set forth in the aforementioned

paragraphs of this Complaint, engaged in direct, intentional, and unlawful Title VII retaliatory

discrimination against the Plaintiffs because of their protected Title VII activities, as specifically

described above.

761.    Plaintiffs complained to managers, Defendant's human resources personnel and others about the discrimination, including discrimination based on age, they were experiencing and as such engaged in protected activity under 42 U.S.C. § 2000e-3.

762.    Defendant retaliated against Plaintiffs by taking actions that would dissuade the reasonable employee from making or supporting a claim of discrimination under Title VII and ADEA.  For example, in response to Plaintiffs' complaint to Human Resources, the Director of the Afghanistan Service (second or third tier manager) called a meeting in her office, exposed the seniors as the complainants, and put a gag on their work related e-mails.  Their managers continued to harass them, continued to be marginalize the complainants, in greater effort to force them to retire.

763.    For example, Defendant subjected Plaintiffs to a heightened scrutiny of their work, and their Managing Editor wrote abrasive e-mails to each of the complainants  on or about May 2012.  In one of the e-mails, Mr. Ibrahim (Managing Editor) told Mr. Achagzai, that he is a man from the 70s and 80s and he is therefore incompetent in his job.  In another e-mail, Mr. Ibrahim told Mr. Shah that he misses assignments, while he had discussed the assignment and agreed with Mr. Shah that there was no missed assignments, but when Mr. Shah got to his desk a few moments later he received an e-mail form Mr. Ibrahim, in contradiction to their agreeable discussion. Ms. Khadem's interviews were rejected in retaliation.  Mr. Mohmand was targeted with assignments.  Mr. Stanazai was targeted with e-mails, assignments etc.

764.    Management changed the annual evaluations without following the necessary protocol.  These changed evaluations were a retaliation to Plaintiffs' complaints.  The annual evaluations were changed to be more biased and further targeting the senior staff.

765.    Management required Plaintiffs to participate in tasks for which they were not trained that similarly situated employees did not endure.

766.    Plaintiffs suffered injuries as a direct and proximate result of Defendant's unlawful retaliatory conduct, including but not limited to humiliation, loss of reputation, emotional distress and physical illness.

767.    Plaintiffs request for relief as provided in the Prayer for Relief below.


**COUNT NINE**

**<u>EMPLOYMENT DISCRIMINATION –RETALIATION</u>**
**Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq*..**
**(On Behalf of All Plaintiffs)**

768.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

769.    Pursuant to the ADEA and applicable federal government equal employment opportunity regulations, the Agency, as a federal employer, is specifically prohibited from unlawful retaliation against Plaintiffs, because they engaged in EEO activities protected by the ADEA 20 U.S.C Section 633a(a) and 623(b). 29 C.F.R. Section 1614.103 (2004).

770.    The Agency by virtue of the unlawful adverse actions set forth in the aforementioned paragraphs of this Complaint, engaged in direct, willful and unlawful ADEA retaliatory discrimination against Plaintiffs because of her protected ADEA activities.

771.    Plaintiffs' managers and supervisors included Mr. Ibrahim, Ms. Maiwandi, Ms. Mendelson, and later Mr. Farivar and Mr. Dahiyat.

772.     The Agency, by and through its managers actions and the actions of Human Resources and employees servicing beneath management in the supervisory chain of command engaged in calculated and purposeful campaign of unlawful retaliation, unlawful, unlawful discrimination and unlawful workplace harassment against the Plaintiffs.

773.     The Agency intentionally subjected Plaintiffs to intentional and unlawful ADEA retaliatory discrimination.  The intentional, unlawful retaliation was created and perpetuated and tolerated by management.

774.     The Agency is liable for the intentional and unlawful ADEA retaliation against the Plaintiffs because the Agency officials and managers knew or should have known of the aforementioned unlawful retaliation and did not take immediate, appropriate and effective corrective action.

775.     The Agency's aforementioned treatment of the Plaintiffs, considered in its totality and in cumulative manner, as set forth in the above paragraphs of this claim and Complaint, constitutes unlawful, direct, intentional, adverse, tangible, retaliatory and discriminatory employment actions prohibited by ADEA.

776.     The Agency's aforementioned treatment of Plaintiffs constitute, unlawful, willful, adverse, retaliatory discrimination in violation of 29 U.S.C Sections 633a(a) and 623(a)(1)(2)(d) and 626(b).

777.     Defendant by and through its agents, retaliated against Plaintiff when it knew or should have known that the same were in violation of the ADEA and any alleged reasons to the contrary are pretextual.

778.     As a result of Defendant's discriminatory actions Plaintiffs suffered pecuniary and non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience,

mental anguish, loss of enjoyment of life, and other non-pecuniary losses.  Because of these

losses Plaintiffs seek compensatory damages.

779.    Defendant's actions were done with malice and/or with reckless indifference to

Plaintiffs' protected rights.  Plaintiffs are therefore entitled to punitive damages.

780.    Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT TEN

### NEGLIGENCE AND NEGLIGENCE PER SE
### IN THE WORKPLACE


781.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs

above as though fully set forth herein.

782.    Defendant owes a legal duty to Plaintiffs, a duty to use reasonable care in

providing a reasonably safe work place.

783.    Defendant owes a duty to Plaintiffs to use ordinary care in supervising an

employee's activities.

784.    Defendant owes a duty to Plaintiffs to use ordinary care in providing employees

adequate help in performance of work.

785.    Defendant owes a duty to Plaintiffs to use ordinary care in hiring managers and

employees.

786.    Defendant owes a duty to Plaintiffs to use ordinary care to supervise its

employees.

787.   Defendant owes a duty to Plaintiff to use ordinary care in training its employees.

788.   Defendant breached the legal duties it owed to the Plaintiff as follows:

    a.   Defendant does not provide a safe workplace free from harassment, discrimination, hostile work environment and emotional distress;

    b.   Defendant does not use ordinary care in supervising an employee's activities as evidenced by the multiple claims against Plaintiffs' supervisor and the continued outrageous conduct Defendant allows to continue on a day to day basis;

    c.   Defendant does not provide ordinary care in hiring employees as Defendant continually hires employees without the proper experience, then fails and refuses to train the new hires,  while expecting them to meet certain levels; further Plaintiff's hiring methodology does not follow well grounded human resource policies;

    d.   Defendant does not use ordinary care in supervising its employees as evidenced by the multiple claims against Plaintiffs supervisor and the continued outrageous conduct defendant allows to continue on a day to day basis contributing to a hostile work environment.

    e.   Defendant does not use ordinary care in training its employees as Defendant has failed and refused to train employees concerning age discrimination, harassment, discrimination, diversity, EEOC policy, the written policies in Defendants Employee Handbook and other areas; this failure is compounded by the fact that Defendant does not train its supervisors in how to handle situations, how to enforce the written policies in Defendants Employee Handbook and other areas however Defendant expects its supervisors to perform these functions without training which only leads to violations of employee rights.

789.   As a result of Defendant's negligence outlined herein Plaintiffs' supervisor and Defendant discriminated against Plaintiffs, caused the existence of an ongoing hostile work environment, subjected Plaintiffs to harassment and retaliated against Plaintiffs.

790.    As a further result of Defendant's negligence outlined herein Plaintiffs' supervisor and defendant have discriminated against Plaintiffs when they enforced Defendant's written policy on Plaintiffs differently than their enforcement of the same policy on other employees of Defendant.

791.    As a result of Defendant's negligence outlined herein Plaintiffs' supervisor and Defendant have discriminated against Plaintiffs based on their national origin and age.

792.    As a further result of Defendants negligence managers and supervisors have committed various torts against Plaintiffs.

793.    Plaintiffs seeks un-liquidated damages within the jurisdictional limits of this court.

794.    Defendant's unlawful conduct complained of by Plaintiffs herein was done with malice and/or reckless indifference to the rights of Plaintiffs which entitles Plaintiffs to exemplary damages.

**COUNT ELEVEN**

**PARTICIPATORY LIABILITY – CIVIL CONSPIRACY IN THE WORKPLACE AT BROADCASTING BOARD OF GOVERNORS**

795.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

796.    Defendant in combination with Plaintiffs' supervisors and other staff agreed to maintain the status quo of Defendant's discrimination, harassment, age discrimination, national origin discrimination, retaliation, hostile work environment, to not enforce Defendant's written

policies among employees, all the while being grossly negligent without regard to the duties Defendant and Plaintiffs' supervisor owed Plaintiffs.

797.    Defendant and Plaintiffs' supervisors agreed to commit all the acts outlined herein, which is evidenced by Defendant's ratification of the outrageous conduct.

798.    Defendant and Plaintiffs' supervisor knew the agreed acts would result in harm to Plaintiffs.

799.    To accomplish the object of their agreement, Plaintiffs has outlined the outrageous conduct herein, which has thus far allowed Defendant to maintain its status quo violating Plaintiffs' rights on a day-by-day basis.

800.    Defendants agreement and conduct flies in the face of normally accepted Human Resource practices.

801.    Defendants conspiratorial agreement proximately caused injury to Plaintiffs.

802.    Plaintiffs seek un-liquidated damages within the jurisdictional limits of this court.

803.    Defendants unlawful conduct was done with malicious, violent, oppressive, fraudulent, wanton, or grossly reckless indifference to the rights of Plaintiffs which entitles Plaintiffs to exemplary damages.

804.    Plaintiffs also seek reasonable attorneys' fees, court costs, including reasonable expert fees.

## COUNT TWELVE

## VICARIOUS LIABILITY

## RESPONDENT SUPERIOR – RATIFICATION

## IN THE WORKPLACE AT BROADCASTING BOARD OF GOVERNORS

805.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

806.     The acts of Plaintiffs' supervisor and employees were performed while in the employment of Defendant and were within the course and scope of that employment or within the authority delegated to the employee.

807.     Therefore the conduct of Plaintiffs' supervisor towards Plaintiffs as outlined herein was performed while in the employment of Defendant.

808.     Further the conduct of Plaintiffs' supervisor, employee toward Plaintiffs as outlined herein was approved by Defendant as Defendant took no steps to change, alter, stop or modify said conduct.

809.     At the time of the conduct of Plaintiffs' supervisor, Plaintiffs' supervisor was acting on Defendant's behalf.

810.     After the events complained of, Defendant was fully aware of Plaintiffs' supervisor acts and approved them by Defendants acts or failure to act.

811.     Defendant approved Plaintiffs' supervisors' acts with intent to validate them.

812.     Therefore Defendant is liable for the acts of Plaintiffs' supervisor as outlined herein.

813.    Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT THIRTEEN

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

814.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

815.    Defendant had a duty to maintain a work environment that was free of discrimination, harassment, humiliation and hostility.

816.    Defendant ignored and failed to investigate or accommodate.

817.    Defendant's negligent conduct is the direct cause of Plaintiffs' severe emotional distress.  Plaintiffs' suffered direct injury to their professional reputation around the world and Defendant's negligent conduct has endangered Plaintiffs' emotional well being and livelihood.

818.    Defendant in a negligent breach of this duty is responsible for Plaintiffs' injuries and emotional distress and interference in her ability to care for their families.

819.    As a result of Defendant's discriminatory actions Plaintiffs suffered pecuniary and non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.  Because of these losses Plaintiffs seek compensatory damages.

820.    Defendant's actions were done with malice and/or with reckless indifference to Plaintiffs' protected rights.  Plaintiffs are therefore entitled to punitive damages.

821.    Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT FOURTEEN

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

822.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

823.    Defendant knew about all the matters claimed herein, however Defendant failed and refused to take any steps to stop the discrimination, hostile work environment and retaliatory acts against the senior Plaintiffs.

824.    Defendant acted intentionally in harming the Plaintiff's and causing their damages.

825.    By Defendant's intentional failure and refusal to stop the discriminatory, hostile work environment and retaliatory actions, and the continued acts caused Plaintiffs to suffer severe emotional distress which exacerbated Plaintiffs' other medical conditions and caused certain medical and emotional conditions.

826.    Defendant knew that continuing to allow the discriminatory, hostile work environment, and harassment created a high degree of risk of harm to Plaintiffs and others, however Defendant deliberately proceeded to act in conscience disregard of that risk.

827.    Defendant had knowledge of senior employees physical and emotional distresses were severe.  Despite this knowledge Defendant continues to fail and refuses to stop the discriminatory, hostile work environment.

828.    Plaintiffs' severe emotional distress includes painful emotional and mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, uncontrollable crying episodes, difficulty sleeping, emotional outburst, stomach disorders, headaches, depression and worry and anxiety.

829.     Defendants extreme and outrageous conduct was intensified with day to day harassment of Plaintiffs, proximately caused severe emotional distress.

830.     Plaintiffs' severe emotional distress cannot be remedied by any other cause of action.

831.     Plaintiffs seek un-liquidated damages within the jurisdictional limits of this court.

832.     Defendants unlawful conduct complained of by Plaintiffs herein was done with malice and reckless indifference to the rights of Plaintiffs which entitles Plaintiffs to exemplary damages.

833.     Plaintiffs also seek punitive damages.

834.     Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT FIFTEEN

## INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS IN THE WORKPLACE

835.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

836.     Ms. Khadem was hospitalized in November 2014.

837.     Ms. Spozhmai Maiwandi publicized Ms. Khadem's private life and medical condition to other employees of Defendant and the public.

838.     Ms. Spozhmai Maiwandi told Ms. Shafia Sardar that Ms. Khadem was having surgery for a chronic illness.

839.     Ms. Sardar also received an e-mail from Ms. Maiwandi in this regard and shared it with her co-workers at the Pashto service.

840.    Ms. Khadem had only informed her immediate manager Mr. Ibrahim of her need to take time off for her health.

841.    The information publicized was not matters a) already known, b) matters of public record, c) not matters in public view.

842.    The information publicized was highly private.

843.    Defendant intentionally and willfully publically disclosed private facts about Plaintiffs.

844.    The unlawful public disclosure of private facts about Plaintiffs private health and private lives, and private matters complained of herein was done with malice and reckless indifference to the rights of Plaintiffs which entitles Plaintiffs to exemplary damages.

845.    As a result of Defendant's public disclosures of Plaintiffs' private facts, Plaintiffs have suffered non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses. Because of these losses Plaintiff seeks compensatory damages.

846.    Defendant's actions were done with malice and reckless indifference to Plaintiff's protected rights.  Plaintiff is there entitled to punitive damages.

847.    Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT SIXTEEN

## NEGLIGENT HIRING, RETENTION AND SUPERVISION


848.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

849.     As a result of direct negligence on the part of upper-management's hiring this Managing Editor Plaintiffs have suffered extreme emotional distress.

850.     VOA placed its managers in a position to cause foreseeable harm, harm which the Plaintiffs could have been spared had VOA management taken reasonable care in making its decision concerning the hiring and retention of the Managing Editor of Pashto Service.

851.     VOA knew or should have known the managers' propensity for the sort of conduct which caused the injuries of the Plaintiffs.

852.     As a direct and proximate result of VOA's aforementioned conduct the Plaintiffs are entitled to legal and equitable remedy.

853.     Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT SEVENTEEN

## TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT


854.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein

855.     Defendant hired all Plaintiffs.   Defendant was aware of its obligation as a to provide non-hostile work environment free of discrimination tortuous conduct and harassment. However Defendant continued to allow this behavior, including Defendant putting a gag on work related e-mails.

856.     Plaintiffs endured Defendant's inconsistent and pretextual harassment and discrimination,

857.    Further Defendant's managers acted with malice wrote and made statements with intent to harm and retaliate against the Plaintiffs. The statements were made to Plaintiffs, Plaintiffs' co-workers and possibly others.

858.    Such conduct directly and proximately interfered with Plaintiff's contract and interfered with Plaintiffs job performance and ability to feel safe in their work environment.

859.    Plaintiffs have suffered and will continue to suffer damages as set forth below including but not limited to damage to reputation, emotional distress, mental anguish, impairment of possible future earnings.

860.    As a result of Defendant's public disclosures of Plaintiffs' private facts, Plaintiffs have suffered non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses. Because of these losses Plaintiff seeks compensatory damages.

861.    Defendant's actions were done with malice and reckless indifference to Plaintiffs' protected rights.  Plaintiff is there entitled to punitive damages.

862.    Plaintiffs request relief as provided in the Prayer for Relief below.


## COUNT EIGHTEEN

## DEFAMATION

863.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein

The actions and statements of Defendant as alleged above constitute defamation.

864.    As a result of Defendant's public disclosures of Plaintiffs' private facts, Plaintiffs have suffered non-pecuniary losses, including but not limited to emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

Because of these losses Plaintiff seeks compensatory damages.

865.    Defendant's actions were done with malice and reckless indifference to Plaintiff's

protected rights.  Plaintiff is therefor entitled to punitive damages.

866.    Plaintiff also seeks reasonable attorney's fees, court costs and including

reasonable expert fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray this Court to:

a) Defendant be summoned to appear and answer herein;

b) Issue finding of facts and conclusions of law that Defendant's acts, practices, and

procedures, subjected Plaintiffs to discrimination, based on their age and  national origin,

harassment, hostile work environment and retaliation as complained of herein and

violated Plaintiffs' rights as secured under Title VII and or the Age Discrimination

Employment Act, and like statutes.

c) Grant Plaintiffs permanent injunction enjoining Defendant, its officers, agents,

successors, employees, attorneys, assigns and other representatives, and all those acting

in concert; or participation with them and at their direction, from engaging in any policy

or practice shown to discriminate against Plaintiffs in violation of Title VII on the basis

of national origin, harassment, hostile work environment and retaliation;

d) Grant to Plaintiffs a judgment for damages, for age discrimination, national origin

discrimination, harassment, hostile work environment and retaliation, $350,000.00 each

at the time of filing;

e)  Retain jurisdiction over this action to assure full compliance with orders of this Court as well as applicable laws;

f)  Plaintiffs seek an award of punitive damages in an amount the Court deems appropriate to punish Defendant for the willful and malicious misconduct repeatedly and an amount that is necessary to deter this Defendant from engaging in such misconduct in the future, in the amount of $750,000.00 or more;

g)  Plaintiffs pray that the court award Plaintiffs costs and expenses of this action and award Plaintiffs reasonable attorney fees as provided in Title VII 42 U.S.C. §2000e-5(k) and 29 U.S.C.A. §626, et. seq.; the Age Discrimination Employment Act;

h)  Plaintiffs, in accordance with his/her rights under the United States Constitution, and statutory rights under Title VII 42 U.S.C §2000e-5(k) and 29 U.S.C.A. §626, et. seq.; the Age Discrimination Employment Act, demands a trial by jury on issues tried to a jury;

i)  Post judgment interest per annum permitted at the highest rate permitted, from date of judgment until judgment is paid;

j)  All Court costs;

k)  All expert witness fees incurred both in preparation and prosecution of this action;

l)  All court reporter fee incurred in the preparation and prosecution of this case;

m) Plaintiffs be granted all writs necessary to enforce the judgment of this Court;

n)  Plaintiffs be awarded such further relief as the nature of the case may require or as may be determined by this Honorable Court to be just, equitable, reasonable, and proper as punitive damages; compensatory damages for the financial and emotional harm caused by Defendant, and other damages permitted;

## DEMAND FOR TRIAL BY JURY

798.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action .  See also U.S. Const. Amendment 7.   In accordance with the Federal Rules, this jury demand is being filed with the Clerk of the United States District Court for the District of Columbia, as required by Fed. R. Civ. P. 5(d) and Fed. R. Civ. P. 38 (b).


Respectfully  Submitted,

Taher Achagzai
Zeeba Khadem
Naseem Stanazai
Syed B. Shah
Mohammed Zamen Mohmand


By Counsel

Dated: May 5th, 2014

/S/  S. Sarah Shah
S. Sarah Shah
D.C. Bar No. 995094
Law Offices of Shah & Shah PLLC
1666 Connecticut Avenue, N.W.
Suite 222
Washington, D.C. 20009
Telephone: (202) 450-1051
Direct: (202) 450-1059
Fax: (202) 234-1270

Attorney for Plaintiffs