# IN THE UNITED STATES DISTRICT
# COURT FOR THE DISTRICT OF COLUMBIA

_____

Taher Achagzai et al                          )
                                              )
                Plaintiffs                    )        Judge:   Moss, Randolph
                                              )        Case No. 1:14-CV-00767
                                              )
                v.                            )
                                              )
                                              )
BROADCASTING BOARD                            )
OF GOVERNORS                                  )
                                              )
                Defendant                     )
                                              )
_____ )

## FIRST AMENDED COMPLAINT

For their Complaint against the Board of Broadcast Governors, Plaintiffs, Taher

Achagzai, Syed B. Shah, Mohammed Zamen Mohmand, Zeba Khadem and Naseem S. Stanazai,

all of whom are International Broadcasters at the Pashto Language Service, Voice of America,

by and through their undersigned attorney, based on information and belief and/or the Plaintiffs'

knowledge and state the following:

## JURISDICTION

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C.§§451 (judiciary), 28

U.S.C.§1331 (federal question), 28 U.S.C. §1337 (commerce), 28 U.S.C. §1343 (civil rights), 29

U.S.C.§626(b) (ADEA Enforcement, Age Discrimination in Employment Act, 29 U.S.C. §633a)

and 42 U.S.C. §2000e-5(f)(1)(unlawful employment practices) and (Title VII Enforcement) and

42 U.S.C. §1981a(equal rights).

## VENUE

2.      The employment practices of Defendant alleged to be unlawful were committed within the jurisdiction of the District of Columbia. In addition, Defendant maintains its primary business location within the jurisdiction of the District of Columbia. Accordingly, venue is proper pursuant to 28 U.S.C. §1391(b)(1)&(2).

## EXHAUSTION OF ADMINISTRATION REMEDIES

3.      Prior to filing this action, Plaintiffs timely filed with Office of Civil Rights within the forty five (45) days, their written charge asserting Defendant's discrimination based on age and national origin, as well as hostile work environment and harassment, including continued retaliation revealed, and all additional claims. In conformance with the law, Plaintiffs have exhausted administrative remedies, therefore all conditions precedent to the Plaintiffs maintaining this civil action have occurred or been waived.

## PROTECTED CLASS MEMBERSHIP

4.      This lawsuit is brought under 42 U.S.C. §2000 et. Seq. (Title VII) and its counterpart 42 U.S.C. §1981 and 29 U.S.C. §626(b). Title VII and §1981 prohibit employers from discriminating "against any individual with respect to their compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin. See: 42 U.S.C. §2000e-2(a).

5.      This lawsuit is brought under 42 U.S.C. §2000 et seq. (Title VII) and its counterpart 42 U.S.C. §1981 and 29 U.S.C. §626. Title VII and §1981 prohibit employers from discriminating against any individual with respect to their compensation, terms, conditions, or privileges of

employment because of such individual's race, color, religion, sex or national origin. 42 U.S.C. §2000e-2(a). Additionally this lawsuit is brought pursuant to the Age Discrimination Act 29 U.S.C. §636. Plaintiffs identify that they are members of the following protected classes:

a)  Age – over forty (40) years old; and
b)  National origin; and
c)  Hostile work environment; and
d)  Filed complaint with Office of Civil Rights concerning unlawful employment conditions; and
e)  Retaliation; and
f)  Pattern and/or practice of discrimination; and
g)  Disparate treatment.

## PARTIES

6.  Plaintiffs, Mohammed Zamen Mohmand, Syed B. Shah, Naseem Stanazai, Taher Achagzai, and Zeba Khadem are all naturalized citizens of the United States, and of Afghan national origin and native Pashto and Dari language speakers.

7.  The Plaintiffs are International Broadcasters, employed at Voice of America (GS-12), assigned to South Asia Division, Afghan Service (Pashto Language), located at 330 Independence Ave. Washington DC, 20237.

8.  Plaintiffs are over the age of 40, with varying number of years of service.

a)  Taher Achagzai (DOB: 11/12/1938), age 77; Mr. Achagzai has been employed by VOA since November 1988 (first as a Purchase Order Vendor and later promoted to full staff in 2001) (27 years of service);

b)  Naseem S. Stanazai (DOB: 12/20/1953), age 62; Mr. Stanazai has been employed by VOA since 2001 (14 years of service);

c)  Syed B. Shah (DOB: 09/04/1947), age 67; Mr. Shah has been employed by VOA since 1982 (first as a Purchase Order Vendor and later promoted in 1989 to full staff) (33 years of service);

d)  Mohammed Zamen Mohmand (DOB: 12/29/1947), age 67; Mr. Mohmand has been employed by VOA since September 21, 1985 (nearly 30 years of service);

e)      Zeba Khadem (DOB: 03/03/1951), age 64; Ms. Khadem has been employed by VOA since October 1984 (nearly 31 years of service).

9.      Plaintiffs have never before brought a claim against any other employer including BBG.

10.     During their many years of employment with VOA, Plaintiffs have consistently been highly ranked in their annual evaluations, been recipients of awards, promotions and recognized for their many talents including on air voice, interviews, shows, expertise in the Pashto language, as well as high level of professionalism and commitment to the team, until the time period leading to this complaint.

11.     Defendant, Broadcasting Board of Governors (hereinafter BBG) is an independent federal agency responsible for all U.S. government and government sponsored non-military, international broadcasting. The Voice of America (hereinafter VOA) is Plaintiffs' current employer and one of Defendant's Broadcasters.

## BACKGROUND FACTS COMMON TO ALL PLAINTIFFS[1]

12.     Plaintiffs' immediate and second level supervisors, managers or persons engaged in the new format and discriminatory acts by management, during the pertinent times related to the claims of this complaint include but are not limited to the following individuals:

a.      Mr. Mohammad Ibrahim Nasar (Nasir or Nasar) current Managing Editor, GS-13, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

b.      Mr. Ghilzai Amanullah, former Managing Editor of Ashna Radio, Afghanistan Branch/Pashto Service, South Asia Division, VOA;

---

[1] Facts are based on and continued from Office of Civil Rights Report of Investigation and Exhibits for all five Plaintiffs.

    c.      Ms. Beth Mendelson, former Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division, from August 2006 to upon information and belief, sometime early in 2012;

    d.      Mr. Masood Farivar, current Chief of the Afghanistan Branch/Pashto Service, GS 14, Pashto Service/Ashna Radio, Afghanistan Branch, South Asia Division;

    e.      Ms. Spozhmai Maiwandi, GS-15, former Director, South Asia Division, who held this position from 2007 to, on or about, April 2013;

    f.      Mr. Ismail Dahiyat, the former Director, South & Central Asia Division;

    g.      Ms. Rebecca McMenamin, Acting Associate Director for Language Programming;

    H.      Barbara Brady, former Chief of Staff, started in January 2010;

    I.      David Ensor was sworn in as the 28th Director of the Voice of America on June 16, 2011.  Upon information and belief, Mr. Ensor resigned from this position in April 2015.

13.    Plaintiffs have been and are continuously discriminated against and subjected to a hostile work environment, based on their age and national origin, and have suffered  reprisal for reporting harassing behavior starting 2006 and more recently 2010 and ongoing.

14.    Their managers began subjecting Plaintiffs to acts that made productivity nearly impossibly and which prevented them from being able to successfully perform their duties. Their Editing Manager, Ibrahim Nasir and his predecessor targeted the seniors by:

    a)      taking away assignments at the last minute without notice;
    b)      switching up assignments at the last minute without notice;
    c)      bombarding seniors with assignments, while junior staff are idle;
    d)      giving plum assignments, shows, travel opportunities to junior and Pakistani staff;
    e)      creating unfair and biased schedules;
    f)      constantly changing the schedule without any notice;
    g)      removing Plaintiffs from positions of shift editor or taking away their shows;
    h)      removing senior staff  voices off the air, except only to substitute for others;
    i)      assigning seniors tasks that are beyond their job, such as production;
    j)      assigning them tasks for which they had not been trained;
    k)      failing to provide them with adequate training;
    l)      excluding them from training until after they filed a complaint;
    m)      humiliating them by making false accusations against them (such as accusing them of not accepting an assignment, or not completing assignments);

n) treating younger staff more favorably by offering them computer training, a variety of assignment privileges, overlooking their mistakes and promoting them regardless of their lack of language skills and constant mistakes while reducing Plaintiffs to mere translator after taking their voices off the air;

o) failing to provide them password for Dalet Plus (necessary for their daily assignments);

p) affirmatively, maliciously, and intentionally instructing younger staff "not to help the senior (aged) employees" especially if they are asking for help;

q) asking junior staff to report to the Managing Editor, Mr. Nasir, for any assistance that they may give to the senior staff;

r) changing their performance standards to justify a lower rate of performance;

s) surreptitiously (failing to follow protocol) changing Plaintiffs' annual evaluations in reprisal for their complaints about discrimination;

t) ignoring their requests for help;

u) ignoring their notices of discrimination, reprisal, harassment and hostile work environment;

v) Former Division Chief, Ms. Maiwandi, falsely giving Plaintiffs information about "closing the Pashto Service" to force them into retirement;

w) encouraging Plaintiffs to retire;

x) putting a gag on their work related e-mails;

y) Division Director exposing Plaintiffs to their co-workers their supervisor as the complainants, the trouble-makers;

z) sending the seniors a trail of inaccurate e-mails targeting them with false accusations;

aa) Managing editor sending inappropriate e-mails at 1 or 2 am, harassing Mr. Achagzai and telling him he is from a different era, that he is a senior and does not have adequate knowledge of modernity;

bb) excluding them from meetings;

cc) not including their input or suggestions regarding the scheduling;

dd) not acknowledging senior staff in public;

ee) Management using third party, a junior employee, to communicate with the senior staff, even during senior's shifts as shift editors when it is necessary to relay information about shows etc.  or interfering with senior's position as shift editor by going directly to the staff to give assignments, to undermine the senior's position as shift editor;

ff) allowing junior staff to control their own schedule at the expense of senior staff duties;

gg) allowing junior staff to change assignments sua sponte without consulting with senior staff members as part of the team during that shift;

hh) failing to provide Plaintiffs with completed copies of their annual evaluations;

ii) failing to accommodate the needs of the senior staff;

jj) Mr. Nasir claiming that he is "the law," in response to senior concern;

kk) being ridiculed and stopped from conducting interviews.

15.     Beginning in some instances since 2006, but mostly since 2010, management has continuously discriminated against the senior staff at VOA and in particular against the five senior Plaintiffs. The discrimination became more overt when Mr. Ibrahim Nasir became the Managing Editor on or about April 2010 and upon information and belief when Ms. Barbara Brady was named VOA's Chief of Staff on or about January 2010.

16.     Management has had notice since 2006, and/or at the latest since 2010, of senior complaints regarding, hostile work environment, harassment, discrimination based on age and national origin, as well as a disparate treatment by management between the senior staff, and the junior staff as well as those members of the staff who support management in their efforts to force the five senior complainants into retirement by whatever means necessary.

17.     Few of the seniors (not party to this matter) succumbed to the pressure to retire and did in fact retire. Plaintiffs have been told by management either directly or indirectly that he or she should retire. Since 2006 and ongoing, it has been the intent of VOA management, to somehow through an assortment of harassment and hostile acts to pressure the seniors to have no other choice but to retire or resign, as was the case with several of their colleagues such as Abdul Bari Jahani, and Dr. Amin Walkman as well as other seniors in the Afghanistan Service both Farsi and Dari, who were forced into retirement, harassed, subjected to a hostile work environment and discriminated against.

18.     Management ignored the senior staff complaints and notices in an effort to force them into retirement. VOA management relied on the policy of what they have called the "New Format" to harass and force the seniors into retirement. As a direct result of the New Format, there was a disparate impact on the Senior staff of the language services.

18.     Management failed to follow-up on the discriminatory policy, harassment, reprisal and hostile work environment, despite the senior complaints to different members of management, which includes filing complaints with the Office of Human Resources and later Office of Civil Rights. Management responded with claims of implementation of the New Format. However the New Format as it was implemented was highly discriminatory against the senior staff.

19.     On different occasions, the Plaintiffs complained to upper management including, Ms. Maiwandi (the Director of South Asia Division at the time, who was removed on or about April 2013), and Ms. Mendelson (Chief of Afghanistan Service, who was removed from this position on or about 2012) and Mr. Ismail Dahiyat, the acting Director, South & Central Asia Division as well as Ms. Rebecca McMenamin, Acting Associate Director for Language Programming; Barbara Brady, VOA Chief of Staff; even to the ombudsmen and later Human Resources, and Office of Civil Rights, the reaction was that this situation will get better, this will change.

20.     Mr. Stanazai met with Ms. Barbra Brady, VOA Chief of Staff, on or about October 25th, 2012. Mr. Stanazai complained that the Pashto Service is completely ignoring the hiring procedures in hiring new employees and discriminating against the seniors. Mr. Stanazai discussed the Pashto Service as well as the discriminatory standard applied by Mr. Ibrahim Nasir, Editing Manager. She promised Mr. Stanazai to discuss this with the new Service Chief Mr. Masood Farivar.  However Mr. Ibrahim Nasir's harassing emails targeting Mr. Stanazai and retaliatory practices continued.

21.     On November 23, 2011.  Mr. Shah went to Ms. Maiwandi's office and gave a formal notice about Mr. Ibrahim Nasir and his use of scheduling as harassment of the seniors in the Pashto Service.

22.     During Mr. Shah's discussion with Ms. Maiwandi on November 23, 2011, she said, the

new staff members are creating the new programming and the "seniors are not able to do this and

to reach the level of technology." Mr. Shah said to Ms. Maiwandi, "whatever junior staff need to

do, or know how to do, just do it, but please don't harm the show, by targeting the seniors." Mr.

Shah told her "this is my last time, I will not come back to discuss these problems with you

anymore because there is no benefit in discussing it with you."

23.     Mr. Shah went to Mr. Ibrahim Nasir for help with the schedule and told him "this

schedule is a problem." Mr. Ibrahim Nasir listened and said that he was going to look into the

schedule. Rather Mr. Nasir retaliated and removed Mr. Shah from his position as shift editor and

replaced him permanently with Mr. Ashiqullah Rahimzoy a contractor (POV). Mr. Shah was

replaced because he complained that he was being targeted as a senior member of the staff.

24.     On a different occasion Mr. Shah complained to Ms. Maiwandi about the schedule, she

told him that management has asked and decided to replace Mr. Shah with Mr. Ashiqullah

Rahimzoy who is a contractor. Mr. Shah responded that, he is not asking about whether a POV

contractor can become a shift editor, but that "I simply want to ask (request) that we seniors are

not harmed."

25.     When Ms. Khadem complained to upper management including, Ms. Maiwandi (Director

of South Asia Division), and Ms. Mendelson (Chief of Afghanistan Service) and even asked Ms.

Mendelson "why do you hate me" they told her to wait, "this will change" they said. But it did

not change for the better, Mr. Ibrahim consistently made decision to deny of Ms. Khadem's ideas

based on his discriminatory intent and reprisal against Ms. Khadem for complaining against him

to HR. This situation brought Ms. Khadem to tears. She was devastated and severely damaged

by this point. Ms. Khadem was starting to have symptoms of rash and headaches and body aches, as a reaction to what was happening to her at her job.

26.     On a different occasion, Ms. Maiwandi, in response to a complaint by Mr. Mohmand, in respond to his concerns about discrimination she told him that the following people will be fired she listed the names of four of the seniors in the division (Mr. Shah, Mr. Achagzai, Mr. Mohmand himself and Ms. Khadem).

27.     On or about May 2012, Plaintiffs requested the office of Human Resources to investigate the discrimination against seniors at the Pashto service.  However, as well as result the harassment and retaliation continued and further caused the seniors great deal of harm and suffering.

28.     Mr. Stanazai also complained to Ms. Rebecca McMenamin (Acting Associate Director of Language Programming).  Mr. Stanazai requested a meeting with her on August 7, 2012 and met with her a few days later. Mr. Stanazai complained about VOA hiring practices, favoritism and that VOA is not considering education and experiences for hiring purposes at the Afghanistan Service, as a result the seniors with education, training, and experience are sidelined, marginalized and harassed in an assortment of ways.  She told Mr. Stanazai "these are strong words that you say that there is discrimination, favoritism and double standard practiced in Afghanistan service."  She said "we cannot undo the past but we will not allow these practices if exist in the future." She promised she would discuss this with VOA Chief Mr. David Ansor. Mr. Stanazai never heard back from her regarding this complaint.

29.     Mr. Stanazai requested to meet VOA chief David Ansor, but Mr. Ensor's office said since you have spoken to Ms. Rebecca McMenamin, she will let Mr. Ensor know about the issue.

However, Mr. Ansor knew of the circumstances at the Pashto Service, because Mr. Achagzai had forwarded his e-mail in response to Mr. Ibrahim Nasir's false attacks, to Mr. Ensor, to keep him abreast of what was going on at the Pashto Service.

30.     David Ensor (VOA Director) or his office failed to act further in trying to prevent further harm.  Neither Mr. Stanazai nor Mr. Achagzai heard back from David Ensor's office.  The egregious matter was simply and completely ignored.

31.     On a different occasion, Mr. Stanazai complained to Ms. Maiwandi again about a staff meeting where senior employees were compared to old cars and the new employees were called new model cars in terms of the qualifications for their jobs, meeting deadlines and learning new technology. In the same meeting the junior staffs were commenting to each other about how the seniors are slow. This has become the culture of the service where it is accepted by staff and encouraged by the management, to laugh and joke and make fun of the seniors.

32.     Mr. Stanazai also complained to Mr. Maiwandi about misleading statements in staff meetings.  It came to a point when unreasonable claims were being made by the junior staff just to make the senior staff "look bad."  For example claiming an unreasonable time to recount how long translations take.  Mr. Stanazai complained about the staff meeting where Ms. Beth Mendelson was present, and where managers tried to discredit the senior employees by claiming that only 30 minutes is enough time to translate ten minute news to be aired. This is untrue and mathematically impossible.  But this false statement was accepted by Ms. Mendelson during a staff meeting.  This type of behavior against the seniors was and still is accepted and perpetuated by management.

33.     Ms. Khadem complained to management about her schedule, she was told that the reductions in the schedule tasks were temporary.  Unfortunately, soon thereafter, Mr. Ibrahim Nasir reduced her air time again, and in the subsequent schedules her assignments have been either reduced or she has been assigned unfairly.

34.     Mr. Stanazai complained to Ms. Maiwandi because Mr. Ibrahim Nasir had designated him to be a mere translator and had assigned Mr. Khalil Khan to voice the news Mr. Stanazai had translated.  Mr. Ibrahim Nasir had deliberately and intentionally reduced Mr. Stanazai to a simple language translator and removed Mr. Stanazai's voice from the air.

35.     Mr. Stanazai brought the issue to the attention of Afghanistan Service Chief Ms. Beth Mendelson, in May of 2010, a few times about his work environment. Mr. Stanazai told her that he had been removed from news editing and shift editor and replaced with Mr. Noor a junior employee with no prior experiences in shift editing and or copy editing. Ms. Beth Mendelson was not responsive.

36.     Notices to upper management always went unheard and nothing ever changed by way of putting a stop to harassment of the seniors.  Mr. Stanazai reported this event to Ms. Maiwandi, and explained to her the preferential treatment of new employees verses senior employees.

37.     When Mr. Shah and other seniors complained to upper-management they were told by Director of South Asia Division, Ms. Maiwandi, to "retire now" and further she told Mr. Shah, that the Pashto language service was " being closed down anyway" and there would not be any point in continuing at this job, knowing full well that the Pashto language service would not be "closed down" when American interest in Afghanistan has increased and that the Pashto

language programing was of great importance to building democracy in Afghanistan and the region as United States had committed to doing.

38.     When the senior staff complained to the members of Management individually, not any of these members of management denied that the seniors were being discriminated against. Most of them failed to help and others such as Mr. Ibrahim Nasir and Ms. Maiwandi, retaliated creating an even more hostile work environment. In fact, on August 13, 2012 Ms. Maiwandi put a gag on seniors' work related e-mails. On August 17, 2012, Ms. McMenamin called the seniors into an emergency meeting to tell them that they should continue to work hard and she as Ms. Maiwandi's supervisor wanted to let the complainants know that Ms. Maiwandi (Director of the Service) was wrong in putting a gag on the Plaintiffs' work related e-mails and that M.s Maiwandi was not following VOA policy when on August 13, 2012 she put a gag on senior e-mails.

39.     Management has acted willfully and with intent to discriminate against the senior staff.

40.     Mr. Ibrahim Nasir's predecessor, Mr. Amanullah Ghilzai who was the Managing Editor for several years up until 2010, states the following: "I confirm that the Service Chief of the Afghanistan Service, Miss. Beth Mendelson would push me on a regular basis to get rid of the senior and older staff members and replace them by much younger people."

41.     From about April 2010, when Mr. Ibrahim Nasir became the Managing Editor of the Pashto Service, he has been adverse and hostile towards the five seniors. Immediately he changed the schedules to discriminate against the seniors in the service.

42.     There is a pattern and practice by which management runs the Pashto Service and other VOA language services in a discriminatory manner. This pattern and practice of discrimination

by VOA management has caused great damage to Plaintiffs' physical and mental well-being, to their reputations, and their ability to continue their job under such deliberately discriminatory and malicious circumstances.

43.     When Plaintiffs complained, management failed to remedy this situation which has perpetuated a pattern of the discriminatory practices as and damages as described in the facts of this complaint and beyond.

44.     The pattern and practice of harassment established by Mr. Ibrahim Nasir, and management, includes abruptly switching the assignment of senior staff without providing adequate time to complete the assignment. Typically Mr. Ibrahim Nasir uses this tactic as a form of retaliation against the seniors for complaining against him. Upper-Management masks this harassment as part of the New Format.

45.     The schedules created by Mr. Ibrahim Nasir since 2010, have consistently marginalized the seniors and replaced them with less experienced, less trained, even contractor junior staff. Further the schedules have created chaotic and divisive environment, where the seniors are treated as though they are not part of the service or simply on call or substitute employees and the substance of the shows and assignments go to the junior staff. This new format has had a disparate impact on the seniors of the language services.

46.     Mr. Ibrahim Nasir ignores the needs of the service, the substance and quality of the programming, and only manipulates the schedule to serve his discriminatory goals of harassing and retaliating against the seniors to force them to leave their jobs. This is reflected in the constant deterioration of the Pashto Service programing, including repeated and egregious linguistic mistakes on the air.

47. The junior staff are often favored and the seniors have been marginalized, pushed out of their shows and demoted because of their age and national origin.

48. The management has taken every opportunity to force a hostile work environment on the seniors, which included tampering with their schedules in a specific way so as to harass each of them individually, demote them individually, assign them to tasks in which they have not trained and/or tasks that are not part of their job, such as production, all in an effort to create a hostile work environment and eventually force the seniors into retirement.

49. Mr. Ibrahim Nasir reduced Ms. Khadem's 15 shows per week to only one program per week.

50. Mr. Ibrahim Nasir has demoted seniors from their position of editor and assigned them to production, or he has set them aside as mere translators. But most importantly, he has taken their voices off the air, to the best of his ability. Since Mr. Ibrahim Nasir has been the Managing Editor, seniors' voices mostly go on the air mostly as substitute for other staff.

51. The additional schedules created by Mr. Ibrahim Nasir, through the last schedule of January/February 2014, have mismatched staff qualifications with assignments. He has discriminated against the senior staff. He has assigned the junior staff tasks and shows and programing for which they lack the necessary experience.

52. Mr. Ibrahim Nasir has removed the seniors even though they have experience, are qualified, available and able to continue to improve the service. Two of the junior staff, Mr. Khan and Ms. Ghaffar, are from Pakistan, as is Mr. Ibrahim Nasir. Management made allowances for them and hired them at GS-12, as a means for those two individuals to avoid taking the language test. However, based on their work product it is clear they lack language

skills. Both these individuals, Mr. Khalil Khan and Ms. Nazrana Ghaffar are from Pakistan, as is Mr. Ibrahim Nasir (the Managing Editor) who supports them. Mr. Ibrahim Nasir takes opportunities from senior staff and gives them to Mr. Khan and Ghaffar.

53.     The April 2012 schedule is neither fair to Ms. Khadem or to the quality of programming. The scheduled is created with an agenda to push out the seniors and there is a complete lack of equal opportunity between on the one hand the five senior staffer and on the other hand the non-senior staff or those who support Mr. Ibrahim Nasir in his harassment of the five complainants.

54.     The seniors are asked by their junior colleagues when they will retire.

55.     Mr. Ibrahim Nasir concealed information about the new shows from the five seniors. The seniors were excluded. The five seniors were excluded as though they were not even part of the Pashto service.

56.     The best assignments, the plum assignments, such talk shows, music shows, youth shows, as well as travel to New York or Tokyo for example are distributed to the junior staff and mostly kept concealed form the seniors.

57.     Mr. Ibrahim Nasir changes schedules and assignments most of the time without telling the seniors.

58.     Mr. Ibrahim Nasir changed Mr. Stanazai's duties, Ms. Khadem's duties, Mr. Shah's duties, Mr. Mohmand's duties as well as Mr. Achagzai's duties and removed them from assignments without notice.

59.     Mr. Ibrahim Nasir continues to consult only the junior staff while deliberately excluding the five seniors from assignment related discussions and new programming meetings, as a result of the new format.

60.     Mr. Ibrahim Nasir did not follow protocol established by many decades at this service of giving notice before making changes to the schedule. He deliberately flouts scheduling methods, which were fair, only to create an environment that is hostile towards the senior staff. When anyone of the seniors mention the past standard practices, such as notice, discussion, and informed group decisions about programming, Mr. Ibrahim Nasir's simple answer is either "I am the law here now" or "forget about the past we do things differently now" other times, he and his right hand man Mr. Noor would say this is how the "higher-ups" (upper management) want things to be.

61.     Mr. Abid Noor, stated that the "higher-ups" want the seniors to be reduced from the service and that is why Mr. Ibrahim Nasir is creating the schedules and giving assignments in a biased manner.

62.     Mr. Ibrahim Nasir was aware of management's goal to get rid of the seniors by harassing them and pushing them out of their jobs, reducing their shows, changing their schedules, humiliating them, harassing them and blocking their complaints and worse of all constantly retaliating against them. In step with management's mandates Mr. Ibrahim Nasir took the lead against the seniors but mostly the five complainants of the Pashto Service.

63.     Starting on or about December 2010, Mr. Shah and other seniors were directly asked by co-workers when he (they) was going to retire.

64.     Management insinuated to some of the seniors that it is time to retire. For example, Mr. Ibrahim Nasir told Mr. Mohmand in response to Mr. Mohmand's inquiry for demoting him form shift editor that Mr. Mohmand should "go and relax."

65.     Mr. Ibrahim Nasir, the Managing Editor, instructed junior staff members not to help the seniors. Mr. Mohammad Ibrahim Nasir, the Managing Editor told several of the junior employees to not help the senior staff. He said this to Ashiqullah Rahimzoy who later told Mr. Shah.

66.     Plaintiff's Managing Editor failed to send them to computer training in a timely fashion and at times only sent the junior staff to learn Dalet Plus.

67.     Plaintiffs' Managing Editor, Mohamad Ibrahim Nasir bombarded them with assignments, making it impossible at times for them to complete them all in the time given. Mr. Ibrahim Nasir ignored the fact that other non-senior staff members were available to do the assignments. He deliberately allowed them to sit around chatting while the seniors were struggling to complete multiple assignments.

68.     Plaintiffs' Managing Editor changed their performance standards and annual evaluations without informing any of the five senior staff Plaintiffs. Plaintiffs' performance evaluations were changed on or about 2011. The changes were designed so as to target seniors by creating vague areas of evaluation that would be used against the seniors as a basis or cause to terminate their position.

69.     Plaintiffs' schedules were changed multiple times.  Plaintiffs were not informed of the changes as a form of harassment. Typically, schedules would only change based on needs of the service. However, under Mr. Mohammad Ibrahim Nasir's discriminatory agenda against the

seniors, he would make significant changes to the schedule without informing the senior staff.

The last schedule change of January 2014, was again without notice, and discriminatory.

70.     Mr. Mohamad Ibrahim Nasir directed, instructed and commanded other employees to

"write a report on any senior you help and give me the report." He was collecting data about the

seniors to later use it against them as evidence of their incompetence. However at the same time

he was creating situations in which seniors would need to ask for help such as needing the Dalet

Plus password. Mr. Ibrahim Nasir only sent a few of the junior staff for training and gave them

his own password. The seniors were left without the use of Dalet Plus.

71.     As with other projects, Mr. Ibrahim Nasir excluded seniors when creating or working on

creating the Google Hangouts.

72.     Mr. Ibrahim Nasir sent junior staff on travel assignments, for example to New York or

Tokyo, etc. and actively kept it a secret from the senior staff. Typically such official trips are not

kept a secret, or kept hidden, they are part of the reporting network, about which the home base

reporters including seniors should be made aware.

73.     Management and Mr. Ibrahim Nasir created new on air programing for the junior staff,

and took the seniors off the air and also without any notice, discussion or input from the senior

staff.

74.     Mr. Ibrahim Nasir manipulated the schedule unnecessarily to assign seniors to

production, for which some of the seniors were not trained, and more, which was not part of their

job.

75.     Plaintiffs' Managing Editor after making unreasonable demands wrote e-mails manipulating the facts of the situation to place the blame on the senior staff.

76.     Plaintiffs' managers failed to provide the five Plaintiffs a completed copy of their previous annual evaluations.

77.     Plaintiffs' Managing Editor allows the junior staff to manage their own schedules and assignments compared to the senior staff.

78.     The daily logs will show that the seniors are required to work more compared to the other junior employees on shift. For example on October 25th, 2012, Mr. Shah completed 4 assignments while Shafia Sardar did not translate or produce and Ashiquillah Rahimzoy translated one piece on Pakistan and women. Still Mr. Ibrahim Nasir complains that the seniors are not doing as much work as the junior staff, which is unsubstantiated and in fact false on most accounts.

79.     In March of 2012, Mr. Ibrahim Nasir said that he was following recommendation of the "higher ups" to get rid of the seniors in the Pashto Service. By their own admission, upper management was following the New Format.

80.     Mr. Ibrahim Nasir wanted to create, in his own terms "a report on the seniors" giving him a false basis, excuse or reason to give the seniors a poor performance reports. On or about November 2012 and through today, it has become clear that both Beth Mendelson and Spozhmai Maiwandi ignored all of seniors' e-mails and in person complaints with the malicious intent to force the seniors to leave the service and retire.

81.     On March 13, 14, & 15, 2012 Mr. Ibrahim Nasir sent Ms. Khadem three false and accusatory e-mails, forcing her to believe she was not good at her job.  The annual employee evaluations had been altered by management, without notice to senior employees, as a kind of trap for which Mr. Ibrahim Nasir was collecting evidence, when forcing Ms. Khadem and the other seniors into impossible situations, and following it up with humiliating e-mails to which he could later point to as a source of poor evaluations, thus forcing the seniors to retire.

82.     Mr. Ibrahim Nasir, forced seniors to do production, which is outside of their skill set and outside of their job description.  After harassing and humiliating them for not knowing production, Mr. Ibrahim Nasir realized that production was not part of their job.  This is something Mr. Ibrahim Nasir knew or should have known before targeting and causing great harm to the senior staff.

83.     After having created this set of impossible circumstances, forcing Ms. Khadem to fail, and waiting for her to fail.  When she did not fail, Mr. Ibrahim again put on record in an email telling Ms. Khadem that her work was "unprofessionally done."  This was not only untrue but Mr. Ibrahim Nasir had purposefully bombarded Ms. Khadem to harass her when knowing that no one could accomplish what he requested, he again harassed her and told her she was bad at her job.  He was forcing her to retire by falsely setting her up to fail and when she did not fail he still managed to harass her.

84.     Mr. Ibrahim Nasir knew, or should have known that Ms. Khadem had been highly successful at the VOA for the last 30 years.  He planned on shamming her into retirement.  This is a pattern he followed with the five seniors who were complaining against him.

85.     Management also targeted the seniors, by giving them overwhelming assignments when there were other junior staff available and capable of doing that assignment.

86.     Management excluded seniors when the assignments were important or historical in Afghan politics. In the recent elections of April 2014, a historic moment in Afghanistan's history, the seniors were not assigned on air shows, while one of the junior staff covered the program for four hours and later complained that it was too much work for her and that it was Mr. Ibrahim Nasir and upper-management's decision to put her on that assignment.

87.     Mr. Ibrahim Nasir was constantly dividing the service between the junior and the senior staff which in turn was harming the shows and ultimately VOA, as well as damaging the health and well being of the Plaintiffs. All notices to management regarding this damaging and dangerous situation was ignored and sneered at by management. As a result the senior staff have been damaged and the Pashto language programing has been damaged.

88.     The schedule that was supposed to have been implemented on February 25, 2013, was again packed with discriminatory scheduling in which the seniors were not treated fairly.

89.     On January 2014, Mr. Ibrahim Nasir changed the schedule again, this time, failing to follow the protocol he had agreed to allow staff to help in preparing a balanced and fair schedule. Again this new schedule is biased against the five seniors, and unfair and imbalanced.

90.     Defendant's discriminatory acts are based on reprisal for Plaintiffs' reporting of discrimination and harassment behavior. Plaintiffs reported the nature of the harassment by to several members of upper management, the Ombudsman, Human Resources and finally to the Office of Civil Rights. After the reports to management the harassment and retaliation continued. Management continues to systematically create a hostile work environment, retaliate whenever possible, and carry out a clear plan to force the senior staff and in particular these five seniors, out of the service.

91.     Before Ms. Maiwandi (Director of South Asia Division) was removed from position of

managing the service, sometime in early part of 2013, Mr. Mohmand visited her in her office to

complain on behalf himself and the other seniors about discrimination in the Pashto service. Ms.

Maiwandi responded with mentioning the names of the seniors and saying they will be let go, for

this reason she encouraged him to retire.  She said "you (Mohmand) and Mr. Achagzai and Mr.

B. Shah and Ms. Khadem will be let go."

92.     Khalil Khan and Nazrana Ghaffar have been hired at GS-12 as international broadcasters

at the Pashto Service. However contrary to the requirements of GS-12, they do not have enough

broadcasting experience or the necessary language skills. Their language tests were waived by

Ms. Maiwandi and with the support of Mr. Ibrahim Nasir. They have been exempt from doing

the news, the most important and most difficult job in broadcast radio. While, Mr. Ibrahim Nasir

has assigned at least one of the seniors, Mr. Stanazai to do the news, five days a week and five

different broadcasting shifts.

93.     Mr. Khalil Khan, a junior employee of the Pashto service, who does not have the

necessary training or language skills to do the news, had been assigned as a shift editor. Abid

Noor who also does not have any translating and editing skills and is unable to copy-edit was

promoted by Ms. Maiwandi to GS-12 and he is now some type of advisor to Mr. Ibrahim Nasir

and at times is/was the shift editor five days a week (while Mr. Achagzai's promotion to GS-12

was rejected by Maiwandi and delayed for years).

94.     Mr. Ibrahim Nasir's intent to harm the senior staff is evident in a series of harassing e-

mails he sent to the senior staff and about the senior staff. In one e-mail he wrote to Mr.

Achagzai on August 12, 2012 where he wrote: "I am sorry to say, you are stuck in the 70s and

early 80s and still think that the time has not moved a day forward." He told Mr. Mohmand, that it is time for Mr. Mohmand to "go and relax" i.e. retire. He complained that Mr. Shah and Ms. Khadem are not checking their e-mails.

95.    Mr. Ibrahim Nasir told the staff "I am the law" during one of the first meetings he had with the staff when he first started this post of Managing Editor.

96.    VOA management knew of Mr. Ibrahim Nasir's opinion that he believes he is the law and the abuse of power and harassment that came with it, but still they endorsed him as he targeted the seniors and showed them that he really is the law at the expense of their health and well being and even after they complained to Ms. Maiwandi (Director) and Ms. Mendelson (Chief) nothing was done to help alleviate the harm. Finally, after the seniors went to HR with their complaints, Ms. Maiwandi retaliated by telling the seniors to stop writing e-mails and stop defending themselves because Mr. Ibrahim Nasir is right in whatever he does.

97.    Plaintiffs' supervisors and management and HR have treated Plaintiffs with condescension and disdain, ignoring their pleas for help, ignoring their expertise and experience, discounting their radio and journalistic experience and taking away their long held shows only to give opportunities to less qualified junior employees.

98.    The Plaintiffs have extensive experience, with Pashto language. However, Plaintiffs, especially Mr. Stanazai was removed from the schedule and replaced with junior staff, less experienced staff, who made such terrible mistakes on the air that it has permanently damaged the reputation of the Pashto Service.

99.    Mr. Ibrahim Nasir, without any explanation, reason or logic, placed junior staff to be shift editors, cover press conferences; and edit the news; as well as having their own shows and

assignments to travel abroad for coverage of events, while at the same time, trying to reduce the involvement of the senior staff by delegating them to mere translators and production.

100.     Mr. Ibrahim Nasir made himself inaccessible to the senior staff. He uses his position as a means of animosity towards the seniors. He communicates with the junior staff or those staff members who support him against the five complainants.

102.     Many times Mr. Ibrahim Nasir scheduled the senior staff of the Pashto Service for jobs or tasks for which they were not trained: for example, production. While production is a skill that most of the seniors are familiar with and have done in the past, it is not a skill that was part of their job requirements. It was unfair and retaliatory action by management to force the Plaintiffs to a marginal role in the service and usher them out the door, to retire and leave their position.

103.     The seniors were being targeted, forced to retire, their voices removed from the air, by management, while the junior employees were given easy assignments such as air shows: "voice of friends," music shows, women's shows, youth programing, and trips abroad, talk shows and poetry shows. They were simply excused from any other critical tasks necessary for their position, such is news casting, features, editorials and other complex issues such as translating and adapting complex English texts into idiomatic Pashto appropriate for International radio broadcasting for which they were not qualified, and while these are the major duties of a GS-12 broadcaster. But to cover-up these enormous short-comings, Mr. Ibrahim Nasir targeted the seniors instead to place the blame on the senior staff for his and his friends inability to perform as required and to run an efficient service.

104.    Upon information and belief, Mr. Mohamad Ibrahim Nasir, the Managing Editor is not

from Afghanistan, does not speak or write idiomatic Afghan Pashto language, and does not speak

Dari.

105.    Management's goal, as part of its New Format is to force senior staff to retire, they even

tell the junior staff not to help the seniors, causing seniors hardship, frustration, and making their

jobs very difficult if not impossible at times. Several senior staff could not handle the level of

harassment and decided to retire.

106.    The Pashto service also treats senior and junior employees differently. The junior staff

members are given plum assignments, travel, leeway with their schedules, and put into

managerial positions while the seniors are marginalized or reduced to a simple translator or

producer

107.    By looking at the last three to four schedules it is obvious the junior employees are given

supervisory positions such as shift editorship, and shows, without the required qualifications,

while the seniors who are fully qualified are not given such positions in the service and are

demoted to production or reduced to a simple translator which is the case with Mr. Stanazai and

the other four senior complainants.

108.    On May 7th, 2013, Mr. Stanazai's and Mr. Achagzai's requested and met with Mr.

Farivar, current Chief of the Afghan Service. They met at 3:00 pm, regarding web improvement.

Mr. Taher Achagzai requested the Service Chief to listen to at least one of the evening shows

where Khalil Khan is an MC, to see for himself how the quality is butchered by him, the same

goes to Nazrana Ghaffar's quality of reading. His mumbling and numerous mistakes and miss-

pronunciations show not only, he did not have any prior experience in radio journalism, but his

language skills are below standard. However, the seniors who are experts in Pashto language, have been recognized around the world, and who have built this service with their reputations, and who are available to do the shows, are excluded and in certain instances, permanently replaced.

109.    Mr. Ibrahim Nasir gets in the way of seniors performing their jobs. In the schedule issued on February 25, 2013 and again on April 10th, 2013 it became evident to every single member of Pashto Service team that schedule was not fair and balanced, but it is a tool used by Mr. Ibrahim Nasir to discriminate against the seniors while he promoted those junior staff he was supporting or those who support him in harassing these five Plaintiffs.

110.    Mr. Khalil and Ms. Nazrana Ghaffar, both are from Pakistan and unable to speak in Dari language.

111.    Because Mr. Khan and Ms. Ghaffar are both form Pakistan, and they have poor language skills, Mr. Ibrahim Nasir has assigned Mr. Khalil as a shift editor and Ms. Ghaffar to shows, and gives them many more privileges. He assigns them shows, sends Mr. Khalil on trips and additional privileges on a daily basis, such as overlooking deadlines and translation mistakes as well lack of language skills. Further, because they are from Pakistan, both these individuals were not required to take the Pashto language test. These tests were waived. In return for Mr. Ibrahim Nasir's favors, he expects Mr. Khan and Ms. Ghaffar to support him in his discrimination of the Afghan seniors in the Pashto service.

112.    As part of the New Format, at least five or six new shows were created, however, the seniors were not given any of these show and not included in creating the shows.

113.    This pattern of inequality in access to opportunities on the basis of national origin and age based on the deliberate New Format, is not a result of random or non-discriminatory factors. Rather it is the result of an ongoing and continuous pattern and practice of discrimination.

114.    The weeding out of Afghan senior employees from the Pashto service was not a result of chance, rather they were caused by VOA management's New Format Policy, as admitted by management, and their practices that had an adverse impact on senior Afghan employees that cannot be justified by any necessity and for which alternative policies and practices with less discriminatory impact could be utilized that equally service any asserted justification.

115.    The harassment, affects Plaintiffs' physical health, their mental health, and their confidence in his job. Each Plaintiffs has suffered unspeakable stress, which has impacted their health and well-being.  They have not been able to function in the same way they had always had.   The Plaintiffs have been harmed and damaged by these actions. Ms. Khadem's level of stress became extreme after having been constantly refused for shows, assignments, interviews etc. that she broke out into stress related hives.  She left work and went to the emergency room. Mr. Mohmand has had to leave work due to stress and now suffers from insomnia.  Mr. Stanazai and Mr. Achagzai have had stress related health problems that has caused them great pain.  Mr. Shah has a heart condition that was exacerbated by the harm caused to him in his place of employment.  He too has been forced to go to the clinic in the VOA building and also went to emergency care for his heart condition.

## CAUSES OF ACTION

### COUNT ONE
### EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN
Pattern or Practice of Discrimination –Systemic Disparate Treatment Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

(On Behalf of All Plaintiffs)

116.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

117.    Plaintiffs are all natives of Afghanistan and employees of BBG as international broadcasters within the meaning of 42 U.S.C. §2000(e) et seq.

118.    By its actions and those of its agents, as set forth above, BBG (VOA) deliberately and intentionally discriminated against each Plaintiff because of their national origin and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

119.    VOA has engaged in a pattern and practice of intentional discrimination against Afghan senior employees. VOA management maintained and implemented uniform employment practices that discriminate against Afghan seniors with respect to terms and conditions of employment.

120.    The discriminatory practices of VOA, have denied Plaintiffs their right to equal employment opportunity in violation of 42 U.S.C. §2000(e) et. seq. in that Plaintiffs have been deprived of desirable opportunities, assignments, promotions, and have been denied promotions/career advancement opportunities that were given to equally or less qualified junior non-Afghan staff.

121.    This pattern of inequality in access to opportunities on the basis of national origin and age based on the deliberate New Format, is not a result of random or non-discriminatory factors. Rather it is the result of an ongoing and continuous pattern and practice of discrimination led by a small group of Pakistani managers who disfavor Afghan senior employees.

122.   Defendant treated Plaintiffs differently than their co-workers. Defendant routinely treats junior Pakistani employees better compared to seniors who are from Afghanistan.

123.   Plaintiffs did put Defendant on notice, on several occasions, that Defendant did not equally enforce the Defendants written policies.

124.   Defendant willingly, knowingly and intentionally refused to take any steps to equally enforce the Defendants written policies among all employees.

125.   Defendant condoned the discriminatory acts as well as the retaliatory acts, by of Plaintiffs' Managers, Chiefs, and Supervisors and others in position of authority over staff in all the language services, as well as the Plaintiffs.

126.   Plaintiffs suffered when Defendant refused to provide equal treatment for Plaintiffs in the application of Defendant's written policies.

127.   The unlawful employment practices complained of herein were intentional.

128.   The unlawful employment practices complained of herein were done with malice and/or reckless indifference to the protected rights of Plaintiffs and other senior employees.

129.   Defendant's discriminatory conduct caused Plaintiffs to suffer injury and emotional and physical distress.

130.   On behalf of themselves Plaintiffs request as provided in the Prayer for Relief below.

131.   On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT TWO**

**EMPLOYMENT DISCRIMINATION ON THE BASIS OF AGE**
Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq.
Pattern or Practice of Discrimination –Systemic Disparate Treatment
(On Behalf of all Plaintiffs)

132.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

133.    Plaintiffs are all natives of Afghanistan and employees of BBG as international broadcasters within the meaning of 42 U.S.C. §2000(e) et seq.

134.    By its actions and those of its agents, as set forth above, BBG (VOA) deliberately and intentionally discriminated against each Plaintiff because of their national origin and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

135.    VOA has engaged in a pattern and practice of intentional discrimination against Afghan senior employees.  VOA management maintained and implemented uniform employment practices that discriminate against Afghan seniors with respect terms and conditions of employment.

136.    The discriminatory practices of VOA, have denied Plaintiffs their right to equal employment opportunity in that Plaintiffs have been deprived of desirable opportunities, assignments, promotions, and have been denied opportunities that were given to equally or less qualified junior non-Afghan staff.

137.    This pattern of inequality in access to opportunities on the basis of national origin and age based on the deliberate "New Format," is not a result of random or non-discriminatory factors.  Rather it is the result of an ongoing and continuous pattern and practice of

discrimination led by a small group of Pakistani managers who disfavor Afghan senior employees.

138.    Defendant's discriminatory conduct caused Plaintiffs to suffer injury and emotional and physical distress.

139.    On behalf of themselves Plaintiffs request as provided in the Prayer for Relief below.

140.    On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT THREE
## EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN
Disparate Impact
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.
(On Behalf of All Plaintiffs)

141.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

142.    VOA's managers adopted and maintained and implemented uniform employment practices that have a disparate impact on senior employees from Afghanistan at the Afghanistan Language Service, with respect to their terms and conditions of employment.

143.    The weeding out of Afghan senior employees from the Pashto service was not a result of chance, rather caused by VOA management's "New Format" Policy, as admitted by management, and their reliance and practices that had an adverse impact on senior Afghan employees that cannot be justified by any necessity and for which alternative policies and practices with less discriminatory impact could be utilized that equally service any asserted justification.

144.     BBG's discriminatory practices described herein have resulted in harm to the senior employees who are Afghan in the Pashto Service, VOA.

145.     On behalf of themselves Plaintiffs request relief as provided in the Prayer for Relief below.

146.     On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan Service, Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT FOUR**
**EMPLOYMENT DISCRIMINATION ON THE BASIS OF AGE**
Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq.
Disparate Impact
(On Behalf of all Plaintiffs)

147.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

148.     VOA's managers adopted and maintained and implemented uniform employment practices that have a disparate impact on senior employees from Afghanistan at the Afghanistan Language Service, with respect to their terms and conditions of employment.

149.     The weeding out of Afghan senior employees was not a result of chance, caused by VOA management's New Format Policy, as admitted by management, and their reliance and practices that had an adverse impact on senior Afghan employees that cannot be justified by any necessity and for which alternative policies and practices with less discriminatory impact could be utilized that equally service any asserted justification.

150.     BBG's discriminatory practices described herein have resulted in harm to the senior
employees who are Afghan in the Pashto Service, VOA.

151.     On behalf of themselves Plaintiffs request relief as provided in the Prayer for Relief
below.

152.     On behalf of themselves and other similarly situated Afghan seniors at the Afghanistan
Service, Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT FIVE**
**EMPLOYMENT DISCRIMINATION ON THE BASIS OF**
**NATIONAL ORIGIN AND AGE**
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.
Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq.
Hostile Work Environment and Disparate Treatment
(On Behalf of all Plaintiffs)

153.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as
though fully set forth herein.

154.     Plaintiffs will prove that they was has been forced to work through a hostile work
environment.

155.     The hostile work environment was a result of constant unwelcomed harassment.

156.     The harassment was pervasive and with such severity that in fact it altered the conditions
of employment and created an abusive atmosphere.

157.     Plaintiffs were further and repeatedly discriminated against each time Defendant
provided different treatment to other employees of Defendant.

158.    The additional retaliation, harassment and discriminatory conduct as well as the additional harm to the Plaintiffs, greatly contributed to the hostile work environment, causing great harm to each Plaintiffs.

159.    The Agency was/is aware that the type of behaviors outlined above exists in Defendant's work place.

160.    Plaintiffs did put Defendant on notice, on many occasions, that Defendant does not equally enforce the Defendant's written policies. The Defendant willingly, knowingly and intentionally refused to take any steps to equally enforce the Defendant's written policies among all of Defendant's employees resulting in discriminatory acts against the Plaintiffs.

161.    Defendant condoned managements' actions against the Plaintiffs. The actions of the Defendant as perpetrated by their agents and as described and complained of above are unlawful employment practices in that they likely have the effect of discriminating against depriving and tending to deprive equal employment to and otherwise causing a hostile work environment for Plaintiffs because of their age, in violation of ADEA 29, U.S.C §623(a).

162.    At all times relevant to this cause of action, Defendant had a duty under the ADEA to refrain from discriminating against, harassing, retaliating against and permitting hostile work environment for Plaintiffs based on their age. Defendant had a duty under the ADEA to prevent the ongoing hostile work environment based on Plaintiffs' age.

163.    Plaintiffs reported discrimination, unequal treatment, harassment and hostile work environment on numerous occasions to management and supervisory employees of Defendant.

164.    Plaintiffs filed a complaint with Office of Human Resources on or about May 2012.

165.     Despite knowledge of the severe and pervasive hostile work environment, discrimination and harassment based on age and despite repeated reports and complaints by Plaintiffs, Defendant refused to take action to investigate remediate, stop, prevent or otherwise address the ongoing discrimination, harassment, hostile work environment, or retaliation.

166.     Defendant not only condone but encouraged managers', chiefs' and directors' decisions to discriminate against Plaintiffs based on Plaintiffs' national origin.

167.     Plaintiffs suffered adverse employment action when Defendant refused to provide equal treatment for Plaintiffs in the application of Defendant's written policies.

168.     Defendant intentionally and willfully discriminated against Plaintiffs.

169.     The unlawful employment practices complained of herein were intentional.

170.     The unlawful employment practices complained of herein were done with malice and/or reckless indifference to the protected rights of Plaintiffs and other senior employees.

171.     Defendant believes it is above having to comply with the law. This belief combined with the acts or failure to act by Defendant to stop the discrimination and hostile work environment creates chaos and directly contributes to the day-to-day hostile work environment.

172.     Defendant does not apply its written policies equally among all its employees and admits that its practice is directly discriminatory in nature against Plaintiffs thereby contributing to the disparate treatment of Plaintiffs. Such action against Plaintiffs was predicated on Plaintiffs being members of protected classes. These acts contributed to the day-to-day hostile work environment.

173.    The disparate treatment of Plaintiffs continues with the favoritism that runs rampant within Plaintiffs' work environment. This disparate treatment of Plaintiffs has been based on Plaintiffs being member of a protected class. The disparate treatment continues on the day-to-day hostile work environment.

174.    But for Plaintiffs' membership in the protected class, they would not have suffered the disparate treatment.

175.    Plaintiffs have several times been victim of disparate treatment and disparate impact and reserves the right to further raise and explore these issues during discovery.

176.    Defendant has failed to take meaning or lasting action, failed to take remedial actions, failed to correct employees, failed to separate the employees, and or failed to take corrective action all the while encouraging a hostile work environment.

177.    Defendant's actions were taken in reckless disregard to the law and with malice towards the Plaintiffs and those of their colleagues who fall into the same protected categories.

178.    The events outlined here in its entirety will and does establish a hostile work environment created, endorsed, supported and encouraged by the Defendant.

179.    The unlawful employment practices complained of herein were done maliciously and with reckless indifference to the protected rights of Plaintiffs and similar employees.

180.    As a result of Defendant's, actions, decisions, and conduct, Plaintiffs, and those similarly situated has suffered and will continue to suffer.

181.    As a result of Defendant's actions, Plaintiffs have suffered emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses, which have caused

and exacerbated Plaintiffs' medical condition. Because of these losses Plaintiffs seek

compensatory damages and punitive damages.

182.    Defendant's actions were done with malice and with reckless indifference to Plaintiffs'

protected rights. Plaintiffs seek and are entitled to punitive damages.

183.    Plaintiff also seeks reasonable attorney's fees, court costs and including reasonable expert

fees.

**COUNT SIX**
**EMPLOYMENT DISCRIMINATION ON THE BASIS OF**
**NATIONAL ORIGIN AND AGE**
Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq.
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.
Systemic Harassment
(On Behalf of All Plaintiffs)

184.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as

though fully set forth herein.

185.    This is is a claim against BBG arising under Title VII as amended and ADA as amended,

prohibiting harassment based on national origin and age in the workplace.

186.    Defendant created a system of harassment and hostile work environment that

discriminated against senior Afghan employees based on their age and their national origin that

altered the terms, conditions and privileges of their employment by exposing them to offensive

unwelcome harassment. Management perpetuated the harassment and condoned the harassment

perpetrated by others.

187.    Defendant is liable for harassment because it knew or should have known of the

harassment and failed to exercise reasonable care to take prompt corrective action.

188.     Defendant's actions and inactions created a work environment hostile to senior

employees where harassment of senior broadcasters in the language services is the Agency's

standard operating procedure. In other words Defendant has a general policy of discrimination

against the senior broadcasters in the form of forced retirement.

189.     Defendant's discriminatory conduct caused Plaintiffs to suffer injury and physical and

emotional distress by constant and prolonged attempts of constructive discharge.

190.     Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT SEVEN
## WILLFUL DISCRIMINATION
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq. Age Discrimination in
Employment Act of 1967, 29 U.S.C. §621 et seq.
(On Behalf of All Plaintiffs)

191.     Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as

though fully set forth herein.

192.     Defendant engaged in the acts summarized above knowing its its conduct was prohibited

by Title VII, ADEA, or alternatively, it showed a reckless disregard for its employees and their

protected rights.

193.     Therefore its acts violating Title VII and ADEA were willful as defined in the Acts.

194.     Defendant's failure to ensure tolerable working conditions free of discrimination,

harassment, and retaliation was intentional, malicious, deliberate, willful and oppressive and was

carried out with the intent to force the senior staff into retirement.

195.    Because of the intolerable working conditions Plaintiffs have been forced to consider

resignation or retirement. But being forced to continue to work under these circumstances has

been intolerable and taken an extreme toll on their physical and mental health.

196.    Defendant's wrongful and illegal conduct caused Plaintiffs' loss of reputation and a

career that they had long worked to maintain, and emotional distress and physical injury.

197.    Plaintiffs request relief as provided in the Prayer for Relief below.

## COUNT EIGHT
## EMPLOYMENT DISCRIMINATION –RETALIATION
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.
(On Behalf of All Plaintiffs)

198.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as

though fully set forth herein.

199.    Pursuant to Title VII and applicable federal government equal employment opportunity

regulations, the Agency, as a federal government employer, is specifically prohibited from

unlawful retaliation and discrimination against the Plaintiffs because they engaged in EEO

activity protected by Title VII. 42 U.S.C. Sections 2000e-16a(a); and 42 U.S.C. Section 2000e-

3(a); and 29 C.F.R. Section 1614.103 (2004).

200.    The Plaintiffs engaged in Title VII protected activities; was subjected to series of direct,

intentional, cumulative, and increasingly severe, adverse, tangible and discriminatory

employment actions, as set forth in detail in the paragraphs above; and there exists a causal

connection between their protected activity and the adverse employment actions.

201.    Defendant's retaliation against Plaintiffs through 2014 include but not limited to:

1)      Management doing whatever they want regardless of the law;

2)      Management doing whatever they want regardless of legal counseling;

3)      Management directing staff to act contrary to written policy. For example, Mr. Ibrahim Nasir (Managing Editor) telling other employees not to help the senior staff, or Ms. Maiwandi telling senior staff not write work related e-mails. Threats that continued well into 2013 and ongoing to 2014.

4)      Management treating some employees differently than all other employees.

5)      Management conspiring to harass Plaintiffs.

6)      Management conspiring to discriminate against Plaintiffs.

7)      Management conspiring to retaliate against Plaintiffs.

8)      Management creating events at the workplace to cause more stress and aggravation for Plaintiffs.

202.   Most of the acts complained of within this Complaint were retaliatory in nature and directed toward Plaintiffs, because Plaintiffs belong to the protected groups as outlined above, under ADEA and Title VII.

203.   It is unlawful to retaliate against an individual for opposing discriminatory employment practices or for filling a discriminatory charge, testifying or participating in anyway in an investigation, proceeding or litigation under the ADEA, and Title VII.

204.   Defendant further violated Plaintiffs' civil rights by taking adverse actions against them in response to their complaints about discriminatory working conditions.

205.   During the course of Plaintiffs' employment, Defendant acted through management in a continuous course of conduct, discriminated in retaliation against Plaintiffs in the terms and conditions and privileges of their employment.

206.    Plaintiffs further allege that Defendant discrimination and retaliatory conduct is in violation of Title VII and is willful under Title VII.

207.    The unlawful employment practices complained of herein are intentional.

Defendant by and through its agents, retaliated against Plaintiff when it knew or should have known that the same were in violation of the ADEA and any alleged reasons to the contrary are pre-textual.

208.    The unlawful employment practices complained of herein were done with malice and reckless indifference to the protected rights of Plaintiffs and other similarly situated seniors in language services.

209.    The Agency, by and through its managers actions and the actions of Human Resources and employees servicing beneath management in the supervisory chain of command engaged in calculated and purposeful campaign of unlawful retaliation, unlawful, unlawful discrimination and unlawful workplace harassment against the Plaintiffs.

210.    The Agency intentionally subjected Plaintiffs to intentional and unlawful Title VII retaliatory discrimination. The intentional, unlawful retaliation was created and perpetuated and tolerated by management.

211.    The Agency is liable for the intentional and unlawful Title VII retaliation against the Plaintiffs because management and the agency officials and managers knew or should have known of the aforementioned unlawful retaliation and did not take immediate, appropriate and effective corrective action.

212.    The Agency's aforementioned treatment of the Plaintiffs, considered in its totality and in cumulative manner, as set forth in the above paragraphs of this claim and Complaint, constitutes unlawful, direct, intentional, adverse, tangible, retaliatory and discriminatory employment actions prohibited by Title VII.

213.    The Agency's aforementioned treatment of Plaintiffs constitutes unlawful intentional retaliation and discrimination in violation of 42 U.S.C. Sections 2000e-16a (a) and 2000e-3(a) and (b), intentional, unlawful discriminatory practices in violation of 42 U.S.C. Section 1981a(a)(1) and (b)(1)(2).

214.    The Agency, by virtue of the adverse actions set forth in the aforementioned paragraphs of this Complaint, engaged in direct, intentional, and unlawful Title VII retaliatory discrimination against the Plaintiffs because of their protected Title VII activities, as specifically described above.

215.    Plaintiffs complained to managers, Defendant's human resources personnel and others about the discrimination, including discrimination based on age, they were experiencing and as such engaged in protected activity under 42 U.S.C. § 2000e-3.

216.    Defendant retaliated against Plaintiffs by taking actions that would dissuade the reasonable employee from making or supporting a claim of discrimination under Title VII and ADEA. For example, in response to Plaintiffs' complaint to Human Resources, the Director of the Afghanistan Service (second or third tier manager) called a meeting in her office, exposed the seniors as the complainants, and put a gag on their work related e-mails. Their managers continued to harass them, continued to be marginalize the complainants, in greater effort to force them to retire.

217.     For example, Defendant subjected Plaintiffs to a heightened scrutiny of their work, and their Managing Editor wrote abrasive e-mails to each of the complainants on or about May 2012. In one of the e-mails, Mr. Ibrahim Nasir (Managing Editor) told Mr. Achagzai, that he is a man from the 70s and 80s and he is therefore incompetent in his job. In another e-mail, Mr. Ibrahim Nasir told Mr. Shah that he misses assignments, while he had discussed the assignment and agreed with Mr. Shah that there was no missed assignments, but when Mr. Shah got to his desk a few moments later he received an e-mail form Mr. Ibrahim Nasir, in contradiction to their agreeable discussion. Ms. Khadem's interviews were rejected in retaliation. Mr. Mohmand was targeted with assignments.  Mr. Stanazai was targeted with e-mails, assignments etc.

218.     Management changed the annual evaluations without following the necessary protocol. These changed evaluations were in retaliation to Plaintiffs' complaints. The annual evaluations were changed to be more biased and further targeting the senior staff.

219.     Management required Plaintiffs to participate in tasks for which they were not trained that similarly situated employees did not endure.

220.     Plaintiffs suffered injuries as a direct and proximate result of Defendant's unlawful retaliatory conduct, including but not limited to humiliation, loss of reputation, emotional distress and physical illness.

221.     Plaintiffs request for relief as provided in the Prayer for Relief below.

**COUNT NINE**
**EMPLOYMENT DISCRIMINATION –RETALIATION**
Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et seq..
(On Behalf of All Plaintiffs)

222.    Plaintiffs re-allege and incorporate by reference the allegations of all paragraphs above as though fully set forth herein.

223.    Pursuant to the ADEA and applicable federal government equal employment opportunity regulations, the Agency, as a federal employer, is specifically prohibited from unlawful retaliation against Plaintiffs, because they engaged in EEO activities protected by the ADEA 20 U.S.C Section 633a(a) and 623(b). 29 C.F.R. Section 1614.103 (2004).

224.    The Agency by virtue of the unlawful adverse actions set forth in the aforementioned paragraphs of this Complaint, engaged in direct, willful and unlawful ADEA retaliatory discrimination against Plaintiffs because of her protected ADEA activities.

225.    Plaintiffs' managers and supervisors included Mr. Ibrahim Nasir, Ms. Maiwandi, Ms. Mendelson, and later Mr. Farivar and Mr. Dahiyat.

226.    The Agency, by and through its managers actions and the actions of Human Resources and employees servicing beneath management in the supervisory chain of command engaged in calculated and purposeful campaign of unlawful retaliation, unlawful, unlawful discrimination and unlawful workplace harassment against the Plaintiffs.

227.    The Agency intentionally subjected Plaintiffs to intentional and unlawful ADEA retaliatory discrimination. The intentional, unlawful retaliation was created and perpetuated and tolerated by management.

228.    The Agency is liable for the intentional and unlawful ADEA retaliation against the Plaintiffs because the Agency officials and managers knew or should have known of the

aforementioned unlawful retaliation and did not take immediate, appropriate and effective corrective action.

229.    The Agency's aforementioned treatment of the Plaintiffs, considered in its totality and in cumulative manner, as set forth in the above paragraphs of this claim and Complaint, constitutes unlawful, direct, intentional, adverse, tangible, retaliatory and discriminatory employment actions prohibited by ADEA.

230.    The Agency's aforementioned treatment of Plaintiffs constitute, unlawful, willful, adverse, retaliatory discrimination in violation of 29 U.S.C Sections 633a(a) and 623(a)(1)(2)(d) and 626(b).

231.    Defendant by and through its agents, retaliated against Plaintiff when it knew or should have known that the same were in violation of the ADEA and any alleged reasons to the contrary are pre-textual.

232.    As a result of Defendant's discriminatory actions Plaintiffs suffered pecuniary and non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses. Because of these losses Plaintiffs seek compensatory damages.

234.    Defendant's actions were done with malice and/or with reckless indifference to Plaintiffs' protected rights. Plaintiffs are therefore entitled to punitive damages.

235.    Plaintiffs request relief as provided in the Prayer for Relief below.

**PRAYER FOR RELIEF**
**WHEREFORE, Plaintiffs respectfully pray this Court to:**

a)      Defendant be summoned to appear and answer herein;

b)      Issue finding of facts and conclusions of law that Defendant's acts, practices, and procedures, subjected Plaintiffs to discrimination, based on their age and national origin, harassment, hostile work environment and retaliation as complained of herein and violated Plaintiffs' rights as secured under Title VII and or the Age Discrimination Employment Act, and like statutes.

c)      Grant Plaintiffs permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, assigns and other representatives, and all those acting in concert; or participation with them and at their direction, from engaging in any policy or practice shown to discriminate against Plaintiffs in violation of Title VII on the basis of national origin, harassment, hostile work environment and retaliation;

d)      Grant to Plaintiffs a judgment for damages, for age discrimination, national origin discrimination, harassment, hostile work environment and retaliation, $350,000.00 each at the time of filing

e)      Retain jurisdiction over this action to assure full compliance with orders of this Court as well as applicable laws;

f)      Plaintiffs seek an award of punitive damages in an amount the Court deems appropriate to punish Defendant for the willful and malicious misconduct repeatedly and an amount that is necessary to deter this Defendant from engaging in such misconduct in the future, in the amount of $750,000.00 or more;

g)       Plaintiffs pray that the court award Plaintiffs costs and expenses of this action and award

Plaintiffs reasonable attorney fees as provided in Title VII 42 U.S.C. §2000e-5(k) and 29

U.S.C.A. §626, et. seq.; the Age Discrimination Employment Act;

h)       Plaintiffs, in accordance with his/her rights under the United States Constitution, and

statutory rights under Title VII 42 U.S.C §2000e-5(k) and 29 U.S.C.A. §626, et. seq.; the Age

Discrimination Employment Act, demands a trial by jury on issues tried to a jury;

i)       Post judgment interest per annum permitted at the highest rate permitted, from date of

judgment until judgment is paid;

j)       All Court costs;

k)       All expert witness fees incurred both in preparation and prosecution of this action;

l)       All court reporter fee incurred in the preparation and prosecution of this case;

m)       Plaintiffs be granted all writs necessary to enforce the judgment of this Court;

n)       Plaintiffs be awarded such further relief as the nature of the case may require or as may

be determined by this Honorable Court to be just, equitable, reasonable, and proper as punitive

damages; compensatory damages for the financial and emotional harm caused by Defendant, and

other damages permitted;

## DEMAND FOR TRIAL BY JURY

236.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury in this action.  See also U.S. Const. Amendment 7.  In accordance with the Federal Rules,

this jury demand is being filed with the Clerk of the United States District Court for the District

of Columbia, as required by Fed. R. Civ. P. 5(d) and Fed. R. Civ. P. 38 (b).

Dated: June 29, 2015                    Respectfully Submitted,

                                        Taher Achagzai; Zeeba Khadem; Naseem Stanazai

                                        Syed B. Shah; Mohammed Zamen Mohmand

                                        By Counsel

                                        /S/  Shameela  Sarah Shah_____
                                        Shameela Sarah Shah
                                        D.C. Bar No. 995094
                                        Law Offices of Shah & Shah PLLC 1666
                                        Connecticut Avenue, N.W. Suite 222
                                        Washington, D.C. 20009
                                        Telephone: (202) 450-1051
                                        Direct: (202) 450-1059
                                        Fax: (202) 234-1270

                                        Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 29th day of June 2015, I electronically filed the above using CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

                                        /s/ Shameela Sarah Shah_____
                                        Shameela Sarah Shah, D.C. BAR #995094
                                        Attorney for Plaintiffs