# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TAHER ACHAGZAI, *et al.*,

        *Plaintiffs*,

   v.

BROADCASTING BOARD OF
GOVERNORS,

        *Defendant*.

Civil Action No. 14-768 (RDM)

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on Defendant's motion for summary judgment. Dkt. 67.
Five broadcasters at the Pashto Language Service, a division of Voice of America ("VOA"),
have made numerous claims alleging workplace discrimination on the basis of age in violation of
the Age Discrimination in Employment Act of 1967 ("ADEA"), and on the basis of national
origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). The Court
previously dismissed or granted summary judgment on the majority of those claims, in addition
to denying a motion by two plaintiffs for a preliminary injunction. *See* Dkt. 24; Dkt. 47; Dkt. 52.
In its March 18, 2016 Memorandum Opinion and Order, however, the Court held that four of the
claims—discrimination and retaliation, under both Title VII and the ADEA—made by Plaintiff
Naseem S. Stanazai survived Defendant's motion to dismiss, and that it was premature to grant
summary judgment on those claims without discovery. Dkt. 52 at 33.

Having completed discovery, Defendant Broadcasting Board of Governors ("the
Board")—the federal agency that administers the VOA—again moves for summary judgment.
Dkt. 67. The Board argues that the two employment actions identified in the Court's March 18,

2016 Opinion as potentially giving rise to claims for discrimination or retaliation were not, in fact, "adverse employment actions" as required to prove a claim of discrimination under Title VII and the ADEA, nor were the actions "materially adverse" as required to prove a claim of retaliation under those statutes. In the alternative, the Board argues that Plaintiff has failed to identify any evidence of discriminatory or retaliatory motive.

For the reasons explained below, the Court concludes that neither of the actions at issue constitutes an "adverse employment action" or "materially adverse action" for purposes of Title VII and the ADEA. Defendant's motion for summary judgment will therefore be **GRANTED**.

## I. BACKGROUND

Because the Court has fully set forth the facts of this case in its previous opinions, Dkt. 24; Dkt. 47; Dkt. 52, it relays in detail here only recent developments and those facts directly relevant to the remaining claims. During the times relevant to the present motion, Plaintiff Naseem S. Stanazai was a broadcaster at the Pashto Service of the VOA. Dkt. 25 at 3 (Am. Compl. ¶ 7). He is a naturalized United States citizen of Afghan national origin whose native languages are Pashto and Dari. *Id.* (Am. Compl. ¶ 6). At the time of the conduct at issue, he was fifty-nine years old and had worked at VOA for twelve years. *Id.* (Am. Compl. ¶ 8). Defendant Broadcasting Board of Governors is an independent federal agency that oversees all non-military, international broadcasting sponsored by the federal government, including VOA. *Id.* at 4 (Am. Compl. ¶ 11). Stanazai alleges that he suffered numerous acts of discrimination and hostility after the VOA implemented a "new format" in an effort to modernize its offerings. *Id.* at 5–7 (Am. Compl. ¶¶ 13–18); Dkt. 68-1 at 1–2. The complaint alleges that these abuses began in 2006 but grew worse when Mohammed Ibrahim Nasar became the Managing Editor of the Pashto Service in 2010. Dkt. 25 at 7 (Am. Compl. ¶ 15). Stanazai asserts that, after he began

voicing his displeasure with the various changes, Nasar retaliated and discriminated against him by manipulating his broadcasting schedule to give additional responsibilities to less-qualified colleagues rather than him and to remove him from more desirable assignments. *Id*. at 9–12 (Am. Compl. ¶¶ 23–25, 28–29, 31–32, 34–35).

After his supervisors failed to address his concerns, Stanazai sought administrative recourse through Equal Employment Opportunity ("EEO") counseling with the Board's Office of Civil Rights on March 22, 2013. Dkt. 30-2 at 101. A month later, he filed an administrative discrimination complaint accompanied by an attachment detailing his allegations of discrimination. *See id.* at 106. Defendant never issued a final decision on Plaintiff's complaint because Stanazai requested an Equal Employment Opportunity Commission ("EEOC") hearing before the Board could render a decision. *Id.* at 3 (McDay Decl. ¶ 11). The EEOC, in turn, dismissed its own proceeding when Plaintiff brought this action. *Id.* (McDay Decl. ¶ 12).

The Court issued its first opinion in this case on June 12, 2015. *See Achagzai v. Broad. Bd. of Governors*, 109 F. Supp. 3d 67 (D.D.C. 2015). The Court dismissed several tort claims without prejudice for failure to exhaust administrative remedies, struck the remainder of the original complaint for failure to comply with Federal Rules of Civil Procedure 8 and 12(f), and granted Plaintiffs leave to file an amended complaint. *Id*. at 72. Plaintiffs did so, *see* Dkt. 25, and the Board again moved to dismiss or, in the alternative, for summary judgment, Dkt. 30. Just days after the Board's motion was fully briefed, two of the plaintiffs filed a motion for a preliminary injunction, asking the Court to halt further scheduling changes at the Pashto Service. *See* Dkt. 41. After that motion was fully briefed, the Court held oral argument on all of the pending motions. At oral argument, the Court informed the parties that it would deny the motion for a preliminary injunction, and it subsequently issued a Memorandum Opinion and Order

explaining that the two plaintiffs seeking preliminary relief had not satisfied any of the four factors necessary to obtain a preliminary injunction. *See Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274 (D.D.C. Feb. 8, 2016). The Court also provided Plaintiffs with two weeks to file a supplemental memorandum "identif[ying] for each of the five plaintiffs discrete acts of discrimination that occurred within 45 days of when they first sought counseling from an EEO counselor." Minute Order (Feb. 5, 2016). Plaintiffs filed that memorandum on February 19, 2016, *see* Dkt. 50, and the Board responded on March 1, 2016, *see* Dkt. 51.

Shortly thereafter, on March 18, 2016, the Court granted in part and denied in part Defendant's motion to dismiss, or, in the alternative, for summary judgment. *See Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164 (D.D.C. 2016). The Court held that four of the plaintiffs failed to exhaust their administrative remedies and, accordingly, granted Defendant's motion as to their claims. *Id.* at 175–79. As to Stanazai, however, the Court held that he had timely exhausted his administrative remedies with respect to two incidents and that those events at least plausibly gave rise to claims for disparate treatment and retaliation under both Title VII and the ADEA. *Id.* at 180–85. Concluding that the record available at the time did not conclusively resolve whether those incidents constituted "adverse employment actions" as required by the statutes, the Court denied the Board's motion in part, *id.* at 185, and ordered the parties to conduct discovery followed by a second round of summary judgment briefing, Minute Order (Apr. 15, 2016). Plaintiffs sought reconsideration of the Court's March 18, 2016 decision, which the Court denied on May 9, 2016. *See* Dkt. 57; Dkt. 59.

The Court's previous opinions have thus substantially narrowed the issues in controversy. Only two alleged events arguably support Plaintiff's remaining claims. First, on February 5, 2013, Nasar—Stanazai's direct supervisor—asked Stanazai to translate three minutes of Pashto

audio into English. Dkt. 30-2 at 117. Stanazai told Nasar that he could not complete the assignment in the time he was initially given.[1] *Id.* Nasar then emailed Masood Farivar—the head of the Pashto service at the time and Nasar's direct supervisor, Dkt. 67-13 at 2–3—asserting that he had "asked Stanazai to translate" the three minutes of audio, but that "Stanazai ha[d] refused to do it," despite "having two and [a] half hours before he complete[s] his shift," Dkt. 67-11 at 3. Nasar copied Stanazai on the email, who then replied that he had not in fact refused to do the translation, but rather requested more time because of the amount of other work he had that afternoon. *Id.* Nasar, in turn, responded by detailing the work he believed that Stanazai had to complete that day and the time he thought necessary to do so, stating that any difficulty in managing the tasks could "come[] only when one does not take his job serious[ly]." *Id.* at 2–3. Stanazai replied again, further explaining his position regarding the time the assignment required and his competing obligations. *Id.* at 2. He added, "[r]easoning about time and prioritizing it[] does not mean refusing an assignment." *Id.* At Farivar's request, the three met the following day to discuss the issue, at which point Nasar allegedly stated—to Stanazai's "surprise"—that he had not intended to send the email in question, and Farivar urged collegiality. Dkt. 30-2 at 130.

The second relevant event occurred on February 25, 2013. That day, Nasar issued a new schedule for the broadcasters. Dkt. 67-3 at 8. The Pashto Service broadcasted seven days a week, with each broadcast "day" consisting of four one-hour blocks. Dkt. 67-7 at 2–3. For each block, broadcasters could be assigned to one of several roles. *Id.* At the time of the February 25 schedule, the only role relevant to the claims still in controversy was called "shift editor." Dkt.

---

[1]  The parties dispute whether Stanazai said he needed more time, or simply that he could not complete the task. *See* Dkt. 67-11 at 1–3. Because the Court concludes that Nasar's email is not an adverse employment action regardless of the event that precipitated it, the origin of the dispute is not material.

68-2 at 3. Stanazai attests that shift editors were responsible for "editing and managing the team on . . . daily assignments." *Id.* Elsewhere he describes the position as "supervisory," Dkt. 25 at 26, and states that "the shift editor's job [was] to assign [broadcasters] any job he deemed necessary to be done," Dkt. 30-2 at 118. The Board describes the shift editor's responsibilities slightly differently, stating that the "role was to conduct a second-level review and edit of all copy before it was read on the air and to serve as a point of contact for the [M]anaging [E]ditor to move the programming forward." Dkt. 67-1 at 9; *see also id.* at 23 (stating that the role "consisted of editing copy, coordinating the program, and delivering reports to the master of ceremonies").

In a deposition, however, Stanazai substantially agreed with the Board. He stated that, even while serving as shift editor, he had not formally held a supervisory position, that the "[s]hift editor's job is to basically copy edit the news and other feature stories," and that the responsibilities of the shift editor were generally not any different from copy editing. Dkt. 67-4 at 28. Indeed, "[t]he shift editor, usually, and the copy editor were almost the same," with the possible exception that, at times, the shift editor would "assign other jobs to others." *Id.* at 28–29. Both sides acknowledge that "shift editor" was not a formal position into which people were hired, but rather a set of responsibilities assigned to individuals whose formal position was "broadcaster," a non-supervisory role. *Id.* at 27; Dkt. 67-1 at 23–24; Dkt. 67-5 at 2–4.

Stanazai's current claims center on the distribution of shift editor assignments. For at least ten months prior to the February 25 schedule, Stanazai was assigned to be the shift editor for a one-hour block on Friday evenings and a one-hour block on Saturday evenings. Dkt. 67-8 at 2–3; Dkt. 67-3 at 25. One of Stanazai's fellow broadcasters, Abid Noor, was assigned to be a shift editor for six one-hour blocks spread across Sundays, Mondays, and Tuesdays. Dkt. 67-8 at

2–3.  After the implementation of the February 25 schedule, however, Stanazai was assigned to be shift editor for two one-hour blocks on Saturdays.  Dkt. 67-7 at 2.  Noor, in contrast, was assigned to be a shift editor for ten one-hour blocks, with two each day, Sundays through Thursdays.  *Id.*

Almost immediately after the February 25 schedule was issued, the staff voiced their displeasure at the distribution of assignments.  Stanazai's concern was that he "was reduced to only one day" as shift editor each week, while Noor was given five days with shift editor assignments.  Dkt. 67-3 at 25.  Stanazai also disputed Noor's qualifications for the assignment, suggesting that Noor lacked the proper language skills to copy edit stories.  *Id.*  As a result of this and other staff discontent, Nasar met with the broadcasters on March 5, 2013, to receive input on a new schedule.  Dkt. 67-2 at 2; Dkt. 68-1 at 2–3.  Following this discussion, a new schedule was issued on April 10, 2013.  Dkt. 67-3 at 25; Dkt. 67-9.  The new schedule eliminated the "shift editor" assignment based on staff feedback, and instead split the duties of that role between a "copy editor" and a "coordinator."  Dkt. 67-2 at 2; Dkt. 67-6 at 17.  The April 10 schedule assigned Stanazai the copy editor role for eight one-hour blocks and made him the backup copy editor for two one-hour blocks.  Dkt. 67-9 at 2–3.  Noor was scheduled for six one-hour blocks as coordinator, but no shifts as copy editor.  *Id*.  A further schedule issued on July 8, 2013, left Stanazai's schedule and responsibilities unchanged.[2]  Dkt. 70-1 at 2–3.

---

[2]  Defendant characterizes Stanazai's schedule as of July 2013 as being "unchanged from the April 2013 schedule," Dkt. 70 at 3, and Stanazai does not dispute this contention.  It appears, however, that Stanazai may in fact have received *additional* copy editing responsibilities of the sort he had been seeking, becoming the primary copy editor on Saturdays rather than the backup.  *Compare* Dkt. 70-1 at 2 (listing "Stanazai/Hasib" on the July 2013 Schedule), *with* Dkt. 67-9 at 2 (listing "Ashiq/Stanazai" on the April 2013 schedule).  Regardless, Stanazai's editing responsibilities clearly did not decrease when the April 2013 schedule was revised in July 2013.

## II.  LEGAL STANDARD

On a motion for summary judgment under Rule 56, the Court considers the full record before it, but it may not resolve any bona fide factual disputes.  The Court, accordingly, may grant summary judgment only when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where, as here, the defendant has moved for summary judgment, it "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party makes this initial showing, the burden shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in its favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there exists a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.

*See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's

evidence is "not significantly probative," the Court should grant summary judgment. *Liberty*

*Lobby*, 477 U.S. at 249–50.

## III. DISCUSSION

The Board argues that Stanazai's remaining claims fail because neither the February 25

schedule nor the February 5 email constitutes an adverse action sufficient to support a retaliation

or discrimination claim under Title VII or the ADEA. Dkt. 67-1 at 7. Stanazai's opposition

resists the Court's prior narrowing of the issues and fails to address much of the substance of

Defendant's motion, stating instead that to focus on these two actions in isolation is "misleading"

because Stanazai has in fact offered proof of the Board having "systematically taken adverse

action against [him] since 2006 that . . . continued up to December 13, 2016 and [is still] . . .

[on]going." Dkt. 68-1 at 7. Stanazai in fact admits that at least "[t]he schedule of February 25,

2013 is not an indication of . . . retaliation or [less] opportunity given to Mr. Stanazai."[3] *Id.* at 2.

As the Court previously held, however, Stanazai's administrative remedies were exhausted *only*

with respect to the "two incidents that allegedly occurred within 45 days of his March 22, 2013,

EEO counseling." *Achgazai*, 170 F. Supp. 3d at 180. The Court, accordingly, may consider only

these two events, and, as explained below, it concludes that neither was sufficiently adverse to

support a claim for retaliation or discrimination under Title VII or the ADEA.

### A. The February 5, 2013 Email

Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973), Stanazai bears the initial burden of establishing a prima facie discrimination or

---

[3] Stanazai's brief asserts that "[t]he schedule of February 25, 2013 is not an indication of less retaliation or opportunity given to Mr. Stanazai." Dkt. 68-1 at 2. The Court, however, understands Stanazai to mean "not an indication of retaliation or less opportunity."

retaliation case under both the ADEA and Title VII, *id.* at 802. Discrimination claims brought under these statutes require a plaintiff to show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). An adverse employment action must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citation omitted). "Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation," are not sufficient. *Forkkio v. Powell,* 306 F.3d 1127, 1130 (D.C. Cir. 2002) (citation omitted). That means that "not everything that makes an employee unhappy is an actionable adverse action." *Douglas*, 559 F.3d at 552 (citation omitted). An adverse employment action requires proof of more: the employer's action must "affect[] the terms, conditions, or privileges of employment or future employment opportunities." *Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev., Office of Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017).

To prove a retaliation claim, in contrast, a plaintiff must show only that he or she suffered "(i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). A "materially adverse action" is one that "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The "materially adverse" standard thus "encompass[es] a broader sweep of actions than those in a pure discrimination claim." *Id.* at 1198 n.4. A retaliation claim is "'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so

long as 'a reasonable employee would have found the challenged action materially adverse.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 64, 68).

The Court first considers whether the February 5 email was an "adverse employment action" in the context of Stanazai's discrimination claim. As the Court previously observed, "[s]tanding alone, it is unlikely that the purportedly 'false and accusatory e-mail[],' Dkt. 30-2 at 104, constitute[s] an adverse employment action" because, "[a]s the D.C. Circuit has repeatedly observed, 'a thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions.'" *Achagzai*, 170 F. Supp. 3d at 181 (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)) (internal quotation marks omitted) (alteration in original). The Court denied summary judgment as to Stanazai's claim on this point, however, because of the possibility that a more concrete consequence might have resulted from the email. *Id.* Specifically, the Court held that the Board had "not submitted any evidence refuting Stanazai's allegation that he was demoted from a supervisory position and that less qualified employees were given supervisory authority at his expense." *Id.* at 182.

Having now considered the additional evidence presented by the parties regarding what occurred, the Court concludes that the February 5 email did not have any tangible consequences and thus did not constitute an adverse employment action. After Nasar emailed Stanazai and Farivar criticizing Stanazai's performance, the three met and discussed the issue. Dkt. 67-19 at 26–27. Stanazai described the meeting as resulting in Nasar retracting his earlier accusation:

> To my surprise Mr. Nasar said he did not intend to send that email to us. Mr. Farivar at the end of the meeting suggested having workable relations at least. I said I simply want him to treat me with fairness, according to rights granted by the laws of the United States and VOA rules. The meeting was over.

*Id.* at 26. More importantly, Stanazai offers no evidence that any subsequent employment action, such as the denial of a promotion, was premised in whole or in part, directly or indirectly, on the

email.  To the contrary, Stanazai does not even reference the email in his opposition to the

Board's motion for summary judgment beyond asserting that it is a disputed fact whether "Mr.

Stanazai was targeted on February 5th, 2013 when he was accused of not completing an

assignment."  Dkt. 68-3 at 1.  This assertion, even if it were supported by evidence, is

nonresponsive to the question of whether there were consequences to the email.  Being

"targeted" is the sort of "[p]urely subjective injur[y], such as . . . public humiliation or loss of

reputation" that is legally insufficient to constitute an adverse employment action.  *See Forkkio*,

306 F.3d at 1130.

Accordingly, although given ample opportunity to take discovery, Stanazai has failed to

identify *any* evidence that would permit a reasonable jury to find that the email "result[ed] in a

tangible consequence, such as a demotion, loss of a bonus, or missed opportunity for

advancement."  *Achagzai*, 170 F. Supp. 3d at 181.  A reprimand such as this one that does not

lead to any concrete, negative outcome is not an adverse employment action.  *See Russell*, 257

F.3d at 818; *accord Brooks v. Clinton*, 841 F. Supp. 2d 287, 298–99 (D.D.C. 2012) (holding that

"harassing emails that challenged and criticized [an employee's] work product" were

"supervisory acts [that] cannot constitute an adverse employment action because" the plaintiff

could not show "any materially adverse consequences to the terms, conditions, or privileges of

employment" (internal quotation marks omitted)).

For the same reasons, Stanazai's retaliation claim fails to the extent it is premised on the

February 5 email.  Although retaliation claims may be based on "a broader sweep of actions than

. . . pure discrimination claim[s]," *Baloch*, 550 F.3d at 1198 n.4, that does not relieve the plaintiff

of his obligation to identify an action that would "dissuade[] a reasonable worker from making or

supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68 (citation omitted).  An

informal criticism that resulted in no consequences beyond precipitating a meeting—at which *both* participants were admonished to "hav[e] workable relations"—would not prevent a reasonable worker from bringing or substantiating a discrimination claim. *See Durant v. D.C. Gov't*, 875 F.3d 685, 698 (D.C. Cir. 2017) (holding that a letter informing an employee of "specific deficiencies regarding [his] conduct," including failure to complete a task in a timely manner, was not materially adverse); *id.* ("A reprimand letter setting forth allegations of deficient work performance is not a materially adverse action absent a showing that the letter would have dissuaded a reasonable employee from engaging in protected activity."). This is not a case in which an employee was subjected to actions that would lead a reasonable employee to reconsider whether to engage in protected activity in the future. *Cf. Baloch*, 550 F.3d at 1199 (observing that a reprimand letter held not to be a materially adverse action "contained no abusive language, but rather job-related constructive criticism, which 'can prompt an employee to improve her performance'" (quoting *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005))). Nasar's email, while critical, fails to rise to the level of material adversity necessary for Stanazai's retaliation claim to survive.

## B.     The February 25, 2013 Schedule

Although the February 5 email, standing alone, is not an adverse action for purposes of a retaliation or discrimination claim, the Court's previous decision recognized that the email might still be relevant to a claim that *other* behavior by the Board was discriminatory or retaliatory. *Achagzai*, 170 F. Supp. 3d at 181–82. Specifically, the Court identified the February 25 schedule as potentially adverse given Stanazai's "allegation that he was demoted from a supervisory position and that less qualified employees were given supervisory authority at his expense." *Id.* at 182. The Court, accordingly, denied summary judgment on Stanazai's discrimination and

retaliation claims "insofar as they allege that the Board discriminated or retaliated against Stanazai by either demoting him or promoting other VOA employees in his stead based on considerations of age or nationality," *id.* at 185, because "[t]he Board ha[d] not submitted any evidence refuting Stanazai's allegation," *id.* at 182. The parties have now submitted additional evidence of what the responsibilities of Stanazai and his coworkers were both before and after the schedule was issued. In light of this evidence, the Court now concludes that the February 25 schedule was not sufficiently adverse to support a retaliation or discrimination claim.

Stanazai argues that in the February 25 schedule he was assigned to work as a shift editor on only Saturdays, while Noor—who Stanazai states was less qualified—was assigned five days of shift editing duties each week. Dkt. 68-1 at 11. Stanazai originally framed this new schedule as a demotion because it reduced the number of days each week he was scheduled as a shift editor from two to one. *See Achagzai*, 170 F. Supp. 3d at 182 ("Stanazai alleges both that he was demoted from a supervisory position and that, when the new schedule issued, less qualified employees were given supervisory authority."). He has at various points in his opposition to the present motion continued to frame his claim this way, *see* Dkt. 68-1 at 11, and he did so in his deposition as well, Dkt. 67-4 at 20 ("I was reduced to one day . . . ."). As the copies of the February 25 schedule and the schedule that preceded it make clear, however, Stanazai's shift editor responsibilities were not actually reduced. While he previously had been scheduled as shift editor for one one-hour block on Friday and one one-hour block on Saturday, Dkt. 67-8 at 2–3, the February 25 schedule still scheduled Stanazai for two one-hour blocks, Dkt. 67-7 at 2–3. The February 25 schedule, accordingly, cannot represent either a materially adverse action or an adverse employment action if only Stanazai's duties are considered, because nothing about those duties changed in any material respect. While there can be "no doubt that the removal of [an

employee's] supervisory responsibilities constitute[s] an adverse employment action," *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002); *see also Youssef v. FBI*, 687 F.3d 397, 402 (D.C. Cir. 2012) ("'[A]n extraordinary reduction in responsibilities' constitut[es] materially adverse action under Title VII." (quoting *Holcomb*, 433 F.3d at 902)), here no such responsibilities were removed. Stanazai concedes as much. Dkt. 68-1 at 2 ("The schedule of February 25, 2013 is not an indication of . . . retaliation or [less] opportunity given to Mr. Stanazai . . . .").

Stanazai, however, has now offered an alternative theory for why the February 25 schedule change constituted both a materially adverse action and an adverse employment action. He maintains the schedule is "a good example of the shows and opportunities that were given to less qualified and junior employees," *id.*, and that the relative imbalance of shift editor responsibilities between him and Abid Noor created by the February 25 schedule was "adverse to Mr. Stanaz[a]i because it impact[ed] his chances to become a [M]anaging [E]ditor," *id.* at 11. In particular, Stanazai argues that Noor was assigned to work as the shift editor five days a week, for a total of ten hours, while he was assigned to work as the shift editor only once a week, for a total of two hours. *See* Dkt. 68-1 at 2, 11; Dkt. 67-7 at 2–3. This disparity, according to Stanazai, substantially undermined his prospects for promotion to Managing Editor—a GS 13 position—because the "VOA[] [has] many times . . . promoted people [to GS 13] based on [their] experience and education." Dkt. 68-2 at 3. Stanazai also maintains, more generally, that the disparity in allocation of shift editor responsibilities between him and Noor adversely affected his opportunities to earn overtime and to obtain training. *Id.*

The evidence before the Court forecloses Stanazai's argument that the relative imbalance of responsibilities between him and Noor—or any other broadcaster—on the February 25 schedule materially affected his chances of becoming Managing Editor. He states that he "tried

to apply for the position of Managing Editor at least 3 times." *Id.* Two of those applications were in 2006 and 2008, Dkt. 33-3 at 12, and therefore could not have been affected by the February 25 schedule, which was not announced and implemented until 2013, Dkt. 68-2 at 3. The only application that could have been affected came in December 2016. *Id.* at 3. Even setting aside the other problems with Stanazai's theory, discussed in greater detail below, Stanazai's own description of the person hired to fill the Managing Editor role rebuts his argument. Contrary to his assertion that shift editor responsibilities were a vital component of becoming Managing Editor, the person chosen for the role was not one of the shift editors during the period for which records have been produced—nor does she appear to have otherwise had editing responsibilities. *See* Dkt. 67-7 at 2–3; Dkt. 67-8 at 2–3; Dkt. 67-9 at 2–3. The December 2016 hire was "an on-air talent," who Stanazai suggests was "not qualified" in part because of her *lack* of prior editing responsibilities. Dkt. 68-2 at 4.[4] Stanazai has thus offered no support for the inference that he was not promoted to Managing Editor because the February 25 schedule failed to provide him with the opportunity to gain the type of experience that would have made the difference in his application. Without some evidence that he was denied the December 2016 promotion because he lacked sufficient experience as a shift editor, no reasonable jury could find that the February 25 schedule constituted the first step in a chain of events leading to a materially adverse action or an adverse employment action. *See Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (per curiam) (upholding grant of summary judgment on a retaliation claim when the plaintiff "failed to establish that a reduction in airtime responsibilities constituted a materially adverse action" because she "offered nothing . . . establishing that the reduction in her airtime

---

[4]  Stanazai refers to the person hired as "Shaiesta Lamai Sadat," while the schedules refer to a "Shaista." *Compare* Dkt. 68-2 at 4, *with* Dkt. 67-7 at 2. Based on Stanazai's descriptions of the individual in question, these appear to be references to the same person.

production—from 17 minutes to 13 minutes—could affect her compensation, grade, or opportunity for future advancement").

Stanazai further alleges that the relative imbalance in shift editor work negatively affected his prospects, more generally, to "be promoted, get overtime, have opportunities, training etc." Dkt. 68-2 at 3. He offers no support for this vague assertion, however, and instead merely relies on conclusory statements in his own declaration.[5] In response, the Board argues that any changes to the schedules of Noor or Stanazai effected by the February 25 schedule did not result in the objectively tangible harm required for a discrimination claim or the material harm required for a retaliation claim. For several reasons, the Court agrees.

First, as discussed above, the schedule did not reduce Stanazai's previously established responsibilities. Instead, his claim rests on dissatisfaction with the assignment of additional duties to Noor, whose capabilities Stanazai questioned. Although Stanazai previously stressed that he did not care who the assignments went to, so long as it was someone other than Noor, he now seems to suggest that those duties should have been given to him. *Compare* Dkt. 67-4 at 30–31 ("Q: [W]as it your position that [Noor] should have been removed from shift editor and you should have been assigned to the shift editor? A: I—I didn't say I should be assigned. . . .

---

[5] The Court notes, as it did in its earlier opinion, that Plaintiff has attached hundreds of pages of records to his filings in this case, while continually failing to follow the Court's instructions that the relevant facts be identified. *See Achagzai*, 170 F. Supp. 3d at 178. In his opposition to the present motion, for example, Plaintiff has failed to produce a list of material facts in dispute pursuant to Local Rule 7(h)(1) that cites to the record, instead offering a list of twenty-three questions and statements without support. "Although it is possible that these extensive materials might identify additional [relevant facts] not discussed in Plaintiff['s] brief, it is not the Court's role to mine the record in an effort to identify potentially helpful evidence not identified by the parties." *Id.* (citing *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996) ("It is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies.")).

They could assign Roshan. They could assign Hasib. They could assign Achagzai."), *and id.* at 31 ("My objection is . . . unqualified people . . . ."), *with* Dkt. 68-2 at 3–4. This formulation of Stanazai's claim also fails because he has offered no evidence of a connection between his ability to "be promoted, get overtime, have opportunities, training etc." and Noor's hours. Notably, Stanazai has not established that Noor's hours would have otherwise been assigned to Stanazai or that any connection existed between the number of hours Noor worked as shift editor each week and any material aspect of Stanazai's employment. He, accordingly, has not presented sufficient evidence for a reasonable jury to conclude that the relative distribution of hours (which did not diminish Stanazai's previously assigned responsibilities) would "have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 68 (internal quotation marks omitted), or altered the terms of his employment, *see Wiley*, 511 F.3d at 161.

Second, although Stanazai specifically asserts that his opportunity to earn overtime was affected by the February 25 schedule, he again offers no evidence that his compensation or opportunity to secure additional pay actually varied as a result of the new assignments. The Board, in contrast, provides evidence that the broadcaster position (with its corresponding pay grade) presumed rotation among these less formal roles within the studio without providing for any change in wage. *See* Dkt. 67-5. Taken together, no reasonable jury could conclude on the evidence presented that Stanazai's compensation was in fact dependent on the amount of work he did as a shift editor. Without such a connection between the schedule and his pay, this theory as to why the February 25 schedule constitutes an adverse employment action or a materially adverse action also fails. *See Taylor v. Small*, 350 F.3d 1286, 1296 (D.C. Cir. 2003) ("Because [the plaintiff] did not present any evidence upon which one could reasonably find she suffered an

adverse employment action, the district court properly granted summary judgment in favor of her employer . . . .").

Third, even if the February 25 schedule might in theory have had some effect on Stanazai's chances for promotion, it was in place for such a short period of time that as a practical matter there is no basis for a reasonable jury to find that it did in fact result in any such harm. Beginning on April 10, 2013, the VOA eliminated the "shift editor" assignment based on staff feedback, and instead created two new assignments: "copy editor" and "coordinator." Dkt. 67-2 at 2; Dkt. 67-6 at 17. The copy editor role, however, was similar to that of the shift editor. Dkt. 67-4 at 28–29. The April 10 schedule assigned Stanazai the copy editor role for eight one-hour blocks and made him the backup copy editor for two one-hour blocks—substantially more than *any* other employee. Dkt. 67-9 at 2–3. Noor was scheduled for six one-hour blocks as coordinator, but no shifts as copy editor. *Id.* A schedule issued on July 8, 2013, if anything further increased Stanazai's responsibilities as a copy editor. Dkt. 70-1 at 2. Employer actions regarding assignments or duties that are temporary in nature and not accompanied by economic consequences are rarely cognizably adverse, whether considered in the context of a discrimination or a retaliation claim. *See Ng v. Lahood*, 952 F. Supp. 2d 85, 95 (D.D.C. 2013) (holding that "a limited reduction in work responsibilities" over "a limited period of time . . . does not qualify as an adverse employment action" for purposes of a discrimination or retaliation claim); *Peyus v. Lahood*, 919 F. Supp. 2d 93, 101–02 (D.D.C. 2013) (same); *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) (approximately two-week suspension with pay not an adverse employment action); *see also Kangethe v. District of Columbia*, 206 F. Supp. 3d 661, 670 (D.D.C. 2016) ("[G]eneralized and speculative assertions of benefits that may accrue from a temporary post are insufficient."); *cf. Forkkio*, 306 F.3d at

1131–32 (removal of noneconomic benefits previously provided on temporary basis are not adverse employment action).  Similar to the plaintiff in *Kangethe v. District of Columbia*, Stanazai has at most suggested that for a few weeks "he was denied an opportunity to carry greater supervisory responsibilities[] [and] gain even more experience" that might "have opened other avenues of advancement."  *Kangethe*, 206 F. Supp. 3d at 670.  "These benefits are too intangible and speculative" to be cognizably adverse.  *Id.*

Underlying all of these infirmities is Stanazai's failure to come forward with material evidence beyond his own, uncorroborated declarations that the February 25 schedule had any material consequences.  *See* Dkt. 67-19; Dkt. 68-2.  All he offers by way of additional support is an affidavit from Nasar's predecessor as Managing Editor, which states that Beth Mendelson, the direct supervisor of the Pashto Service's Managing Editor, "would push [the former Managing Editor] on [a] regular basis to get rid of the senior and older staff members and replace them [with] much younger people."  Dkt. 68-2 at 17–18.  The affiant also states that in 2008 he recommended that Stanazai receive a live news assignment, only to be overruled by Mendelson, who then assigned a younger broadcaster.  *Id.*  This affidavit, however, is not germane to whether the February 25 schedule constituted a cognizably adverse action for at least two reasons.

First, the affidavit is dated November 3, 2012, and references events occurring prior to Nasar's hiring in 2010; it does not address the relevant time period in 2013.  *Id.*  Second, and more importantly, it says nothing about the key question before the Court—whether the February 25 schedule was sufficiently adverse to give rise to a retaliation or discrimination claim.  At most, it describes an earlier adverse employment action that is not presently before the Court. By contrast, the Board has offered evidence that the February 25 schedule had no material effect

on Stanazai's role at the Pashto Service; that the distribution of job responsibilities was conducted in a manner consistent with both the broadcasters' job descriptions and past practice; and that Stanazai's frustration with certain assignments was promptly addressed in a revised schedule, which gave him substantially expanded editorial responsibilities. *See* Dkt. 67-5 (position description for Stanazai's job); Dkt. 67-6 (Nasar Dep.); Dkt. 67-14 (Nasar Aff.); Dkt. 67-16 (Mendelson Aff.); Dkt. 67-7 (February 25 schedule); Dkt. 67-8 (schedule preceding February 25 schedule); Dkt. 67-9 (schedule succeeding February 25 schedule). To the extent this evidence does not wholly rebut Stanazai's claim about the effect of the February 25 schedule, moreover, the D.C. Circuit has stressed that "the burden on a defendant moving for summary judgment may be discharged without factual disproof of the plaintiff's case; the defendant need only identify the ways in which the plaintiff has failed to come forward with sufficient evidence to support a reasonable jury to find in [his] favor on one or more essential elements of [his] claim." *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015). Stanazai's conclusory averments about the effect on his career resulting from the several weeks his office operated under the February 25 schedule are insufficient for a reasonable jury to reach a verdict in his favor.

To be sure, "under certain circumstances a plaintiff's sworn declaration can create a genuine issue of material fact and thereby render summary judgment inappropriate." *Ortiz-Diaz*, 867 F.3d at 76. But this case differs materially from those cases in which a plaintiff's own declaration was deemed sufficient to avoid summary judgment. The plaintiff in *Ortiz-Diaz*, for example, unlike Stanazai, offered "objective, non-conclusory statements of fact" in his declaration that explained in detail how a transfer away from a biased supervisor would improve his career prospects. *Id.* The defendant in that case, moreover, did not dispute that, "as a general

matter," transfers of the type in question would "help[] one's prospects for advancement." *Id.* at 76. Here, in contrast, Stanazai fails to offer any non-conclusory explanation for how Noor's relatively more extensive shift-editor experience over a period of several weeks cost Stanazai a promotion to Managing Editor three years later or otherwise materially affected his career. This absence of evidence is fatal to both Stanazai's claim that the schedule was an adverse employment action and his argument that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wiley*, 511 F.3d at 161 (quoting *Burlington N.*, 548 U.S. at 68).

Taken together, the Court concludes that—in light of the evidence offered by both parties—Stanazai's declarations are insufficient to create a genuine dispute of material fact regarding whether the February 25 schedule was sufficiently adverse to support a discrimination or retaliation claim under the ADEA or Title VII.

### III. CONCLUSION

For the reasons discussed above, the Board's motion for summary judgment will be **GRANTED**.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: April 20, 2018